## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------x
                      :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **SEMCRUDE, L.P.,** *et al.*, | : | **Case No. 08-11525 (BLS)** |
| | : | |
| **Debtors.** | : | **Joint Administration** |
| | : | **Requested** |

-------------------------------------------------------------------------x

### DECLARATION OF TERRENCE RONAN IN SUPPORT OF THE
### DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, Terrence Ronan, hereby declare under penalty of perjury:

1. I have been employed as the Senior Vice President, Finance of SemGroup, L.P. ("SemGroup") since March 1, 2008. In that capacity, I have been responsible for overseeing SemGroup's treasury, cash management, and credit functions and I am familiar with the day-to-day operations, business, and financial affairs of SemCrude, L.P., its parent, SemGroup, and certain direct or indirect subsidiaries of SemGroup (collectively, the "SemGroup Companies" or the "Debtors") and their affiliates. On July 17, 2008, I was appointed acting President and Chief Executive Officer of SemGroup.

2. Concurrently with the filing of this declaration (the "Declaration"), the SemGroup Companies have each filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). To enable the SemGroup Companies and their affiliates to operate effectively and minimize certain of the potential adverse effects of the commencement of their reorganization cases, the SemGroup Companies have requested certain relief in "first day" applications and motions filed with the Court (the "First Day Pleadings"). The First Day Pleadings, described in detail below, seek, among other things, to ensure the continuation of the SemGroup Companies' cash management

system and other business operations without interruption, use cash collateral in the operation of the business, preserve valuable relationships with suppliers and customers, maintain employee morale and confidence, and establish certain other administrative procedures to promote a seamless transition into chapter 11. This relief will be critical to the SemGroup Companies' restructuring efforts.

3.      This Declaration is submitted to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the petitions for relief under the Bankruptcy Code filed on the date hereof (the "Commencement Date") and (ii) the First Day Pleadings. Any capitalized term not defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the SemGroup Companies' senior management, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the SemGroup Companies' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the SemGroup Companies.

4.      This Declaration is intended to provide a summary overview of the SemGroup Companies and their affiliates and the commencement of these chapter 11 cases. Parts I through IV of this Declaration provide an overview of the business, organizational structure, and capital structure of the SemGroup Companies, and the circumstances giving rise to the commencement of these chapter 11 cases. Part V summarizes the First Day Pleadings filed concurrently herewith.

**I.**

## The SemGroup Companies' Business

5.       Founded in February 2000, SemGroup is engaged in diversified services for the North American crude oil and refined products industry. Together, the SemGroup Companies and their affiliates, located both domestically and abroad, provide gathering, transportation, storage, distribution, marketing, and other midstream services primarily to independent producers and refiners of petroleum products located along the North American energy corridor from the Gulf Coast region to central Canada and the West Coast of the United Kingdom. The breadth of the service offering of the SemGroup Companies and their affiliates enables them to be a "one-stop solution provider" for both independent oil and gas producers and refiners. For oil and gas producers, the SemGroup Companies and their affiliates serve as a first purchaser of petroleum products; for refiners, the SemGroup Companies and their affiliates serve as both a supplier of petroleum products and a purchaser of non-petrochemical refined products such as gasoline, distillates, natural gas liquids ("NGLs"), and liquid asphalt cement.

6.       The SemGroup Companies and their affiliates have a significant asset base consisting primarily of pipelines, gathering systems, processing plants, storage facilities, terminals, and other distribution facilities located between North American production and supply areas, including the Gulf Coast, Mid-Continent and Alberta, Canada, and areas of high demand such as the Midwest region of the United States. The SemGroup Companies and their affiliates also have storage, terminal, and marine facilities at Milford Haven in the United Kingdom with pipeline connectivity to nearby refiners that enables them to supply product to the East Coast market of the United States. The principal business strategy of the SemGroup

Companies and their affiliates is to utilize their assets and distribution expertise to provide consistently high-quality midstream services to generate sustainable margins and cash flow.

