KELLEY DRYE & WARREN LLP
James S. Carr (JC-1603)
Eric R. Wilson (EW-4320)
101 Park Avenue
New York, New York 10178
Tel: 212-808-7800
Fax: 212-808-7897

Counsel to IGI Resources, Inc.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SemCrude, L.P., et al.,[1] | ) | Case No. 08-11525 (BLS) |
|  | ) |  |
|  | ) | (Joint Administration Pending) |
| Debtors. | ) |  |

**OBJECTION OF IGI RESOURCES, INC. TO THE**
**MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDER DETERMINING**
**ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES**

IGI Resources, Inc. ("IGI"), by and through its counsel, Kelley Drye & Warren

LLP, hereby objects (the "Objection") to the entry of an order granting the relief requested by the

above-captioned debtors (the "Debtors") in their Motion for an Interim and Final Order Pursuant

To Sections 105(a) And 366 Of The Bankruptcy Code Prohibiting Utilities From Altering,

---

[1]   The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax
identification number, are: SemCrude, L.P. (7524), Chemical Petroleum Exchange, Incorporated (8866),
Eaglwing, L.P. (7243), Grayson Pipeline, L.L.C. (0013), Greyhawk Gas Storage Company, L.L.C. (4412),
K.C. Asphalt L.L.C. (6235), SemCanada II, L.P. (3006), SemCanada L.P. (1091), SemCrude Pipeline,
L.L.C. (9811), SemFuel Transport LLC (6777), SemFuel, L.P. (1015), SemGas Gathering LLC (4203),
SemGas Storage, L.L.C. (0621), SemGas, L.P. (1095), SemGroup Asia, L.L.C. (5852), SemGroup Finance
Corp. (3152), SemGroup, LP. (2297), SemKan, L.L.C. (8083), SemManagement, L.L.C. (0772),
SemMaterials Vietnam, L.L.C. (5931), SemMaterials, L.P. (5443), SemOperating G.P., L.L.C. (5442),
SemStream, L.P. (0859), SemTrucking, L.P. (5355), and Steuben Development Company, L.L.C. (9042).

Refusing, Or Discontinuing Service (the "Utility Motion").  In support of this Objection, IGI represents as follows:

## PRELIMINARY STATEMENT

1.      The Debtors seek to compel IGI to continue to provide natural gas to the Debtors' under a Base Contract (defined below) by deeming IGI a utility.  Such relief should not and cannot be granted for at least two reasons.  First, IGI is not a utility subject to section 366 of the Bankruptcy Code.  Section 366 of the Bankruptcy Code is not intended to create rights for debtors against entities that do not operate as monopolies.  The Debtors can obtain natural gas from other marketers, and thus, IGI is not a monopoly.

2.      Second, section 556 of the Bankruptcy Code expressly prohibits any injunction that seeks to compel IGI to sell natural gas to the Debtors because the Base Contract is a forward contract.  Section 556 of the Bankruptcy Code provides, among other things, that neither the automatic stay nor an "order of a court in any proceeding under this title," which includes the injunctive relief sought in the Utility Motion, apply to contracts between a debtor and a forward contract merchant under a forward contract.  Therefore, it is inappropriate to seek – by way of a utility order or otherwise – an injunction prohibiting IGI from exercising its right to terminate the Base Contract.

## BACKGROUND

3.      On or about March 1, 2008, IGI and SemMaterials, LP entered into a Base Contract for Sale and Purchase of Natural Gas (the "Base Contract").[2]  This Base Contract is the

---

[2]      Due to the proprietary nature of some of the terms of the Base Contract, a redacted copy of the Base Contract is attached hereto as Exhibit "1".  To the extent required, IGI is prepared to submit under seal, an unredacted version to the Court.

standard NAESB form agreement used by IGI in connection with sales of natural gas to its customers.  The Base Contract sets forth the terms and conditions for future sales of natural gas by IGI to the Debtors through oral and/or written confirmations.  IGI also provides certain balancing services to the Debtors under the Base Contract.

4.      On July 22, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and the Utility Motion.  Exhibit A to the Utility Motion lists IGI as a utility that must continue to provide goods and/or services to the Debtors in accordance with section 366 of the Bankruptcy Code.

## OBJECTION

### A.    IGI Is Not A Utility

5.      IGI is not a utility for purposes of section 366 of the Bankruptcy Code.  Section 366 of the Bankruptcy Code provides:

> (a)      Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

> (b)      Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

6.      The Bankruptcy Code does not provide a definition of the term "utility."  However, the legislative history of section 366 indicates that Congress intended that section to

apply only to those "utilities" which have a special position with respect to the debtor.[3]  Utilities

may include, for example, "an electric company, gas supplier, or telephone company that is a

monopoly in the area so the debtor cannot easily obtain comparable services from another

utility." *House Report No. 95-595 at 350.*

7.      Courts have generally held that section 366 of the Bankruptcy Code only applies

to traditional "utilities."  *See One Stop Realtour Place, Inc. v. Allegiance Telecom, Inc.*, 268 B.R.

430, 436 (Bankr. E.D. Pa. 2001) (telephone company is within the meaning of a utility); *Kiriluk*

*v. Chester Water Auth.*, 76 B.R. 979 (Bankr. E.D. Pa. 1987) (a provider of sewer service is a

utility); *In re Gehrke*, 57 B.R. 97 (Bankr. D. Or. 1985) (an electric co-op association is a utility);

*Good Time Charlie's Ltd. v. Black*, 25 B.R. 226 (Bankr. E.D. Pa. 1982) (shopping mall that

supplied debtor with electricity was a utility).  In each case, the debtor was dependent on the

services provided by the utility and such services were unavailable from any other source.  In

other words, the utility enjoyed a monopolistic position.

