# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                          :   **Chapter 11**
                                :
**SEMCRUDE, L.P., et al.,**     :   **Case No. 08-11525 (BLS)**
                                :
            Debtors.            :   **Jointly Administered**
                                :
                                :   Objection Deadline: July 30, 2008 at 4:00 p.m.
                                :   Hearing Date: July 31, 2008 at 10:00 a.m.
                                :
                                :
-------------------------------------------------------------x

## DEBTORS' EMERGENCY MOTION (A) FOR AUTHORIZATION TO (i) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (ii) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (iii) GRANT PRIMING LIENS, SECURITY INTERESTS, AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO 11 U.S.C. § 364(c) AND (d); (iv) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (B) SCHEDULE A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

SemCrude, L.P., its parent, SemGroup, L.P. ("SemGroup"), and certain direct and

indirect subsidiaries of SemGroup, as debtors and debtors in possession (collectively, the

"SemGroup Companies" or the "Debtors"),[1] respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: SemCrude, L.P. (7524), Chemical Petroleum Exchange, Incorporated (8866), Eaglwing, L.P. (7243), Grayson Pipeline, L.L.C. (0013), Greyhawk Gas Storage Company, L.L.C. (4412), K.C. Asphalt L.L.C. (6235), SemCanada II, L.P. (3006), SemCanada L.P. (1091), SemCrude Pipeline, L.L.C. (9811), SemFuel Transport LLC (6777), SemFuel, L.P. (1015), SemGas Gathering LLC (4203), SemGas Storage, L.L.C. (0621), SemGas, L.P. (1095), SemGroup Asia, L.L.C. (5852), SemGroup Finance Corp. (3152), SemGroup, L.P. (2297), SemKan, L.L.C. (8083), SemManagement, L.L.C. (0772), SemMaterials Vietnam, L.L.C. (5931), SemMaterials, L.P. (5443), SemOperating G.P., L.L.C. (5442), SemStream, L.P. (0859), SemTrucking, L.P. (5355), and Steuben Development Company, L.L.C. (9042).

## BANKRUPTCY RULE 4001 CONCISE STATEMENT[2]

1.     By this motion, the Debtors request (A) entry of interim and final orders (the "DIP Orders") granting (i) authorization to obtain postpetition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) approval to use cash collateral pursuant to section 363 of the Bankruptcy Code, and (iii) authorization to grant adequate protection pursuant to sections 361, 363(e), 364(d)(1), and 507 of the Bankruptcy Code to the Debtors' prepetition secured lenders (collectively, the "Financing Arrangement") and (B) authorization to treat as confidential pursuant to section 107 of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") the letter agreements regarding fees entered into by SemGroup in connection with the postpetition financing (the "Fee Letters").[3] A summary of the Financing Arrangement is set forth in that certain Summary of Terms and Conditions of a Priming DIP Facility (the "DIP Term Sheet"), a copy of which is attached hereto as Exhibit A. The DIP Term Sheet provides the principal terms and conditions for a final debtor in possession financing facility agreement (the "Final DIP Agreement") that will be executed by the Debtors and their postpetition lenders in advance of the initial hearing on this motion (the "Interim Hearing"). A copy of the proposed interim order (the "Interim Order") regarding the DIP Term

---

[2] Capitalized terms used in this Concise Statement have the meanings ascribed to them in the DIP Term Sheet, unless otherwise defined herein.

[3] Section 107(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may – (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title."

Bankruptcy Rule 9018 provides, in pertinent part, that "on motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . ."

Sheet is attached hereto as Exhibit B. The Interim Order is subject to continuing review and comment by the Debtors and the DIP Lenders and the Debtors intend to file a final form of the proposed Interim Order (and a blackline reflecting all modifications made to the Interim Order) with the Court prior to the Interim Hearing.

2.     Material provisions of the Financing Arrangement are set out at the following sections of the DIP Term Sheet and/or the Interim Order:[4]

(a)     Borrowing Limits. Bank of America, N.A. ("Bank of America" or "Administrative Agent")[5] and certain other lenders[5] (collectively, the "DIP Lenders") agree to provide to SemCrude, L.P. (the "Borrower"), as debtor in possession, a secured superpriority debtor in possession credit facility in an aggregate principal amount of $250,000,000, with a sublimit of $150,000,000 for letters of credit (the "DIP Facility"). DIP Term Sheet ¶ Transaction, DIP Facility Amount; Interim Order ¶ 1.

