## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **SEMCRUDE, L.P., *et. al.*,** | : | **Case No. 08-11525 (BLS)** |
| | : | |
| **Debtors.** | : | **Jointly Administered** |
| | : | |

-----------------------------------------------------------x

## DISCLOSURE STATEMENT FOR FOURTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Mark D. Collins
John H. Knight
(302) 651-7700

- and -

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Martin A. Sosland
Sylvia A. Mayer
(214) 746-7700

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated: September 25, 2009

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. EASTERN TIME ON OCTOBER 21, 2009 UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE.

THIS DISCLOSURE STATEMENT, THE FOURTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED SEPTEMBER 25, 2009, ANNEXED HERETO AS <u>EXHIBIT B</u>, THE OTHER EXHIBITS ANNEXED HERETO, THE ACCOMPANYING BALLOTS AND THE RELATED MATERIALS DELIVERED TOGETHER HEREWITH ARE BEING FURNISHED BY THE DEBTORS TO RECORD HOLDERS OF IMPAIRED CLAIMS KNOWN TO THE DEBTORS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION BY THE DEBTORS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE SECTION V.K., "THE PLAN – CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN." THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT UNDER "CERTAIN FACTORS AFFECTING THE DEBTORS" IN SECTION IX HEREOF.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

**ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WILL BE DEEMED TO CONSTITUTE APPROVAL OF THE MANAGEMENT INCENTIVE PLAN FOR PURPOSES OF SECTIONS 162(m) AND 422 OF THE TAX CODE, AS WELL AS SECTION 16 OF THE SECURITIES EXCHANGE ACT AND ANY STOCK EXCHANGE LISTING REQUIREMENT.**

**NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT**

**OR PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL THE SECURITIES DESCRIBED HEREIN AND IS NOT A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES IN ANY STATE WHERE SUCH OFFER OR SALE IS NOT PERMITTED.**

NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT HERETO EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT HERETO. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF AND THE DEBTORS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION CONTAINED HEREIN.**

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS, THE VALUE OF THEIR ASSETS OR THE VALUES OF THE SECURITIES DESCRIBED HEREIN TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND/OR EQUITY INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN

OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND SUCH PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OR PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE SEMGROUP COMPANIES, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS, DISTRIBUTIONS ON CLAIMS, AND LIQUIDATION OF THE SEMGROUP COMPANIES' ASSETS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. SEE SECTION IX, "CERTAIN FACTORS AFFECTING THE DEBTORS" FOR A DESCRIPTION OF VARIOUS RISKS RELATING TO THE SECURITIES TO BE ISSUED PURSUANT TO THE PLAN AND RISKS ASSOCIATED WITH THE BUSINESS OF THE SEMGROUP COMPANIES. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, NOR CAN THE IMPACT OF ANY SUCH FACTORS BE ASSESSED.

**HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH**

**RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.**

**TABLE OF CONTENTS**

I.   OVERVIEW OF CHAPTER 11 PLAN .................................................................. 2
     A.   INTRODUCTION ..................................................................................... 2
     B.   CHAPTER 11 PLAN .................................................................................. 2
          1.   Distributable Value ......................................................................... 3
          2.   Adequate Protection ........................................................................ 4
          3.   Administrative Expense Claims ........................................................ 4
          4.   Postpetition Financing Claims .......................................................... 6
          5.   Professional Compensation and Reimbursement Claims ..................... 6
          6.   Priority Tax Claims .......................................................................... 6
          7.   Prepetition Lenders ......................................................................... 6
          8.   Other Secured Claims ...................................................................... 7
          9.   Producers' Claims ........................................................................... 7
          10.  Producers' Settlement ...................................................................... 8
          11.  Other Twenty-Day Claims Settlement .............................................. 13
          12.  Holders of Senior Notes Claims and General Unsecured Claims ........... 16
          13.  Reclamation Claims ........................................................................ 17
          14.  Release of Third Parties ................................................................... 17
          15.  Summary of Classification and Treatment of Claims and Equity
               Interests ........................................................................................ 17
     C.   CREDITORS' COMMITTEE STATEMENT REGARDING GLOBAL
          COMPROMISE ........................................................................................ 28
     D.   PRODUCERS' COMMITTEE STATEMENT .................................................. 30
     E.   POSITION STATEMENT OF CERTAIN TRADING PARTNERS AND
          CUSTOMERS OF THE DEBTORS ............................................................... 30
     F.   RESERVATION OF RIGHTS ...................................................................... 31
II.  INTRODUCTION TO DISCLOSURE STATEMENT ............................................ 31
     A.   PURPOSE OF THIS DISCLOSURE STATEMENT ......................................... 32
     B.   HOLDERS OF CLAIMS ENTITLED TO VOTE ............................................. 32
     C.   VOTING PROCEDURES ........................................................................... 32
     D.   CONFIRMATION HEARING ...................................................................... 34
III. GENERAL INFORMATION ............................................................................ 34
     A.   BACKGROUND OF THE SEMGROUP COMPANIES ..................................... 34

B.   REORGANIZED SEMGROUP COMPANIES ................................................... 35

    1.   SemCrude (including SemCanada Crude) ............................................. 38

    2.   SemStream ................................................................................. 42

    3.   SemEuro ..................................................................................... 44

    4.   SemCAMS .................................................................................. 45

    5.   SemMexico ................................................................................. 46

    6.   SemGas ...................................................................................... 47

C.   OFFICE FACILITIES ............................................................................... 49

D.   EMPLOYEES ........................................................................................... 49

E.   REGULATION .......................................................................................... 49

    1.   General ...................................................................................... 49

    2.   Regulation of United States Pipeline and Storage Operations ............... 50

    3.   Regulation of Canadian Gathering, Processing, Transportation and Marketing Businesses ................................................................ 53

    4.   Regulation of United Kingdom Operations ........................................ 53

    5.   Regulation of Mexican Operations ................................................... 54

    6.   Environmental, Health and Safety Regulation .................................... 54

F.   RELATIONSHIP WITH SGLP .................................................................... 58

G.   PREPETITION INDEBTEDNESS ............................................................... 59

    1.   Prepetition Credit Agreement ........................................................ 60

    2.   White Cliffs Credit Agreement ...................................................... 61

    3.   SemEuro Credit Agreement .......................................................... 61

    4.   Senior Notes Indenture ................................................................. 62

    5.   Manchester Securities Corp. and Alerian Finance Partners Term Loan ......................................................................................... 62

IV.   THE CHAPTER 11 CASES ......................................................................... 63

A.   EVENTS LEADING UP TO COMMENCEMENT OF CHAPTER 11 CASES ................................................................................................... 63

B.   SUPPLIER PROTECTION PROGRAM ........................................................ 64

C.   OTHER FIRST DAY ORDERS .................................................................... 64

    1.   Case Administration Orders ........................................................... 64

    2.   Critical Obligations ...................................................................... 64

3. Business Operations ............................................................. 65
4. Financial Operations ............................................................. 65
D. CHAPTER 11 DEBTOR IN POSSESSION FINANCING ................. 65
E. PRODUCERS' CLAIMS AND LITIGATION ................................. 66
1. Producers' Litigation ............................................................. 66
F. TWENTY-DAY CLAIMS ............................................................. 69
1. The Debtors' Schedules of Assets and Liabilities ................... 70
2. Individual Creditor Objections ................................................ 70
3. Resolution of Global Legal Objections..................................... 71
G. PRODUCERS' SETTLEMENT ..................................................... 72
1. Overview................................................................................. 72
2. Payment to Producer Representative ...................................... 73
3. First Purchaser Producer Twenty-Day Claims ........................ 73
4. Secured First Purchaser Producer Claims................................ 73
5. Reimbursement of Professional Fees ...................................... 74
6. Producer Deficiency Claims ................................................... 74
7. Producer State-Specific Adversary Proceedings ..................... 74
8. Twenty-Day Claims ................................................................ 75
9. Conditions to Effectiveness .................................................... 76
H. OTHER TWENTY-DAY CLAIMS SETTLEMENT ....................... 77
1. Overview................................................................................. 77
2. Release of Litigation .............................................................. 79
I. RECLAMATION CLAIMS ........................................................... 80
J. APPOINTMENT OF OFFICIAL COMMITTEES ........................... 80
1. Creditors' Committee.............................................................. 80
2. Producers' Committee ............................................................ 81
K. ASSET DISPOSITIONS ............................................................... 81
1. SemMaterials Disposition and SGLP Settlement ..................... 81
2. SemFuel ................................................................................. 83
L. EMPLOYEE INCENTIVE AND SEVERANCE PLANS.................. 83
1. Incentive Plan......................................................................... 83

|  |  | 2. | Severance Program | 83 |
| M. |  | EXCLUSIVITY | | 84 |
| N. |  | ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 84 |
| O. |  | INVESTIGATIONS | | 85 |
|  | 1. | SEC | | 85 |
|  | 2. | CFTC | | 86 |
|  | 3. | Special Committee | | 86 |
|  | 4. | Examiner Appointment | | 86 |
| P. |  | CREDITORS' COMMITTEE'S COMPLAINT | | 86 |
| Q. |  | MANAGEMENT COMMITTEE | | 87 |
|  | 1. | Adversary Proceedings | | 87 |
|  | 2. | Settlement | | 88 |
|  | 3. | Kivisto Designees | | 89 |
| R. |  | OTHER ADVERSARY PROCEEDINGS | | 89 |
|  | 1. | Stayed Crude Oil Cases | | 89 |
|  | 2. | Producers' Litigation Cases | | 90 |
|  | 3. | Tender Adversary Cases | | 90 |
|  | 4. | Catsimatidis Proceedings | | 91 |
|  | 5. | Other Adversary Proceedings | | 91 |
| S. |  | CREDITORS' COMMITTEE RULE 2004 MOTIONS | | 93 |
| T. |  | RELATED CANADIAN INSOLVENCY CASES | | 95 |
|  | 1. | Amended and Restated Initial Order | | 95 |
|  | 2. | Claims Process and Canadian Bar Date | | 95 |
|  | 3. | Cross Border Restructuring | | 96 |
|  | 4. | The Canadian Plans | | 96 |
| V. | THE PLAN | | | 98 |
| A. | OVERVIEW | | | 98 |

B.    TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, POSTPETITION FINANCING CLAIMS, PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS AND PRIORITY TAX CLAIMS; PAYMENT OF SENIOR NOTES INDENTURE TRUSTEE FEES AND US TERM LENDER GROUP FEES ........................................................................................... 99

    1.    Administrative Expense Claims................................................ 99

    2.    Postpetition Financing Claims ............................................... 100

    3.    Professional Compensation and Reimbursement Claims ...................... 100

    4.    Priority Tax Claims............................................................. 101

    5.    Senior Notes Indenture Trustee Fees ...................................... 101

    6.    US Term Lender Group Fees ................................................. 102

C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ....................................................................... 102

    1.    Classes 1 through 26 – Priority Non-Tax Claims (Unimpaired) .......... 102

    2.    Classes 27 through 52 – Secured Tax Claims (Unimpaired)................ 103

    3.    Classes 53 through 55 – Secured First Purchaser Producer Claims (Impaired) ................................................................... 103

    4.    Classes 70 through 95 – Secured Working Capital Lender Claims (Impaired) ................................................................... 104

    5.    Classes 96 through 121 – Secured Revolver/Term Lender Claims (Impaired) ................................................................... 105

    6.    Class 122 – White Cliffs Credit Agreement Claim (Impaired) ............. 106

    7.    Classes 123 through 148 – Other Secured Claims (Unimpaired).......... 106

    8.    Classes 149 through 174 – Senior Notes Claims (Impaired)................ 107

    9.    Classes 175 through 200 – Lender Deficiency Claims (Impaired)........ 108

    10.    Classes 201 through 226 – General Unsecured Claims (Impaired)....... 109

    11.    Classes 227 through 252 – Intercompany Claims (Impaired) .............. 110

    12.    Classes 253 through 278 – Intercompany Equity Interests (Unimpaired)................................................................. 111

    13.    Class 279 – SemGroup Equity Interests (Impaired) ........................ 111

D.    ACCEPTANCE OR REJECTION OF THE PLAN ......................... 112

    1.    Impaired Classes to Vote .................................................... 112

    2.    Acceptance by Class of Creditors.......................................... 112

| | | | |
|---|---|---|---|
| | 3. | Cramdown | 112 |
| | 4. | Controversy Concerning Impairment | 112 |
| E. | | IMPLEMENTATION OF THE PLAN | 113 |
| | 1. | Non-Substantive Consolidation | 113 |
| | 2. | Restructuring Transactions | 113 |
| | 3. | Producer Representative | 114 |
| | 4. | Litigation Trust Arrangements | 114 |
| | 5. | Section 1145 Securities | 115 |
| | 6. | Corporate Action | 115 |
| | 7. | Existence | 116 |
| | 8. | Vesting of Assets in the Reorganized Debtors | 116 |
| | 9. | Cancellation of Debt and Equity Securities and Related Obligations | 116 |
| | 10. | Effectuating Documents and Further Transactions | 117 |
| | 11. | Compensation and Benefit Plans | 117 |
| F. | | PRESERVATION AND PROSECUTION OF CAUSES OF ACTION HELD BY THE DEBTORS | 117 |
| G. | | PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS OR ASSERTED ADMINISTRATIVE EXPENSES UNDER THE PLAN | 118 |
| | 1. | Objections to Claims; Prosecution of Disputed Claims | 118 |
| | 2. | No Distributions Pending Allowance | 120 |
| | 3. | Estimation of Claims | 120 |
| | 4. | Payments and Distributions on Disputed Claims | 120 |
| H. | | LITIGATION TRUST | 122 |
| I. | | PROVISIONS REGARDING DISTRIBUTIONS | 122 |
| | 1. | Time and Manner of Distributions | 122 |
| | 2. | Timeliness of Payments | 124 |
| | 3. | Distributions by the Disbursing Agent | 124 |
| | 4. | Manner of Payment under the Plan | 125 |
| | 5. | Delivery of Distributions | 125 |
| | 6. | Fractional New Common Stock / Warrants | 125 |
| | 7. | Undeliverable Distributions | 125 |

|  |  |  |  |
|---|---|---|---|
|  | 8. | Time Bar to Cash Payments | 126 |
|  | 9. | Distributions after Effective Date | 126 |
|  | 10. | Setoffs | 126 |
|  | 11. | Allocation of Plan Distributions between Principal and Interest | 127 |
|  | 12. | Record Date | 127 |
|  | 13. | Senior Notes Indenture Trustee as Claim Holder | 127 |
|  | 14. | Limited Recoveries | 127 |
| J. |  | TREATMENT OF EXECUTORY CONTRACTS AND EXPIRED LEASES | 127 |
|  | 1. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 127 |
|  | 2. | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 128 |
|  | 3. | Inclusiveness | 128 |
|  | 4. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 128 |
|  | 5. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 129 |
|  | 6. | Insurance Policies | 129 |
| K. |  | CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN | 129 |
|  | 1. | Conditions Precedent to Effective Date of the Plan | 129 |
|  | 2. | Failure of Conditions Precedent | 131 |
|  | 3. | Waiver of Conditions Precedent | 132 |
| L. |  | EFFECT OF CONFIRMATION | 132 |
|  | 1. | Title to and Vesting of Assets | 132 |
|  | 2. | Discharge of Claims and Termination of Equity Interests | 132 |
|  | 3. | Discharge of Debtors | 132 |
|  | 4. | Injunction on Claims | 133 |
|  | 5. | Term of Existing Injunctions or Stays | 134 |
|  | 6. | Exculpation | 134 |
|  | 7. | Preservation of Causes of Action / Reservation of Rights | 135 |
|  | 8. | Injunction on Causes of Action | 135 |
|  | 9. | Limited Release of Officers and Employees | 136 |