7.	The SemGroup Companies and their affiliates use their industry knowledge and strategic asset base to capitalize on the logistical inefficiencies that exist in the North American crude oil, natural gas, NGLs, refined products, and liquid asphalt cement distribution systems. More specifically, the SemGroup Companies and their affiliates have configured their assets to generate sustainable gross margins during both increasing and decreasing petroleum product price environments and various product seasons. The terminalling and storage activities of the SemGroup Companies and their affiliates benefit most from an increasing price environment, or a "contango" market, when a premium is placed on storage, and their gathering and marketing activities benefit most from a declining price environment, or a "backwardated" market, when a premium is placed on prompt delivery. As part of the seasonal balance strategy, the SemGroup Companies and their affiliates use their storage assets to purchase gasoline and liquid asphalt cement products at seasonally lower prices in the winter and sell forward for delivery at higher prices during the summer driving and road construction season. Conversely, the SemGroup Companies and their affiliates typically use their storage assets to purchase heating oil and NGLs during the summer for delivery in the winter under a similar strategy.

8.	The SemGroup Companies and their affiliates operate through eight primary business segments: SemCrude, SemFuel, SemCanada, SemMaterials, SemStream, SemGas, SemEuro, and SemGroup Holdings (via their publicly traded master limited partnership, SemGroup Energy Partners, L.P. ("SemGroup Energy Partners")). These business segments provide the following services:

(a) *SemCrude* gathers, transports, stores, blends, markets, and distributes crude oil in the United States. SemCrude's sale of crude oil is primarily to refiners and other resellers in various types of sale and exchange transactions.

(b) *SemFuel* purchases, ships, stores, markets, and distributes refined products in the United States. SemFuel has a significant shipping history on the major common carrier pipelines linking the PADD I, PADD II, and PADD III regions and, due to the volume of product that SemFuel moves along these major pipelines, it has been granted "preferred shipper status."

(c) *SemCanada* is a leading independent natural gas marketing and energy-asset management business in Canada and consists of the SemGroup Companies' natural gas processing, gathering, and marketing operations and crude oil marketing and blending operations.

(d) *SemMaterials* purchases, produces, stores, and distributes liquid asphalt cement products and residual fuel throughout most of the United States and Mexico.

(e) *SemStream* purchases, transports, terminals, stores, markets, and distributes propane and other NGLs, with a principal focus on Propane, in the United States.

(f) *SemGas* was established in November 2004 to provide high-deliverability, multi-cycle natural gas storage to meet the growing need for peak-day natural gas deliverability and "swing" gas capability for large gas users, such as gas-fired electric power producers. The activities of SemGas consist primarily of acquiring and developing storage assets and acquiring and constructing natural gas gathering pipeline systems and natural gas processing assets.

(g) *SemEuro's* operations include SemLogistics Milford Haven and SemEuro Supply. SemEuro was established in 2006 as a result of SemGroup's purchase of the largest storage facility in the United Kingdom. With plans for future growth, the SemGroup Companies expanded their operations in Western Europe by founding SemEuro Supply Limited in July 2006 to engage in marketing and supply activities in North Western Europe.

(h) *SemGroup Holdings* was formed in July 2007 to hold SemGroup's investment in future entities, initially SemGroup Energy Partners. SemGroup Holdings controls SemGroup Energy Partners through ownership of its general partner, which holds a 2% general partner interest and all of the incentive distribution rights in SemGroup Energy Partners.

9.     Historically, to manage exposure to market changes in commodity prices, to protect gross margins on purchased petroleum products, and to manage liquidity risk associated with margin deposit requirements on overall derivative positions, the SemGroup Companies and their affiliates utilized futures and options contracts. As the SemGroup Companies and their affiliates purchased inventory from suppliers, they established the margin with future sales through one of the following methods: (a) they had already sold that product for physical delivery pursuant to sales contracts at a market index price; (b) they sold the product for future physical delivery pursuant to back-to-back sales contracts; or (c) they entered into futures or options contracts on the New York Mercantile Exchange (NYMEX) and over-the-counter (OTC) markets.