8.      IGI does not have a monopoly over the sale of natural gas to the Debtors.  There

are numerous other providers of natural gas that are available to the Debtors, including the local

distribution company ("LDC").  Under the Base Contract, each party agreed that, for any gas

actually consumed (rather than resold) by such party, the LDC is the provider of last resort and

---

[3]      The legislative history to section 366 of the Bankruptcy Code states, in relevant part:

> This section gives debtors protection from a cut-off of service by a utility
> because of the filing of a bankruptcy case.  This section is intended to cover
> utilities that have some special position with respect to the debtor, such as an
> electric company, gas supplier, or telephone company that is a monopoly in the
> area so that the debtor cannot easily obtain comparable service from another
> utility.  The utility may not alter, refuse, or discontinue service because of the
> nonpayment of a bill that would be discharged in the bankruptcy case.

House Report No. 95-595, 95th Cong., 1st Sess. 350 (1977); *see* Senate Report No. 95-989, 95th Cong., 2d
Sess. 60 (1978) (emphasis added).

can supply such party's gas consumption needs if gas is not delivered pursuant to the Base

Contract. *See* Base Contract, Special Provisions, Section 10.5. Avista Corp. and Intermountain

Gas Company are two examples of LDCs that are available to supply natural gas to the Debtors.

In addition, each party agreed "that the other party is not a 'utility' as such term is used in 11

U.S.C. Section 366," and agreed "to waive and not assert the applicability of the provisions of 11

U.S.C. Section 366 in any bankruptcy proceeding involving such party." *See id.* Because IGI is

not a utility under section 366 of the Bankruptcy Code, the Court should exempt IGI from the

relief sought in the Utility Motion.

**B.      The Base Contract Is A Forward Contract That IGI May
          Terminate At Will Without Further Court Order_____**

        9.      The Base Contract is a NAESB Standard form agreement, and thus, the Debtors

have acknowledged that the Base Contract is a "forward contract" under the Bankruptcy Code.

The Base Contract specifically states that each transaction under the contract "constitutes a

'forward contract' within the meaning of the United States Bankruptcy Code" and that the parties

are each "'forward contract merchants' within the meaning of the United States Bankruptcy

Code." *See* Base Contract, Section 10.5. As such, there should be no dispute over whether the

Base Contract is a forward contract.

        10.     The characterization of the Base Contract as a "forward contract" is also

supported by the language of the Bankruptcy Code. Pursuant to section 101(25) of the

Bankruptcy Code:

>       The term "forward contract" means -
>
>       (A) *a contract* (other than a commodity contract, as defined in section
>       761) for the purchase, sale, or transfer of a commodity, as defined in
>       section 761(8) of this title, or any similar good, article, service, right, or
>       interest which is presently or in the future becomes the subject of dealing
>       in the forward contract trade, or product or byproduct thereof, with a

maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase or reverse repurchase transaction (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in this section), consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement.[4]

11.    The Base Contract falls within the foregoing definition.  The Base Contract covers purchases of natural gas, a freely traded commodity that is dealt both on the New York Mercantile Exchange and numerous private exchanges or marketplaces, with the underlying transactions having a maturity date more than two days into the future.  Pursuant to the Base Contract, the Debtors purchase natural gas from IGI upon written or oral confirmations of specified price and quantity, for delivery more than two days from the date of such agreement. Further, in a "forward contract," the parties usually expect to make actual delivery.  *In re Borden Chemicals and Plastics*, 336 B.R. 214, 218 ) (Bankr. D. Del., 2006) (*quoting In re Olympic Natural Gas Co.*, 294 F.3d at 741 (*citing Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 441 (7th Cir. 2000)) (holding that when eventual delivery of commodity is reasonably assured, the contract is a forward contract); *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 579 (9th Cir. 1982) (stating that forward contract is "predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future"); *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 990 (8th Cir. 1999) ("[I]t is the contemplation

---

[4]    11 U.S.C. § 101(25)(A).  Section 101(25) of the Bankruptcy Code refers to section 761(8) for the definition of a commodity, which adopts the definition of "commodity" found in the Act.  The Act is defined in section 761(1) as the Commodity Exchange Act.  7 U.S.C. § 1 *et seq.*  In turn, section 1a(4) of the Commodity Exchange Act defines "commodity" to include natural gas.  *In re Mirant Corp.*, 310 B.R. 548, 565 n25 (Bankr. N.D. Tx. 2004); 5 Collier on Bankruptcy 556.02[2], at 556-5 (Lawrence P. King ed., 15th ed. 2002) ("Thus, the terms 'commodity contract' and 'forward contract,' taken together, seamlessly cover the entirety of transactions in the commodity and forward contract markets, whether exchange-traded, regulated, over-the-counter or private.")  As such, a contract for the purchase and sale of natural gas is a forward contract within the contemplation of section 101(25).

of physical delivery of the subject commodity that is the hallmark of an unregulated cash-

forward contract."). Accordingly, the Base Contract is a contract for the "purchase, sale, or

transfer of a commodity," with the underlying transactions having a maturity date[5] more than

two days into the future.[6] Because the Base Contract fits squarely within the definition of a

"forward contract," the safe harbor provisions of section 556 automatically apply and inquiry

into extrinsic evidence is neither necessary nor appropriate. *See, e.g., Calyon New York Branch

v. American Home Mortgage Corp.* (*In re American Home Mortgage Corp.*), 379 B.R. 503

(Bankr. D. Del. 2008) ("[I]f the definition of [the financial transaction] is met, the . . . safe harbor

provisions apply, period.").

12.    IGI is also a "forward contract merchant" as defined by section 101(26) of the

Bankruptcy Code.[7] As held by the *Mirant* court, "a forward contract merchant is a person that,

---

[5]    The term "maturity" means the due date for the commencement of performance. Moreover, "maturity date" is not limited to a single date and the House Report on section 101(25) clearly contemplates a series of transactions. H.R. Rep. No. 101-484, p.4 (1990), U.S. Code Cong. & Admin. News 1990, pp. 223, 226 ("[A] forward contract merchant often has a series of forward contracts with the same customer, which are set off and 'netted out.' Legislation was enacted in 1982 to permit a non-defaulting forward contract merchant to terminate and net out forward contracts when the other party files a bankruptcy petition.") *In re Mirant Corp.*, 310 B.R. at 565 n.26.