(b)     Interest Rate. The loans under the DIP Facility will bear interest at the rate of 1-month LIBOR (subject to a floor of 4.00%) plus 6.00% or Prime (subject to a floor of 3.00%) plus 5.00%. DIP Term Sheet ¶ Interest Rates.

(c)     Maturity. The DIP Facility will expire no later than six (6) months from the date of the commencement of the Debtors' chapter 11 cases (the "Commencement Date"), provided, that the maturity date may be extended to nine (9) months from the Commencement Date upon the DIP Lenders' holding more than 50% of the aggregate DIP Facility commitments (the "Required Lenders") satisfaction that certain conditions relating to the sale of the Debtors' assets have been met. DIP Term Sheet ¶ Maturity Date.

(d)     Events of Default. To be determined by the parties and set forth in the Final DIP Agreement.

•     ──────────────

[4]  The summaries and descriptions of the terms and conditions of the DIP Term Sheet and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Term Sheet and Interim Order. In the event there is a conflict between this Motion and the DIP Term Sheet or Interim Order, the DIP Term Sheet or Interim Order, as applicable, shall control in all respects.

[5]  The DIP Lenders constitute a subset of the lenders under the Debtors' Prepetition Credit Agreement.

(e) Liens. Bank of America, for its own benefit and for the benefit of the DIP Lenders, shall be granted first and priming liens on all assets of the Borrower, including, without limitation, a pledge of the equity in the "unrestricted" subsidiaries of the Borrower and those assets that are subject to liens granted pursuant to the Prepetition Loan Documents, but excluding any assets (other than those assets that are subject to liens granted pursuant to the Prepetition Loan Documents) as to which a valid, perfected and unavoidable lien existed as of the Commencement Date and excluding the Debtors' claims and causes of action arising under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions") (but including, subject to entry of the Final DIP Order, proceeds or property recovered in respect of the Avoidance Actions). In addition, Bank of America, for its own benefit and for the benefit of the DIP Lenders, shall be granted perfected junior liens in all property of the Debtors that is subject to valid, perfected and non-avoidable liens. Pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Facility shall be entitled to superpriority claim status in the Debtors' chapter 11 cases. DIP Term Sheet ¶ Security; Interim Order ¶¶ 6, 7.

(f) Fees.[6] The Debtors will pay an unused line fee of 1% for undrawn amounts under the DIP Facility. The Debtors will also pay 6.00% *per annum* on the outstanding face amount of each letter of credit plus customary fees for issuance, amendments and processing and a fronting fee equal to 0.25 to 1.00% *per annum*. DIP Term Sheet ¶¶ Unused Line Fee, Letter of Credit Fees.

(g) Conditions. The DIP Facility shall be conditioned on, among other things, Bank of America's receipt of an initial Budget (defined below), receipt of all necessary consents, finalization of satisfactory legal documentation (including representations and warranties, covenants, events of default and other terms and conditions deemed appropriate by Bank of America and the Required Lenders for a transaction of this type) and the Bankruptcy Court's entry of interim and final orders approving the

---

[6] Due to the commercially sensitive nature of the fees disclosed in the Fee Letters, the Debtors have not attached copies of the Fee Letters to the Motion and the Debtors have not disclosed the fees contained therein in the Motion. However, the Debtors propose to provide the Office of the United States Trustee for the District of Delaware with copies of the Fee Letters in advance of the hearing on this Motion. In addition, the Debtors propose to submit copies of the Fee Letters to the Court at the initial hearing on the Motion, and further to provide copies of the Fee Letters to any statutory committee formed in these cases prior to the Final Hearing, provided that the confidentiality of the contents of the Fee Letters be preserved pursuant to Bankruptcy Code section 107 and Rule 9018 of the Bankruptcy Rules.

DIP Facility, each of which is acceptable to Bank of America and the Required Lenders.  DIP Term Sheet ¶¶ Conditions.