| | | | |
|---|---|---|---|
| | 10. | Releases by the Debtors | 136 |
| | 11. | Releases by Holders of Claims and Equity Interests | 136 |
| | 12. | Releases by Members of Creditors' Committee | 137 |
| | 13. | Releases by Members of Producers' Committee | 137 |
| | 14. | Release of Guarantors | 137 |
| M. | | MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN | 138 |
| | 1. | Modification of the Plan | 138 |
| | 2. | Revocation or Withdrawal of the Plan | 138 |
| N. | | MISCELLANEOUS PROVISIONS | 138 |
| | 1. | Dissolution of Creditors' Committee and Producers' Committee | 138 |
| | 2. | Plan Supplement | 139 |
| | 3. | Payment of Statutory Fees | 139 |
| | 4. | Expedited Tax Determination | 140 |
| | 5. | Post-Confirmation Date Fees and Expenses | 140 |
| | 6. | Substantial Consummation | 140 |
| | 7. | Severability | 140 |
| | 8. | Governing Law | 140 |
| | 9. | Closing of the Chapter 11 Cases | 141 |
| | 10. | No Effect on Downstream Claims | 141 |
| VI. | | REORGANIZED DEBTORS | 141 |
| A. | | FINANCIAL INFORMATION AND VALUATIONS | 141 |
| | 1. | Historical Financial Information | 141 |
| | 2. | Projections | 141 |
| | 3. | Valuation | 151 |
| B. | | CORPORATE GOVERNANCE AND MANAGEMENT OF REORGANIZED SEMGROUP | 154 |
| | 1. | Board of New Holdco | 154 |
| | 2. | Board Committees | 156 |
| | 3. | Executive Officers | 157 |
| | 4. | Management Incentive Plan | 157 |
| C. | | SUMMARY OF CAPITAL STRUCTURE OF THE REORGANIZED SEMGROUP COMPANIES | 158 |

| | | | |
|---|---|---|---|
| | 1. | Exit Financing | 159 |
| | 2. | Second Lien Term Loan Facility | 160 |
| | 3. | White Cliffs Financing | 161 |
| | 4. | SemEuro Financing | 162 |
| | 5. | SemMexico Facility | 163 |
| | 6. | New Common Stock | 164 |
| | 7. | Warrants | 165 |
| | 8. | Certificate of Incorporation and Bylaws | 166 |
| VII. | LITIGATION TRUST | | 166 |
| | A. | ESTABLISHMENT OF THE TRUST; LITIGATION TRUST AGREEMENT | 166 |
| | B. | PURPOSE OF THE LITIGATION TRUST | 167 |
| | C. | FUNDING EXPENSES | 167 |
| | D. | TRANSFER OF ASSETS | 168 |
| | E. | VALUATION OF ASSETS | 168 |
| | F. | LITIGATION; RESPONSIBILITIES OF LITIGATION TRUSTEE | 169 |
| | G. | INVESTMENT POWERS | 169 |
| | H. | ANNUAL DISTRIBUTION; WITHHOLDING | 170 |
| | I. | REPORTING DUTIES | 170 |
| | | 1. Litigation Trust Assets Treated as Owned by Creditors | 170 |
| | | 2. Tax Reporting | 170 |
| | J. | TRUST IMPLEMENTATION | 172 |
| | K. | REGISTRY OF BENEFICIAL INTERESTS | 172 |
| | L. | TERMINATION | 172 |
| | M. | NET LITIGATION TRUST RECOVERY | 172 |
| VIII. | SECURITIES LAW MATTERS | | 173 |
| | A. | ISSUANCE AND RESALE OF 1145 SECURITIES | 173 |
| | B. | LISTING | 175 |
| IX. | CERTAIN FACTORS AFFECTING THE DEBTORS | | 176 |
| | A. | CERTAIN RISKS RELATED TO THE PLAN | 176 |
| | | 1. Undue delay in confirmation of the Plan may significantly disrupt operations of the Debtors | 176 |

2. The Debtors may not be able to obtain confirmation ............................ 177

3. Parties in interest may object to the Debtors' classification of Claims ................................................................................................. 177

4. Certain tax consequences of the Plan raise unsettled and complex legal issues and involve various factual determinations ....................... 178

B. RISKS RELATED TO THE CAPITALIZATION OF THE REORGANIZED SEMGROUP COMPANIES ............................................. 178

C. RISKS RELATED TO THE FINANCIAL AND OPERATIONAL RESULTS OF THE REORGANIZED SEMGROUP COMPANIES ............... 182

D. RISKS RELATED TO THE LITIGATION TRUST ......................................... 191

X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .............. 191

A. CONSEQUENCES TO THE DEBTORS ........................................................ 192

1. Transfer of Property to New Holdco ...................................................... 192

2. Cancellation of Indebtedness Income .................................................... 192

3. Limitations on NOL Carryforwards and Other Tax Attributes ............. 193

B. CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS ......................... 193

1. Consequences of Exchanges Pursuant to the Plan to Claim Holders .... 193

2. Distributions in Discharge of Accrued but Unpaid Interest .................. 195

3. Ownership and Disposition of Second Lien Term Loan Facility .......... 196

4. Ownership and Disposition of New Common Stock ............................. 197

5. Tax Treatment of the Litigation Trust and Holders of Beneficial Interests ................................................................................................. 199

6. Ownership, Disposition and Exercise of Warrants ................................ 201

C. INFORMATION REPORTING AND WITHHOLDING ................................. 201

XI. CLAIMS ALLOWANCE ....................................................................................... 202

A. SCHEDULES OF ASSETS AND LIABILITIES ............................................ 202

B. CLAIMS BAR DATE AND NOTICE OF BAR DATE .................................. 202

C. ALLOWANCE AND IMPAIRMENT OF CLAIMS ....................................... 202

1. Allowed Claims ..................................................................................... 203

2. Impaired Claims ..................................................................................... 203

D. OBJECTIONS TO CLAIMS ........................................................................... 203

XII. VOTING PROCEDURES ....................................................................................... 203

A. HOLDERS OF CLAIMS ENTITLED TO VOTE ........................................... 205

B. VOTE REQUIRED FOR ACCEPTANCE BY A CLASS ............................... 206

C. VOTING PROCEDURES ............................................................. 206

    1. Voting Procedures ............................................................. 206

    2. Withdrawal of Ballot ........................................................ 206

XIII. CONFIRMATION OF THE PLAN ..................................................... 206

A. CONFIRMATION HEARING ....................................................... 206

B. REQUIREMENTS FOR CONFIRMATION OF THE PLAN ....................... 207

    1. Requirements of Section 1129(a) of the Bankruptcy Code ................. 207

    2. Requirements of Section 1129(b) of the Bankruptcy Code ................. 210

XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ................................................................................. 211

A. LIQUIDATION UNDER CHAPTER 7 ............................................. 211

B. ALTERNATIVE PLAN ............................................................. 211

C. CONTINUATION OF THE BANKRUPTCY CASE ............................... 212

XV. CONCLUSION ........................................................................ 212

**Exhibits**

Exhibit A – Material Defined Terms

Exhibit B – The Plan

Exhibit C – Disclosure Statement and Voting Procedures Order

Exhibit D – Liquidation Analysis

Exhibit E – Historical Financial Statements

Exhibit F – Debtors' Preliminary Schedule of Suspense Liabilities

## DISCLOSURE STATEMENT FOR FOURTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Capitalized terms used throughout this Disclosure Statement are defined in <u>Exhibit A</u> attached hereto.

On July 22, 2008, SemGroup and certain of its direct and indirect subsidiaries and affiliates filed voluntary petitions seeking protection under chapter 11 of the Bankruptcy Code. The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors in connection with (i) the solicitation of acceptances of the Fourth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code and (ii) the Confirmation Hearing scheduled for October 26, 2009, commencing at 10:00 a.m. Prevailing Eastern Time. This Disclosure Statement supersedes the Disclosure Statement for the Second Amended Joint Plan of Affiliated Debtors that was approved by the Bankruptcy Court on July 21, 2009 and the Third Amended Joint Plan of Affiliated Debtors that was filed with the Bankruptcy Court on August 25, 2009.

Attached as exhibits to this Disclosure Statement are copies of the following documents: (a) the Material Defined Terms (<u>Exhibit A</u>); (b) the Plan (<u>Exhibit B</u>); (c) the Disclosure Statement and Voting Procedures Order (<u>Exhibit C</u>), which, among other things, approves this Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan and certain procedures with respect to voting and the temporary allowance of Claims for voting purposes; (d) the Liquidation Analysis (<u>Exhibit D</u>), which sets forth estimated recoveries in a chapter 7 liquidation as compared to estimated recoveries under the Plan; (e) the Historical Financial Statements (<u>Exhibit E</u>); and (f) the Debtors' Preliminary Schedule of Suspense Liabilities (<u>Exhibit F</u>). For those holders of Claims entitled to vote under the Plan, a Ballot for the acceptance or rejection of the Plan is separately enclosed. For those holders of Other Twenty-Day Claims, an Election Notice for participation in the Other Twenty-Day Claims Settlement is separately enclosed.

The Plan represents a compromise and settlement of various significant Claims, including Claims of Producers, among the Prepetition Lenders, the Producers' Committee, the Creditors' Committee and the Debtors. The Creditors' Committee supports the Plan as the best way to ensure a prompt and fair resolution of the Debtors' Chapter 11 Cases and its summary and explanation of the compromises contained in the Plan is included in Section I.C, "Overview of Chapter 11 Plan – Creditors' Committee Statement Regarding Global Compromise." The Producers' Committee unanimously supports the Plan, including the Producers' Settlement, as the best way to resolve the ongoing issues regarding the First Purchaser Producer Claims and its summary and explanation of the compromises embodied in the Plan is included in Section I.D., "Overview of Chapter 11 Plan – Producers' Committee Statement." The Plan is also supported by the US Term Lender Group. The Plan seeks to preserve the value of the Debtors for its Creditors while recognizing and balancing the fact that the Prepetition Lenders have direct claims against the Debtors that would result in the Debtors' other Creditors receiving little, if any, value for their Claims. If New Common Stock were to be allocated pro rata among all holders of Secured Claims, inclusive of both the secured and unsecured portion of their Allowed Claims, the Prepetition Lenders would receive almost all of the New Common Stock. As part of

the Creditors' Settlement embodied in the Plan, the Prepetition Lenders' allotment of New Common Stock will be reduced to 95.0% to provide up to 5.0% of the New Common Stock to the holders of Senior Notes Claims and General Unsecured Claims, provided the applicable Classes vote to accept the Plan as described herein.

# I.     OVERVIEW OF CHAPTER 11 PLAN

## A.     INTRODUCTION

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order confirming a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan.

## B.     CHAPTER 11 PLAN

*The following summary is provided for the convenience of holders of Claims and Equity Interests. All holders of Claims and Equity Interests are encouraged to review the full text of the Plan and the Plan documents, and to read carefully this entire Disclosure Statement, including all exhibits hereto.*

The Plan will allow the Debtors to emerge from chapter 11 reorganized around its core businesses with a restructured, deleveraged balance sheet designed to maximize recoveries to Creditors who will become the owners of the Reorganized SemGroup Companies. Below is a summary of the distributable value, claims and distributions to be made by the Debtors as of the

Effective Date, as contemplated under the Plan. The Debtors currently expect the Effective Date to occur on or around November 6, 2009, but can offer no assurances with respect to when, or if, the Effective Date will occur.

### 1. *Distributable Value*

The Debtors expect their total available distributable value as of the Effective Date to be approximately $2,446 million, consisting of the following:

- $1,111 million in Cash,

- $300 million in Second Lien Term Loan Interests, and

- $1,035 million in New Common Stock and Warrants.

The $1,111 million in Cash consists of (i) approximately $653 million of Cash generated during the Chapter 11 Cases from the operations of the Debtors, which includes approximately $122.1 million in Restricted Cash, (ii) approximately $164 million of Cash of the Canadian subsidiaries of SemGroup to be distributed pursuant to the Canadian Plans or a bankruptcy, receivership or other proceeding of SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc., (iii) approximately $157 million in Cash from sales of assets by the SemGroup Companies and (iv) approximately $80 million of Cash expected to be received from the Canadian subsidiaries of SemGroup for crude settlements occurring after the Effective Date. In addition, the Debtors and Prepetition Lenders will contribute certain Causes of Action to the Litigation Trust. The Debtors will distribute interests in the Litigation Trust to the holders of certain Allowed Claims. The Debtors have not placed a value on the Litigation Trust.

The Plan assumes that the Debtors' Cash on the Effective Date will include Restricted Cash received by the Debtors from J. Aron, BP and Conoco related to their respective Undisputed Production Receivables. For more information regarding the turnover of the Restricted Cash, see Section IV.E.1, "The Chapter 11 Cases – Producers' Claims and Litigation." The restriction on the Cash received from J. Aron, BP and Conoco can be lifted by a subsequent order of the Bankruptcy Court. The Debtors filed a motion on September 15, 2009 to seek such an order in connection with the confirmation of the Plan along with a motion to shorten the notice period so that such motion could be heard on September 24, 2009. J. Aron, Conoco, and BP contend that the restrictions are integral to their protection against double payment for the same oil and their right to claim against the Restricted Cash and that the restrictions cannot be lifted absent the furnishing of equivalent protection. J. Aron, Conoco, and BP have also indicated that they will oppose any order lifting the restrictions or otherwise prejudicial to their interests that may be sought by the Debtors. On September 17, 2009, BP and Conoco filed an objection to the Debtors' motion to shorten the notice period and have requested, among other things, that the motion not be heard until October 8, 2009.

The Debtors will retain approximately $72 million of the estimated $1,111 million in Cash on the Effective Date for working capital and general corporate purposes and will distribute the remaining Cash, Second Lien Term Loan Interests, New Common Stock, Warrants and interests in the Litigation Trust to holders of Allowed Claims as provided in the Plan and

summarized below. The Debtors also expect to draw down $57 million under the Exit Facility on the Effective Date to pay amounts outstanding under the Postpetition Financing Agreement and the fees for the Exit Facility.

## 2. *Adequate Protection*

The Debtors estimate that as of the Petition Date they owned approximately $485 million of assets not pledged to secure any prepetition Claims. Pursuant to the Postpetition Financing Order, the Bankruptcy Court granted adequate protection Liens and super priority Claims for the benefit of the Prepetition Lenders (and any Producer that could establish that it held a Lien or trust right entitled to priority over the Liens of the Prepetition Administrative Agent for the benefit of the Prepetition Lenders) in an amount equal to the diminution in value of their collateral during the Chapter 11 Cases.

The Debtors, in consultation with the Prepetition Administrative Agent, believe that the value of the Prepetition Lenders' collateral as of the Petition Date will have diminished by approximately $403 million as of the Effective Date, inclusive of approximately $60 million attributed to use of the Prepetition Lenders' cash collateral to fund the completion of the White Cliffs pipeline in accordance with the Postpetition Financing Order. The Creditors' Committee disagrees with the Debtors and the Prepetition Administrative Agent and believes that the value of the Prepetition Lenders' collateral as of the Petition Date diminished by approximately $60 million on account of the funding to complete the White Cliffs pipeline.

Under the Plan, the adequate protection claim of the Prepetition Lenders is satisfied by allocation of value in the Reorganized Debtors and not by Cash payments. The approximately $82 million of remaining previously unencumbered value is allocated under the Plan to holders of Unsecured Claims, including Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## 3. *Administrative Expense Claims*

Pursuant to section 503(b)(9) of the Bankruptcy Code, Entities who provided goods to the Debtors in the ordinary course of the Debtors' business and which were received by the Debtors within 20 days before the Petition Date are entitled to an Administrative Expense Claim. The Debtors have scheduled approximately $307 million for Claims that are potentially entitled to priority under section 503(b)(9). These Twenty-Day Claims are, however, subject to legal objections filed by the Debtors and the Prepetition Administrative Agent for the benefit of the Prepetition Lenders regarding, among other things, the proper valuation of such Claims. If the Bankruptcy Court rules in favor of the Debtors and the Prepetition Administrative Agent on the outstanding section 503(b)(9) global legal objections, the amount due to claimants will be substantially less than the amount scheduled. Moreover, the Twenty-Day Claims are subject to factual objections filed by the Debtors, the Prepetition Administrative Agent, and the Creditors' Committee. Thus, although the gross section 503(b)(9) amount asserted by claimants in their Proofs of Claim is approximately $351.3 million and although many other claimants referred to Section 503(b)(9) in their Proofs of Claim without asserting a specific amount, the Debtors believe the net amount due for the Twenty-Day Claims will not be materially higher, and may be much lower, than the $307 million scheduled.

In addition, certain claimants filed contingent, unliquidated Twenty-Day Claims alleging that those Claims will be valid if their setoff Claims are disallowed. The Debtors believe these contingent Twenty-Day Claims are invalid for a variety of reasons and intend to contest their allowance. For a more detailed description regarding the objections to Twenty-Day Claims and the timeframe for resolving such objections, see Section IV.F, "The Chapter 11 Cases – Twenty-Day Claims."

After lengthy negotiations spanning nineteen hours, the Debtors, the Lender Steering Committee, the Prepetition Administrative Agent, the Producers' Committee and the Producer Plaintiffs reached agreement on September 14, 2009 regarding the treatment of the First Purchaser Producer Twenty-Day Claims under the Plan. For a discussion regarding the Producers' Settlement, see Section I.B.10, "The Chapter 11 Cases – Producers' Settlement."