## II.

### Organizational Structure

10.     In addition to the gathering, terminalling, and processing facilities operated by the SemGroup Companies and their affiliates, the SemGroup Companies occupy two facilities for its executive offices in Tulsa, Oklahoma. The first facility consists of approximately 79,713 square feet of office space under a lease that expires in May 2011. The second facility consists of approximately 150,000 square feet of office space under a lease that expires in February 2013. The SemGroup Companies also operate smaller facilities in certain other states.

11.     SemGroup is the direct or indirect parent company of the other SemGroup Companies, including SemGroup Energy Partners, which is not a debtor in these chapter 11 cases. SemGroup Energy Partners is a publicly traded master limited partnership and its common units are traded on the NASDAQ Global Market under the symbol "SGLP."

SemGroup Energy Partners provides crude oil and liquid asphalt cement terminalling and storage services and crude oil gathering and transportation services. Certain of the operations and assets of the SemGroup Companies and their affiliates are maintained and operated through SemGroup's indirect equity ownership in SemGroup Energy Partners. SemGroup Energy Partners' financial statements are consolidated in SemGroup's financial statements.

12.    As of July 1, 2008, the SemGroup Companies and their affiliates had 1,688 employees in the United States, all of which are employed by SemManagement L.L.C., a debtor in these chapter 11 cases.

## III.

## Capital Structure

13.    As of May 31, 2008, the material indebtedness of the SemGroup Companies and their affiliates consists of approximately $3.1 billion of total debt, including more than $2 billion of secured debt and $594 million of 8.75% unsecured senior notes. As of July 16, 2008, the SemGroup Companies and their affiliates were given notice of default under their secured credit facilities and had no additional borrowing availability under those facilities.

14.    Below is a summary of the material indebtedness of the SemGroup Companies:[1]

A.    <u>Secured Debt</u>

*The U.S. and Canadian Credit Facility*

15.    As of the Commencement Date, SemCrude, L.P., as U.S. borrower (the "U.S. Borrower"), and SemCams Midstream Company, as Canadian borrower (the "Canadian Borrower"), and SemGroup and SemOperating G.P., L.L.C., as guarantors, are parties to an

---

[1] Credit facilities where none of the SemGroup Companies are either a borrower or a guarantor are not summarized herein.

Amended and Restated Credit Agreement, dated as of October 18, 2005 (as amended, modified, and supplemented from time to time through and including the Commencement Date, the "U.S. and Canadian Credit Facility"), with Bank of America, N.A. ("BoA"), as administrative agent, and the other lenders party thereto. The U.S. and Canadian Credit Facility consists of (i) a $1.74 billion working capital facility, which matures in 2010 ("Loan I"); (ii) a $142 million U.S. term loan that matures in 2011 ("Loan II"); and (iii) a $665 million U.S. revolving credit facility, maturing in 2010 ("Loan III"). The amounts borrowed under the U.S. and Canadian Credit Facility were used to fund, among other things, working capital requirements and general corporate purposes.

16. Pursuant to an Amended and Restated Security Agreement, dated as of May 31, 2005, executed in connection with the U.S. and Canadian Credit Facility, the borrowers thereunder granted first priority liens and security interests in favor of BoA in their then owned or thereafter acquired right, title, and interest in and to all or substantially all of the personal property of the U.S. Borrower and the Canadian Borrower. The Loan I lenders have a first lien on and security interest in the working capital assets, consisting primarily of inventory and receivables (collectively, the "Working Capital Collateral") and a second lien on and security interest in the fixed assets (the "Fixed Asset Collateral") of the U.S. Borrower and the Canadian Borrower. The Loan II and III lenders have a *pari passu* first lien on and security interest in the Fixed Asset Collateral and a *pari passu* second lien on and security interest in the Working Capital Assets. All of the lenders have a *pari passu* lien on all of the equity interests of the US Borrower and the Canadian Borrower.