[6]    Similar contracts for the future sales of natural gas have been recognized in bankruptcy as being within the Bankruptcy Code's definition of "forward contracts" because they contain a hedging component. See, e.g., In re Borden Chemicals and Plastics, 336 B.R. at 221-22 (quoting the House Report: "the principal purpose [sic] a forward contract is to hedge against possible fluctuations in the price of a commodity," H.R. Rep. No. 101-484, at 4 (1990), U.S. Code Cong. & Admin. News 1990, pp. 223, 226, and the Senate Report: "[f]orward contracts play a central role in the movement of commodities among producers and users, as well as in the hedging of risks associated with these and other transactions").

[7]    Section 101(26) of the Bankruptcy Code provides:

> "forward contract merchant" means a Federal reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761), or any similar good, article, service, right or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

11 U.S.C. § 101(26).

in order to profit, engages in the forward contract trade as a merchant or with a merchant." *In re Mirant*, 310 B.R. at 568. IGI, in order to profit, engages in the forward contract trade, as a merchant and with other merchants. In fact, the Debtors specifically acknowledge in the Base Contract that the parties are each "forward contract merchants" as such term is defined in the United States Bankruptcy Code. *See, e.g., See* Base Contract, Special Provisions, Section 10.5.

13. Since the Base Contract is a forward contract entered into by forward contract merchants, special creditor protections mandated by Congress apply. Namely, IGI is free to terminate the Base Contract at will. Under section 556 of the Bankruptcy Code, "[t]he contractual right of a … forward contract merchant to cause the liquidation of a … forward contract because of a condition of the kind specified in section 365(e)(1) of this title [conditions relating to filing bankruptcy, insolvency or financial condition] . . . shall not be stayed, avoided, or otherwise limited by operation of any provision under this title or by the order of a court in any proceeding under this title." 11 U.S.C. § 556. Section 556 dictates that the rights of IGI to terminate the Base Contract remain undisturbed by either (i) the automatic stay or (ii) an "order of a court in any proceeding under this title," which includes any interim or final order granting the relief sought in the Utility Motion, that forbids IGI "from altering, refusing or discontinuing services" to the Debtors. Because IGI may elect to terminate the Base Contract – as it is permitted to do without a court order under section 556 of the Bankruptcy Code – the utility order cannot and should not interfere with this right.

**WHEREFORE**, IGI respectfully requests that the Court find that relief sought in the

Utility Motion is not applicable to IGI and grant such other relief as may be just and proper.

Dated:   New York, New York            KELLEY DRYE & WARREN LLP
         July 22, 2008


                                      By:   */s/ Eric R. Wilson*
                                            James S. Carr (JC-1603)
                                            Eric R. Wilson (EW-4320)

                                      101 Park Avenue
                                      New York, New York 10178
                                      (212) 808-7800

                                      Counsel to IGI Resources, Inc.

**EXHIBIT 1**

# Base Contract for Sale and Purchase of Natural Gas

This Base Contract is entered into as of the following date March 1, 2008

The parties to this Base Contract are the following:

| PARTY A<br>IGI Resources, Inc. | PARTY NAME | PARTY B<br>SemMaterials, LP |
|---|---|---|
| PO Box 6488  Boise, ID  83707-6488 | ADDRESS | 4303 Gekeler Lane, Boise, ID 83716 |
| **www.igires.com** | BUSINESS WEBSITE | **www.semgrouplp.com** |
| 2701212 | CONTRACT NUMBER | |
| 19-429-0953 | D-U-N-S® NUMBER | 20-509-0271 |
| ☒ US FEDERAL:  82-0401137<br><br>☐ OTHER: | TAX ID NUMBERS | ☒ US FEDERAL:  57-1215443<br><br>☐ OTHER: |
| Idaho | JURISDICTION OF ORGANIZATION | Oklahoma |
| ☒ Corporation ☐ LLC<br>☐ Limited Partnership ☐ Partnership<br>☐ LLP ☐ Other: | COMPANY TYPE | ☐ Corporation ☐ LLC<br>☒ Limited Partnership ☐ Partnership<br>☐ LLP ☐ Other: _____ |
| | GUARANTOR (IF APPLICABLE) | |

## CONTACT INFORMATION

| | | |
|---|---|---|
| ATTN:  _Rick Matthews_<br>TEL#:  509-459-1361  FAX#:  509-459-1358<br>EMAIL:  rick.matthews@bp.com | • COMMERCIAL | ATTN:  _Ron Mahan_<br>TEL#:  208-345-2538  FAX#:  208-336-0135<br>EMAIL:  Rmahan@semgrouplp.com |
| ATTN:  _Customer Service Department_<br>TEL#:  360-693-8220  FAX#:  360-693-8230<br>EMAIL: | • SCHEDULING | ATTN:  _Ron Mahan_<br>TEL#:  208-345-2538  FAX#:  208-336-0135<br>EMAIL:  Rmahan@semgrouplp.com |
| ATTN:  _Natural Gas Marketing -- Contract Administration_<br>TEL#:  208-395-0500  FAX#:  208-395-0530<br>EMAIL:  laurie.baker@bp.com | • CONTRACT AND LEGAL NOTICES | ATTN:  _Ron Mahan_<br>TEL#:  208-345-2538  FAX#:  208-336-0135<br>EMAIL:  Rmahan@semgrouplp.com |
| ATTN:  _Natural Gas Marketing - Credit_<br>TEL#:  208-395-0500  FAX#:  208-395-0530<br>EMAIL:  karl.wagner@bp.com | • CREDIT | ATTN:  _Ron Mahan_<br>TEL#:  208-345-2538  FAX#:  208-336-0135<br>EMAIL:  Rmahan@semgrouplp.com |
| ATTN:  _Natural Gas Marketing - Confirmations_<br>TEL#:  208-395-0500  FAX#:  208-395-0536<br>EMAIL: | • TRANSACTION CONFIRMATIONS | ATTN:  _Ron Mahan_<br>TEL#:  208-345-2538  FAX#:  208-336-0135<br>EMAIL:  Rmahan@semgrouplp.com |