(h)    <u>Sales Process</u>.  The Final DIP Agreement shall set forth milestones and timeframes, acceptable to Bank of America and the Required Lenders, for the successful completion of the sale of all or substantially all of the Borrower's and the Guarantors' (defined below) assets, including, without limitation, the hiring of professionals in connection therewith, the approval of bidding procedures, and approval of a sale by this Court, as well as other conditions to be determined.  The DIP Lenders' financial advisors shall receive all information with respect to the sale process substantially concurrently with the Borrower's and its advisors' receipt of such information.  DIP Term Sheet ¶ Sale Process.

**<u>Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2</u>**

3.    The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out at the following sections of the DIP Term Sheet and the Interim Order:

(a)    ***Grant of Priority or a Lien on Property of the Estate.***  DIP Term Sheet ¶ Security; Interim Order ¶¶ 6, 7.

(b)    ***Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case.***  Interim Order ¶ 13.

(c)    ***Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case.***  Interim Order ¶¶ 3, 18.

(d)    ***Waiver or Modification of the Automatic Stay.***  Interim Order ¶ 9.

(e)    ***Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit.***  Not applicable.

(f)    ***Establishment of Deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation or entry of a confirmation order.***  Not applicable.

(g)    ***Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.***  Interim Order ¶¶ 7, 15.

(h) ***Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.*** Interim Order ¶¶ 3, 9, 20.

(i) ***Indemnification of Any Entity.*** The Debtors anticipate that the Final DIP Agreement will contain customary indemnification provisions.

(j) ***Release, Waiver or Limitation on Rights under Section 506(c).*** Interim Order ¶¶ 10, 11.

(k) ***Liens Granted on Claims Arising Under Chapter 5.*** Interim Order ¶¶ 6, 7, 13.

4.    In accordance with Rule 4001-2(a)(i)(A)-(G) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors draw the Court's attention to certain material provisions of the DIP Term Sheet and in the relief set forth in the attached Interim Order:

(a) **Binding the Estate to Validity, Perfection, or Amount of Secured Debt**. Although the Financing Arrangement includes certain stipulations by the Debtors relating to the validity, amount and perfection of the prepetition liens, the Financing Arrangement reserves the right of parties in interest, including any committee, to file a motion or application (i) challenging the amount, validity, enforceability, priority or extent of the Prepetition Indebtedness or the Prepetition Secured Lenders' security interests in and liens upon the Prepetition Collateral or (ii) asserting any claims or causes of action against the Prepetition Secured Lenders on behalf of the Debtors' estates. The Interim Order reserves for 60 days after appointment the right of a statutory committee of creditors to challenge the validity or perfection of the liens securing the Prepetition Credit Agreement. Interim Order ¶¶ 3, 18.

(b) **Waiver of Section 506(c) Surcharge.** The proposed waiver of the estates' rights will be effective only after entry of the Final DIP Order granting such relief. Interim Order ¶ 10.

(c) **Liens on Avoidance Actions.** Bank of America (for its own benefit and the benefit of the DIP Lenders) will not be granted liens on the Debtors' Avoidance Actions; however, subject to entry of the Final DIP Order, Bank of America (for its own benefit and the benefit of the DIP Lenders) will be granted liens on any proceeds or property recovered in respect of any Avoidance Actions. Interim Order ¶¶ 6, 7, 13.

(d)    **Priming Lien.** The DIP Term Sheet provides for a priming lien with the consent of the Required Lenders (as defined in the Prepetition Credit Agreement). DIP Term Sheet ¶ 13; Interim Order ¶ 7.

5.    These provisions were negotiated and are necessary for the Debtors to procure the financing made available under the DIP Term Sheet in a sufficient amount and on a timely basis.

## Background

6.    On July 22, 2008, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Jurisdiction and Venue

7.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The SemGroup Companies' Business

8.    The SemGroup Companies and their affiliates provide gathering, transportation, storage, distribution, marketing, and other midstream services primarily to independent producers and refiners of petroleum products located along the North American energy corridor from the Gulf Coast region to central Canada and along the West Coast of the United Kingdom. Their assets primarily consist of pipelines, gathering systems, processing plants, storage facilities, terminals, and other distribution facilities located between North

American production and supply areas, including the Gulf Coast, Mid-Continent and Alberta, Canada, and areas of high demand such as the Midwest region of the United States. The SemGroup Companies and their affiliates also have storage, terminal, and marine facilities in Milford Haven in the United Kingdom with pipeline connectivity to nearby refiners that enable the SemGroup Companies to supply product to the East Coast market of the United States.