The Fourth Amended Joint Plan also provides for a settlement of the Other Twenty-Day Claims under which the Debtors propose to pay Cash on the Effective Date equal to 66% of the aggregate amount of each Settling Party's Other Twenty-Day Claims as set forth on Schedule 3 of the Plan. For a description of the Other Twenty-Day Claims Settlement, see Section I.B.11, "The Chapter 11 Cases – Other Twenty-Day Claims Settlement." The total payouts for Other Twenty-Day Claims to the Settling Parties and the total reserve funded for Other Twenty-Day Claims held by Non-Settling Parties cannot exceed $154 million. If this requirement is not met, then the Debtors may be unable to consummate the Plan.

The sole Twenty-Day Claim to which neither the Producers' Settlement nor the Other Twenty-Day Claims Settlement applies is the Alon Claim, which is expected to total approximately $10.5 million.

Each holder of an Other Twenty-Day Claim will receive an Election Notice concurrently with the Debtors' solicitation of votes to accept the Plan. The Election Notice will contain information regarding the terms of the Other Twenty-Day Claims Settlement, including the deadline for returning such notice.

**TO CONSENT AND AGREE TO THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, A HOLDER MUST COMPLETE ITS ELECTION NOTICE AND RETURN IT TO THE BALLOTING AGENT BY THE SPECIFIED DEADLINE. IF A HOLDER ELECTS TO ACCEPT THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, SUCH HOLDER WILL BE DEEMED TO HAVE CONSENTED AND AGREED TO RECEIVE TREATMENT FOR SUCH CLAIM THAT IS DIFFERENT FROM THAT SET FORTH IN SECTION 503(B)(9) OF THE BANKRUPTCY CODE AND WILL BE BOUND BY THE TERMS OF SUCH SETTLEMENT, INCLUDING THOSE SET FORTH ABOVE.**

**IF AN ELECTION NOTICE IS NOT RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE, OR IF THE HOLDER ELECTS NOT TO PARTICIPATE ON ITS ELECTION NOTICE,**

**SUCH HOLDER WILL BE A NON-SETTLING PARTY AND SUBJECT TO THE TREATMENT DESCRIBED IN SECTION I.B.11(B) HEREIN.**

### 4. *Postpetition Financing Claims*

On the Effective Date, the Debtors expect that the total amount of outstanding Postpetition Financing Claims will be approximately $95 million, which includes approximately $66 million of letters of credit outstanding under the Postpetition Financing Agreement. Under the Plan, all obligations under the Postpetition Financing Agreement will be paid in full and all outstanding letters of credit will be substituted and cancelled.

### 5. *Professional Compensation and Reimbursement Claims*

From July 22, 2008 through August 31, 2009, approximately $127.7 million in Professional Compensation and Reimbursement Claims were invoiced and $114.4 million in Professional Compensation and Reimbursement Claims have been paid in connection with the Chapter 11 Cases. The Debtors will continue to pay Professional Compensation and Reimbursement Claims in accordance with orders of the Bankruptcy Court through the Confirmation Date. The Debtors estimate that the accrued and unpaid Professional Compensation and Reimbursement Claims to be paid pursuant to the Plan as of the Effective Date will be approximately $77 million. Under the Plan, the Professional Compensation and Reimbursement Claims will be paid in full.

### 6. *Priority Tax Claims*

On the Effective Date, the Debtors expect that the total amount of outstanding Priority Tax Claims will be approximately $5.5 million. Under the Plan, the Priority Tax Claims will be paid in full.

### 7. *Prepetition Lenders*

On the Effective Date, the Debtors expect that the Prepetition Lenders will have approximately $2,939 million of Secured Claims in respect of obligations under the Prepetition Credit Agreement, which consists of approximately $2,128 million with respect to the Secured Working Capital Lender Claims (including approximately $480 million of Lender Swap Obligations (as defined in the Prepetition Credit Agreement)) and approximately $811 million with respect to the Secured Revolver/Term Loan Lender Claims. On the Effective Date, the Debtors expect that the Prepetition Lenders will have approximately $1,072 million of deficiency claims, after taking into account Administrative Expense Claims, Postpetition Financing Claims and Professional Compensation and Reimbursement Claims but prior to taking into account the Compromise and Settlement reflected in the Plan.

Pursuant to the Plan, on the Effective Date the Prepetition Lenders will receive (a)(i) an estimated amount of approximately $524 million in Cash, (ii) the Second Lien Term Loan Interests, and (iii) 95.0% of the New Common Stock (subject to dilution for the Warrants (described below) and the Management Plan) on behalf of their Secured Claims, and (b) 60% of the Litigation Trust Interests on behalf of their Lender Deficiency Claims which are Unsecured

Claims. The Prepetition Administrative Agent, based upon the advice of its financial and legal advisors, has provided the Debtors with the recovery split between the Secured Working Capital Lender Claims and the Secured Revolver/Term Loan Lender Claims as set forth in the chart included in Section I.B.15 below. The Lender Steering Committee and the US Term Lender Group support the allocation between Secured Working Capital Lender Claims and Secured Revolver/Term Loan Lender Claims set forth in the Plan.

If any Claims by Prepetition Lenders with respect to Lender Swap Obligations (as defined in the Prepetition Credit Agreement) are determined to not be Allowed Secured Working Capital Lender Claims but are determined to be Allowed Unsecured Claims, they will be classified under the Plan as Allowed Lender Deficiency Claims, and accordingly, the holders of such Claims will receive their Pro Rata Share of the Litigation Trust Interests distributed to holders of Lender Deficiency Claims. The result of such a determination would be a greater percentage recovery for holders of Allowed Secured Working Capital Lender Claims and a smaller percentage recovery for holders of Lender Deficiency Claims compared with those reflected in this Disclosure Statement.

The Debtors or the Reorganized Debtors will evaluate the Lender Swap Obligations, and if appropriate, file any objections to such Claims. The holders of certain Lender Swap Obligations have requested that the Debtors review and evaluate the need for filing such Claim objections prior to the Plan voting deadline, as such determination may impact how the holders of Lender Swap Obligations vote on the Plan.

### 8.     *Other Secured Claims*

On the Effective Date, the Debtors expect that the total amount of Other Secured Claims will be no greater than $5 million and will include non-Producer operators', mechanics' and materialmans' Liens. Under the Plan, the Other Secured Claims will be paid in full in Cash.

### 9.     *Producers' Claims*

In the course of their businesses, certain Debtors (SemCrude, Eaglwing, and SemGas) purchased oil and gas products from third parties in several states. As a result of the commencement of the Chapter 11 Cases, the payment for June and July 2008 oil and gas product was not made. Recognizing that certain issues would be of specific interest to the Producers, after motion to the Bankrutpcy Court by certain Producers, the United States Trustee appointed the Producers' Committee to address those issues. In these Chapter 11 Cases, the Producers asserted statutory lien and trust Claims based on state law and Twenty-Day Claims based on section 503(b)(9) of the Bankruptcy Code.

Following the Petition Date, Debtors were inundated by motions for temporary restraining orders and motions for relief from automatic stay from third parties, which included certain Producers. Given the similar threshold issues of law raised in these cases, the Debtors sought to establish omnibus procedures for handling these claims. Pursuant to the Lien Procedures Order, certain Producers filed single consolidated declaratory judgment actions—one per state—to adjudicate the threshold questions of law regarding such state's applicable lien or trust statute, including the validity, extent, and priority of the state statutory lien and/or trust in

relation to other security interests in the oil and gas production. Actions were filed for the following states: Colorado, Kansas, Missouri, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming.

On April 17, 2009, certain parties to the Producers' litigation filed motions for summary judgment on the Texas, Kansas and Oklahoma lien and Oklahoma trust claims. These motions were heard on May 13 and 14, 2009. The Bankruptcy Court issued its ruling on the motions for summary judgment on June 19, 2009. Therein, the Bankruptcy Court granted summary judgment in favor of the Prepetition Administrative Agent for the Prepetition Lenders and against the Producers in the states of Oklahoma, Texas and Kansas. The Bankruptcy Court certified its decisions on the summary judgment motions for direct appeal to the United States Court of Appeals for the Third Circuit.

The Producers in the Oklahoma, Texas and Kansas actions filed notices of appeal of the decisions in the Bankruptcy Court and the United States Court of Appeals for the Third Circuit. The Oklahoma Producers also filed a motion with the United States Court of Appeals for the Third Circuit requesting that the Third Circuit certify certain questions of law raised in the Oklahoma appeal to the Oklahoma Supreme Court. On August 11, 2009, the Third Circuit issued a scheduling order setting expedited briefing in each of the appeals. The appellants' briefs were filed on August 27, 2009, and the appellees' briefs were filed on September 16, 2009.

The Third Circuit was scheduled to hear oral argument on the merits of the appeals and the Oklahoma Producers' motion to certify certain questions of law to the Oklahoma Supreme Court on October 7, 2009, but pursuant to the Producers' Settlement, discussed below at Section I.B.10., "The Chapter 11 Cases – Producers' Settlement," the parties requested on September 16, 2009 that the hearing be adjourned to no earlier than November 11, 2009. On September 17, 2009, the Third Circuit granted the parties' request.

After lengthy negotiations spanning nineteen hours, the Debtors, the Lender Steering Committee, the Administrative Agent, the Producers' Committee and the Producer Plaintiffs reached an agreement on September 14, 2009 to resolve the Producers' litigation. See below for a brief description regarding the Producers' Settlement, and for a more detailed description, see Section I.B.10, "The Chapter 11 Cases - Producers' Settlement."

Pursuant to the Disclosure Statement Order, votes to approve or reject the Plan will be made by Operators and not Owners. Accordingly, the Producer Representative will distribute any amounts allocated to such Claims to such Operators and not directly to any Owners.

### 10. *Producers' Settlement*

#### a. Overview

The Bankruptcy Court ordered the parties to a judicial mediation held on September 13, 2009 that was conducted by the Honorable Kevin Gross, United States Bankruptcy Court Judge for the District of Delaware. On September 14, 2009, after lengthy negotiations spanning nineteen hours, the Debtors, the Prepetition Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs agreed to a resolution of their outstanding disputes that would allow for a consensual plan of reorganization. The Producers'

Settlement, which also has the support of the Creditors' Committee, provides for the following payments under the Plan and the resolution of certain ongoing litigation as described below.

b.    Payment to Producer Representative

On the Effective Date, Cash in the total amount of $172.5 million will be distributed to the Producer Representative who will be responsible for making distributions to Producers in accordance with the Plan, including Section 3.1 of the Plan. Notwithstanding anything to the contrary in the Plan or elsewhere, the Producers will not be entitled to any further payment from the Debtors, the Prepetition Administrative Agent or the Prepetition Lenders on account of their Claims other than the distributions payable to the holders of Unsecured First Purchaser Producer Claims as holders of General Unsecured Claims.

c.    First Purchaser Producer Twenty-Day Claims

On the Effective Date, the Producer Representative will make distributions to holders of Allowed First Purchaser Producer Twenty-Day Claims in accordance with Section 2.1 of the Plan. Each holder of a First Purchaser Producer Twenty-Day Claim will be deemed, as of the Effective Date, to have an Allowed First Purchaser Producer Twenty-Day Claim equal to the amount listed on Schedule 1 of the Plan plus any additional amount, if any, agreed to in writing by the Producers' Committee or the Producer Representative or Allowed by Final Order. Pursuant to the September 15 Order, only holders of First Purchaser Producer Twenty-Day Claims which timely filed objections to the Notice may seek allowance of its Claim in an amount different than listed on Schedule 1 of the Plan, which disputes will be resolved pursuant to the September 15 Order by the Producer Representative in accordance with Section 8.3 of the Plan. Notwithstanding anything to the contrary in the Plan or elsewhere, the sum of (i) the payments of 100% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Debtors other than Eaglwing set forth on Schedule 1 of the Plan plus (ii) the payments of 65% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Eaglwing set forth on Schedule 1 of the Plan shall not exceed $125.5 million.

d.    Secured First Purchaser Producer Claims

As soon as practicable after the Effective Date, the Producer Representative will pay each holder of an Allowed Secured First Purchaser Producer Claim, its Pro Rata Share of Cash in an amount equal to $47 million less the sum of (i) the aggregate amount of Cash paid or to be paid in respect of Allowed First Purchaser Producer Twenty-Day Claims against Eaglwing in excess of 65% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Eaglwing set forth on Schedule 1 of the Plan until the Allowed First Purchaser Producer Twenty-Day Claims against Eaglwing are paid in full, (ii) the amount of Cash paid or to be paid to professionals pursuant to Section 3.1(d) of the Plan, (iii) the fees and expenses incurred by the Producer Representative and its professionals paid or to be paid and (iv) the amount of Cash, if any, paid or to be paid to the holders of Allowed First Purchaser Producer Twenty-Day Claims in excess of $125.5 million, exclusive of Cash distributed pursuant to Section 3.1(c)(i) of the Plan. No portion of any Secured First Purchaser Producer Claim will be an Unsecured Claim against the Debtors for any purpose under the Plan. No portion of any unpaid Secured First Purchaser Producer Claim is released, compromised, or discharged under the Plan solely for the purposes

of any Downstream Claims against Downstream Purchasers, which Downstream Claims Producers will be free to assert in courts of competent jurisdiction.

### e. Reimbursement of Professional Fees

Subject to allowance by the Producers' Committee or by the Producer Representative, as soon as practicable after the Effective Date, the Producer Representative will reimburse the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings for the Active States in Cash for payment of reasonable fees and out-of-pocket costs incurred in connection with the Producer State-Specific Adversary Proceedings for the Active States or in the Other Proceedings, as applicable. The Producers' Committee estimates that the total fees and expenses at the Effective Date will be approximately $4 million. In addition, the Producer Representative will pay any professional fees and expenses of the Producers' Committee to the extent that the fees and expenses exceed the cap contained in Section 1.127 of the Plan. For the avoidance of doubt, all amounts payable pursuant to Section 3.1(d) of the Plan will be payable solely from the $172.5 million distributed to the Producer Representative pursuant to Section 3.1(a) of the Plan.

### f. Producer Deficiency Claims

No portion of any Secured First Purchaser Producer Claim will be an Unsecured Claim for any purpose under the Plan. Each holder of an Unsecured First Purchaser Producer Claim will vote as a holder of a General Unsecured Claim under the Plan and will be treated for all purposes as the holder of a General Unsecured Claim under the Plan.

### g. Producer State-Specific Adversary Proceedings

The Debtors, the Prepetition Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs have agreed to take, and in some cases have already taken, the following actions with respect to the Producer State-Specific Adversary Proceedings:

#### (i) Third Circuit Appeals.

The Debtors, the Prepetition Administrative Agent and the Producer Plaintiffs jointly submitted a request on September 16, 2009 to the Third Circuit Court of Appeals to adjourn the oral argument on the Third Circuit Appeals to a date after the anticipated Effective Date, which request was granted on September 17, 2009. To the extent the Third Circuit Appeals are not remanded pursuant to Section 3.1(f)(iii) of the Plan, the Debtors, the Prepetition Administrative Agent and the Producer Plaintiffs will, no later than the Effective Date, voluntarily dismiss with prejudice the Third Circuit Appeals, against, but only against, the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders.

#### (ii) Bankruptcy Court Proceedings.

On the Effective Date, to the extent that the Third Circuit Appeals are not remanded to the Bankruptcy Court pursuant to Section 3.1(f)(iii) of the Plan, the Producer Plaintiffs will file all papers necessary to voluntarily dismiss with prejudice the Producer State-Specific Adversary

Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders. With the exception of (i) any Bankruptcy Court proceedings with respect to the Bankruptcy Court decision on global legal objections to Twenty-Day Claims argued on September 9, 2009 and (ii) any Bankruptcy Court proceedings with respect to Other Twenty-Day Claims, all Producer-related litigation commenced in the Bankruptcy Court or to which the Debtors or the Prepetition Administrative Agent is a party shall be abated as to all parties until November 11, 2009. Each applicable Producer Plaintiff will file all papers necessary to voluntarily dismiss with prejudice the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders from all such Producer-related litigation commenced in the Bankruptcy Court on the Effective Date concurrently with the payment by the Debtors to the Producer Representative described in Section 3.1(a) of the Plan. Each of the Producer Plaintiffs, the Debtors, the Prepetition Administrative Agent and the applicable Prepetition Lenders will take all such actions, including executing stipulations, as are reasonably required to effect the foregoing dismissals with prejudice.

(iii)    Producer Decisions.

If the Plan is confirmed and the Producer Plaintiffs submit an application to the Third Circuit Court of Appeals requesting that it remand to the Bankruptcy Court and an application to the Bankruptcy Court requesting that the Bankruptcy Court vacate the Producer Decisions, then neither the Prepetition Administrative Agent nor the Debtors will oppose any such applications.