*GECC Facility*

17. As of the Commencement Date, SemCrude Pipeline, L.L.C. ("SemCrude Pipeline"), as borrower, is a party to a Credit Agreement, dated as of June 17, 2008 (as amended, modified, and supplemented from time to time through and including the Commencement Date, the "GECC Credit Facility"), with General Electric Capital Corporation ("GECC"), as administrative agent, and the other lenders party thereto. The GECC Credit Facility, used to fund the construction of a pipeline from Platteville, Colorado to Cushing, Oklahoma, is comprised of (i) a $60 million revolving credit facility and (ii) a $60 million term loan facility.

18. Pursuant to a Security Agreement, dated as of June 17, 2008, executed in connection with the GECC Credit Facility, SemCrude Pipeline pledged, collaterally assigned, and granted to GECC for the benefit of itself and the others lenders, a continuing security interest in its then owned or thereafter acquired right, title, and interest in and to all or substantially all of its personal property. On July 18, 2008, GECC sent to SemCrude Pipeline a notice alleging that SemCrude Pipeline was in default under the GECC Credit Facility. SemCrude Pipeline disputes that it is in default.

B. Unsecured Debt

*The 8-3/4% Notes*

19. Pursuant to an indenture, dated as of November 18, 2005, SemGroup and SemGroup Finance Corp. (together, the "Issuers") issued approximately $600 million of unsecured notes, which bear interest at the rate of 8.75% per annum (the "Senior Notes"), maturing in 2015. Wells Fargo Bank, N.A. ("Wells Fargo") is the indenture trustee under the indenture for the Senior Notes. Interest on the Senior Notes is payable bi-annually on May 15 and November 15 of each year. The Senior Notes are guaranteed by, or are otherwise obligations of, certain of the Issuers' subsidiaries.

C.    Recent Financial Information

       20.    As of May 31, 2008, the SemGroup Companies and their affiliates had consolidated assets totaling approximately $6.14 billion and consolidated liabilities totaling approximately $7.53 billion. The consolidated revenues of the SemGroup Companies and their affiliates during the fiscal year 2007 were approximately $13.2 billion.

## IV.

### Events Leading to the Chapter 11 Cases

       21.    The SemGroup Companies are in a severe liquidity crisis attributable to a host of factors, including, among others, recent margin calls of massive proportions related to large NYMEX and OTC futures and options positions and overall exposure to the recent extreme volatility in commodity prices. This has been compounded by the ever-tightening and volatile credit and financing markets.

       22.    Historically, the SemGroup Companies and their affiliates aimed to establish a margin on their anticipated purchases of product inventory by selling that product for physical delivery to customers or by entering into future delivery obligations under futures contracts on the NYMEX and OTC markets. Through these transactions, the SemGroup Companies and their affiliates sought to maintain a position that is substantially balanced between purchases and sales or future delivery obligations. Such transactions were always subject to a degree of risk. Rising commodity prices or an expectation of rising prices increased the cash needed to manage commodity price exposure and thereby increased liquidity requirements, limited amounts available through borrowing, and reduced the volume of petroleum products to be purchased. The volatility experienced in petroleum product prices during the last two years has been unprecedented. As a result, the SemGroup Companies'

trading strategy began to fail. For example, from January 2006 to June 2008, the NYMEX West Texas Intermediate benchmark price increased $66.75 per barrel. During the three months ended March 31, 2008, the SemGroup Companies and their affiliates posted $1.96 billion to satisfy margin deposit requirements, a 115% increase over the three months ended March 31, 2007. During the twelve months ended December 31, 2007, the SemGroup Companies and their affiliates posted $1.70 billion to satisfy margin deposit requirements, a 159% increase over the twelve months ended December 31, 2006.