## ACCOUNTING INFORMATION

| | | |
|---|---|---|
| ATTN:  _Natural Gas Marketing - Accounting_<br>TEL#:  208-395-0500  FAX#:  208-395-0536<br>EMAIL: | • INVOICES<br>• PAYMENTS<br>• SETTLEMENTS | ATTN:  _Accounts Payable, PO Box 211788, Columbia, SC 29221_<br>TEL#:  _____  FAX#:  803-758-2419<br>EMAIL: |
| BANK:<br>ABA:<br>OTHER DETAILS: | WIRE TRANSFER NUMBERS (IF APPLICABLE) | BANK:<br>ABA:<br>OTHER DETAILS: |
| BANK:<br>ABA:<br>OTHER DETAILS: | ACH NUMBERS (IF APPLICABLE) | BANK:<br>ABA:<br>OTHER DETAILS: |
| ATTN:  _Bank of America-c/o Remittance Services Lockbox 12124_<br>ADDRESS:  _12124 Collections Center Drive  Chicago, IL 60693_ | CHECKS (IF APPLICABLE) | ATTN:  _Accounts Receivable_<br>ADDRESS:  _P.O.Box 211788, Columbia, SC 29221_ |

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
September 5, 2006

## Base Contract for Sale and Purchase of Natural Gas

### (Continued)

This Base Contract incorporates by reference for all purposes the General Terms and Conditions for Sale and Purchase of Natural Gas published by the North American Energy Standards Board. The parties hereby agree to the following provisions offered in said General Terms and Conditions. In the event the parties fail to check a box, the specified default provision shall apply. <u>Select the appropriate box(es) from each section:</u>

| | | | | | |
|---|---|---|---|---|---|
| **Section 1.2**<br>Transaction<br>Procedure | ☒<br>OR<br>☐ | Oral (default)<br><br>Written | **Section 10.2**<br>Additional<br>Events of<br>Default | ☒<br><br>☐ | No Additional Events of Default (default)<br><br>Indebtedness Cross Default |
| | | | | | ☐   Party A: _____ |
| **Section 2.7**<br>Confirm Deadline | ☒<br>OR<br>☐ | 2 Business Days after receipt (default)<br><br>5 Business Days after receipt | | | ☐   Party B: _____ |
| | | | | ☐ | Transactional Cross Default<br><u>Specified Transactions:</u> |
| **Section 2.8**<br>Confirming Party | ☐<br>OR<br>☐<br>☒ | Seller (default)<br><br>Buyer<br><br>IGI Resources, Inc. | | | _____<br>_____ |
| **Section 3.2**<br>Performance<br>Obligation | ☒<br>OR<br>☐ | Cover Standard (default)<br><br>Spot Price Standard | **Section 10.3.1**<br>Early<br>Termination<br>Damages | ☒<br><br>OR<br><br>☐ | Early Termination Damages Apply (default)<br><br>Early Termination Damages Do Not Apply |
| ████████████████████████████ | | | ██████████████████████████ | | |
| | | | | OR | |
| | | | | ☐ | Other Agreement Setoffs Do Not Apply |
| **Section 6**<br>Taxes | ☒<br>OR<br>☐ | Buyer Pays At and After Delivery Point (default)<br><br>Seller Pays Before and At Delivery Point | | | |
| ███████████████████████ | | | **Section 15.5**<br>Choice Of Law | | Idaho |
| **Section 7.2**<br>Method of Payment | ☒<br>☐<br>☐ | Wire transfer (default)<br>Automated Clearinghouse Credit (ACH)<br>Check | **Section 15.10**<br>Confidentiality | ☒<br>OR<br>☐ | Confidentiality applies (default)<br><br>Confidentiality does not apply |
| ████████████████████ | | | | | |

☒ **Special Provisions** Number of sheets attached:  (7)

Addendum(s): _____

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

| IGI RESOURCES, INC. | PARTY NAME | SEMMATERIALS, LP |
|---|---|---|
| | SIGNATURE | By: *Frank Panzer* |
| By: | | |
| Stephen S. McCandlish | PRINTED NAME | Frank R. Panzer |
| Vice President | TITLE | President |

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
September 5, 2006

# General Terms and Conditions
# Base Contract for Sale and Purchase of Natural Gas

## SECTION 1.    PURPOSE AND PROCEDURES

**1.1.**    These General Terms and Conditions are intended to facilitate purchase and sale transactions of Gas on a Firm or Interruptible basis. "Buyer" refers to the party receiving Gas and "Seller" refers to the party delivering Gas. The entire agreement between the parties shall be the Contract as defined in Section 2.9.

**The parties have selected either the "Oral Transaction Procedure" or the "Written Transaction Procedure" as indicated on the Base Contract.**

**Oral Transaction Procedure:**

**1.2.**    The parties will use the following Transaction Confirmation procedure. Any Gas purchase and sale transaction may be effectuated in an EDI transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties. The parties will be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a Transaction Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Transaction Confirmation as the identification and authentication of Confirming Party. If the Transaction Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions), which modify or supplement the Base Contract or General Terms and Conditions of this Contract (e.g., arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 1.3 but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any transaction agreed to by the parties.

**Written Transaction Procedure:**

**1.2.**    The parties will use the following Transaction Confirmation procedure. Should the parties come to an agreement regarding a Gas purchase and sale transaction for a particular Delivery Period, the Confirming Party shall, and the other party may, record that agreement on a Transaction Confirmation and communicate such Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means, to the other party by the close of the Business Day following the date of agreement. The parties acknowledge that their agreement will not be binding until the exchange of nonconflicting Transaction Confirmations or the passage of the Confirm Deadline without objection from the receiving party, as provided in Section 1.3.