### Relief Requested

9.     The Debtors request that the Court authorize SemCrude, L.P., as Borrower and authorize SemOperating G.P., L.L.C., SemGroup, L.P., and each of SemGroup, L.P.'s debtor subsidiaries (each a "Guarantor" and together with the Borrower, the "Loan Parties"), as debtors and debtors in possession in these chapter 11 cases, to obtain senior secured, superpriority, postpetition financing up to an aggregate principal amount of $250,000,000 from Bank of America, as administrative agent, and certain other lenders party to the DIP Facility, pursuant to the terms of this motion, the Interim Order, any Final DIP Order (defined below), the DIP Term Sheet, and the Final DIP Agreement.

10.     In addition, Bank of America has requested that the Fee Letters and the contents thereof be treated as confidential information pursuant to Bankruptcy Code section 107 and Bankruptcy Rule 9018. The Debtors shall provide copies of the Fee Letters to the Court, any statutory committee appointed in these chapter 11 cases and the Office of the United States Trustee for the District of Delaware, but shall not file the Fee Letters with the Court. The Debtors request that the DIP Orders provide that the parties receiving copies of the Fee Letters be prohibited from disclosing any of their contents to third parties, including, without limitation, in pleadings filed with the Court or on the record in these chapter 11 cases.

11.     Pursuant to the proposed Financing Arrangement, all loans and obligations provided by the DIP Lenders, will:

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, constitute superpriority claims against each of the Debtors, with priority over any and all administrative expenses, adequate protection claims and all other claims of any kind asserted against the Debtors, including the claims of the Prepetition Secured Lenders for adequate protection;

(b)     Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on and security interest in all tangible and intangible pre- and postpetition property of the Debtors' estates not subject to valid, perfected, and non-avoidable liens as of the Commencement Date, other than the Avoidance Actions, but subject to entry of the Final DIP Order, any proceeds or property recovered in respect of any Avoidance Actions;

(c)     Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on and security interest in all tangible and intangible pre- and postpetition property of the Debtors that is subject to valid, perfected and non-avoidable liens; and

(d)     Pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on and security interest in all of the collateral that is subject to existing liens that secure the obligations of the Debtors under or in connection with the Prepetition Credit Agreement (defined below).

12.     As set forth above, the Debtors' obligations under the DIP Facility will be senior to all obligations under the Prepetition Credit Agreement (defined below).  As such, the liens created under the DIP Facility are priming liens with respect to liens currently held by the Prepetition Secured Lenders.  The Required Lenders (as defined in the Prepetition Credit Agreement) have consented to the granting of the liens described in paragraphs 11(a) and (d) hereof.  In addition, the Debtors submit that the Prepetition Secured Lenders are adequately protected as described herein and in the Interim Order.

13.     Pending the entry of the final order approving the DIP Facility (the "Final DIP Order"), the Debtors request that the Court (A) authorize the Debtors, on an interim basis,

(i) to borrow up to $150,000,000 under the DIP Facility, (ii) to use cash collateral as provided in the Interim Order, (iii) to grant to the DIP Lenders the liens and superpriority claims described herein and in the Interim Order, and (iv) to provide adequate protection in favor of the Prepetition Secured Lenders, as described herein and in the Interim Order, (B) approve the proposed notice of the final hearing to consider approval of the DIP Facility (the "Final Hearing") and the adequacy of the proposed service thereof, and (C) schedule the Final Hearing.