(iv)    Other Proceedings.

Each of the Debtors, the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings, the Prepetition Administrative Agent, the Prepetition Lenders and their respective affiliates, as applicable, will abate all Other Proceedings to which it is a party until November 11, 2009. On the Effective Date, the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings will file all papers necessary to voluntarily dismiss with prejudice the Other Proceedings with respect to the Debtors, the Prepetition Administrative Agent, and the applicable Prepetition Lenders and/or their affiliates, as applicable. Each of the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings, the Debtors, the Prepetition Administrative Agent and the applicable Prepetition Lenders and/or their affiliates will take all such actions, including executing stipulations, as are reasonably required to effect the foregoing dismissals with prejudice.

h.    Twenty-Day Claims

The Debtors, the Prepetition Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs have agreed as follows with respect to the Twenty-Day Claims.

(i)    Global Legal Objections.

The Producers' Settlement resolves the global legal objections with respect to the First Purchaser Producer Twenty-Day Claims. The Producers' Settlement will have no effect on any legal objections with respect to the Other Twenty-Day Claims.

(ii)     Factual-Based Objections.

The Debtors, the Prepetition Administrative Agent and the Lender Steering Committee, as applicable, will (A) abate their fact-based objections to First Purchaser Producer Twenty-Day Claims until November 11, 2009 and (B) voluntarily dismiss with prejudice any fact-based objections to the First Purchaser Producer Twenty-Day Claims on the Effective Date. After the Effective Date, the Producer Representative will be permitted to pursue the disputes against any First Purchaser Producer regarding certain Twenty-Day Claims that were set forth in the Notice in accordance with the Producer claims resolution process described in Section 8.3 of the Plan; provided, however, that the expenses incurred by the Producer Representative in connection with pursuing such disputes will be paid out of the $47 million referred to in Section 3.1(c) of the Plan. The Producers' Settlement will have no effect on the ability of the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders to pursue any and all fact-based objections with respect to the Other Twenty-Day Claims.

i.      Payments by Operators

Operators receiving payments under the Plan will be responsible for disbursing payment to Owners entitled to payment thereto, if any. The Debtors will provide data in their possession related to certain Owners to the Producer Representative, on which the Operators can rely in making distributions pursuant to the Plan.

j.      No Impact on Litigation Trust

Notwithstanding anything in Section 3.1 or the Plan to the contrary, and without the express written consent of the Litigation Trust Board, no Entity or Creditor (including but not limited to the Prepetition Administrative Agent, the Postpetition Administrative Agent, the Producer Representative, the holder of a Secured Lender Claim, any Operator, or any Owner), will be permitted to assert, bring, institute, commence, or participate in any Litigation Trust Claim (other than distributions, if any, in its capacity as a holder of Litigation Trust Interests).

k.      Conditions to Effectiveness

(i)     Producers' Settlement Payments.

The sum of (A) the total payments with respect to the First Purchaser Producer Twenty-Day Claims plus (B) the total payments with respect to the Secured First Purchaser Producer Claims (including payments pursuant to Sections 3.1(c)(i), (ii), (iii) and (iv) of the Plan) will not exceed $172.5 million in the aggregate.

The sum of (A) the total payments with respect to the Other Twenty-Day Claims paid by the Debtors to the Settling Parties under the Other Twenty-Day Claims Settlement, or otherwise, plus (B) the total reserve funded by the Debtors with respect to Other Twenty-Day Claims held by Non-Settling Parties will not exceed $154 million in the aggregate.

The sum of (A) the amount of the total payments in Section 18.1(b)(i) of the Plan plus (B) the amount of the total payments in Section 18.1(b)(ii) of the Plan plus (C) the payment with respect to the Alon Claim will not exceed $337 million in the aggregate.

(ii)     Adversary Proceedings.

The Producer Plaintiffs will have voluntarily dismissed with prejudice the Producer State-Specific Adversary Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders by no later than the Effective Date.

The parties to the Producer State-Specific Adversary Proceedings will have filed papers, in a form acceptable to the Debtors and the Prepetition Administrative Agent, voluntarily dismissing with prejudice the Third Circuit Appeals by no later than the Effective Date.

The Producer Plaintiffs will have voluntarily dismissed with prejudice the Other Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders and/or their affiliates, as applicable, by no later than the Effective Date.

(iii)    Twenty-Day Claims.

The Debtors and the Prepetition Administrative Agent will have voluntarily dismissed with prejudice all fact-based objections to First Purchaser Producer Twenty-Day Claims by no later than the Effective Date of the Plan; provided, however, that the Producers' Committee or the Producer Representative is permitted to pursue the disputes regarding certain First Purchaser Producer Twenty-Day Claims that were set forth in the Notices filed by the Debtors on July 17, 2009.

(iv)    Other Producer-Related Litigation.

Other than the legal and fact-based objections to the Other Twenty-Day Claims, all Producer-related litigation commenced in the Bankruptcy Court and to which the Debtors or the Prepetition Administrative Agent are currently parties will have been voluntarily dismissed with prejudice as to the Debtors, the Prepetition Administrative Agent, and the Prepetition Lenders as of the Effective Date.

(v)     Release of Restricted Cash.

The Clerk of the Bankruptcy Court will have entered an order, in form and substance acceptable to counsel for the Administrative Agent and counsel for the Producers' Committee, authorizing the release from escrow of the Restricted Cash for use to fund the Plan.

## *11.*    **Other Twenty-Day Claims Settlement**

a.      Overview

The holders of the Other Twenty-Day Claims are not parties to the Producers' Settlement. In order to resolve the outstanding issues related to the ongoing litigation with respect to the Other Twenty-Day Claims, the Debtors will seek agreement of the holders of the Other Twenty-Day Claims to the Other Twenty-Day Claims Settlement as provided below.

(i)     Settling Parties.

The Debtors have prepared a schedule (Schedule 3 to the Plan) that lists the Other Twenty-Day Claims.  Schedule 3 provides the name of the claimant, the amount that the Debtors scheduled on the Notice or the Fourth Amended Schedules, as applicable, for that claimant, which amount is subject to the global legal objections and fact-based objections discussed above in Section I.B.3, and a column entitled "Proposed Settlement Amount" that represents 66% of the amount on Schedule 3 of the Plan for that claimant.  Any holder of an Other Twenty-Day Claim that elects to participate in the Other Twenty-Day Claims Settlement will be deemed to have an Allowed Claim equal to the Proposed Settlement Amount for that claimant and will receive in payment for its Other Twenty-Day Claim, Cash on the Effective Date equal to the Proposed Settlement Amount.

As part of the Other Twenty-Day Claims Settlement, the Debtors and the Prepetition Administrative Agent will not pursue any objections to the Other Twenty-Day Claims of such Settling Party, and any decisions that the Bankruptcy Court reaches with regard to the global legal objections will not affect a Settling Parties' entitlement to payment on the Effective Date as described above.

In exchange for this payment, the Other Twenty-Day claimant will release certain parties as described in Section I.B.11(b) below, including the Prepetition Lenders or holders of Swap Claims (excluding J. Aron & Company, Bank of Oklahoma and their respective affiliates), the Prepetition Administrative Agent, the Postpetition Administrative Agent, the Postpetition Lenders and the Catsimatidis Group.  The claimant will not receive a mutual release from the parties who the claimant is releasing under the Plan.

(ii)     Non-Settling Parties.

On the Effective Date, the Debtors will reserve in Cash an amount equal to the amount of the Other Twenty-Day Claims of each Non-Settling Party (at that date) set forth on Schedule 3 of the Plan (or such lesser amount as shall be approved by the Bankruptcy Court) and hold such reserve until the status of such Claim has been Allowed by agreement of the Prepetition Administrative Agent and the holder of such Other Twenty-Day Claim or Final Order.  Each of the Debtors (solely prior to the Effective Date), the Creditors' Committee (solely as prior to the Effective Date and solely as to Avoidance Actions) and Prepetition Administrative Agent will be free to pursue any objections, including both fact-based objections and global legal objections, with respect to such Other Twenty-Day Claims of Non-Settling Parties.

(iii)     Election Notices.

Each holder of an Other Twenty-Day Claim will receive an Election Notice concurrently with the Debtors' solicitation of votes to accept the Plan.  The Election Notice will contain information regarding the terms of the Other Twenty-Day Claims Settlement, including the deadline for returning such notice.

## TO CONSENT AND AGREE TO THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, A HOLDER MUST COMPLETE ITS

**ELECTION NOTICE AND RETURN IT TO THE BALLOTING AGENT BY THE SPECIFIED DEADLINE. IF A HOLDER ELECTS TO ACCEPT THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, SUCH HOLDER WILL BE DEEMED TO HAVE CONSENTED AND AGREED TO RECEIVE TREATMENT FOR SUCH CLAIM THAT IS DIFFERENT FROM THAT SET FORTH IN SECTION 503(B)(9) OF THE BANKRUPTCY CODE AND WILL BE BOUND BY THE TERMS OF SUCH SETTLEMENT, INCLUDING THOSE SET FORTH ABOVE.**

**IF AN ELECTION NOTICE IS NOT RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE, OR IF THE HOLDER ELECTS NOT TO PARTICIPATE ON ITS ELECTION NOTICE, SUCH HOLDER WILL BE A NON-SETTLING PARTY AND SUBJECT TO THE TREATMENT DESCRIBED IN SECTION I.B.11(B) HEREIN.**

<ul><li>b. <u>Release of Litigation</u></li></ul>

In addition to the provisions of Section 20.11 of the Plan, upon the Effective Date, each Creditor that elects to participate in the Other Twenty-Day Claims Settlement forever discharges the Debtors, the Prepetition Lenders (excluding J. Aron & Company and its affiliates), and the Prepetition Administrative Agent, jointly and as to each of them, from and against any and all liability that they now have, had, or may have arising out of or relating to such Creditor's Other Twenty-Day Claim. The Creditor agrees to voluntarily dismiss with prejudice any motions, objections, or other pleadings regarding such Other Twenty-Day Claim from the Bankruptcy Court's consideration. The Creditor also agrees not to aid, assist, support, or otherwise participate with any other party in prosecuting Other Twenty-Day Claims against the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent and/or the Prepetition Lenders (excluding J. Aron & Company and its affiliates) or to take any positions contrary to the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent and/or the Prepetition Lenders (excluding J. Aron & Company and its affiliates). The release of Other Twenty-Day Claims is specifically intended to include and does include Other Twenty-Day Claims that the Creditor might not now know or expect to exist in their favor at the Effective Date, even if knowledge of such claims might have otherwise materially affected the granting of this release. The Creditor understands and agrees that the release of Other Twenty-Day Claims will be treated as a full and complete defense to, and will forever be a complete bar to the commencement or prosecution of, any and all Claims released in Section 3.2(d) of the Plan. The Creditor intends that the release of Other Twenty-Day Claims and the release contained in Section 20.11 of the Plan be complete and not subject to a claim of mistake of fact and that such release and delivery according to the terms of the Other Twenty-Day Claims Settlement present a FULL AND COMPLETE SETTLEMENT of the Claims released in Section 3.2(d) of the Plan. Regardless of the adequacy or inadequacy of the consideration paid, the release included in Section 3.2(d) of the Plan and in Section 20.11 of the Plan is intended to settle or avoid litigation and/or settle the claims released herein, and to be final and complete.

## 12.    *Holders of Senior Notes Claims and General Unsecured Claims*

The Debtors expect that, in addition to the Lender Deficiency Claims, the total amount of Unsecured Claims as of the Effective Date will be approximately $1,193 million, which includes the following:

- approximately $610 million of Senior Notes Claims, and

- approximately $583 million of other General Unsecured Claims, which includes $46 million of Unsecured First Purchaser Producer Claims.

Under the Plan, the collective distributions to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims are split 75% and 25%, respectively. The greater allocation to Senior Notes Claims results from, among other reasons, the fact that the Senior Notes are jointly and severally guaranteed by 23 of the Debtors while, in most cases, only one Debtor is liable with respect to each General Unsecured Claim. In addition, the Senior Notes are jointly and severally guaranteed by SemCAMS ULC, SemCanada Nova Scotia and SemCanada Energy and the holders of the Senior Notes Claims are waiving any recovery from the Canadian Debtors or under the Canadian Plans as a result of their recovery under the Plan. As a result, (i) the holders of Allowed Senior Notes Claims are entitled to receive their Pro Rata Share of (a) 3.75% of the New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (b) Warrants to purchase 3.75% of the New Common Stock (subject to dilution of ownership percentage from the Management Stock) and (c) 30% of the Litigation Trust Interests, and (ii) the holders of Allowed General Unsecured Claims are entitled to receive their Pro Rata Share of (a) 1.25% of the New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (b) Warrants to purchase 1.25% of the New Common Stock (subject to dilution of ownership percentage from the Management Stock) and (c) 10% of the Litigation Trust Interests.

Since holders of Senior Notes Claims have the same Claim against most of the Debtors as a result of the guarantees of the Senior Notes, if one Class of Senior Notes Claims approves the Plan, then each holder of Senior Notes Claims will receive its Pro Rata Share of the New Common Stock, Warrants and the Litigation Trust Interests as discussed above. **If all of the Classes of Senior Notes Claims reject the Plan, then the holders of Senior Notes Claims will receive their Pro Rata Share in the Litigation Trust Interests, but will receive fewer shares of New Common Stock and no Warrants.** If all Classes of Senior Notes Claims reject the Plan, then the additional shares of New Common Stock and the Warrants allocated to Senior Notes Claims as a result of the Compromise and Settlement will be re-allocated to holders of General Unsecured Claims in Classes of General Unsecured Claims that approve the Plan.

If a Class of General Unsecured Claims approves the Plan, then such holders in that Class will receive their Pro Rata Share of the New Common Stock, Warrants and the Litigation Trust Interests as discussed above. **If a Class of the General Unsecured Claims rejects the Plan, then the holders of Claims in such Class will receive their Pro Rata Share in the Litigation Trust Interests, but will receive fewer shares of New Common Stock and no Warrants.** The additional shares of New Common Stock and Warrants allocated to holders of any such Class of General Unsecured Claims as a result of the Compromise and Settlement will be re-allocated to

holders of Classes of General Unsecured Claims that approve the Plan. If all Classes of General Unsecured Claims reject the Plan, then all of the additional shares of New Common Stock and Warrants allocated to the General Unsecured Claims as a result of the Compromise and Settlement will be re-allocated to holders of Senior Notes Claims so long as one Class of Senior Notes Claims has approved the Plan.

If all of the Classes of Senior Notes Claims and General Unsecured Claims reject the Plan, then all of the New Common Stock allocated to Senior Notes Claims and General Unsecured Claims as a result of the Compromise and Settlement will be re-allocated to the holders of Lender Deficiency Claims and no Warrants will be issued under the Plan.

### 13. Reclamation Claims

The Plan does not include any recovery for Reclamation Claims. Pursuant to section 546(c) of the Bankruptcy Code, Reclamation Claims are subject to the prior perfected liens on inventory of the Prepetition Administrative Agent and Prepetition Lenders; accordingly, the Debtors believe that no valid Reclamation Claims exist.

### 14. Release of Third Parties

**The Plan will operate as a full release of all Entities (regardless of whether such Entities are Debtors) that are Guarantors (as such term is defined in the Prepetition Credit Agreement) or Guarantors (as such term is defined in the Senior Notes Indenture) from any liability arising out of or relating to the Prepetition Credit Agreement and the Senior Notes Indenture, respectively.**

### 15. Summary of Classification and Treatment of Claims and Equity Interests

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan as of the Effective Date. For a more detailed description of the classification and treatment of Claims and Equity Interests under the Plan, see Section V.C., "The Plan – Classification and Treatment of Claims and Equity Interests."