23.     Increased margin requirements have had a severe negative impact on the SemGroup Companies' liquidity position, which worsened significantly in recent weeks. On July 16, 2008, the SemGroup Companies transferred their NYMEX trading account to Barclays, thereby converting loss contingencies into recognized losses totaling in excess of $2.4 billion. It became clear that the SemGroup Companies would not have sufficient liquidity to cover margin calls. Of the approximate $2.4 billion in aggregate NYMEX trading losses, approximately $290 million is owed to SemGroup by a trading company wholly owned by Thomas L. Kivisto, SemGroup's co-founder and then President and Chief Executive Officer. On July 17, 2008, Mr. Kivisto commenced an administrative leave of absence, and I assumed the role of acting President and Chief Executive Officer.

24.     The operations of the SemGroup Companies and their affiliates consist of a broad asset base that provides a counter-cyclical position whereby the SemGroup Companies and their affiliates seek to take advantage of both winter and summer seasonal contango markets and thereby capitalize on a volatile market. Because of their strategic asset base and business model, the SemGroup Companies and their affiliates are in a position to benefit from swings in

market prices and shifts in the market structure during periods of volatility in the petroleum product market.

25.     The SemGroup Companies' exposure to the recent extreme volatility in commodity prices and increased margin requirements has been exacerbated by the fact that the SemGroup Companies' credit facilities could not accommodate the capital needs associated with the trade book on the NYMEX market. In addition, as of July 17, 2008, the trade book on the OTC account was $850 million negative mark to market. Between July 17 and the Commencement Date, the SemGroup Companies and their affiliates have received termination notices from a number of counterparties, thereby fixing losses on those accounts, the totality of which is being calculated. Accordingly, despite the sale of their NYMEX account to Barclays prior to the Commencement Date, the SemGroup Companies are still facing a real liquidity crisis.

26.     While the cash drain of the margin calls associated with the SemGroup Companies' trading business has impaired the overall liquidity of the SemGroup Companies, making the operation of their business extremely difficult, the trading books largely have been either sold, transferred, or closed. The remainder of the SemGroup Companies' business, consisting of the buying, selling, and transport of physical product, is a valuable enterprise with more than $1.5 billion in fixed assets as of May 31, 2008.

27.     The SemGroup Companies believe it is in the best interest of all stakeholders to commence the chapter 11 cases. Chapter 11 will facilitate the stabilization of the SemGroup Companies' business, enable the Debtors to apply the provisions of chapter 11 to maximize the value of their estates in the short term though the use of cash collateral and long term in the form of debtor-in-possession financing ("DIP Financing"), and provide the Debtors

with the best forum in which to market and sell some or all of their business segments. The SemGroup Companies anticipate having DIP Financing within a week.

28.     To assist in the stabilization and reorganization of the SemGroup Companies' business, the Debtors have retained The Blackstone Group, L.P. as financial advisor and appointed AP Services, LLC as crisis manager, with Lisa J. Donahue as its Chief Restructuring Officer.

## V.

### Summary of First Day Pleadings

29.     Concurrently with the filing of their chapter 11 petitions, the SemGroup Companies have filed, for the Court's approval, a number of motions and accompanying proposed orders (the "First Day Orders"), which the SemGroup Companies believe are necessary to enable them to operate with a minimum of disruption and loss of productivity. The SemGroup Companies request that each of the First Day Orders be entered as critical elements in stabilizing and facilitating their operations during the pendency of the chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

### Debtors' Motion For An Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of Chapter 11 Cases

30.     The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules. Joint administration will ease the administrative burden for this Court and parties in interest and will obviate the need for duplicative notices, motions, applications, and orders and thereby save considerable time and expense for the Debtors and their estates.

31.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases, and, in fact, the rights of all

creditors will be enhanced by the reduction in costs resulting from the joint administration. The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files. Finally, supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee for the District of Delaware will be simplified.

32.     I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted in all respects.

**Debtors' Motion for Authorization to (i) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363(C), (ii) Provide Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361 And 363, and (iii) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(B)**

33.     The Debtors request (a) pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code (i) authority to use cash collateral pursuant to section 363 of the Bankruptcy Code; (ii) authority to grant the Debtors' prepetition secured lenders adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code; and (iii) modification of the automatic stay for the limited purposes provided in the proposed Interim Order at to the motion, and (b) the scheduling of a final hearing thereon.