**1.3.**    If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party. The failure of the receiving party to so notify the sending party in writing by the Confirm Deadline constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation. If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations. In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation, where the parties have selected the Oral Transaction Procedure of the Base Contract, (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed in this sentence.

**1.4.**    The parties agree that each party may electronically record all telephone conversations with respect to this Contract between their respective employees, without any special or further notice to the other party. Each party shall obtain any necessary consent of its agents and employees to such recording. Where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, the parties agree not to contest the validity or enforceability of telephonic recordings entered into in accordance with the requirements of this Base Contract.

## SECTION 2.    DEFINITIONS

The terms set forth below shall have the meaning ascribed to them below. Other terms are also defined elsewhere in the Contract and shall have the meanings ascribed to them herein.

**2.1.**    "Additional Event of Default" shall mean Transactional Cross Default or Indebtedness Cross Default, each as and if selected by the parties pursuant to the Base Contract.

**2.2.**    "Affiliate" shall mean, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of at least 50 percent of the voting power of the entity or person.

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

2.3.    "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

2.4.    "Base Contract" shall mean a contract executed by the parties that incorporates these General Terms and Conditions by reference; that specifies the agreed selections of provisions contained herein; and that sets forth other information required herein and any Special Provisions and addendum(s) as identified on page one.

2.5.    "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

2.6.    "Business Day(s)" shall mean Monday through Friday, excluding Federal Banking Holidays for transactions in the U.S.

2.7.    "Confirm Deadline" shall mean 5:00 p.m. in the receiving party's time zone on the second Business Day following the Day a Transaction Confirmation is received or, if applicable, on the Business Day agreed to by the parties in the Base Contract; provided, if the Transaction Confirmation is time stamped after 5:00 p.m. in the receiving party's time zone, it shall be deemed received at the opening of the next Business Day.

2.8.    "Confirming Party" shall mean the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party.

2.9.    "Contract" shall mean the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation, all of which shall form a single integrated agreement between the parties.

2.10.    "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a transaction.

2.11.    "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a transaction.

2.12.    "Cover Standard", as referred to in Section 3.2, shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Contract, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available), or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with: the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

2.13.    "Credit Support Obligation(s)" shall mean any obligation(s) to provide or establish credit support for, or on behalf of, a party to this Contract such as cash, an irrevocable standby letter of credit, a margin agreement, a prepayment, a security interest in an asset, guaranty, or other good and sufficient security of a continuing nature.

2.14.    "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

2.15.    "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a transaction.

2.16.    "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a transaction.

2.17.    "EDI" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of Transaction Confirmations under this Contract.

2.18.    "EFP" shall mean the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts. EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the Commodity Exchange Act.

2.19.    "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

2.20.    "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

2.21.    "Guarantor" shall mean any entity that has provided a guaranty of the obligations of a party hereunder.

2.22.    "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

2.23.    "Indebtedness Cross Default" shall mean if selected on the Base Contract by the parties with respect to a party, that it or its Guarantor, if any, experiences a default, or similar condition or event however therein defined, under one or more agreements or instruments, individually or collectively, relating to indebtedness (such indebtedness to include any obligation whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of borrowed money in an aggregate amount greater than the threshold specified in the Base Contract with respect to such party or its Guarantor, if any, which results in such indebtedness becoming immediately due and payable.

2.24.    "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

2.25.    "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

2.26.    "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

2.27.    "Payment Date" shall mean a date, as indicated on the Base Contract, on or before which payment is due Seller for Gas received by Buyer in the previous Month.

2.28.    "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

2.29.    "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

2.30.    "Specified Transaction(s)" shall mean any other transaction or agreement between the parties for the purchase, sale or exchange of physical Gas, and any other transaction or agreement identified as a Specified Transaction under the Base Contract.

2.31.    "Spot Price " as referred to in Section 3.2 shall mean the price listed in the publication indicated on the Base Contract, under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices. If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

2.32.    "Transaction Confirmation" shall mean a document, similar to the form of Exhibit A, setting forth the terms of a transaction formed pursuant to Section 1 for a particular Delivery Period.

2.33.    "Transactional Cross Default" shall mean if selected on the Base Contract by the parties with respect to a party, that it shall be in default, however therein defined, under any Specified Transaction.

2.34.    "Termination Option" shall mean the option of either party to terminate a transaction in the event that the other party fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer for a designated number of days during a period as specified on the applicable Transaction Confirmation.

2.35.    "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular transaction.

# SECTION 3.    PERFORMANCE OBLIGATION

3.1.    Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract. Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a transaction.

**The parties have selected either the "Cover Standard" or the "Spot Price Standard" as indicated on the Base Contract.**

**Cover Standard:**

3.2.    The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s) excluding any quantity for which no replacement is available; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s) excluding any quantity for which no sale is available; and (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available for all or any portion of the Contract Quantity of Gas, then in addition to (i) or (ii) above, as applicable, the sole and exclusive remedy of the performing party with respect to the Gas not replaced or sold shall be an amount equal to any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the quantity of such Gas not replaced or sold. Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3. The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

---

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
NAESB Standard 6.3.1
September 5, 2006

**Spot Price Standard:**

**3.2.** The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price. Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3. The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

**3.3.** Notwithstanding Section 3.2, the parties may agree to Alternative Damages in a Transaction Confirmation executed in writing by both parties.

**3.4.** In addition to Sections 3.2 and 3.3, the parties may provide for a Termination Option in a Transaction Confirmation executed in writing by both parties. The Transaction Confirmation containing the Termination Option will designate the length of nonperformance triggering the Termination Option and the procedures for exercise thereof, how damages for nonperformance will be compensated, and how liquidation costs will be calculated.

# SECTION 4.    TRANSPORTATION, NOMINATIONS, AND IMBALANCES

**4.1.** Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s). Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

**4.2.** The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s). Each party shall give the other party timely prior Notice, sufficient to meet the requirements of all Transporter(s) involved in the transaction, of the quantities of Gas to be delivered and purchased each Day. Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

**4.3.** The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges. If Buyer or Seller receives an invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges. If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller. If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer.