### The Prepetition Credit Agreement

14.　　Prior to the Commencement Date, the Prepetition Secured Lenders made certain loans and other extensions of credit to the Debtors pursuant to and in accordance with the terms and conditions of a credit agreement (the "Prepetition Credit Agreement," and together with all other documentation executed in connection therewith, the "Prepetition Loan Documents"). The parties to the Prepetition Loan Documents include: (i) SemCrude, L.P., as the US Borrower; (ii) SemCams Midstream Company, as the Canadian Borrower; (iii) SemGroup, L.P. and SemOperating G.P., L.L.C., as Guarantors; (iv) Bank of America, N.A., as Administrative Agent and L/C Issuer ("Bank of America"); (v) the Prepetition Secured Lenders; (vi) Banc of America Securities LLC, as Joint Lead Arranger and Sole Book Manager; (vii) BNP Paribas, as Joint Lead Arranger and Co-Syndication Agent; (viii) Bank of Montreal d/b/a "Harris Nesbitt," as Co-Syndication Agent; and (ix) Bank of Oklahoma, N.A. and The Bank of Nova Scotia, as Co-Documentation Agents.

15.　　As of the Commencement Date, the Debtors remained obligated to the Prepetition Secured Lenders for the following approximate amounts under the Prepetition Loan Documents: (i) $1.72 billion to the Working Capital Lenders (as defined in the Prepetition Credit Agreement) (ii) $665 million to the Revolver Lenders (as defined in the Prepetition Credit Agreement); (iii) $141 million to the US Term Lenders (as defined in the Prepetition Credit

Agreement), in each case in respect of loans made, letters of credit issued or other financial accommodations made by the Prepetition Secured Lenders pursuant to, and in accordance with, the Prepetition Loan Documents, (iv) holders of Lender Swap Obligations in amounts yet to be determined, and (v) holders of Secured Account Exposure for any account funding or overdraft arrangement in amounts yet to be determined, plus certain accrued and unpaid interest and costs and expenses (collectively, the "Prepetition Indebtedness").

16. Pursuant to an (i) Amended and Restated Security Agreement, dated May 31, 2005; (ii) Canadian Security Agreement, dated March 16, 2005; (iii) US Borrower Guaranty of Canadian Borrower's Obligations, Lender Swap Obligations and Secured Account Exposure, dated March 16, 2005; (iv) Canadian Borrower Guaranty of US Borrower's Obligations, Lender Swap Obligations and Secured Account Exposure, dated March 16, 2005; (v) Parent Guaranty, dated March 16, 2005; (vi) US Subsidiary Guaranty, dated March 16, 2005; (vii) Canadian Subsidiary Guaranty, dated March 16, 2005; (viii) Pledge Agreement, dated March 16, 2005; and (ix) Canadian Pledge Agreement, dated March 16, 2005 (in each case as amended, restated, modified, ratified or supplemented from time to time, together with any and all other security agreements, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, assignments or other security documents, the "Collateral Documents"), the Debtors granted first priority and second priority liens upon and security interests in the property described in the Collateral Documents (collectively, the "Prepetition Collateral") to Bank of America, as administrative agent, for the benefit of the Prepetition Secured Lenders.

17. In addition, as of the Commencement Date, substantially all of the Debtors' cash, securities, or other property (and the proceeds therefrom) and other amounts on

deposit or maintained by the Debtors in any account or accounts with the Prepetition Secured Lenders are subject to valid first priority and second priority liens under the Prepetition Loan Documents for the benefit of the Prepetition Secured Lenders.

## Cash Collateral

18.     On the Commencement Date, the Debtors filed a Motion for Authorization to (i) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363(c), (ii) Provide Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361 and 363, and (iii) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) [Docket No. 18] (the "Cash Collateral Motion"), seeking (i) authority to use Cash Collateral (as defined in the Cash Collateral Motion) pursuant to section 363 of the Bankruptcy Code; (ii) authority to grant the Debtors' prepetition secured lenders adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code; and (iii) modification of the automatic stay for the limited purposes provided in the proposed interim order submitted therewith.

19.     On July 23, 2008, the Court entered an Interim Order (I) Authorizing the Debtors' Limited Use of Cash Collateral, (II) Granting Replacement Liens, Adequate Protection and Administrative Expense Priority to Certain Pre-Petition Secured Parties and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 [Docket No. 64] (the "Cash Collateral Order."). Under the Cash Collateral Order, the Debtors were authorized to use Cash Collateral (as defined in the Cash Collateral Order) from the Commencement Date through August 15, 2008 (subject to earlier termination as set forth in the Cash Collateral Order).