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|---------------------------------------------------------|--------------------|
| Unclassified | Administrative Expense Claims | Claims in this Class are not impaired.<br><br>Payment of the Alon Claim in Cash.<br><br>Payment for Allowed Administrative Expense Claims of Producers in accordance with the | No<br><br>Holders of Other Twenty-Day Claims will be able to accept in the Other Twenty-Day Claims Settlement. | Estimated at $255 million (assuming full acceptance of the Other Twenty-Day Claims Settlement, payment of | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | Producers' Settlement.<br><br>Payment for each estimated Other Twenty-Day Claim held by a Non-Settling Party in Cash upon the final adjudication or resolution of such Claims. The amount of such Claims set forth on Schedule 3 of the Plan will be reserved in Cash pending such adjudication or resolution. | | First Purchaser Producer Twenty-Day Claims in accordance with the Producers' Settlement and payment of the Alon Claim) | |
| Unclassified | Postpetition Financing Claims | Claims in this Class are not impaired.<br><br>Payment of each Allowed Postpetition Financing Claim in full in Cash. | No | $95 million (including $66 million of outstanding letters of credit) | 100% |
| Unclassified | Professional Compensation and Reimbursement Claims | Claims in this Class are not impaired.<br><br>Payment of each Allowed Professional Compensation and Reimbursement Claim in full in Cash. | No | $77 million | 100% |
| Unclassified | Priority Tax Claims | Claims in this Class are not impaired. Payment of each Allowed Priority Tax Claim in full in Cash. | No | $5.5 million | 100% |
| Classes 1-26 | Priority Non-Tax Claims | Claims in these Classes are not impaired.<br><br>Payment of each Allowed Priority Non-Tax Claim in full in Cash. | No | $0 | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Classes 27-52 | Secured Tax Claims | Claims in these Classes are not impaired.<br><br>Payment of each Secured Tax Claim in full in Cash. | No | $0 | 100% |
| Classes 53-55 | Secured First Purchaser Producer Claims | Claims in these Classes are impaired.<br><br>Each holder of an Allowed Secured First Purchaser Producer Claim will receive its Pro Rata Share of Cash in an amount equal to $47 million less the sum of (i) the aggregate amount of Cash paid in respect of Allowed First Purchaser Producer Twenty-Day Claims against Eaglwing in excess of 65% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Eaglwing set forth on Schedule 1 attached to the Plan, (ii) the amount of Cash paid pursuant to Section 3.1(c) of the Plan, and (iii) the amount of Cash, if any, distributed to the holders of Allowed First Purchaser Producer Twenty-Day Claims in excess of $125.5 million, exclusive of Cash distributed pursuant to Section 3.1(c)(i) of the Plan. | Yes | Estimated at $0 as a result of the June Decisions. | N/A |
| Classes 70-95 | Secured Working Capital Lender Claims | Claims in these Classes are impaired.<br><br>Each holder of an | Yes | $2,128 million | 56.1% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | Allowed Secured Working Capital Lender Claim will receive its Pro Rata Share of (i) Working Capital Lender Effective Date Cash in an estimated amount of approximately $431 million of Lender Cash (after distribution of the Litigation Trust Funds), (ii) 58.0% (or $174 million in principal amount) of the Second Lien Term Loan Interests, and (iii) 56.30% (or 23,306,753 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock).<br><br>Each holder of an Allowed Secured Working Capital Lender Claim will also receive its Pro Rata Share of certain distributions after the Effective Date pursuant to Section 5.4(b)(y) of the Plan. | | | |
| Classes 96-121 | Secured Revolver/Term Lender Claims | Claims in these Classes are impaired.<br><br>Each holder of an Allowed Secured Revolver /Term Lender Claim will receive its Pro Rata Share of (i) Revolver/Term Loan Lender Effective Date Cash in an estimated amount of approximately $93 million of Lender Cash (inclusive of the Auriga Revolver/Term Lender Distribution and | Yes | $811 million | 75.6% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | excess Cash proceeds from the sale of assets of SemFuel), (ii) 42.0% ($126 million in principal amount) of the Second Lien Term Loan Interests, (iii) 38.70% (or 16,023,247 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock) and (iv) the US Term Lender Group Fees; provided, however, that the US Term Lender Group Fees will be paid to the professionals of the US Term Lender Group pursuant to Section 2.6 of the Plan.<br><br>Each holder of an Allowed Secured Revolver/Term Lender Claim will also receive its Pro Rata Share of certain distributions after the Effective Date pursuant to Section 5.5(b)(y) of the Plan. | | | |
| Class 122 | White Cliffs Credit Agreement Claim | Claims in this Class are impaired.<br><br>Each holder of an Allowed White Cliffs Credit Facility Claim will be paid in full. The White Cliffs Credit Agreement will be amended, extended or refinanced on terms to be agreed by the holders of the White Cliffs Credit Agreement. | Yes | $120 million | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------------|---------------------|
| Classes 123-148 | Other Secured Claims | Claims in these Classes are not impaired.<br><br>Each holder of an Other Secured Claim will receive one of the following distributions: (i) the payment of such holder's Allowed Secured Claim in full in Cash; (ii) the sale or disposition proceeds of the property securing any Allowed Other Secured Claim to the extent of the value of its interest in such property; (iii) the surrender to the holder of any Allowed Other Secured Claim of the property securing such Claim; or (iv) such other distributions as will be necessary to satisfy the requirements of the Plan. | No | Estimated at up to $5 million. | 100% |
| Classes 149-174 | Senior Notes Claim | Claims in these Classes are impaired.<br><br>If any Class of Senior Notes Claims votes to accept the Plan, then each holder of an Allowed Senior Note Claim will receive its Pro Rata Share of (i) 3.75% (or 1,552,500 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (ii) Warrants to purchase 3.75% (or 1,634,210 shares) of New Common Stock (assuming full Warrant exercise and subject to dilution of ownership percentage | Yes | $610 million | **8.34%** (assuming that any Class of Senior Notes Claims approves the Plan)<br><br>**0.44% - 11.01%** (depending on level of approval of the Plan by Classes of Senior Notes Claims and General Unsecured Claims) |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | from the Management Stock), (iii) 30% of the Litigation Trust Interests, and (iv) the Senior Notes Indenture Trustee Fees; provided, however, that the Senior Notes Indenture Trustee Fees will be paid to the Senior Notes Indenture Trustee pursuant to Section 2.5 of the Plan.<br><br>In addition, if all Classes of General Unsecured Claims vote to reject the Plan and any Class of Senior Notes Claims votes to accept the Plan, each Allowed Senior Notes Claim will be entitled to receive its Pro Rata Share of the New Common Stock and Warrants that would have been distributed to the holders of General Unsecured Claims as a result of the Creditors' Settlement.<br><br>If each Class of Senior Notes Claims votes to reject the Plan, then each holder of an Allowed Senior Notes Claim will receive its Pro Rata Share of (i) 0.26% (or 106,498 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (ii) 30% of the Litigation Trust Interests, and (iii) the Senior Notes Indenture Trustee Fees; provided, however, that | | | |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | the Senior Notes Indenture Trustee Fees will be paid to the Senior Notes Indenture Trustee pursuant to Section 2.5 of the Plan.<br><br>If no Class of Senior Notes Claims votes to accept the Plan, then the shares of New Common Stock and the Warrants that would have been distributed to the holders of Senior Notes Claims as a result of the Creditors' Settlement will be re-allocated among the Class(es) of General Unsecured Claims that vote to approve the Plan. If no Class(es) of General Unsecured Claims vote to approve the Plan, then the shares of New Common Stock (but not Warrants) that would have been distributed to the holders of Senior Notes Claims as a result of the Creditors' Settlement will be re-allocated among the holders of Allowed Lender Deficiency Claims. | | | |
| Classes 175-200 | Lender Deficiency Claims | Claims in these Classes are impaired.<br><br>Each holder of an Allowed Lender Deficiency Claim will receive its Pro Rata Share of 60% of the Litigation Trust Interests.<br><br>If no Class of Senior | Yes | $1,072 million | 0.00% (assuming that none of the shares of New Common Stock allocated to holders of Senior Notes Claims and |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | Notes Claims or General Unsecured Claims votes to approve the Plan, then the additional shares of New Common Stock (but not Warrants) that would have been issued to holders in all such Classes as a result of the Creditors' Settlement will be re-allocated among the holders of Allowed Lender Deficiency Claims. | | | General Unsecured Claims are re-allocated to the Lender Deficiency Claims) No value has been attributed to the Litigation Trust Interests.<br><br>**Up to 4.52%** (depending on whether any shares of New Common Stock are re-allocated to the Lender Deficiency Claims) |
| Classes 201-226 | General Unsecured Claims | Claims in these Classes are impaired.<br><br>If a Class votes to accept the Plan, then each holder of an Allowed General Unsecured Claim in such Class will receive its Pro Rata Share of (i) 1.25% (or 517,500 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (ii) Warrants to purchase 1.25% (or 544,737 shares) of New Common Stock (assuming full exercise of Warrants and subject to dilution of ownership percentage | Yes | $583 million | **2.91%** (assuming that all Classes of General Unsecured Claims approve the Plan). No value has been attributed to the Litigation Trust Interests.<br><br>**0.11% - 11.17%** (depending on the level of approval of the Plan by Classes of |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | from the Management Stock) and (iii) 10% of the Litigation Trust Interests.<br><br>In addition, if all Classes of Senior Notes Claims vote to reject the Plan, each holder of a Claim in a Class of General Unsecured Claims that votes to accept the Plan will be entitled to receive its Pro Rata Share of the additional New Common Stock and the Warrants that would have been distributed to the holders of Senior Notes Claims as a result of the Creditors' Settlement. If a Class votes to reject the Plan, then each holder of a General Unsecured Claim in such Class will receive its Pro Rata Share of (i) 0.06% (or 25,327 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock) and (ii) 10% of the Litigation Trust Interests.<br><br>If one or more Classes of General Unsecured Claims votes to reject the Plan, then the additional shares of New Common Stock and the Warrants that would have been issued to holders in such rejecting Class(es) as a result of the Creditors' Settlement will be re-allocated among the Classes of General | | | Senior Notes Claims and General Unsecured Claims) |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | Unsecured Claims that approved the Plan. If no Classes of General Unsecured Claims vote to accept the Plan, then such shares of New Common Stock and Warrants will be re-allocated among the holders of Senior Notes Claims if any Class of Senior Notes Claims approves the Plan. If none of the Classes of Senior Notes Claims or General Unsecured Claims approve the Plan, then such shares of New Common Stock will be re-allocated among the holders of Allowed Lender Deficiency Claims and no Warrants will be distributed. | | | |
| Classes 227-252 | Intercompany Claims | Claims in these Classes are impaired.<br><br>Each holder of an Allowed Intercompany Claim will receive its Pro Rata Share of the New Common Stock that it would have received if such Allowed Intercompany Claim were an Allowed General Unsecured Claim, which New Common Stock will be redistributed to holders of Allowed Secured Working Capital Lender Claims in accordance with the Plan.<br><br>The treatment of the General Unsecured Claims in Classes 201- | Yes | $7,270 million | N/A |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | 226 is not impacted by the distribution for Intercompany Claims in Classes 227-252. | | | |
| Classes 253-278 | Intercompany Equity Interests | Claims in these Classes are not impaired. | No | N/A | N/A |
| Class 279 | SemGroup Equity Interests | Claims in this Class are impaired.<br><br>Each holder of a SemGroup Equity Interest will receive no distribution in the Plan. | No | N/A | 0% |

## C.   CREDITORS' COMMITTEE STATEMENT REGARDING GLOBAL COMPROMISE

*At the request of the Creditors' Committee, the Debtors have included in this Disclosure Statement the following discussion provided by the Creditors' Committee.*

The Creditors' Committee's global compromise, a multi-faceted settlement of inter-creditor disputes (the "Creditors' Committee Intercreditor Issues"), is included within the Plan's interdependent settlements and compromises. The Creditors' Committee supports the Plan as the best way to ensure a prompt and fair resolution of the Debtors' Chapter 11 Cases because the Plan takes each of these potential inter-creditor disputes into account and provides the certainty of meaningful distributions to unsecured Creditors without the delay and expense occasioned by protracted litigation.

Although litigation of any and each of the Creditors' Committee Intercreditor Issues could produce somewhat different absolute and relative recoveries for Creditors from those provided by the Plan, the Creditors' Committee believes that such litigation would be expensive, uncertain, and would not be finally resolved for years, thus delaying and potentially materially reducing the enterprise value of the Reorganized Debtors and, in turn, distributions to all Creditors. Importantly, the Creditors' Committee believes that the recoveries provided under the Plan to unsecured Creditors represent a favorable litigation outcome of all of the Creditors' Committee Intercreditor Issues, and the Plan yields results that are well within the range of reasonable litigation outcomes.

The Creditors' Committee Intercreditor Issues include, among others:

***Challenge of Adequate Protection Claims***.  Under the Debtors' cash collateral and Postpetition Financing Order, all unencumbered assets available for distribution to unsecured creditors were pledged to the Prepetition Agent, for the benefit of the Prepetition Lenders, to secure any adequate protection claims arising under the Bankruptcy Code owing on account of the diminution in value, if any, of assets comprising the Prepetition Agent's collateral.  The Creditors' Committee disputes the position that the Debtors have taken with respect to the diminution in value since the commencement of these Chapter 11 Cases of the Prepetition Lenders' collateral.  Specifically, other than with respect to the cash needed to complete the construction of the White Cliffs pipeline, the Creditors' Committee believes the diminution in value of the Prepetition Lenders' collateral since the bankruptcy filing was not caused by the automatic stay or the Debtors' use of such collateral, and that the bankruptcy in fact enabled the Prepetition Lenders to market the assets in a timely and organized manner and the automatic stay allowed the Debtors' businesses to stabilize following the loss of leadership and industry confidence that was already in motion as of the Petition Date.  Thus, the Creditors' Committee believes that any downward change in value since the bankruptcy filing is not of a type that would be recognized by the Bankruptcy Court as supporting a claim for adequate protection.

***Challenge to the Incurrence of SemGroup's Guaranty of the Prepetition Lenders' Claims***.  The order approving the Postpetition Financing Agreement provided the Creditors' Committee with standing to commence an adversary proceeding or contested matter (i) challenging the amount, validity, enforceability, priority or extent of the prepetition claims arising out of the Prepetition Credit Agreement or the Prepetition Lenders' security interests in and liens upon the prepetition collateral, or (ii) otherwise asserting any claims or causes of action against the Prepetition Lenders on behalf of the Debtors' estates.  The Creditors' Committee has conducted an investigation and analysis of the Prepetition Lenders' liens and claims and found no defects in respect of technical issues of perfection of their liens.  As part of its investigation into more fact-based challenges, the Creditors' Committee prepared a complaint that, among other things, seeks to avoid the Prepetition Lenders' claims against SemGroup, L.P., which was an upstream guarantor of SemCrude's borrowings under the Prepetition Credit Agreement.  The global compromise embodied in the Plan would resolve such potential litigation, as well as any other claims the Creditors' Committee may have against the Prepetition Agent and the Prepetition Lenders acting in such capacity.  The Creditors' Committee and the Prepetition Administrative Agent, on behalf of the Prepetition Lenders, have agreed to extend the deadline with respect to these and other potential challenges until November 30, 2009.  The Creditors' Committee reserves the right to commence such litigation in the event the Plan has not become effective by such date.

***Challenge to the Validity and Accuracy of the Intercompany Claims***.  Additionally, the Creditors' Committee believes there may exist various bases to contest the amount, allowance and priority of certain Intercompany Claims which the Plan, to the extent they are allowed, deems to constitute collateral securing the claims of the Prepetition Lenders.

***Existence of Senior Notes Claims at Wyckoff***.  The Creditors' Committee disputes the Debtors' contention that Senior Notes Claims pursuant to a guarantee of the Senior Notes Indenture at non-Debtor Wyckoff were released prior to the Petition Date.

As discussed above, after careful review of the potential recoveries under various litigation outcomes of the Creditors' Committee Intercreditor Issues; and after considering the complexity and uncertainty of the outcomes of such litigation; the expense, inconvenience and delay necessarily attending it; and the paramount interests of the Creditors in having an expeditious reorganization; the Creditors' Committee has concluded that unsecured Creditors will be best served by agreeing to the settlements and compromises embodied in the Plan. Nothing in this Disclosure Statement or the Plan is to be construed as a waiver of any rights or claims the Creditors' Committee may have in the event the Plan is not confirmed or does not become effective.

## D.    PRODUCERS' COMMITTEE STATEMENT

*At the request of the Producers' Committee, the Debtors have included in the Disclosure Statement the following discussion provided by the Producers' Committee.*

The Plan embodies a significant settlement achieved by the Producers' Committee after months of contentious litigation and negotiations. The Producers' Committee unanimously supports the Plan as the best way to ensure a prompt and fair resolution of the Debtors' Chapter 11 Cases and the claims of Producers as against the Debtors and the Prepetition Administrative Agent, while still preserving rights and claims of Producers as against Downstream Purchasers. The compromise will result in immediate payment of the Twenty-Day Claims of Producers, as well as providing meaningful value on account of statutory lien and trust claims of Producers. Absent the settlement, Producers would continue to litigate both Twenty-Day Claim issues, as well the priority of their lien and statutory trust. Litigation is costly, time consuming, and uncertain.  In light of these considerations, the Producers' Committee believes the settlement as embodied in the Plan is fair and reasonable.