34.     The Debtors are currently engaged in good faith negotiations with their prepetition secured lenders and others to obtain debtor-in-possession financing (the "DIP"). The Debtors expect to finalize the terms, and file a motion seeking approval, of the DIP in July 2008. Currently, however, the Debtors lack sufficient unencumbered funds with which to operate their businesses on a going basis. Accordingly, the Debtors have an urgent and immediate need for cash to operate pending Court approval of a DIP.

35.     The Debtors have determined, in the exercise of their business judgment, with the assistance of their advisors, including The Blackstone Group L.P. and AP Services,

LLC, that they require the use of cash collateral. The Debtors propose to use cash collateral pursuant to the terms and condition outlined in the proposed Interim Order and to provide adequate protection as set forth in the Interim Order and the motion. The Debtors submit that, under the circumstances, the terms and conditions contained in the Interim Order are fair and reasonable and in the best interests of their estates and creditors.

**Debtors' Motion for Order (i) Authorizing Debtors to (a) Continue Existing Cash Management System, (b) Maintain Existing Bank Accounts and Business Forms, and (c) Continue Intercompany Arrangements, Including Intercompany Loans, and Historical Practices with Non-Debtor Affiliates and (ii) Granting an Extension of Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code**

36.     The Debtors request that the Court enter an order, pursuant to sections 105(a), 363(c), and 345(b) of the Bankruptcy Code, (i) authorizing the Debtors to (a) continue to operate their cash management system (the "Cash Management System"); (b) fund the SemGroup Companies' operations; (c) maintain the Debtors' existing bank accounts (the "Bank Accounts") and business forms; and (d) continue their intercompany arrangements, including intercompany loans, and historical practices with non-debtor affiliates to the extent specifically identified as such in the budget ("Budget"), as more fully described in the Debtors' Motion for Authorization to (i) Utilize Cash Collateral pursuant to 11 U.S.C. § 363(c), (ii) Provide Adequate Protection to Prepetition Secured Parties pursuant to 11 U.S.C. §§ 361 and 363, and (iii) Schedule a Final Hearing pursuant to Fed. R. Bankr. P. 4001(B); and (b) an extension of the time to comply with the requirements of section 345(b) of the Bankruptcy Code.

37.     In the ordinary course of business, the Debtors use the Cash Management System, which is similar to that utilized by other large multiple entity companies that operate in numerous locations, to accurately and efficiently collect, transfer, and disburse funds generated by the Debtors' business operations. The Cash Management System has several main

components: (i) cash collection, including the collection of payments made to Debtors by customers; (ii) cash disbursements to fund the Debtors' operations, primarily consisting of payments to vendors and service providers to ensure a steady supply of products to the Debtors' customers, as well as funding payroll; (iii) cash concentration; (iv) maintenance of certain miscellaneous stand-alone accounts; (v) relationships with domestic non-Debtor affiliates that give rise to intercompany claims; and (vi) relationships with Canadian affiliates that give rise to intercompany claims. The Debtors' Canadian affiliates maintain a cash management system that generally does not overlap with the Debtors' Cash Management System other than with respect to the intercompany transaction described in the cash management motion.

38.     If the Debtors were required to comply with the Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11," their operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of their existing bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them.

39.     The relief requested in this motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System and granting an extension of the time to comply with section 345(b) of the Bankruptcy Code will avoid many of the possible disruptions and distractions as the Debtors transition to chapter 11.

40.     I believe that the relief requested in the cash management motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these cases and the Debtors' reorganization efforts.

**Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Wages, Compensation, and Employee Benefits and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

41.     The Debtors request, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, that the Court authorize the Debtors to (a) honor and pay, in their sole discretion, (i) obligations relating to wages, salary, and compensation for their employees; (ii) payroll taxes owed to various taxing authorities; (iii) certain expense reimbursements; and (iv) amounts under various benefit plans and policies for their employees, and all costs incident to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies for their employees as they were in effect as of the Commencement Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course.