# SECTION 5.    QUALITY AND MEASUREMENT

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter. The unit of quantity measurement for purposes of this Contract shall be one MMBtu dry. Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

# SECTION 6.    TAXES

**The parties have selected either "Buyer Pays At and After Delivery Point" or "Seller Pays Before and At Delivery Point" as indicated on the Base Contract.**

**Buyer Pays At and After Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

**Seller Pays Before and At Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

# SECTION 7.    BILLING, PAYMENT, AND AUDIT

**7.1.** Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged. If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas. The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved
NAESB Standard 6.3.1
September 5, 2006

**7.2.** Buyer shall remit the amount due under Section 7.1 in the manner specified in the Base Contract, in immediately available funds, on or before the later of the Payment Date or 10 Days after receipt of the invoice by Buyer; provided that if the Payment Date is not a Business Day, payment is due on the next Business Day following that date. In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this Section 7.2.

**7.3.** In the event payments become due pursuant to Sections 3.2 or 3.3, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated. Payment from the nonperforming party will be due five Business Days after receipt of invoice.

**7.4.** If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed without undue delay. In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

**7.5.** If the invoiced party fails to remit the full amount payable when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

**7.6.** A party shall have the right, at its own expense, upon reasonable Notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under the Contract. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to transactions under this Contract. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery. All retroactive adjustments under Section 7 shall be paid in full by the party owing payment within 30 Days of Notice and substantiation of such inaccuracy.

**7.7.** Unless the parties have elected on the Base Contract not to make this Section 7.7 applicable to this Contract, the parties shall net all undisputed amounts due and owing, and/or past due, arising under the Contract such that the party owing the greater amount shall make a single payment of the net amount to the other party in accordance with Section 7; provided that no payment required to be made pursuant to the terms of any Credit Support Obligation or pursuant to Section 7.3 shall be subject to netting under this Section. If the parties have executed a separate netting agreement, the terms and conditions therein shall prevail to the extent inconsistent herewith.

# SECTION 8.    TITLE, WARRANTY, AND INDEMNITY

**8.1.** Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

**8.2.** Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS SECTION 8.2 AND IN SECTION 15.8, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

**8.3.** Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury (including death) or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury (including death) or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

**8.4.** The parties agree that the delivery of and the transfer of title to all Gas under this Contract shall take place within the Customs Territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States 19 U.S.C. §1202, General Notes, page 3); provided, however, that in the event Seller took title to the Gas outside the Customs Territory of the United States, Seller represents and warrants that it is the importer of record for all Gas entered and delivered into the United States, and shall be responsible for entry and entry summary filings as well as the payment of duties, taxes and fees, if any, and all applicable record keeping requirements.

**8.5.** Notwithstanding the other provisions of this Section 8, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of Section 5.

# SECTION 9.    NOTICES

**9.1.** All Transaction Confirmations, invoices, payment instructions, and other communications made pursuant to the Base Contract ("Notices") shall be made to the addresses specified in writing by the respective parties from time to time.

**9.2.** All Notices required hereunder shall be in writing and may be sent by facsimile or mutually acceptable electronic means, a nationally recognized overnight courier service, first class mail or hand delivered.

**9.3.** Notice shall be given when received on a Business Day by the addressee. In the absence of proof of the actual receipt date, the following presumptions will apply. Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission. If the day on which such facsimile is received is

not a Business Day or is after five p.m. on a Business Day, then such facsimile shall be deemed to have been received on the next following Business Day. Notice by overnight mail or courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party. Notice via first class mail shall be considered delivered five Business Days after mailing.

9.4.    The party receiving a commercially acceptable Notice of change in payment instructions or other payment information shall not be obligated to implement such change until ten Business Days after receipt of such Notice.

# SECTION 10.    FINANCIAL RESPONSIBILITY

10.1.    If either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Contract (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y or its Guarantor, if applicable), X may demand Adequate Assurance of Performance. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount, for a term, and from an issuer, all as reasonably acceptable to X, including, but not limited to cash, a standby irrevocable letter of credit, a prepayment, a security interest in an asset or guaranty. Y hereby grants to X a continuing first priority security interest in, lien on, and right of setoff against all Adequate Assurance of Performance in the form of cash transferred by Y to X pursuant to this Section 10.1. Upon the return by X to Y of such Adequate Assurance of Performance, the security interest and lien granted hereunder on that Adequate Assurance of Performance shall be released automatically and, to the extent possible, without any further action by either party.

10.2.    In the event (each an "Event of Default") either party (the "Defaulting Party") or its Guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due; (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fail to perform any obligation to the other party with respect to any Credit Support Obligations relating to the Contract; (vii) fail to give Adequate Assurance of Performance under Section 10.1 within 48 hours but at least one Business Day of a written request by the other party; (viii) not have paid any amount due the other party hereunder on or before the second Business Day following written Notice that such payment is due; or (ix) be the affected party with respect to any Additional Event of Default; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 10.3, in addition to any and all other remedies available hereunder.

10.3.    If an Event of Default has occurred and is continuing, the Non-Defaulting Party shall have the right, by Notice to the Defaulting Party, to designate a Day, no earlier than the Day such Notice is given and no later than 20 Days after such Notice is given, as an early termination date (the "Early Termination Date") for the liquidation and termination pursuant to Section 10.3.1 of all transactions under the Contract, each a "Terminated Transaction". On the Early Termination Date, all transactions will terminate, other than those transactions, if any, that may not be liquidated and terminated under applicable law ("Excluded Transactions"), which Excluded Transactions must be liquidated and terminated as soon thereafter as is legally permissible, and upon termination shall be a Terminated Transaction and be valued consistent with Section 10.3.1 below. With respect to each Excluded Transaction, its actual termination date shall be the Early Termination Date for purposes of Section 10.3.1.