20.     Under the Cash Collateral Order, the Debtors granted Bank of America, for the benefit of the Prepetition Secured Lenders: (i) a security interest in and lien on the Prepetition Collateral and all other of the Debtors' now owned and hereafter-acquired real and personal property, assets and rights, of any kind or nature, wherever located, and the proceeds,

products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise (other than causes of action arising under the Bankruptcy Code) and (ii) an allowed administrative claim with priority over all other administrative claims in these chapter 11 cases (subject only to the Carve-Out, as defined in the Cash Collateral Order), including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code, which administrative claims shall have recourse to and be payable from all pre-and postpetition property of the Debtors including, without limitation, the proceeds or property recovered in respect of any avoidance actions, subject to entry of a final order from this Court. As additional adequate protection, the Debtors also agreed to, among other things, pay to Bank of America, for the benefit of the Prepetition Secured Lenders, to reduce the outstanding principal balance of the Prepetition Indebtedness, all proceeds (which will be in the form of cash) from a sale, lease, or disposition of the Collateral (as defined in the Cash Collateral Order), other than Ordinary Course Proceeds, after deducting the necessary direct costs of the Debtors in connection therewith.

## Debtors' Proposed Postpetition Financing Arrangements

### A.    Need for Postpetition Financing

21.    The Debtors lack sufficient unencumbered funds with which to operate their business on an ongoing basis. Absent extension, the use of Cash Collateral terminates on August 15, 2008. Accordingly, pending Court approval of postpetition financing, the Debtors have an urgent and immediate need for cash to continue to operate their business.

22.    As described more fully in the Declaration of Terrence Ronan in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief filed on the Commencement Date, and admitted into evidence at the hearing on the use of Cash Collateral, the Debtors' ability to maintain business relationships with their customers, pay their employees,

and satisfy other critical operating expenses is essential to the Debtors' ability to survive, and the cash available under the Cash Collateral Order is not sufficient to operate the business beyond a very short term. In particular, the Debtors are unable to purchase sufficient inventory for the operation of their business without borrowing additional funds.

**B.     Background of the Postpetition Financing Arrangement**

23.     Prior to the Commencement Date and thereafter, the Debtors, AP Services, LLC and The Blackstone Group LP surveyed various sources of postpetition financing, including financing from the Prepetition Secured Lenders and third parties. In exploring postpetition financing with third parties, the Debtors recognized that the obligations owed to the Prepetition Secured Lenders are secured by substantially all of the Debtors' property, such that (i) the liens of the Prepetition Secured Lenders would have to be primed, either consensually or non-consensually, to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit with liens junior to the liens of the Prepetition Secured Lenders.

24.     Because the Debtors were unable to find a lender willing to extend credit with liens junior to the liens of the Prepetition Secured Lenders, the Debtors were left with no alternative but to seek a priming postpetition financing facility. The Prepetition Secured Lenders advised the Debtors' representatives that they would not consent to be primed by another lender group, therefore, borrowing from another postpetition lender or lending group that required security senior to the Prepetition Secured Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In light of the risk involved and the fact that the DIP Lenders, as a subset of the Prepetition Secured Lenders, were most familiar with the Debtors' business and

financing needs, and were well positioned to timely respond to the Debtors' request for financing, the Debtors determined that the DIP Lenders' proposed DIP Facility is the best financing option available under the circumstances. In addition, pursuant to the proposed Financing Arrangement, the Debtors propose to pledge to the DIP Lenders and the Prepetition Secured Lenders the equity in the Borrower's "unrestricted" subsidiaries, which will, among other things, provide adequate protection, as discussed below, to the Prepetition Secured Lenders.

25.     Consequently, the Debtors have determined that entering into the DIP Term Sheet with the DIP Lenders is appropriate under the circumstances, addresses the Debtors' working capital and liquidity needs, and should be approved.