## E.    POSITION STATEMENT OF CERTAIN TRADING PARTNERS AND CUSTOMERS OF THE DEBTORS

*At the order of the Bankruptcy Court, the Debtors have included in the Disclosure Statement the following statement of position provided by certain of the Debtors' trading partners and customers, including J. Aron & Company, BP Oil Supply Company, and ConocoPhillips Company (the "Trading Partners and Customers").*

The Trading Partners and Customers contend that the Plan as currently drafted purports to settle claims with the Producers using money that the Debtors are not entitled to use. Specifically the Plan conditions its effectiveness on the "release from escrow of the Restricted Cash," consisting of $122.1 million, see § I.B.10.k(v) above and Definition 1.203 below, tendered by the Trading Partners and Customers, without providing such parties any consideration for the use of those funds, which serve as cash collateral to secure the Trading Partners and Customers' claims against the Debtors, and in which the Trading Partners and Customers retain, among other things, recoupment rights, and are deemed to remain in possession of those funds.  The Trading Partners and Customers have opposed such relief on the grounds that it violates the Trading Partners and Customers' secured rights under the Bankruptcy Code, their contracts with the Debtors, and the express terms of the agreed-upon Bankruptcy Court orders under which the Trading Partners and Customers tendered the Restricted Cash.  The

Plan also unlawfully purports to limit the jurisdiction of the Bankruptcy Court to decide "core" bankruptcy matters that are within its exclusive jurisdiction, including by dismissing claims that, as a procedural matter, the Plan and Plan proponents have no ability to accomplish. The Plan is also not feasible given the Plan's requirement that it become effective by November 30, 2009. In any event, no order purporting to release the Restricted Cash can become effective until the time for any appeal or further appeal from any such order has expired, and no appeal could be resolved by November 30, 2009.

## F.     RESERVATION OF RIGHTS

If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, the Plan will be deemed null and void. In such event, nothing contained in this Disclosure Statement or in the Plan will be deemed to constitute a waiver or release of any Claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## II.     INTRODUCTION TO DISCLOSURE STATEMENT

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Fourth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated September 25, 2009, filed by the Debtors with the United States Bankruptcy Court for the District of Delaware and (ii) the Confirmation Hearing scheduled for October 26, 2009, commencing at 10:00 a.m. Prevailing Eastern Time. This Disclosure Statement supersedes the Disclosure Statement for the Second Amended Joint Plan of Affiliated Debtors that was approved by the Bankruptcy Court on July 21, 2009 and the Third Amended Joint Plan of Affiliated Debtors that was filed with the Bankruptcy Court on July 21, 2009.

On September 25, 2009, the Bankruptcy Court, pursuant to section 1125 of the Bankruptcy Code, approved this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT EITHER OF THE FAIRNESS OR THE MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

The Disclosure Statement and Voting Procedures Order, a copy of which is annexed hereto as Exhibit C, sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, the applicable standards for tabulating Ballots and the procedures for temporary allowance of claims for voting purposes. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the Ballot, and the

instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.    PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtors with adequate information to make an informed judgment about the Plan. This information includes, among other things, a description of the Debtors' businesses, a description of the Debtors' prepetition assets and liabilities, a summary of the Debtors' Chapter 11 Cases, a summary of the distributions to be made under the Plan, an explanation of the Plan mechanics and certain factors affecting the Debtors to be considered.

## B.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan (or proposed the plan) are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to Section V, "The Plan."

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Section XIII, "Confirmation of the Plan."

In the event that a Class of Claims entitled to vote does not vote to accept the Plan, the Debtors' determination whether to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code will be announced prior to or at the Confirmation Hearing.

## C.    VOTING PROCEDURES

To determine whether you are entitled to vote on the Plan, refer to Section II.B, "Holders of Claims Entitled to Vote." If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached exhibits and the instructions accompanying the Ballot. Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot(s) in the postage-paid envelope provided.

Refer to Section II.C., "Voting Procedures" and <u>Exhibit C</u> "Disclosure Statement and Voting Procedures Order" for further information.

**To be sure your Ballot is counted, your Ballot must be received by the Balloting Agent, Financial Balloting Group LLC, as instructed on your Ballot, no later than 4:00 p.m. Prevailing Eastern Time on October 21, 2009. Your Ballot will not be counted if received after the Voting Deadline. Refer to Section II.C., "Voting Procedures" for further information.**

If you must return your Ballot to your bank, broker, agent, or nominee, then you must return your Ballot to such bank, broker, agent, or nominee in sufficient time for them to process your Ballot and return it to the Debtors' Balloting Agent before the Voting Deadline. Your Ballot will not be counted if received after the Voting Deadline. Refer to Section II.C., "Voting Procedures" for further information.

DO NOT RETURN YOUR SECURITIES OR ANY OTHER DOCUMENTS WITH YOUR BALLOT.

It is important that Creditors exercise their right to vote to accept or reject the Plan. **Even if you do not vote to accept the Plan, you may be bound by it if it is accepted by the requisite holders of Claims. Refer to Section XIII, "Confirmation Of The Plan" for further information.** The amount and number of votes required for confirmation of the Plan are computed on the basis of the total amount of Claims actually voting to accept or reject the Plan.

*Your Claims may be classified in multiple classes, in which case you will receive a separate Ballot for each class of Claim.* For detailed voting instructions and the names and addresses of the persons you may contact if you have questions regarding the voting procedures, refer to your Ballot or to Section II.C., "Voting Procedures" for further information.

**Holders of Senior Notes Claims will receive greater distributions if any Class of Senior Notes votes to approve the Plan. If all Classes of Senior Notes Claims vote against the Plan, then holders of Senior Notes Claims will receive Litigation Trust Interests, but will receive fewer shares of New Common Stock and no Warrants.**

**Holders of General Unsecured Claims will receive greater distributions if their Class of General Unsecured Claims votes to approve the Plan. If any Class of General Unsecured Claims votes against the Plan, then holders of that Class of General Unsecured Claims will receive Litigation Trust Interests, but will receive fewer shares of New Common Stock and no Warrants.**

*THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS. THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.*

## D.   CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled the Confirmation Hearing on October 26, 2009 at 10:00 a.m. Prevailing Eastern Time, in Courtroom 1 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before October 21, 2009 at 4:00 p.m. Prevailing Eastern Time.

## III.   GENERAL INFORMATION

## A.   BACKGROUND OF THE SEMGROUP COMPANIES

Based in Tulsa, Oklahoma, SemGroup was founded in April 2000 by three principals: (i) Thomas L. Kivisto, SemGroup's former President and CEO, was responsible for oil and commodities trading activities; (ii) Gregory Wallace, SemGroup's former Chief Financial Officer, was responsible for financial and administrative matters; and (iii) Kevin Foxx, SemGroup's former Executive Vice President and Chief Operating Officer and SGLP's current President and CEO, was responsible for operations and commercial issues. SemGroup was created principally through a series of acquisitions from April 2000 through March 2008 for cumulative purchase prices of approximately $1.1 billion. SemGroup's limited partners also included affiliates of Carlyle/Riverstone and Ritchie Capital. From SemGroup's inception through the Petition Date, Mr. Kivisto, Mr. Wallace, and Mr. Foxx continued to control and make key decisions concerning their respective areas of expertise.

Prior to the commencement of the Chapter 11 Cases, the SemGroup Companies were a privately-held group of companies that operated in North America and the west coast of the United Kingdom. Certain of the SemGroup Companies' business units conducted physical and financial marketing and trading activities to take advantage of seasonal and regional market price differences for various energy commodity products and to utilize the SemGroup Companies' transportation and storage assets. The SemGroup Companies also provided midstream energy-related services such as gathering, storage, transportation, processing and distribution services for energy commodities including crude oil, refined petroleum products, natural gas, NGL, and asphalt, both to third party customers and to themselves.

Since SemGroup's formation, its commodities trading activities were directed principally by Mr. Kivisto and included speculative transactions that exposed SemGroup to increasing risk. Specifically, it was Mr. Kivisto's practice to roll forward losing positions with the hope that the unrealized losses would expire as the price of oil normalized. With the sharp increase in the price of crude oil in 2007 and the first half of 2008, the volume of written call options "rolled forward" by SemGroup dramatically increased, significantly increasing the risk of loss as well as the amount SemGroup was required to expend on margin calls. The increased margin requirements had a severe negative impact on SemGroup's liquidity position, which worsened significantly in the weeks leading up the commencement of the Chapter 11 Cases. In response to its liquidity issues, SemGroup sold all of the NYMEX trading accounts held in its commodity

futures brokerage accounts to Barclays on July 15, 2008, which resulted in the conversion of SemGroup's unrealized losses into realized losses for SemGroup totaling in excess of $2.4 billion. At the same time, SemGroup's OTC trading book was approximately $850 million negative on a mark-to-market basis. As a result of the foregoing and other economic issues, SemGroup faced a liquidity crisis and commenced the initial Chapter 11 Cases on July 22, 2008. See Section IV.A, "Events Leading up to Commencement of Chapter 11 Cases."

During the Chapter 11 Cases, the SemGroup Companies continued to operate their various midstream energy-related services, disposed of limited non-core assets, and continued construction of certain projects. Certain of the SemGroup Companies also continued marketing activities to fulfill contractual obligations and to utilize their asset base in accordance with the Trading Protocol.

## B.     REORGANIZED SEMGROUP COMPANIES

After the Effective Date, the Reorganized SemGroup Companies expect to continue to be based in Tulsa, Oklahoma. Their parent company's Class A New Common Stock will be publicly-traded due to the expected number of holders and the parent company will be required to file periodic reports under the Securities Exchange Act. The Reorganized SemGroup Companies will seek to list the Class A New Common Stock for trading on a recognized national securities exchange or market system. The Reorganized SemGroup Companies' primary focus will continue to be providing midstream energy-related services to third party customers and themselves, including gathering, marketing, storage, transportation, processing and distribution for energy commodities including crude oil, natural gas, NGLs, asphalt, and refined products. Some businesses are expected to undertake marketing activities, which would include purchasing and selling commodities to and from various counterparties and customers through a variety of arrangements, including through contracts and exchange trades, to support their primary business operations and utilize assets as permitted under the Risk Management Policy. The Reorganized SemGroup Companies' operations will be on a smaller scale than those conducted prior to the commencement of the Chapter 11 Cases due to a shift away from significant marketing and trading related activities and the disposition of certain assets.

The Reorganized SemGroup Companies will provide their midstream energy-related services in North America from an owned, contracted and leased asset base consisting of pipelines, gathering systems, storage facilities, terminals, processing plants, trucks, and other distribution facilities. The North American services are expected to be provided to production, marketing, trading, wholesale, industrial, commercial, and retail customers. The Reorganized SemGroup Companies will provide their United Kingdom services from owned storage, terminal and marine facilities that have pipeline connectivity to nearby refineries and seaborne transportation services. The United Kingdom midstream services are expected to be provided to customers for trading, structural marketing storage, and compulsory stock storage.

The principal business strategy of the Reorganized SemGroup Companies will be to utilize their assets and operational expertise to:

- Provide consistently high-quality midstream services under predominantly fee and margin based contractual arrangements;

- Minimize commodity price risk exposure;

- Expand business by improving, enhancing, and expanding services at existing facilities and gaining new customers;

- Aggressively manage operating costs to maintain and improve operating margins;

- Improve operational efficiencies;

- Undertake selected growth opportunities with acceptable risk and return profiles;

- Generate sustainable and consistent revenues, operating margins, earnings, and cash flow; and

- Undertake a disciplined capital management program to insure the Reorganized SemGroup Companies have adequate liquidity on a long term basis to support operations.

The Reorganized SemGroup Companies are expected to operate through six primary business units: SemCrude, SemStream, SemCAMS, SemEuro, SemMexico and SemGas.

- SemCrude gathers, blends, transports, stores, markets, and distributes crude oil in the United States and gathers, blends and markets crude oil in Canada (part of SemCanada Crude);

- SemStream purchases, transports, terminals, stores, and distributes propane and other NGLs in the United States;

- SemCAMS processes natural gas in Canada;

- SemEuro receives, stores and redelivers clean petroleum and crude oil products in the United Kingdom;

- SemMexico purchases, produces, stores, and distributes liquid asphalt cement products throughout Mexico; and

- SemGas stores, gathers, compresses, treats and processes natural gas in the United States.

A condensed version of the anticipated structure of the Reorganized SemGroup Companies is included below.



---

[1] Formerly, SemGroup Finance. SemGroup, L.P. will be dissolved on the Effective Date.

For historical financial information regarding these business units, see the Historical Financial Statements at Exhibit E. For projections regarding these business units, see Section VI.A, "Financial Information and Valuations." Please note that prior to the Petition Date, the SemGroup Companies conducted substantial marketing activities (which were the largest contributor to the EBITDA of the SemGroup Companies), but since the Petition Date, the SemGroup Companies have conducted only limited marketing activities. As a result, the financial condition and results of operations of the SemGroup Companies prior to the Petition Date will not be indicative of the financial condition or results of operations after the Effective Date.

As of the Petition Date, SemGroup was a limited partnership and substantially all of its subsidiaries were limited partnerships that were disregarded entities for federal income tax purposes. As a result, substantially all of SemGroup's income taxes were borne by the Equity Interest holders. After giving effect to the restructuring activities contemplated by the Plan, on the Effective Date, New Holdco, a Delaware corporation, will be the ultimate owner of all of the entities that constitute the Reorganized SemGroup Companies. All of the Reorganized SemGroup Companies' income taxes will be borne directly by the Reorganized SemGroup Companies.

All of the SemGroup Companies' employees are, and following the Effective Date are expected to be, employed by SemManagement and various international subsidiaries. SemManagement employs all of SemGroup's domestic employees and makes such employees available to the SemGroup Companies through Personal Services Agreements.

SemGroup Holdings, an indirect subsidiary of the SemGroup Companies, is currently in default under the SemGroup Holdings Loan Agreement. Since the SemGroup Holdings bankruptcy case is not jointly administered with the Chapter 11 Cases, the SemGroup Holdings Loan Agreement will not be affected by the Confirmation of the Plan and will be separately addressed in the SemGroup Holdings bankruptcy case. SemGroup Holdings is not expected to be part of the Reorganized SemGroup Companies.

## 1. SemCrude (including SemCanada Crude)

SemCrude conducts crude oil transportation, storage, terminalling, gathering, blending and marketing in Colorado, Kansas, New Mexico, Nebraska, Wyoming, Oklahoma, Texas, North Dakota, Montana, and Western Canada for third party customers as well as for itself. The SemCrude business unit consists of four primary operations listed in order of their projected financial contribution: (i) White Cliffs pipeline; (ii) Kansas and Oklahoma pipeline; (iii) Cushing storage; and (iv) SemCanada Crude. A majority of SemCrude's projected financial performance is generated from fee-based contractual arrangements that in some instances are fixed and not dependent on usage. SemCrude is projected to be the most significant contributor to the Reorganized SemGroup Companies' financial performance and is presently projected to contribute approximately 48% of the Reorganized SemGroup Companies' EBITDA for fiscal year 2010.

a.    Assets and Operations

*White Cliffs Pipeline*

White Cliffs, a subsidiary of SemCrude, has completed construction of the White Cliffs pipeline, a 524 mile common carrier crude oil pipeline system that originates in Colorado and terminates in Cushing, Oklahoma. The White Cliffs pipeline provides DJ Basin producers direct access to the Cushing market and refiners in the Mid-Continent area. The White Cliffs pipeline project also includes a 100,000 barrel crude oil storage tank and a truck unloading facility owned and operated by SemCrude and located and connected at the White Cliffs pipeline's origination point at Platteville, Colorado. The White Cliffs pipeline's initial design capacity is 29,700 barrels of crude oil per day with one pump station, but the White Cliffs pipeline system can be expanded to 50,000 barrels per day if additional existing stations are brought on line or 70,000 barrels per day if additional pump stations are constructed. The White Cliffs pipeline became fully operational on June 1, 2009.

SemCrude Pipeline, White Cliffs' immediate parent entity, entered into a separate financing agreement to fund the construction costs of the White Cliffs pipeline. See Section VI.C, "Summary of Capital Structure of the Reorganized SemGroup Companies" below for additional details on the financing. To provide a consistent revenue stream and support the White Cliffs financing, White Cliffs entered into five-year throughput agreements with two shippers, each of which have minimum transport commitments of 10,000 barrels of crude oil per day.

White Cliffs is owned 99.17% by SemCrude and 0.83% by the two shippers that entered into the throughput agreements for the White Cliffs pipeline. Each shipper has an option to increase its ownership of White Cliffs to a maximum of 24.5% under the terms of the White Cliffs operating agreement. The shippers' options expire upon the earlier of (i) 30 days after the 30,000 Barrel Threshold Date (as defined in the White Cliffs operating agreement) and (ii) June 1, 2010. To exercise the options, the shippers must pay SemCrude a proportionate share of the White Cliffs pipeline construction costs associated with the option ownership percentage together with a specified premium set forth in the White Cliffs' operating agreement.