42.     As of July 1, 2008, the Debtors employed approximately 1,688 individuals in the United States (of which approximately 1,595 are full-time regular employees, 70 are full-time temporary employees, 7 are part-time regular employees who are not eligible for 401(k) benefits, 10 are part-time regular employees who are eligible for 401(k) benefits, and 6 are part-time temporary employees). The continued operation of the Debtors' business and a successful reorganization depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation. Consequently, it is critical that the Debtors be authorized to satisfy their employee-related obligations and continue their ordinary course employee plans, policies, and programs in effect as of the Commencement Date.

43.     Moreover, if the checks issued and fund transfers requested in payment of the prepetition employee obligations are dishonored, or if such earned obligations are not timely paid postpetition, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties. Without the requested relief, the stability of the Debtors will be

undermined, perhaps irreparably, by the distinct possibility that otherwise loyal employees will seek other employment alternatives. In addition, it would be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

44. I believe the authority to pay all employee obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Motion of Debtors Pursuant to Sections 105(a), 362(d), 363(b), and 503(b)**
**of the Bankruptcy Code for Authority to (I) Continue the Debtors' Workers'**
**Compensation Programs and Their Liability, Property, and Other**
**Insurance Programs and (II) Pay All Prepetition Obligations In Respect Thereof**

45. The Debtors request, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code, to continue their workers' compensation programs and various liability, property, directors' and officers' liability, and other insurance programs. In furtherance of this request, the Debtors request that the Court authorize their banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the Debtors' general disbursement accounts to the extent that such checks or electronic fund transfers relate to any of the Debtors' insurance programs.

46. The nature of the Debtors' business and the extent of their operations make it essential for the Debtors to maintain their insurance programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under one of the insurance programs could result in one or more of the insurance carriers declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtors in the future. If the insurance programs are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and

others, which exposure could have an extremely negative impact on the Debtors' ability to successfully reorganize. Indeed, if such a lapse were to occur, the Debtors would be faced with acquiring replacement policies on an expedited basis at a significant cost to the estates. Accordingly, the Debtors must make all payments in respect of the insurance programs as continuation of these policies is essential to the ongoing operation of the Debtors' business.

47. I believe the authority to pay the insurance programs in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Debtors' Motion For Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

48. The Debtors seek entry of an interim order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) determining that the Debtors' utility companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code pending the entry of a final order; (ii) approving the Debtors' proposed offer of adequate assurance and procedures governing the utility companies' requests for additional or different adequate assurance; (iii) prohibiting the utility companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a final order; (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by their motion pending entry of a final order; and (v) scheduling a final hearing on the motion to consider the relief requested.

49. Given that the Debtors operate a multi-faceted oil and gas business with numerous locations, uninterrupted utility services are essential to the Debtors' ongoing

19

operations and the success of the reorganization. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts. It is essential that the utility services continue uninterrupted during these chapter 11 cases.

50. I believe that granting the Debtors the authority to establish an interest-bearing, newly created, segregated account for the benefit of any utility company in the form of a letter of credit or deposit equal to two (2) weeks of utility service calculated as a historical average over the past twelve (12) months, except to the extent a utility company agrees to a lesser amount, with such utility deposit account to be held in escrow pending court order, together with the other procedures set forth in the motion, is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Debtors' Motion Pursuant to Sections 105(a), 507(a)(8),
and 541 of the Bankruptcy Code (i) Authorizing Payment
of Certain Prepetition Taxes and (ii) Authorizing and Directing Financial
Institutions to Honor and Process Related Electronic Transfers and Checks**

51. The Debtors seek entry of an order, pursuant to sections 105(a), 507(a)(8), and 541 of the Bankruptcy Code, authorizing the Debtors to pay certain taxes to various state and local taxing authorities, including all taxes and assessments subsequently determined upon audit, or otherwise, to be owed for periods prior to the Commencement Date, and including any penalties and interest thereon.