**The parties have selected either "Early Termination Damages Apply" or "Early Termination Damages Do Not Apply" as indicated on the Base Contract.**

**Early Termination Damages Apply:**

10.3.1.    As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract and (ii) the Market Value, as defined below, of each Terminated Transaction. The Non-Defaulting Party shall (x) liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the Buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the Seller if the opposite is the case; and (y) where appropriate, discount each amount then due under clause (x) above to present value in a commercially reasonable manner as of the Early Termination Date (to take account of the period between the date of liquidation and the date on which such amount would have otherwise become due pursuant to the relevant Terminated Transactions).

For purposes of this Section 10.3.1, "Contract Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the Contract Price, and "Market Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the market price for a similar transaction at the Delivery Point determined by the Non-Defaulting Party in a commercially reasonable manner. To ascertain the Market Value, the Non-Defaulting Party may consider, among other valuations, any or all of the settlement prices of NYMEX Gas futures contracts, quotations from leading dealers in energy swap contracts or physical gas trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term and differences in transportation costs. A party shall not be required to enter into a replacement transaction(s) in order to determine the Market Value. Any extension(s) of the term of a transaction to which parties are not bound as of the Early Termination Date (including but not limited to "evergreen provisions") shall not be considered in determining Contract Values and

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
September 5, 2006

Market Values.  For the avoidance of doubt, any option pursuant to which one party has the right to extend the term of a transaction shall be considered in determining Contract Values and Market Values.  The rate of interest used in calculating net present value shall be determined by the Non-Defaulting Party in a commercially reasonable manner.

**Early Termination Damages Do Not Apply:**

10.3.1.    As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract.

**The parties have selected either "Other Agreement Setoffs Apply" or "Other Agreement Setoffs Do Not Apply" as indicated on the Base Contract.**

**Other Agreement Setoffs Apply:**

**Bilateral Setoff Option:**

10.3.2.    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff any Net Settlement Amount against (i) any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; and  (ii) any amount(s) (including any excess cash margin or excess cash collateral) owed or held by the party that is entitled to the Net Settlement Amount under any other agreement or arrangement between the parties.

**Triangular Setoff Option:**

10.3.2.    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option, and without prior Notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff (i) any Net Settlement Amount against any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; (ii) any Net Settlement Amount against any amount(s) (including any excess cash margin or excess cash collateral) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Net Settlement Amount owed to the Non-Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Non-Defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement;  (iv) any Net Settlement Amount owed to the Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Defaulting Party to the Non-Defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Net Settlement Amount owed to the Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Defaulting Party or its Affiliates to the Non-Defaulting Party under any other agreement or arrangement.

**Other Agreement Setoffs Do Not Apply:**

10.3.2.    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff any Net Settlement Amount against any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract.

10.3.3.    If any obligation that is to be included in any netting, aggregation or setoff pursuant to Section 10.3.2 is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate, subject to the Non-Defaulting Party accounting to the Defaulting Party when the obligation is ascertained. Any amount not then due which is included in any netting, aggregation or setoff pursuant to Section 10.3.2 shall be discounted to net present value in a commercially reasonable manner determined by the Non-Defaulting Party.

10.4.    As soon as practicable after a liquidation, Notice shall be given by the Non-Defaulting Party to the Defaulting Party of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from the Non-Defaulting Party.  The Notice shall include a written statement explaining in reasonable detail the calculation of the Net Settlement Amount, provided that failure to give such Notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by the Defaulting Party against the Non-Defaulting Party.  The Net Settlement Amount as well as any setoffs applied against such amount pursuant to Section 10.3.2, shall be paid by the close of business on the second Business Day following such Notice, which date shall not be earlier than the Early Termination Date.  Interest on any unpaid portion of the Net Settlement Amount as adjusted by setoffs, shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

10.5.    The parties agree that the transactions hereunder constitute a "forward contract" within the meaning of the United States Bankruptcy Code and that Buyer and Seller are each "forward contract merchants" within the meaning of the United States Bankruptcy Code.

10.6.    The Non-Defaulting Party's remedies under this Section 10 are the sole and exclusive remedies of the Non-Defaulting Party with respect to the occurrence of any Early Termination Date.  Each party reserves to itself all other rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from the Contract.

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
September 5, 2006

**10.7.**    With respect to this Section 10, if the parties have executed a separate netting agreement with close-out netting provisions, the terms and conditions therein shall prevail to the extent inconsistent herewith.

# SECTION 11. FORCE MAJEURE

**11.1.**    Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2.

**11.2.**    Force Majeure shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars, or acts of terror; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

**11.3.**    Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Contract; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

**11.4.**    Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

**11.5.**    The party whose performance is prevented by Force Majeure must provide Notice to the other party. Initial Notice may be given orally; however, written Notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

**11.6.**    Notwithstanding Sections 11.2 and 11.3, the parties may agree to alternative Force Majeure provisions in a Transaction Confirmation executed in writing by both parties.

# SECTION 12. TERM

This Contract may be terminated on 30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s). The rights of either party pursuant to Section 7.6, Section 10, Section 13, the obligations to make payment hereunder, and the obligation of either party to indemnify the other, pursuant hereto shall survive the termination of the Base Contract or any transaction.

# SECTION 13. LIMITATIONS

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

# SECTION 14.    MARKET DISRUPTION

If a Market Disruption Event has occurred then the parties shall negotiate in good faith to agree on a replacement price for the Floating Price (or on a method for determining a replacement price for the Floating Price) for the affected Day, and if the parties have not so agreed on or before the second Business Day following the affected Day then the replacement price for the Floating Price shall be determined within the next two  following Business Days with each party obtaining, in good faith and from non-affiliated market participants in the relevant market, two quotes for prices of Gas for the affected Day of a similar quality and quantity in the geographical location closest in proximity to the Delivery Point and averaging the four quotes. If either party fails to provide two quotes then the average of the other party's two quotes shall determine the replacement price for the Floating Price. "Floating Price" means the price or a factor of the price agreed to in the transaction as being based upon a specified index. "Market Disruption Event" means, with respect to an index specified for a transaction, any of the following events: (a) the failure of the index to announce or publish information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading on the exchange or market acting as the index; (c) the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the index; or (e) both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred. For the purposes of the calculation of a replacement price for the Floating Price, all numbers shall be rounded to three decimal places.  If the fourth decimal number is five or greater, then the third decimal number shall be increased by one and if the fourth  decimal number is less than five, then the third  decimal number shall remain unchanged.