**C.      Implementation of the DIP Term Sheet**

26.     The Debtors and the DIP Lenders engaged in extensive, arms' length negotiations with respect to the terms and conditions of the proposed DIP Facility. These negotiations culminated in agreement upon the proposed financing, including the form of the DIP Term Sheet. Significantly, the DIP Term Sheet allows the Debtors to immediately use a $150,000,000 commitment from the DIP Lenders, pending this Court's entry of the Interim Order. This commitment should allow the Debtors to meet all of their administrative obligations during the early stages of these chapter 11 cases and to purchase inventory critical to the operation of the Debtors' business.

27.     The DIP Term Sheet provides that the funds available under the DIP Facility will be available to provide the Debtors with working capital and funds for other general corporate purposes solely in accordance with a detailed weekly budget covering a 13-week period (the "Budget") in form and substance satisfactory to Bank of America, as Administrative

Agent for the DIP Lenders. The Budget is designed to implement a sale process, as described in the DIP Term Sheet.

28.    The Debtors and Bank of America anticipate they will finalize and file with the Court the Final DIP Agreement prior to the interim hearing on this Motion.

**D.    Use of Cash Collateral and Proposed Adequate Protection**

29.    In order to address their working capital needs and continue to operate their business, the Debtors also require the use of cash collateral. As discussed above, the Debtors currently have authority pursuant to the Cash Collateral Order to use the Prepetition Secured Lenders' Cash Collateral until August 15, 2008. Pursuant to the proposed Financing Arrangement, the Debtors will use the Prepetition Collateral, including Cash Collateral, provided, that the Prepetition Secured Lenders will be granted adequate protection, as described below.

30.    The Prepetition Secured Lenders are entitled, pursuant to sections 105, 361, 363, and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent there is a diminution in the value of such collateral from and after the Commencement Date. As adequate protection for any such diminution in value, the Prepetition Secured Lenders shall be granted a valid, perfected, replacement security interest in and lien on all of the Collateral (as defined in the Interim Order), including, without limitation, subject to entry of a Final DIP Order, the proceeds or property recovered in respect of Avoidance Actions (the "Adequate Protection Liens"). The Adequate Protection Liens shall be subject and subordinate only to (i) valid, perfected and enforceable prepetition liens, if any, which are senior to the Prepetition Secured Lenders' liens or security interests as of the Commencement Date, (ii) the liens granted to Bank of America, for its own

benefit and for the benefit of the DIP Lenders, and any liens on the Collateral senior to such liens, and (iii) the Carve Out (as defined in the Interim Order). The Adequate Protection Liens also include all security interests and liens granted to Bank of America, for its own benefit and for the benefit of the Prepetition Secured Lenders, pursuant to the Cash Collateral Order.

31. The Debtors also propose, as adequate protection, to pay Bank of America, for the benefit of the Prepetition Secured Lenders, to reduce the outstanding principal balance of the Prepetition Indebtedness, all proceeds from a sale, lease or other disposition of the Collateral (as defined in the Interim Order), after deducting necessary costs of the Debtors in connection therewith, provided, that all of the Debtors' obligations under the DIP Facility have been paid in full, all commitments under the DIP Facility have been terminated, and all outstanding letters of credit issued under the DIP Facility have been cash collateralized.

32. In addition, the Debtors propose to grant and/or pay the Prepetition Secured Lenders the following as adequate protection:

(a) superpriority administrative claims under section 507(b) of the Bankruptcy Code, subject and subordinate only to the Carve Out (as defined in the Interim Order) and the superpriority claims granted in respect of the Debtors' obligations under the DIP Facility;

(b) payment of reasonable professional fees and expenses incurred by Bank of America, as administrative agent to the Prepetition Secured Lenders under the Prepetition Credit Agreement (whether pre- or postpetition);

(c) payment of reasonable fees and expenses of Kaye Scholer LLP, Potter Anderson & Corroon LLP, Capstone Advisory Group, LLC and any other professionals or advisors retained by or on behalf of Bank of America, as administrative agent to the Prepetition Secured Lenders.

33. The foregoing replacement liens, claims, and payments are to be allowed because, among other things, the Debtors will continue to use Cash Collateral and other

collateral which secures the claims and obligations of the Prepetition Secured Lenders in the Debtors' ongoing business. The proposed forms of adequate protection are needed for the purpose of, among other things, protecting the Prepetition Secured Lenders' claims, obligations, and collateral interest from potential depreciation.