*Kansas and Oklahoma Pipeline*

SemCrude owns and operates approximately 620 miles of gathering and transportation pipeline systems and related pipeline storage tanks in Kansas and northern Oklahoma that transport crude oil. The Kansas and Oklahoma pipeline system connects to several third party pipelines in Kansas and Oklahoma, several refineries, and storage terminals located at Cushing, Oklahoma. The Kansas and Oklahoma pipeline systems can currently transport approximately 32,700 barrels of crude oil per day. SemCrude expects to construct a 100,000 barrel storage tank at its Cunningham, Kansas location to allow for the batching of Kansas crude oil in the White Cliffs pipeline. If the storage tank is constructed, it would enable SemCrude to transport an additional 5,000 barrels of crude oil per day.

*Cushing Storage*

SemCrude owns and is constructing crude oil storage in Cushing, Oklahoma, the designated delivery point for NYMEX crude oil contracts and one of the largest crude oil markets in the United States. SemCrude has 3.6 million barrels of owned crude oil storage in operation and an additional 0.5 million barrels of owned crude oil storage under construction in Cushing that is expected to be completed in September 2009. SemCrude directly utilizes and provides to customers fee-based storage and terminal services from owned and leased assets in Cushing. Currently, all of SemCrude's owned operating storage capacity at Cushing is leased to customers.

To further expand its Cushing operations, SemCrude is also constructing a new delivery/receipt pipeline to connect its Cushing operations to TEPPCO's Cushing facility, the terminal where all NYMEX barrels are traded. This line is expected to be operational in the fourth quarter of 2009 and will enable SemCrude and its customers to directly deliver barrels to all other Cushing terminals.

*SemCanada Crude*

SemCanada Crude purchases, aggregates, and blends crude oil in Western Canada, North Dakota, and Montana. SemCanada Crude purchases various grades of crude oil primarily at pipeline and facility receipt locations from small to medium-sized producers and energy trusts. It then aggregates the purchases primarily for sale to independent refiners in Eastern Canada and the northern tier of the United States, as well as to other crude oil aggregators at various aggregation points in Canada and the United States. SemCanada Crude currently markets approximately 20,000 barrels per day of crude oil and is a shipper on all major Canadian feeder pipelines and on a number of trunkline pipelines in Canada.

In addition to the aggregation of crude oil, SemCanada Crude manages and provides marketing for ten blending facilities, of which five are owned by SemCanada Crude, two are owned by SemCrude and three are owned by third parties. In relation to these facilities, SemCanada Crude purchases various grades of crude oil and diluents and, through its blending process, upgrades the product quality of purchased barrels to sell them at higher margins.

SemCanada Crude's North Dakota/Montana aggregation and blending business is supported by assets owned by SemCrude. While SemCrude owns the assets, SemCanada Crude provides operational services by transporting crude oil within the area and between North Dakota and Canada as well as providing gathering, blending, storage services and pipeline transportation services via owned trucks and a historical allocation on the Enbridge North Dakota Pipeline.

*Contracted Assets and Arrangements*

In addition to its owned assets, SemCrude has multiple contractual arrangements with third parties, including SGLP. For further information concerning SemCrude's relationship with SGLP, see Section III.F, "Relationship with SGLP." Specifically, SemCrude and SGLP are parties to a throughput agreement which provides SemCrude access to additional storage capacity at Cushing, Oklahoma, access to SGLP's Oklahoma and Texas crude oil pipelines, storage along SGLP's Oklahoma and Texas pipelines, and truck transportation for crude oil in

Kansas, Oklahoma, and Texas. SemCrude pays market-based fees to SGLP based on the number of barrels of crude oil SGLP gathers, transports, terminals, or stores on SemCrude's behalf, and there are no minimum throughput requirements.

      b.    <u>Revenues and Marketing</u>

A majority of SemCrude's projected revenues will be derived from fee-based contractual arrangements with third party customers. The White Cliffs pipeline's two throughput contracts require each shipper to pay a fixed per barrel tariff rate for the capacity allocated to it on the pipeline regardless of the capacity actually utilized. The agreements run through May 2014. The Kansas and Oklahoma pipeline system transportation and storage is provided to customers on fee-based arrangements typically based on usage with varying term lengths. Cushing storage capacity is provided to customers under fixed fee contractual arrangements typically based on the amount of storage capacity reserved for each customer.

In addition to third party customer revenues, SemCrude expects to generate revenues from limited marketing activities utilizing its assets. SemCrude's United States marketing will include purchasing crude oil for its own account from producers and aggregators and selling crude oil to end users or refiners. SemCanada Crude generates revenues by aggregating crude oil purchases and then selling crude oil in bulk to independent refiners and other crude oil aggregators.

SemCrude will manage marketing price risk by selling and purchasing like quantities of crude oil with purchase and sale transactions or entering into future delivery and purchase obligations with futures contracts, in effect "back-to-back" transactions (purchases and sales of crude oil are predominantly matched). In addition, sale and purchase prices are set to lock in positive margins for SemCrude, meaning the sales price is sufficient to cover purchase costs, any other fixed and variable costs, and SemCrude's profit. All marketing activities will be subject to the Risk Management Policy which will establish limits to manage risk and mitigate financial exposure.

      c.    <u>Market and Competitive Strength</u>

Crude oil commodity prices have experienced unprecedented volatility over the past 24 months with prices ranging from near $30 per barrel to over $140 per barrel. While SemCrude is impacted to a degree by crude oil price movements, a majority of SemCrude's revenues are predicated on fee-based contractual arrangements for transportation and storage which in some instances are fixed and not dependent on usage. For contracts that are fixed fee and not dependent on usage, SemCrude's revenues should be as projected unless a counterparty defaults under a contractual arrangement. For contracts that are dependent on usage, customers could reduce their volume usage if crude oil prices are insufficient to support economic movement of crude oil. SemGroup believes that SemCrude's financial projections are reasonable given that they were developed using recent usage on the Debtors' systems and recent crude oil prices that were significantly below the 24-month highs.

SemCrude's transportation and storage assets can act as a natural hedge. In a declining or bearish price market, the demand for storage could increase as customers choose to store crude

oil and wait for price improvements or sell it forward for delivery at a future date. In an increasing price market, the demand for transportation could increase as customers desire to promptly deliver their products to take advantage of the favorable price environment.

Crude oil prices may impact the volume of crude oil that SemCrude is able to market. If prices decline, then producers may scale back production due to limited profitability, which would have the effect of reducing the availability of production purchases for SemCrude and the volume of crude oil being traded. SemCrude does not expect to have extensive exposure to crude oil price movements as it will sell crude oil to limit its exposure to price movements by locking in its margin at the time of purchase of crude oil.

### 2. SemStream

SemStream is a midstream energy business engaged in the terminalling, marketing and distribution of NGL commodities, primarily propane, and its operations extend to over 40 states. SemStream owns assets that are located in some of the key areas of high propane demand in the United States. SemStream's operations include sales to retail, wholesale and commercial customers matched with purchases from suppliers, and encompass four primary focus areas: (i) private terminal operations; (ii) wholesale marketing at private terminals and six common carrier terminals; (iii) NGL supply to retail, petrochemical and commercial customers; and (iv) residential propane supply through SemStream Arizona.

As a result of the Chapter 11 Cases, some SemStream customers have limited their exposure by reducing their purchases from SemStream. However, the most significant impact has been the loss of the SemStream contract supplier base since the Petition Date. SemStream expects to rebuild its customer and supplier base over the next three years to its pre-Petition Date levels and is expected to be a primary contributor to the Reorganized SemGroup Companies' financial performance; it is projected to contribute approximately 16% of the forecasted EBITDA in fiscal year 2010. SemStream's projected financial performance is predicated on fee-based throughput arrangements and margin generated from propane and other NGL purchases and sales.

### a. Assets and Operations

SemStream owns and operates 11 private terminals with a throughput capacity of over 325 million gallons of propane and normal butane per year. The terminals are located in seven states covering the Mid-South, upper Mid-West and Pacific Northwest regions of the United States. In support of the terminal operations and marketing business, SemStream has access to 8.0 million barrels of storage for NGL products, some owned and some held through lease arrangements; 15 miles of underground pipeline that connect various terminals to supply sources; and a significant rail fleet with 479 leased and 25 owned railcars.

SemStream Arizona is a wholly-owned subsidiary of SemStream and is engaged in retail sales and distribution of propane. It includes a regulated utility business and a non-regulated bulk business, serving over 12,000 residential customers in Arizona. SemStream Arizona's assets include over 200 miles of underground pipelines, propane storage and other equipment.

The Arizona regulated business serves two areas, Payson (about 85 miles north of Phoenix) and Page (near the Arizona/Utah border).

b.    Revenues and Marketing

SemStream's operations generate revenues from the private terminal operations by charging throughput fees on all products moving through its owned terminals. SemStream Arizona generates revenues by selling propane directly to residential customers at a margin.

SemStream is also engaged in wholesale propane marketing and NGL supply businesses. The wholesale marketing business sells propane from the 11 private terminals SemStream owns and conducts wholesale marketing on six common carrier pipelines. The common carrier pipelines serve customers in the Southeast, Northeast, and the upper Midwest regions of the United States. SemStream also has exclusive marketing agreements to market third party facilities, which include two refineries, a propane terminal and a group of gas plants. Most of the exclusive marketing agreements are multi-year term agreements structured with purchases at an index and sales at an index plus. The wholesale customer base consists of small and large retailers, multi-state marketers, rural electric cooperatives, and wholesalers. The NGL supply business consists of supplying propane to retail customers and other feedstocks to petrochemical, refining and other industrial/commercial customers.

The marketing business focuses on propane, but also includes the sale of other NGLs including normal butane, isobutane and natural gasoline. Propane sales are typically seasonal in nature with most sales occurring in the winter heating season. Although the other NGLs have some seasonality, they tend to be less seasonal than propane. The diversity of SemStream's customer base along with the mix of NGLs it markets helps reduce SemStream's seasonal variability; SemStream's summer to winter volume ratio is approximately 1.0:1.6 versus SemGroup's estimate of an industry volume ratio of approximately 1.0:2.5 (there are some areas where SemGroup estimates the industry ratio is as high as 1.0:4.0). SemStream limits price risk by locking in a margin through purchase and sale contracts that are structured at corresponding indexes typically with purchases priced at or below index and sales priced at index plus handling and a profit.

c.    Markets and Competitive Strength

NGL commodity prices tend to have some correlation to crude oil commodity prices and can experience the same volatility. However, this price volatility has limited impact on SemStream, as SemStream typically structures marketing transactions index-to-index with a negotiated differential to lock in a fixed margin. SemStream's other operations are fixed fee arrangements in which SemStream receives a fee for marketing the NGL products for the producer. The fee is a fixed percentage of the sales price and the producer retains the commodity price risk.

Although commodity prices could impact demand for SemStream's services, SemStream's diversity of customers and assets allows SemStream to adjust its customer and product mix in response to changes in demand. SemStream's assets are flexible and have the capability to handle multiple NGL products. While SemStream's operations predominantly

focus on propane in seven states, SemStream operates in areas where propane serves more than 10% of the heating demand in these states. Where propane is a primary or sole heating source, demand for SemStream's propane services is fairly inelastic. In addition to providing propane for heating needs, SemStream provides propane and other NGLs to commercial and industrial customers who use the products in a variety of applications from petrochemical feedstocks to refrigeration and fuel use in transportation equipment.

### 3. SemEuro

SemEuro consists of SemGroup's wholly-owned subsidiary, SemLogistics, which owns the largest independent petroleum products storage facility in the United Kingdom. The facility is located on the north bank of the Milford Haven Waterway on the west coast of Wales. The main activities of SemEuro are the receipt, storage, and redelivery of clean petroleum and crude oil products via sea-going vessels at the Milford Haven site. SemEuro's projected financial performance is based on revenues associated with fixed-fee storage tank leases and related services. SemEuro is projected to contribute approximately 12% of the Reorganized SemGroup Companies' forecasted EBITDA for fiscal year 2010 and is a stand-alone entity with its own operating infrastructure and financing. See Section VI.C, "Summary of Capital Structure of the Reorganized SemGroup Companies."

#### a. Assets and Operations

SemEuro operates as a tank storage business with a commercial storage capacity of 8.5 million barrels. It offers build-bulk and break-bulk operations to its customers that transport products to and/or from the Middle East, Europe, the east coast of the United States, and the west coast of Africa. Build-bulk involves customers importing small cargos, building volume and exporting larger cargos; break-bulk involves customers importing large cargos and exporting smaller cargos.

SemEuro's storage facility includes approximately 80 above ground storage tanks, of which 52 are commercially active, 5 are used for operations, and the remaining 23 are no longer in operational use and are scheduled for demolition. The terminal has two deep water jetties that can accommodate vessels of up to 165,000 dead weight tons. It also has road/rail loading facilities (not in operation) and pipeline connectivity with a nearby Chevron refinery and the Mainline Pipeline Limited, which is owned by four major oil companies (Exxon, Chevron, Total, and Shell) and is expected to be re-commissioned for future delivery of jet fuel to Heathrow airport.

Approximately one-half of SemEuro's storage capacity is multi-product and provides flexibility to meet changing market and customer demands. SemEuro can provide customers with tank storage for clean petroleum products, including gasoline, gasoline blendstocks, jet fuel, gas oil and diesel, and crude oil. SemEuro also generates revenues by providing related services including tank cleaning, loading, transfers, and mixing of products.

Since its acquisition of SemLogistics in 2006, SemEuro has invested significant capital to refurbish and upgrade a majority of its tanks to extend their operational lives by another 20 to 30 years before additional significant capital investment will be needed. SemEuro has also received

approval to demolish the 23 inactive tanks and to construct up to nine new tanks with total storage capacity of 1.5 million barrels. The approval is valid through October 2013 and construction must begin by this time for the approval to remain valid.

b. <u>Revenues and Marketing</u>

SemEuro's revenues are generated from fixed-fee storage tank leasing and related services. SemEuro's customers fall into three broad categories: trading, structural marketing storage, and compulsory stock storage (storage of product within the European Union as a result of the International Energy Agency rules requiring member states to hold oil stocks in reserve). SemEuro's customers typically enter into contracts with terms of between two months and five years, with most of the existing customers having been in place for multiple seasonal contract cycles.

c. <u>Markets and Competitive Strength</u>

SemEuro's ability to handle multiple products limits its dependency on the demand for storage related to a single petroleum product and provides flexibility to change its operations in response to market conditions. Demand for independent storage terminals can be impacted by a wide range of influences such as the forward price curve, expanding oil production, security of supply concerns and mismatches in regional production and consumption of oil and liquid petroleum products. Current market factors have resulted in increased demand for storage due to worldwide demand for clean products and crude oil, concerns over supply security, instability in several of the world's largest crude oil producing countries, unprecedented fluctuations in energy commodities and the United Kingdom's structural shortage of jet fuel. SemEuro has been resilient through these changing markets due to its flexibility and location.

SemEuro's terminal size (approximately 23% of the total independent storage in the United Kingdom) and its vessel handling capabilities make it unique compared with other terminals. In addition to being the only independent United Kingdom facility that serves the bulk, transshipment sector, it is also the only facility capable of handling crude oil. The only other comparable facility in the British Isles is the Bantry Bay terminal in Ireland. However, the owner of this facility, ConocoPhillips, uses Bantry Bay exclusively for proprietary storage and storage of Irish strategic stocks.

Overall, SemEuro has a strong market position and faces minimal direct competition in the British Isles. SemEuro does compete with other European storage providers, predominantly in the Amsterdam, Rotterdam, and Antwerp regions.

*4.* *SemCAMS*

SemGroup acquired natural gas processing and gathering operations in Canada from Central Alberta Midstream, or CAMS, in March 2005. All of SemCAMS' assets are located in West-Central Alberta, in the heart of the Western Canadian Sedimentary Basin, which accounts for more than 80% of Canada's sour natural gas production. SemCAMS' projected financial performance is based on fee-based throughput arrangements and profit sharing from plant operations. SemCAMS is projected to contribute approximately 11% of the Reorganized SemGroup Companies' forecasted EBITDA for fiscal year 2010.

### a.     Assets and Operations

SemCAMS owns and operates varying working interests in (i) three sour natural gas processing plants, (ii) one sweet gas plant, and (iii) a network of more than 600 miles of natural gas gathering and transportation pipelines. The sour gas plants are dually connected to two major long-haul natural gas pipelines that serve Canada and the United States. The plants also have the ability to load product for transportation by truck and railcar.