52. Payment of the prepetition sales and use taxes is critical to the Debtors' continued, uninterrupted operations. Nonpayment of these obligations may cause taxing authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic

stay, and imposing personal liability on the Debtors' officers and directors, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

53.     I believe the authority to pay the taxing authorities in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Debtors' Motion Pursuant to Sections 105, 363, 364, and 1107 of the Bankruptcy Code and Bankruptcy Rule 6003 for Authorization to Pay Certain Critical Providers and Other Critical Prepetition Claims**

54.     The Debtors seek entry of an interim order authorizing them, in their discretion and business judgment, to pay certain prepetition claims (the "Critical Prepetition Claims"), consisting of (I) the prepetition fixed, liquidated, and undisputed claims of certain of the Debtors' critical suppliers and providers of products and services on the terms and conditions set forth herein, and (II) other critical claims, including (a) the prepetition claims of creditors who transport product or supplies by truck, railroad, barge, pipeline, or other similar means, (b) the prepetition claims of creditors storing product or supplies, whether in warehouses, tanks, terminals, underground storage facilities, or other similar means, and (c) prepetition claims related to customs, including customs duties and the prepetition claims of customs brokers.

55.     I have been informed by the SemGroup Companies' business segment leaders that, based on their experience, suppliers will not continue to supply to the SemGroup Companies if not paid, as most suppliers have viable alternatives, including transporting product via truck or rerouting via pipelines. In my experience in the energy industry, I have seen suppliers cease business relationships in similar situations. It is my opinion that, without the continued of support their suppliers, the SemGroup Companies would be irreparably harmed.

56. To satisfy the Critical Prepetition Claims, the Debtors seek an order authorizing, but not obligating, them to pay, in their sole discretion, up to $50,000,000 in cash or in kind (at the Debtors' election), upon approval by the Court of the Debtors' motion to authorize use of cash collateral, filed contemporaneously herewith. In connection with securing new financing in the form of a debtor-in-possession loan, which the Debtors anticipate obtaining within a week, the Debtors intend to seek authority to pay these Critical Prepetition Claims in full.

**Debtors' Motion for an Extension of the Time to File (i) Schedules
of Assets and Liabilities, (ii) Schedules Of Executory Contracts and
Unexpired Leases, (iii) Lists of Equity Security Holders, (iv) Schedules of
Current Income and Expenditure, and (v) Statements of Financial Affairs**

57. The Debtors request, pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 and Local Bankruptcy Rule 1007-1(b), an extension of time to file their (i) schedules of assets and liabilities; (ii) schedules of executory contracts and unexpired leases; (iii) list of equity security holders; (iv) schedules of current income and expenditures; and (v) statement of financial affairs (collectively, the "Schedules").

58. The Debtors' employees are working diligently to gather the information necessary for the preparation of their Schedules: the volume of information is significant and resources are limited. In view of the amount of work entailed in completing the Schedules and the competing demands on the Debtors' employees to assist in efforts to stabilize business operations during the initial postpetition period, and the sudden need to seek bankruptcy protection, the Debtors likely will not be able to properly and accurately complete their Schedules within the time period imposed under the applicable procedural rules. Therefore, the Debtors are requesting a 60-day extension of the applicable time period. Accordingly, I

respectfully submit that ample cause exists for the requested extension for filings the Debtors' Schedules.

**Application of Debtors Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) for Authorization to (I) Employ and Retain KCC as Claims and Noticing Agent for the Debtors and (II) Appoint KCC as Agent of the Bankruptcy Court**

59.     The Debtors request, pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f), authorization to (i) employ and retain Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent for the Debtors and (ii) to appoint KCC as agent of the Bankruptcy Court.

60.     I believe the retention and appointment of KCC in connection with the administration of these chapter 11 cases is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Conclusion**

61.     I believe approval of the First Day Orders is in the best interests of all stakeholders.

62.     I declare under penalty of perjury that this Declaration is true and correct

to the best of my knowledge, information, and belief.

By: _____

Terrence Ronan
SemGroup, L.P.
Acting President and CEO