# SECTION 15.    MISCELLANEOUS

15.1.     This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract.  No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or Affiliate by assignment, merger or otherwise without the prior approval of the other party.  Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

15.2.     If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

15.3.     No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

15.4.     This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s).  This Contract may be amended only by a writing executed by both parties.

15.5.     The interpretation and performance of this Contract shall be governed by the laws of the jurisdiction as indicated on the Base Contract, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

15.6.     This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, or Gas supply, this Contract or transaction or any provisions thereof.

15.7.     There is no third party beneficiary to this Contract.

15.8.     Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract.  Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

15.9.     The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

15.10.     Unless the parties have elected on the Base Contract not to make this Section 15.10 applicable to this Contract, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract , (iii) to the extent necessary to implement any transaction, (iv) to the extent necessary to comply with a regulatory agency's reporting requirements including but not limited to gas cost recovery proceedings; or (v) to the extent such information is delivered to such third party for the sole purpose of calculating a published index.  Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure.  The existence of this Contract is not subject to this confidentiality obligation.  Subject to Section 13, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this confidentiality obligation.  The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure,

and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

15.11.    The parties may agree to dispute resolution procedures in Special Provisions attached to the Base Contract or in a Transaction Confirmation executed in writing by both parties

15.12.    Any original executed Base Contract, Transaction Confirmation or other related document may be digitally copied, photocopied, or stored on computer tapes and disks (the "Imaged Agreement"). The Imaged Agreement, if introduced as evidence on paper, the Transaction Confirmation, if introduced as evidence in automated facsimile form, the recording, if introduced as evidence in its original form, and all computer records of the foregoing, if introduced as evidence in printed format, in any judicial, arbitration, mediation or administrative proceedings will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither Party shall object to the admissibility of the recording, the Transaction Confirmation, or the Imaged Agreement on the basis that such were not originated or maintained in documentary form. However, nothing herein shall be construed as a waiver of any other objection to the admissibility of such evidence.



**DISCLAIMER:** The purposes of this Contract are to facilitate trade, avoid misunderstandings and make more definite the terms of contracts of purchase and sale of natural gas. Further, NAESB does not mandate the use of this Contract by any party. **NAESB DISCLAIMS AND EXCLUDES, AND ANY USER OF THIS CONTRACT ACKNOWLEDGES AND AGREES TO NAESB'S DISCLAIMER OF, ANY AND ALL WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THIS CONTRACT OR ANY PART THEREOF, INCLUDING ANY AND ALL IMPLIED WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT NAESB KNOWS, HAS REASON TO KNOW, HAS BEEN ADVISED, OR IS OTHERWISE IN FACT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING. EACH USER OF THIS CONTRACT ALSO AGREES THAT UNDER NO CIRCUMSTANCES WILL NAESB BE LIABLE FOR ANY DIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY USE OF THIS CONTRACT.**

TRANSACTION CONFIRMATION
FOR IMMEDIATE DELIVERY

EXHIBIT A

| Letterhead/Logo | Date: _____, _____ |
|---|---|
| | Transaction Confirmation #: _____ |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated _____. The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

**SELLER:**
_____
_____
_____
Attn: _____
Phone: _____
Fax: _____
Base Contract No. _____
Transporter: _____
Transporter Contract Number: _____

**BUYER:**
_____
_____
_____
Attn: _____
Phone: _____
Fax: _____
Base Contract No. _____
Transporter: _____
Transporter Contract Number: _____

Contract Price:  $_____/MMBtu or _____

Delivery Period:  Begin: _____, ____        End: _____, ____

**Performance Obligation and Contract Quantity:**  (Select One)

**Firm (Fixed Quantity):**
_____ MMBtus/day
☐ EFP

**Firm (Variable Quantity):**
_____ MMBtus/day Minimum
_____ MMBtus/day Maximum
subject to Section 4.2. at election of
☐ Buyer or ☐ Seller

**Interruptible:**
Up to _____ MMBtus/day

**Delivery Point(s):** _____
(If a pooling point is used, list a specific geographic and pipeline location):

**Special Conditions:**




Seller: _____

By: _____

Title: _____

Date: _____

Buyer: _____

By: _____

Title: _____

Date: _____

SPECIAL PROVISIONS ATTACHED TO AND FORMING PART OF THE
BASE CONTRACT FOR SALE AND PURCHASE OF NATURAL GAS
Dated  March 1, 2008
by and between

IGI Resources, Inc. ("IGI")
And
SemMaterials, LP ("Counterparty")

Collectively IGI and SemMaterials, LP shall be referred to as the "Parties", and individually may be referred to as a "Party".

however, that to the extent the foregoing is greater than the amount allowed under applicable law, the interest rate shall be reduced to the maximum amount chargeable under existing law."

Delete Section 10.5 in its entirety and replace with the following:

"For all transactions with Delivery Point(s) in the United States, the Parties specifically agree that (i) this Contract and all such transactions pursuant hereto are "forward contracts" as such term is defined in the United States Bankruptcy Code and that each Party is a "forward contract merchant" as such term is defined in the United States Bankruptcy Code; (ii) the other Party is not a "utility" as such term is used in 11 U.S.C. Section 366, and accordingly each Party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such Party; and (iii) any Gas actually consumed (rather than resold) by such Party, if Gas is not delivered pursuant to this Contract, the local gas distribution utility for such Party is the provider of last resort and can supply such Party's Gas consumption needs.  For all transactions with Delivery Point(s) in Canada, the Parties agree that this Contract and all such transactions constitute an "eligible financial contract" within the meaning of the Bankruptcy and Insolvency Act (Canada) and the Companies Creditors Arrangements Act (Canada), and similar Canadian legislation."