## The DIP Facility Should Be Authorized

34. The Debtors only have use of cash collateral through August 15, 2008. However, the cash collateral is not sufficient to operate the business beyond a very short term. Approval of the DIP Term Sheet will provide the Debtors with immediate and ongoing access to borrowing availability to purchase inventory and pay their current and ongoing operating expenses. Unless these expenditures are made, the Debtors could be forced to cease operations, which could result in irreparable harm to their business and substantial deterioration of the going concern value of the business. The credit provided under the DIP Facility will enable the Debtors to continue to satisfy their clients' and vendors' needs, provide services, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Facility will also provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees, vendors, and clients, thereby promoting continuation of the business. Accordingly, the timely approval of the relief requested herein is imperative.

35. The Debtors propose to obtain the financing set forth in the DIP Facility by providing, inter alia, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

36. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

37. Section 364(d)(1) of the Bankruptcy Code further provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

38. The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow up to $150,000,000 under the DIP Facility and to use such proceeds to fund their operations. The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

39. Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders extensively and at

arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

40.     Furthermore, section 364 does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

41.     Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent the proposed superpriority claims and priming liens. The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of their sound business judgment.

42.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

43.     Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the continued use of Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt on August 15, 2008, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Secured Lenders in the Debtors' Cash Collateral are protected. Accordingly, as part of the DIP Facility requested herein, the Debtors' request to use Cash Collateral in the operation of their business and administration of these chapter 11 cases should be approved.

## The Proposed Adequate Protection Should Be Authorized

44.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See MNBank Dallas, N.A. v. O'Conner (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987) ("the courts have

considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis"); *Martin v. U.S. (In re Martin)*, 761 F.2d 472 (8th Cir. 1985) ("adequate protection, must . . . be determined on a case-by-case basis, permitting debtors maximum flexibility in structuring a proposal for adequate protection."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (same). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

45.     The Required Lenders (as defined in the Prepetition Credit Agreement) have consented to the Debtors' use of Cash Collateral (as defined in the Interim Order) and the Debtors' entry into the DIP Term Sheet in consideration for the adequate protection provided to them. Moreover, the replacement liens, cash payments and other protections offered to the Prepetition Secured Lenders will sufficiently protect their interest in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of the Bankruptcy Code and the Debtors submit that the Prepetition Secured Lenders are adequately protected despite being primed.

### The Automatic Stay Should Be Modified on a Limited Basis

46.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens and (ii) implement the terms of the proposed interim and final orders.

47. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

48. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

49. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use up to $150,000,000 under the DIP Facility on an interim basis, pending entry of a final order, to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest and (b) schedule a hearing to consider entry of a final order.

50. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans and letters of credit under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees, and clients of the Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business,

to the detriment of all parties in interest.  Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

## Waiver of Bankruptcy Rules 6004(a) and (h)

51.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

52.    No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on: (a) the Office of the United States Trustee for the District of Delaware, (b) those creditors listed on the Debtors' Consolidated List of Creditors Holding 30 Largest Unsecured Claims, (c) counsel to Bank of America, N.A., as administrative agent for the Prepetition Secured Lenders, (d) all Prepetition Secured Lenders, (e) General Electric Capital Corporation, as administrative agent for SemCrude Pipeline, L.L.C.'s secured prepetition lenders, (f) Wells Fargo National Bank, National Association, as indenture trustee for the Debtors' prepetition bondholders, (g) counsel for the Ad Hoc Committee of Noteholders, and (h) all parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request entry of an order, substantially similar to the proposed form of order attached hereto, granting the relief requested herein and such other and further relief as the Court may deem just.

Dated: July 28, 2008
Wilmington, Delaware

Respectfully submitted,

_____
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
L. Katherine Good (No. 5101)
Maris J. Finnegan (*DE admission pending*)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
       knight@rlf.com
       good@rlf.com
       mfinnegan@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Harvey R. Miller
Michael P. Kessler

-and-

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Martin A. Sosland
Sylvia A. Mayer

*Proposed Attorneys for the Debtors and Debtors-in-Possession*