To support operations at the plants, BP Canada Energy and Chevron Canada Resources committed to process all of their current and future natural gas production from lands owned by them, or their subsequent assignees, within a "dedicated area" comprised of approximately 180 townships located in and around the plants. The "dedicated area" covers approximately 35% of the volumes in the area around the plants. This dedication was assigned to SemCAMS in the CAMS acquisition and continues until field depletion.

### b.     Revenues and Marketing

SemCAMS generates revenues from the processing plants through volumetric fees for services under contractual arrangements with working interest owners and third party customers. While SemCAMS does not have direct exposure to commodity prices, demand for its' services are impacted by commodity prices. In addition, SemCAMS generates fee-based revenues from volume throughput on its pipelines. SemCAMS' customers include producers of varying sizes and energy trust companies.

### c.     Markets and Competitive Strength

SemCAMS' natural gas gathering and processing operations are located in an area that generates more than 90% of Canada's total natural gas production and more than 80% of Canada's total sour gas production. Natural gas is used for a variety of purposes in Canada including heating, electricity production, and other industrial processes. Demand for SemCAMS services is expected to be relatively stable due to the prolific natural gas production in the area in which SemCAMS operates. However, drilling activity has slowed in recent months because of lower commodity prices impacting SemCams slightly in the near term. Long term, SemCAMS expects replacement of declining reserves to support operations of its core assets.

### 5.     *SemMexico*

SemMexico operates the only national liquid asphalt network in Mexico. Its national asphalt network purchases, produces, stores, and distributes liquid asphalt cement products. SemMexico purchases asphalt from Pemex, Mexico's national oil company. SemMexico's projected financial performance is based on margin from contractual arrangements with customers and suppliers for liquid asphalt cement. In general, SemMexico's sales and purchases of asphalt are matched and SemMexico carries limited exposure to price movements. SemMexico is projected to contribute approximately 7% of the Reorganized SemGroup Companies' forecasted EBITDA for fiscal year 2010. SemMexico is a stand-alone entity with its own operating infrastructure and financing. See Section VI.C, "Summary of Capital Structure of the Reorganized SemGroup Companies" below for additional details on the financing.

a.    Assets and Operations

SemMexico's national liquid asphalt network consists of 11 manufacturing plants, two emulsion distribution terminals, and its national technical center and headquarters located in Puebla, Mexico. SemMexico also has an asphalt terminal under construction that is expected to be operational in the second quarter of 2010. SemMexico purchases asphalt from five local refineries of Pemex, which is, by law, the only company in Mexico that can refine crude oil to produce liquid asphalt cement. Pemex produces primarily one grade of liquid asphalt cement and does not produce other asphalt products. SemMexico purchases approximately 22% of Pemex's liquid asphalt cement and further processes the asphalt in combination with other raw materials to produce products that are sold to road contractors and government agencies.

b.    Revenues and Marketing

SemMexico generates its revenues from contractual arrangements with customers to procure liquid asphalt cement. In general, SemMexico's sales and purchases of asphalt are matched as SemMexico procures liquid asphalt cement on an as-needed basis thereby limiting price exposure to price movements on inventory.

c.    Markets and Competitive Strength

SemMexico believes that it has approximately a 25% market share of Mexico's asphalt products market and is the leader on asphalt pavement technologies and capabilities. It is the only asphalt company with a national footprint in Mexico. SemMexico has established relationships with government agencies, road contractors and suppliers. SemMexico is exposed to market risk such as the sustainability of road construction and maintenance funds from the Mexican government. However, it is expected that SemMexico's significant market share and relationships with government agencies will help insulate it, in part, from any reduced funding or demand.

6.    *SemGas*

SemGas is a midstream energy business providing gathering, processing and storage services. It has gathering and processing plants and assets in Kansas, Oklahoma, and Texas and 51% interest in a gas storage facility in upstate New York. SemGas aggregates gas supplies from the wellhead and provides various services to producers that condition the wellhead gas production for downstream markets. SemGas' projected financial performance is largely based on percent-of-proceeds and percent-of-index contractual arrangements where SemGas receives a portion of product sales as well as fee-based gathering service payments. SemGas is projected to contribute approximately 6% of the Reorganized SemGroup Companies' forecasted EBITDA for fiscal year 2010.

a.    Assets and Operations

SemGas currently owns and operates over 800 miles of gathering pipelines in Kansas, Oklahoma, and Texas, processing plants with 53 MMcfd of capacity, and an idled nitrogen treating plant with 13MMcfd. After completion of two plant expansions in Northern Oklahoma, SemGas' processing plant capacity will increase to 108 MMcfd.

SemGas' key assets include the Sherman processing plant in north-central Texas with over 400 miles of low pressure gathering lines; the Nash and Hopeton processing plants and gathering systems in Northern Oklahoma; the Eufaula gathering system, which gathers, dehydrates, and compresses gas in eastern Oklahoma; and a gathering system and treating plant in Kansas, including the only nitrogen rejection/helium recovery option in the area (which has been idled until market conditions support profitable operations). SemGas is also involved in several joint ventures focused on natural gas gathering and processing, including the Lakeview, Pine Hollow, and Hyde Creager gathering systems in Pittsburg County, Oklahoma, and a small gathering system joint venture in Harper County, Oklahoma.

SemGas holds a 51% ownership interest in Wyckoff, which owns the Wyckoff gas storage facility located in Steuben County, New York. The project is expected to provide in excess of 3.0 billion cubic feet of storage capacity and achieve 120 MMcfd withdrawal and 96 MMcfd injection capabilities. The project could provide SemGas with 1.5 Bcf of working gas storage capacity, net of its partner's interest. The project recently completed construction and is expected to be fully operational in the third quarter of 2009. The Wyckoff storage facility will have access to the New York City and Boston area markets through its connections to two major pipelines. The remaining interest in Wyckoff is owned by Kaiser-WGSP, which was appointed as manager of the project after the commencement of the Chapter 11 Cases.

Since the commencement of the Chapter 11 Cases, Wyckoff issued a $50 million promissory note in favor of Kaiser-WGSP for amounts required to be funded in connection with the construction of the Wyckoff storage facility. The note is secured by all of the assets of Wyckoff. All principal and interest on the note was due on August 4, 2009. On August 7, 2009, Kaiser-WGSP delivered to Wyckoff a notice of default and demand for payment for the approximately $39.4 million advanced under the note as of such date and the note is now bearing a default interest rate of prime plus 8% per annum. SemGas' indirect share of such drawn obligation is approximately $20.1 million. SemGas has had discussions with Kaiser-WGSP regarding a possible foreclosure forbearance period through March 31, 2010. There can, however, be no assurance that Kaiser-WGSP will ultimately agree to such a forbearance period or that it will not foreclose on its collateral. If a foreclosure should occur, it is not believed that there would be a material impact on the Plan valuation and economics.

b.    Revenues and Marketing

SemGas' revenues are generated from a portfolio of contracts that have an average remaining term of over seven years. The majority of the contracts provide upside potential by providing SemGas participation in commodity price and processing margin upswings through percent-of-proceeds and percent-of-index contracts. On these contracts, SemGas is generally responsible for marketing the gas and NGL for both its and the producers' share of the products. Percent-of-proceeds contracts are based on SemGas paying the producers a percentage of the sale proceeds from the products and percent-of-index contracts are based on SemGas paying the producers a percentage of the sale proceeds based on an index price. SemGas also has fee-based contracts for processing and gathering services. SemGas' customers include producers, operators, marketers and traders.

c.    Markets and Competitive Strength

SemGas' gathering and processing assets face somewhat limited competition as the assets tend to have relatively long term contracts and in some instances are the only assets that can provide the offered services to the customers. SemGas has also been strengthening its competitive position by expansions of its assets. Expansions of capacity in the northern Oklahoma plants can provide upside by accommodating higher gas processing volumes in the event gas commodity prices increase and drilling activity expands. In addition, the gathering system at the Sherman, Texas plant is being extended 18 miles to connect with wells that have been drilled and shut-in until a pipeline connection is constructed. SemGas' gathering and processing volumes can be impacted by market demand for the products it handles.

## C.    OFFICE FACILITIES

The Reorganized SemGroup Companies are expected to maintain their headquarters in Tulsa, Oklahoma. All of the United States business units will also utilize Tulsa as their center of operations except for SemCrude, which will continue to have its center of operations in Oklahoma City. The foreign business units will continue to utilize their existing centers of operations, which are Calgary, Alberta for SemCanada Crude and SemCAMS; Puebla, Mexico for SemMexico; and Milford Haven, Wales for SemEuro. Many of the business units also have satellite offices located throughout North America. The current Tulsa office lease expires in May 2011 and the other office leases have varying expiration dates.

## D.    EMPLOYEES

As of September 1, 2009, the Debtors' workforce consisted of approximately 971 employees, of which approximately 327 were located in the United States and the balance were located in Canada, Mexico and the United Kingdom. The Debtors expect the Reorganized SemGroup Companies' workforce to consist of approximately 1,000 employees, of which approximately 75% will be based in the United States and Canada and 25% will be based in the United Kingdom and Mexico. Certain employees in Canada and Mexico are represented by labor unions. As of September 1, 2009, the SemGroup Companies have never had a labor related work stoppage.

## E.    REGULATION

### 1.    *General*

The SemGroup Companies' and Reorganized SemGroup Companies' operations are subject to extensive regulation. The following discussion of certain laws and regulations affecting the SemGroup Companies should not be relied on as an exhaustive review of all regulatory considerations affecting the SemGroup Companies' operations due to the myriad of complex federal, state, provincial, foreign and local regulations that may affect the SemGroup Companies.

## 2. Regulation of United States Pipeline and Storage Operations

### a. Interstate Storage and Transportation

The SemGroup Companies' interstate pipeline and storage operations are subject to extensive regulation by FERC. The White Cliffs pipeline is subject to regulation by FERC to the extent the tariffs charged to shippers on the pipeline system are required to be submitted and approved by FERC. Under the ICA, FERC has authority to regulate companies that provide petroleum and natural gas based products pipeline transportation services in interstate commerce, including storage services (crude oil storage is not regulated). FERC's authority to regulate those interstate services includes the rates charged for services, terms and conditions of service, certification and construction of new facilities, extension or abandonment of services and facilities, maintenance of accounts and records, acquisition and disposition of facilities, initiation and discontinuation of services, and various other matters. Regulated companies may not charge rates that have been determined not to be "just and reasonable" by FERC, although, pursuant to authorization granted pursuant to the Energy Policy Act of 2005, FERC may now, under certain circumstances, approve market-based rates for storage services, even when the applicant cannot demonstrate a lack of market power. In addition, FERC prohibits petroleum and natural gas based products transportation and storage companies from unduly preferring or unreasonably discriminating against any person with respect to pipeline rates or terms and conditions of service. Failure to materially comply with applicable regulations under the NGA, Natural Gas Policy Act of 1978, Pipeline Safety Act of 1968, and certain other laws, and implementing regulations promulgated thereunder, could result in the imposition of administrative and criminal remedies and civil penalties of up to $1,000,000 per day, per violation. The rates, terms and conditions for the SemGroup Companies' service will be found in FERC-approved tariffs. Pursuant to FERC's jurisdiction over rates, existing rates may be challenged by complaint and proposed rate increases may be challenged by protest. Wyckoff is also regulated by FERC as it holds a Certificate of Public Convenience and Necessity and has approval to charge market-based rates for its services.

### b. Gathering and Intrastate Pipeline Regulation

The ICA and NGA do not apply to intrastate petroleum and natural gas based products facilities and activities (i.e., those that are not used or usable in the conduct of interstate commerce). Interstate gathering services are also exempt from regulation by FERC. The SemGroup Companies own a number of natural gas pipelines that it believes operate wholly intrastate and are therefore exempt from FERC regulation. The SemGroup Companies also own a number of intrastate crude gathering systems that are subject to state, provincial and local, but not federal, regulation.

In the states in which the SemGroup Companies operate, regulation of intrastate natural gas and crude gathering facilities and intrastate crude pipeline service generally includes various safety, environmental and, in some circumstances, nondiscriminatory take requirements and complaint-based rate regulation. For example, the SemGroup Companies' natural gas gathering facilities are, in some cases, subject to state ratable take and common purchaser statutes. Ratable take statutes generally require gatherers to take, without undue discrimination, natural gas production that may be tendered to the gatherer for handling. In certain circumstances, such

laws will apply even to gatherers like the SemGroup Companies that do not provide third party, fee-based gathering service and may require the SemGroup Companies to provide such third-party service at a regulated rate. Similarly, common purchaser statutes generally require gatherers to purchase without undue discrimination as to source of supply or producer. These statutes are designed to prohibit discrimination in favor of one producer over another producer or one source of supply over another source of supply. These statutes have the effect of restricting the SemGroup Companies' right as an owner of gathering facilities to decide with whom they contract to purchase or transport natural gas. The SemGroup Companies' intrastate crude pipeline facilities are subject to various state laws and regulations that affect the rates they charge and terms of service. Although state regulation is typically less onerous than regulation by FERC, proposed and existing rates subject to state regulation and the provision of non-discriminatory service are subject to challenge by complaint.

Intrastate crude oil pipelines and storage facilities are not regulated by the ICA. The SemGroup Companies own a number of intrastate crude oil gathering lines and storage facilities. These pipelines and storage facilities are normally regulated by various state agencies who have jurisdiction over the environmental and commercial (i.e. tariffs) aspects of the assets. Certain intrastate pipelines and storage facilities are regulated by the DOT or a state agency acting on behalf of the DOT as discussed below under Pipeline Safety.

      c.    <u>DOT</u>

All crude oil and liquefied petroleum gases interstate pipelines and certain intrastate crude oil and liquefied petroleum gases pipelines and storage facilities are subject to regulation by the DOT with respect to the design, construction, operation and maintenance of the pipeline systems and storage facilities. The DOT routinely conducts audits of the regulated assets and the SemGroup Companies must make certain records and reports available to the DOT for review as required by the Secretary of Transportation. In some states, the DOT has given a state agency authority to assume all or part of the regulatory and enforcement responsibility over the intrastate assets. The SemGroup Companies are also subject to OSHA regulations with respect to their pipeline and storage operations.

      d.    <u>Regulation of NGL Terminals, Distribution and Utility Operations</u>

All of SemStream's terminal operations and the Arizona non-regulated and regulated propane distribution operations are subject to the code set forth in the National Fire Protection Association Standard #58 ("NFPA 58"), Standard for the Storage and Handling of Liquefied Petroleum Gases. All of the states in which SemStream has operations have adopted some form of NFPA 58 and state agencies routinely conduct physical audits to insure compliance with such regulations.

SemStream's utility operations, Arizona Propane LLC, are subject to regulation by the Arizona Corporation Commission ("ACC"). The ACC regulates the sale price of propane gas to customers connected to Arizona Propane's underground propane gas systems in Payson and Page, Arizona. The ACC also conducts annual inspections of the Payson and Page utility underground pipeline systems under authority delegated to it from the DOT.

### e. Trucking Regulation

The SemGroup Companies operate a fleet of trucks to transport crude oil and oilfield materials as a private, contract and common carrier. The SemGroup Companies are licensed to perform both intrastate and interstate motor carrier services. As a motor carrier, the SemGroup Companies are subject to certain safety regulations issued by the DOT. The trucking regulations cover, among other things, driver operations, maintaining log books, truck manifest preparations, the placement of safety placards on the trucks and trailer vehicles, drug and alcohol testing, safety of operation and equipment, and many other aspects of truck operations. The SemGroup Companies are also subject to OSHA regulations with respect to their trucking operations.

### f. Natural Gas Transactions

The price at which the SemGroup Companies buy and sell natural gas is not currently subject to federal regulation and, for the most part, is not subject to state regulation. The SemGroup Companies' sales of natural gas are affected by the availability, terms and cost of pipeline transportation. As noted above, the price and terms of access to pipeline transportation are subject to extensive federal, state and provincial regulation. FERC is continually proposing and implementing new rules and regulations affecting various segments of the natural gas industry, most notably interstate natural gas transmission companies that remain subject to FERC's jurisdiction. Recently, FERC issued regulations requiring buyers and sellers of natural gas to report, on an annual basis, the volumes of their purchases and sales.

### g. Cross-Border Regulation

The SemGroup Companies' are subject to regulatory matters including export licenses, tariffs, customs and tax issues and toxic substance certifications. Regulations include the Short Supply Controls of the Export Administration Act, the North American Free Trade Agreement and the Toxic Substances Control Act. Violations of license, tariff and tax reporting requirements under these regulations could result in the imposition of significant administrative, civil and criminal penalties. Furthermore, the failure to materially comply with applicable tax requirements could lead to the imposition of additional taxes, interest and penalties.