### 3. Regulation of Canadian Gathering, Processing, Transportation and Marketing Businesses

*The National Energy Board.* Canada's NEB regulates the construction and operation of interprovincial and international pipelines and approves the transportation charges for such pipelines. This includes regulation of gas gathering and processing activities conducted by federal undertakings. Since the 1985 Agreement on Natural Gas Prices made between the Canadian federal government and the provinces of Alberta, British Columbia and Saskatchewan, the natural gas marketing business has been largely unregulated, with the terms of sale being set by negotiations between counterparties. The importation and exportation of natural gas to and from Canada, however, are regulated by the NEB. The Government of Alberta tracks volumes exported from Alberta and, although it has not previously done so, reserves the right to limit the volume of natural gas that may be removed from Alberta in the event of domestic supply constraint.

*The Alberta Energy Resources Conservation Board.* The operation of SemCAMS' gathering and processing assets, located in Alberta, is governed by Alberta's ERCB. In addition to being an independent, quasi-judicial tribunal, the ERCB adjudicates and regulates matters related to energy within Alberta to ensure that the development, transportation and monitoring of the province's energy resources are in the public interest. The ERCB has the authority to regulate the exploration for, and the production, gathering, processing, transmission and distribution of, natural gas conducted within the province and that is not conducted by a federal undertaking. SemCAMS' gathering and processing facilities fall within the ERCB's *Large Facility Liability Management Program*, intended to ensure an appropriate liability management program is in place, within the ERCB's *Sulphur Recovery Standards*, as set forth in Interim Directive 2001-3, and within other regulatory regimes imposed by the ERCB.

*Other Provincial Regulatory Agencies.* The gas processing and gathering industry is subject to federal and provincial environmental laws of general application as well as the environmental regulation set by the NEB and provincial energy regulators. SemCAMS' gas facilities are subject to requirements under facility licenses, regular inspections, monitoring and reporting. The operation of SemCanada's Canadian facilities is also subject to established occupational health and safety procedures and practices.

### 4. Regulation of United Kingdom Operations

In the United Kingdom, the Department of Energy and Climate Change's Energy Resources Development Unit is responsible for the regulation of a number of relevant areas, including licensing, fiscal policy, national oil stocks policy (including their compulsory oil stocking obligations as a member of the European Union and International Energy Agency), policy on oil disposal, offshore environmental policy, oil sharing arrangements and decommissioning. Other regulatory bodies include the Health and Safety Executive, which regulates health and safety in the upstream and downstream oil industry (among others) and the Hazardous Installations Directorate, which is responsible for inspection and enforcement of health and safety regulation with respect to the downstream oil industry (among others). There is no regulator dedicated specifically to the oil industry. The activities of SemEuro may also be regulated as a result of the European Union's participation in the International Carriage of

Dangerous Goods by Road and Rail agreements, as well as the International Maritime Dangerous Goods Code, which governs the safe transport of dangerous goods (including oil) by sea and in due course by the Marine Management Organization when it comes into being pursuant to the Marine and Coastal Access Bill.

At a local level, SemEuro's Milford Haven storage facility falls within the jurisdiction of the Milford Haven Port Authority, or the MHPA. Under the Milford Haven Port Authority Act 2002, the MHPA has the power to publish directions, for the purpose of promoting or securing conditions conducive to the ease, convenience or safety of navigation in Milford Haven, and the approaches to it. MHPA is currently consulting on the Milford Haven Port Authority General Directions (2006). MHPA also has powers and obligations under various regulations, including, among others, the Dangerous Substances in Harbour Areas Regulations 1987 and the Harbour Docks and Piers Clauses Act 1847, as well as responsibility for the enforcement of the Port Marine Safety Code.

### 5. *Regulation of Mexican Operations*

SemMexico is primarily engaged in the purchasing, producing, modifying, storage, and distribution of liquid asphalt cement products throughout Mexico. These activities are subject to compliance with environmental laws and regulations under Mexican technical "Official Standards" and other provisions that establish minimum technical requirements. Companies are required to obtain from the corresponding federal, local and/or municipal authorities, the relevant permits and authorizations to construct and operate asphalt modification plants and carry out the activities described above.

Mexico's Ministry of Communications and Transportation has published several construction standards establishing the specifications required for asphalt surfaces in connection with infrastructure projects, as well as certain manuals identifying the procedures for verifying compliance therewith.

Asphalt treatment, storage and distribution activities are considered hazardous under applicable environmental laws and regulations and are subject to the scrutiny of the Ministry of the Environment and Natural Resources, which is the governmental agency in charge of granting the authorization for the handling, transportation, treatment, storage, importation, exportation and final disposal of asphalt, among others. These authorizations are essential for SemMexico to be able to perform its activities in Mexico.

Coupled with the authorizations and permits that may be granted by the Ministry of the Environment and Natural Resources, asphalt transportation activities within Mexico are subject to having obtained a number of other federal and local permits, including federal licenses for the operators of transportation units mobilizing SemMexico's asphalt products.

### 6. *Environmental, Health and Safety Regulation*

a. General

The SemGroup Companies' operations, including their Canada, United Kingdom and Mexico operations, are subject to stringent laws and regulations by multiple levels of

government relating to the production, transportation, storage, processing, release and disposal of petroleum and natural gas based products and other materials or otherwise relating to protection of the environment.

The following is a summary of the more significant current environmental, health and safety laws and regulations to which the SemGroup Companies' business operations are subject. The SemGroup Companies believe that they are in compliance in all material respects with all applicable laws and regulations.

      b.    <u>Water</u>

The OPA was enacted in 1990 and amends provisions of the Federal Water Pollution Control Act of 1972, as amended, the Clean Water Act, as amended, and other statutes as they pertain to prevention of, and response to, oil spills. The OPA, the Clean Water Act and analogous state, provincial and local laws, subject owners of facilities to strict, joint and potentially unlimited liability for containment and removal costs, natural resource damages and certain other consequences of an oil spill, where such spill is into navigable waters, along shorelines or in the exclusive economic zone of the United States. The OPA and other analogous laws also impose certain spill prevention, control and countermeasure requirements, such as the preparation of detailed oil spill emergency response plans and the construction of dikes and other containment structures at storage facilities to prevent contamination of soils, surface waters and groundwater in the event of an oil overflow, rupture or leak. The OPA establishes a liability limit of $350 million for onshore facilities. However, a party cannot take advantage of this liability limit if the spill is caused by gross negligence or willful misconduct, resulted from a violation of a federal safety, construction or operating regulation, or if there is a failure to report a spill or cooperate in the cleanup.

The federal Clean Water Act, and analogous state and local laws impose restrictions and strict controls regarding the discharge of pollutants into waters of the United States and state waters including groundwater in many jurisdictions. Permits must be obtained to discharge pollutants into these waters. The Clean Water Act and analogous laws provide significant penalties for unauthorized discharges and can impose liability for responding to and cleaning up spills. In addition, the Clean Water Act and analogous state and local laws require individual permits or coverage under general permits for discharges of storm water runoff from certain types of facilities. Some states maintain groundwater protection programs that require permits for discharges or operations that may impact groundwater conditions.

In addition, federal, provincial and local laws in Canada; national, local and European Union regulations and directives in the United Kingdom; and federal, state and local laws in Mexico impose stringent and detailed requirements concerning water resources and the protection of water quality including those that regulate the discharge of pollutants and other harmful substances into water, require permits, impose clean-up obligations for spills and releases and impose fines and penalties for non-compliance.

c.    Sour Gas

SemCAMS operates facilities which process and transport sour gas (gas containing hydrogen sulfide, generally at concentrations of 10 ppm or more). Sour gas handling is regulated in Canada, at both the provincial and federal level, from the wellhead to the point of disposal of the sulfur content removed from processing the sour gas.

Pipelines transporting sour gas are equipped with monitoring stations and valves that automatically shut the flow of the pipeline in response to sudden changes in pressure or detection of sour gas in the atmosphere. SemCAMS' sour gas pipelines are monitored 24 hours per day from a centralized pipeline control center and can be shut down by the attending operators. The distance between automatic pipeline valves is determined based on regulated modeling to meet approved emergency protection zone size and public exposure requirements. The integrity of the sour gas pipelines is maintained through the injection of corrosion inhibition chemicals on an ongoing basis. SemCAMS' sour gas pipelines are inspected on a regular basis to ensure the integrity of the pipelines and associated facilities.

At SemCAMS' processing plants, sulfur recovery and air quality are constantly monitored to ensure required sulfur recovery and emission standards are met. Existing regulations require a sliding range of recovery depending on throughput. SemCAMS' required sulfur recovery ranges vary from 98.3% to 98.8%; operational history has shown actual recovery above license requirements at 98.7% to 99.2%. Residual sulfur that cannot be removed by processing is incinerated.

d.    Air Emissions

The SemGroup Companies' operations are subject to the federal Clean Air Act, as amended, as well as to comparable national, state, provincial and local, Canadian, United Kingdom, European Union and Mexican laws that are applicable to their Canadian, United Kingdom and Mexican operations. The SemGroup Companies believe that their operations are in compliance in all material respects with these applicable laws.

Amendments to the federal Clean Air Act enacted in 1990, as well as changes to state implementation plans for controlling air emissions in regional non-attainment areas, may require most industrial operations in the United States to incur capital expenditures in order to meet air emission control standards developed by the EPA and state environmental agencies. The federal Clean Air Act, as amended, also imposes an operating permit requirement for major sources of air emissions, or Title V permits, which applies to some of the SemGroup Companies' facilities. Other permits are required for certain processing plants and compressor stations.

Scientific studies suggest that emissions of certain gases, including carbon dioxide and methane, commonly referred to as "greenhouse gases," are contributing to warming of the Earth's atmosphere. In response to such studies, the United States Congress is considering a variety of legislative initiatives to reduce emissions of greenhouse gases. In addition, several states have already taken legal measures to reduce emissions of greenhouse gases, primarily through the planned development of greenhouse gas emission inventories and/or regional greenhouse gas cap and trade programs. Most of these cap and trade programs work by

requiring either major sources of emissions, such as electric power plants, or major producers of fuels, such as refineries and gas processing plants, to acquire and surrender emission allowances. The number of allowances available for purchase are reduced each year until an overall greenhouse gas emission reduction goal is achieved. Depending on the scope of a particular program, the SemGroup Companies could be required to purchase and surrender allowances for greenhouse gas emissions resulting from their operations (e.g., at compressor stations).

Also, the EPA may regulate greenhouse gas emissions from mobile sources (e.g., cars and trucks) even if Congress does not adopt new legislation specifically addressing emissions of greenhouse gases. The EPA has publicly stated their goal of issuing a proposed rule to address carbon dioxide and other greenhouse gas emissions from vehicles and automobile fuels but the timing for issuance of this proposed rule is unsettled as the agency reviews their mandates under the Energy Independence and Security Act of 2007, which includes expanding the use of renewable fuels and raising the corporate average fuel economy standards.

### e.  Solid Waste

The SemGroup Companies generate wastes, including hazardous wastes that are subject to the requirements of the RCRA, as well as to strict regulation at the national, provincial, regional and local level in Canada and Mexico, as well as national, local and European Union regulation in the United Kingdom. A substantial portion of the RCRA requirements do not apply to many of the SemGroup Companies' oil and gas wastes, which are exempt from regulation as hazardous wastes under RCRA; however, depending on their constituents, they may be subject to other regulatory standards limiting their levels in soil and groundwater.

### f.  Hazardous Substances

The Comprehensive Environmental Response, Compensation, and Liability Act, as amended, or CERCLA, also known as "Superfund," as well as other national, state, provincial and local, Canadian, Mexican, United Kingdom and European Union laws that are applicable to the SemGroup Companies' operations, can impose liability, often without regard to fault or the legality of the original act, on certain classes of persons that contributed to the release of a "hazardous substance" into the environment. These persons can include the current owner or operator of the site or sites where the release occurred and companies that disposed of, or arranged for the disposal of, the hazardous substances released into the environment. Under CERCLA, such persons may be subject to strict joint and several liability for the costs of cleaning up hazardous substances that have been released into the environment, for damages to natural resources, and for the costs of certain health studies. It is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances or other pollutants released into the environment. In the course of the SemGroup Companies' operations, they have generated, and will continue to generate, some wastes that fall within CERCLA's definition of a "hazardous substance" or are otherwise regulated under other environmental laws and they may be held jointly and severally liable under CERCLA or other laws for all or part of the costs required to clean up sites at which such hazardous substances have been released into the environment. In addition to CERCLA, environmental liability and cleanup laws have been enacted in each of the jurisdictions in which the SemGroup Companies operate.

g.    Environmental Remediation

The SemGroup Companies currently own or lease, and have in the past owned or leased, properties where hazardous materials or wastes have been disposed of or released and they may have liability at other locations where their wastes have been taken for processing, handling or disposal. Some of these properties may be subject to investigation and remediation requirements under CERCLA, RCRA or other national, state, provincial and local Canadian, Mexican, United Kingdom or European Union laws and regulations.

h.    OSHA

The SemGroup Companies are subject to the requirements of OSHA, as well as to comparable national, state, provincial and local, Canadian, Mexican, United Kingdom and European Union laws that are applicable to their Canadian, Mexican and United Kingdom operations concerning the health and safety of workers. In addition, the OSHA hazard communication standard requires that certain information be maintained about hazardous materials used or produced in operations and that this information be provided to employees; state, provincial and local government authorities; and citizens.

i.    Hazardous Materials Transportation Requirements

The DOT regulations affecting pipeline safety require pipeline operators to implement measures designed to reduce the environmental impact of oil discharge from onshore oil pipelines. These regulations require operators to maintain comprehensive spill response plans, including extensive spill response training for pipeline personnel. In addition, the DOT regulations contain detailed specifications for pipeline operation and maintenance.

j.    Anti-Terrorism Measures

The federal Department of Homeland Security Appropriations Act of 2007 requires DHS to issue regulations establishing risk-based performance standards for the security of chemical and industrial facilities, including oil and gas facilities that are deemed to present "high levels of security risk." The DHS issued an interim final rule in April 2007 regarding risk-based performance standards to be attained pursuant to the Act and, on November 20, 2007, further issued an Appendix A to the interim rules that establish chemicals of interest and their respective threshold quantities that will trigger compliance with these interim rules. To the extent the SemGroup Companies' facilities are subject to existing or new rules, it is possible that the costs to comply with such rules could be substantial.

**F.    RELATIONSHIP WITH SGLP**

SGLP is a master limited partnership formed by SemGroup in February 2007 to own, operate, and develop a diversified portfolio of midstream energy assets. SemGroup Holdings was formed in July 2007 to hold SemGroup's investment in SGLP. SemGroup Holdings controlled SGLP through ownership of its general partner, SemGroup Energy Partners G.P., L.L.C., which holds a 2% general partner interest and all of the incentive distribution rights in SGLP.

In July 2007, SGLP completed an initial public offering of 14,375,000 common units representing limited partnership interests. SemGroup sold 12,500,000 common units in the offering and SGLP sold 1,875,000 common units for net proceeds, before expenses, of $256.1 million and $38.7 million, respectively. Immediately following the initial public offering, SemGroup Holdings owned 12,570,504 subordinated units which represented a 37.4% limited partner interest in SGLP.

In connection with the initial public offering, SemCrude transferred to SGLP and certain of its affiliates crude oil assets for a purchase price of $102.0 million. SGLP financed this acquisition with funds borrowed under its credit facility. In February 2008, SGLP purchased substantially all of SemMaterials' domestic liquid asphalt cement terminalling and storage owned assets for a purchase price of $378.8 million. SGLP financed this acquisition through the public issuance of 6,900,000 of its common units and borrowings under its credit facility. On May 12, 2008, SemCrude transferred additional crude oil assets to SGLP and certain of its affiliates for a purchase price of $45.0 million. On May 30, 2008, SemCrude transferred additional crude oil storage and terminalling facilities to SGLP and certain of its affiliates for a purchase price of $90.0 million. SGLP financed both purchases in May 2008 with funds borrowed under its credit facility. SGLP initially derived substantially all of its revenue from contractual arrangements with SemCrude and SemMaterials for crude oil and liquid asphalt services, respectively. After the purchase of such assets, all of the employees of SGLP continued to be employed by SemManagement, a subsidiary of SemGroup, and certain of the SemGroup Companies provided services to SGLP under an omnibus agreement. The operations of the two companies were substantially interconnected.

On July 21, 2008, Manchester Securities and Alerian Capital Management, as the lenders under the SemGroup Holdings Loan Agreement, exercised their rights to vote as the sole members of the general partner of SGLP as the result of various defaults by SemGroup Holdings under the SemGroup Holdings Loan Agreement. Manchester Securities and Alerian Capital Management reconstituted the board of directors at SGLP's general partner to include two representatives from Manchester Securities, one representative from Alerian Capital Management and two existing independent directors. As a result, SemGroup ceased to have any representatives on the board of directors and no longer controlled SGLP even though it still owned SGLP's general partner.

On April 7, 2009, the Debtors and SGLP reached a global settlement of their respective claims relating to the above asset transfer transactions and related agreements. The global settlement resulted in the operations of the two companies being fully separated and remaining business interactions being conducted through new market based contractual arrangements. The global settlement allowed SGLP a General Unsecured Claim of $55 million against certain Debtors. See Section IV.K, "Asset Dispositions" for a discussion of the global settlement.

## G.     PREPETITION INDEBTEDNESS

Immediately prior to the commencement of the Chapter 11 Cases, certain of the SemGroup Companies maintained the following indebtedness:

## *1. Prepetition Credit Agreement*

SemCrude and SemCAMS are borrowers under the Prepetition Credit Agreement. The obligations of SemCrude and SemCAMS are guaranteed by the subsidiaries of SemGroup, subject to certain exceptions.

The Prepetition Credit Agreement consists of an approximately $1.74 billion working capital facility, $665 million revolving credit facility, and $200 million term series B-2 loan facility (of which, approximately $141 million is currently outstanding).

As collateral security for their obligations under the Prepetition Credit Agreement, the borrowers and the guarantors granted a Lien on, and security interest in, substantially all of their assets. Subject to the intercreditor provisions contained in the Prepetition Credit Agreement, the borrowers and guarantors under the Prepetition Credit Agreement have granted (i) a first priority Lien on, and security interest in, the Working Capital Priority Collateral and a second priority Lien on, and security interest in, the Revolver/Term Priority Collateral to secure the Working Capital Obligations (each as defined in the Prepetition Credit Agreement), (ii) a first priority Lien on, and security interest in, the Revolver/Term Priority Collateral and a second priority Lien on, and security interest in, the Working Capital Priority Collateral to secure the Revolver Obligations and the US Term Obligations (each as defined in the Prepetition Credit Agreement) and (iii) a first priority Lien on, and security interest in, the Pari Passu Collateral (as defined in the Prepetition Credit Agreement) to secure all of the obligations under the Prepetition Credit Agreement.

Some of the Prepetition Lenders entered into certain swap transactions with the SemGroup Companies that may have constituted Lender Swap Obligations (as defined in the Prepetition Credit Agreement). Pursuant to the Prepetition Credit Agreement, Lender Swap Obligations (as defined in the Prepetition Credit Agreement) that qualify as such under the Prepetition Credit Agreement benefit from the collateral security interests described above for the working capital facility. According to Proofs of Claim filed by Prepetition Lenders who may have Lender Swap Obligations, the amount of Lender Swap Obligations (as defined in the Prepetition Credit Agreement) outstanding as of the Petition Date totaled approximately $480 million and are included in the Secured Working Capital Lender Claims. If any Claims by Prepetition Lenders with respect to Lender Swap Obligations (as defined in the Prepetition Credit Agreement) are determined not to be Secured Working Capital Lender Claims but are determined to be Allowed Unsecured Claims, they will be classified under the Plan as Allowed Lender Deficiency Claims, and accordingly, the holders of such Claims will receive their Pro Rata Share of the Litigation Trust Interests to be distributed to holders of Lender Deficiency Claims.

While the exact identity and composition of the Exit Facility's lending group has not yet been determined, a number of financial institutions that are also Prepetition Lenders under the Prepetition Credit Agreement have expressed interest in participating thereunder, including BNPP, which is the proposed administrative agent. BNPP, in addition to holding certain other Claims under the Prepetition Credit Agreement, also holds Claims relating to Lender Swap Obligations. In addition, on May 12, 2009, BNPP acquired majority equity ownership in the parent company of another Prepetition Lender under the Prepetition Credit Agreement, Fortis

Capital Corp., which holds Claims relating to Lender Swap Obligations. See Section 1.B.7, "Chapter 11 Plan – Prepetition Lenders." As indicated above, the Debtors will evaluate the Lender Swap Obligations and, if appropriate, file any objections to such Claims. BNPP and Fortis have requested that the Debtors review and evaluate the need for filing such Claim objections prior to the Plan voting deadline, as such determination may impact how BNPP and Fortis vote on the Plan.

### 2. *White Cliffs Credit Agreement*

SemCrude Pipeline is the borrower under the White Cliffs Credit Agreement. SemCrude Pipeline owns 99.17% of White Cliffs and the funds borrowed under the White Cliffs Credit Agreement were used to fund the project costs associated with the White Cliffs pipeline. There are no guarantors under the White Cliffs Credit Agreement. In the event that either of the minority interest owners of White Cliffs exercises its option to purchase additional ownership interests in White Cliffs, the proceeds received from such option exercise(s) will be applied to reduce the outstanding obligations under the White Cliffs Credit Agreement.

The White Cliffs Credit Agreement consists of a term loan facility and a revolving credit facility, each of which had an original commitment of $60 million. The principal amount outstanding pursuant to the White Cliffs Credit Agreement is $120 million. The White Cliffs Credit Agreement matured on June 17, 2009.

As security for its obligations under the White Cliffs Credit Agreement, SemCrude Pipeline granted a Lien on, and security interest in, its ownership interests in White Cliffs.

The Plan contemplates that the White Cliffs Credit Agreement will be refinanced. See the discussion of the capital structure of the Reorganized SemGroup Companies in Section VI.C., "Summary of the Capital Structure of the Reorganized SemGroup Companies."

### 3. *SemEuro Credit Agreement*

SemEuro Limited is the borrower under the SemEuro Credit Agreement. SemEuro Limited is a wholly-owned indirect subsidiary of SemGroup and is an English private limited company. The obligations of SemEuro Limited are guaranteed by its direct subsidiary, SemLogistics.

The SemEuro Credit Agreement consists of a working capital facility and a revolving credit facility. The total working capital commitments were originally $500 million and the total revolving credit commitments were $75 million, which included an overdraft commitment of $50 million. The SemEuro Credit Agreement initially supported SemEuro Supply's marketing business, which was discontinued after the Petition Date. The working capital commitments were subsequently reduced to $46 million and the revolving credit commitments remained unchanged. The principal amount outstanding as of May 31, 2009 under the working capital facility was approximately $5 million and under the revolving credit facility was approximately $44.5 million. The SemEuro Credit Agreement is scheduled to terminate on September 29, 2009 and is governed by English law. As collateral security for the obligations under the SemEuro Credit Agreement, the borrower and the guarantors granted a Lien on, and security interest in, substantially all of their assets.

The Plan contemplates that the SemEuro Credit Agreement will be refinanced. See the discussion of the capital structure of the Reorganized SemGroup Companies in Section VI.C., "Summary of the Capital Structure of the Reorganized SemGroup Companies."

### 4.    *Senior Notes Indenture*

SemGroup and SemGroup Finance are issuers of 8.75% Senior Notes in the original principal amount of $600 million pursuant to the Senior Notes Indenture. The Senior Notes mature on November 15, 2015. Interest is payable semi-annually in arrears.

The obligations of SemGroup and SemGroup Finance are guaranteed by the subsidiaries of SemGroup, subject to certain exceptions. The Senior Notes are not secured by any assets of the issuers or the guarantors.

### 5.    *Manchester Securities Corp. and Alerian Finance Partners Term Loan*

SemGroup Holdings is the borrower under the SemGroup Holdings Loan Agreement, with Manchester Securities Corporation and Alerian Finance Partners as the lenders. The SemGroup Holdings Loan Agreement provides for a $150 million term loan facility, which consists of a $100 million Tranche A facility and a $50 million Tranche B facility. The obligations of SemGroup Holdings are secured by SemGroup Holdings' subordinated units in SGLP and its membership interests in SemGroup Energy Partners G.P., L.L.C., the general partner of SGLP. SemGroup Holdings' bankruptcy proceeding will not be jointly administered with the Chapter 11 Cases and the Plan is not dependent upon the receipt by any Debtor of any recovery in connection with such proceeding.

In connection with the sale of the trading book to Barclays discussed below, SemGroup provided to Barclays a $50 million deposit, delivered in two $25 million increments. The source of the $50 million deposit was money drawn on the White Cliffs Credit Agreement. Upon the conclusion of the sale of the trading book, Barclays returned the deposit to SemGroup by wiring the funds to an account in the name of SemGroup Holdings. Shortly thereafter, the $50 million was returned to SemCrude Pipeline, where the funds were used along with advances of the Prepetition Lenders' cash collateral to complete the construction of the White Cliffs pipeline.

After SemGroup Holdings filed its chapter 11 petition on October 11, 2008, it originally scheduled as an asset a $50 million receivable from SemCrude Pipeline based on an accounting entry recorded to reflect the return of the $50 million to SemCrude Pipeline. SemGroup Holdings subsequently amended its schedules to delete the receivable because the Debtors do not believe consideration exists to support it. Manchester Securities Corporation, which asserts a Claim against SemGroup in addition to its Claim against SemGroup Holdings, has objected to confirmation of the Plan, asserting, among other things, that SemGroup Holdings should not have amended its schedules, that SemGroup Holdings has a $50 million Administrative Expense Claim against SemCrude Pipeline, that the Plan is not proposed in good faith, and that SemCrude Pipeline should be required to pay $50 million in Cash to SemGroup Holdings on the Effective Date. The Debtors believe Manchester's assertions are without merit and that the Plan can be confirmed over Manchester's objection.

# IV.    THE CHAPTER 11 CASES

## A.    EVENTS LEADING UP TO COMMENCEMENT OF CHAPTER 11 CASES

Prior to the commencement of the Chapter 11 Cases, the SemGroup Companies were a privately-held group of companies that operated in North America and the west coast of the United Kingdom.  Certain of the SemGroup Companies' business units conducted physical and financial marketing and trading activities to take advantage of seasonal and regional market price differences for various energy commodity products and to utilize the SemGroup Companies' transportation and storage assets.  The SemGroup Companies also provided midstream energy-related services such as gathering, storage, transportation, processing and distribution services for energy commodities including crude oil, refined petroleum products, natural gas, NGL, and asphalt to third party customers and themselves.

SemGroup's risk management policy authorized SemGroup and certain of its affiliates to conduct trading activities to hedge their risk on purchases of product inventory.  SemGroup's business objective, as reflected in its risk management policy, was to establish a margin on anticipated purchases of product inventory by selling that product for physical delivery to customers or by entering into future delivery obligations under futures contracts on the NYMEX and OTC markets.  SemGroup's risk management policy required that SemGroup's trading activities be supported by physical inventory and that SemGroup not trade in "naked options," which are more speculative.  The risk management policy also established position limits, stop-loss limits and prohibited employees from conducting trades for their own accounts.

SemGroup's trading activities were directed principally by Mr. Kivisto, SemGroup's President and CEO.  Mr. Kivisto's trading strategy, which was based on the assumption of stable crude prices, involved the sale of naked call and put options that did not adhere to the requirements of the SemGroup risk management policy or the Prepetition Credit Agreement.  Mr. Kivisto's strategy resulted in significant losses and, in order to avoid realization of these losses, the options were rolled forward in increasingly larger amounts.  As losses increased, SemGroup was required to post collateral for margin calls.  During the 12 months ended December 31, 2007, SemGroup posted $1.7 billion in cash to satisfy margin deposit requirements, which was a 159% increase over the 12 months ended December 31, 2006.  During the three months ended March 31, 2008, SemGroup posted $1.96 billion in cash to satisfy margin deposit requirements, which represented a 115% increase over the three months ended March 31, 2007.  In addition to conducting trading activities for SemGroup through its subsidiary Eaglwing, Mr. Kivisto also engaged in trades for his own account through his separate trading company, Westback.  Trades conducted in the Eaglwing account for Westback in 2007 and 2008 resulted in large unrealized losses.

The increased margin requirements had a severe negative impact on SemGroup's liquidity position, which worsened significantly in the weeks leading up the commencement of the Chapter 11 Cases.  In June 2008, SemGroup transferred some of its trades from NYMEX to the OTC, which had lower margin requirements.  In July 2008, SemGroup began discussions with Barclays regarding a transfer of SemGroup's trading book.  On July 15, 2008, SemGroup transferred all of the NYMEX trading accounts held in its commodity futures brokerage accounts to Barclays, which resulted in the conversion of loss contingencies into realized cash losses

totaling in excess of $2.4 billion. In consideration for Barclays' agreement to assume the NYMEX trading accounts and all transactions thereunder, SemGroup paid Barclays $143 million and transferred the cash collateral of approximately $2.3 billion posted for the account. At the time of the sale of the trading book to Barclays, Westback owed SemGroup approximately $290 million. In addition to the NYMEX losses, SemGroup's OTC trading book was approximately $850 million negative on a mark-to-market basis. Accordingly, despite the transfer of the NYMEX account to Barclays, SemGroup still faced a liquidity crisis and commenced the initial Chapter 11 Cases on July 22, 2008.

## B. SUPPLIER PROTECTION PROGRAM

On July 22, 2008, the Debtors filed a motion requesting that the Bankruptcy Court approve the Debtors' establishment of a supplier protection program for its critical providers of goods and services. To qualify for the program, providers were required to enter into supplier protection agreements with the Debtors pursuant to which they agreed to continue to provide goods or services to the Debtors under the same terms and in reasonably equivalent volume of goods or level of services that were historically provided until the earlier of (i) January 31, 2009 and (ii) the effective date of a chapter 11 plan. The providers also were required to provide supporting documents to substantiate the amount of their prepetition claims. On July 23, 2008, the Bankruptcy Court entered an order authorizing the Debtors' payment of up to $50 million in prepetition expenses to critical providers who entered into supplier protection agreements. As of May 31, 2009, the Debtors have paid approximately $35.5 million to approximately 170 critical vendors.

## C. OTHER FIRST DAY ORDERS

On July 22, 2008 and continuing thereafter, the Debtors filed voluntary petitions commencing the Chapter 11 Cases. Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' reorganization.

### 1. Case Administration Orders

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases. These orders: (i) authorized the joint administration of the Chapter 11 Cases and (ii) granted an extension of time to file the Debtors' schedules of assets and liabilities and statements of financial affairs. In addition, the Debtors obtained orders authorizing the engagement of WGM and Richards, Layton as legal advisors, Alix Partners as restructuring advisors, and Blackstone as investment bankers and financial advisors.

### 2. Critical Obligations

To allow the Debtors to maintain certain critical operations during the Chapter 11 Cases, the Bankruptcy Court authorized certain payments on prepetition obligations. The Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to: (i) wages, compensation, and employee benefits and (ii) sales, use, and other types of taxes.

### 3. *Business Operations*

Further, the Bankruptcy Court granted the Debtors the authority to continue certain business operations. Among other things, the Bankruptcy Court (i) authorized the Debtors to continue certain workers' compensation and other insurance policies and (ii) prohibited the Debtors' utilities service providers from altering, refusing, or discontinuing service upon the furnishing of an escrow and establishment of certain procedures for determining adequate assurance of payment.

### 4. *Financial Operations*

The Bankruptcy Court authorized the Debtors to (i) maintain their existing bank accounts and forms and (ii) continue their centralized cash management system.

## D. CHAPTER 11 DEBTOR IN POSSESSION FINANCING

On August 8, 2008, the Bankruptcy Court entered an interim order (1) authorizing the Debtors (a) to obtain post-petition financing pursuant to the Postpetition Financing Agreement in an aggregate amount of up to $150 million and (b) to use cash collateral and (2) granting adequate protection to prepetition secured parties. On September 17, 2008, the Bankruptcy Court entered a final order (1) authorizing the Debtors (a) to obtain post-petition financing pursuant to the Postpetition Financing Agreement and, in the case of SemCrude, to borrow thereunder up to an aggregate principal amount of $175 million, all of which could be used for letters of credit; provided, that only $70 million of the Aggregate Commitment (as defined in the Postpetition Financing Agreement) can be used for hedging purposes in accordance with the Trading Protocol, and (b) to use cash collateral, and (2) granting adequate protection to prepetition secured parties. The Postpetition Financing Agreement originally matured on April 22, 2009, but the maturity date was extended to September 30, 2009 pursuant to the terms and provisions of the Sixth Amendment to the Postpetition Financing Agreement, which extension was approved by the Bankruptcy Court on April 23, 2009. Notwithstanding the stated maturity date of September 30, 2009, the aggregate commitments under the Postpetition Financing Agreement can be terminated by the requisite number of lenders thereunder upon the occurrence of certain events of default.

In addition to the extension of the stated maturity date, the Sixth Amendment to the Postpetition Financing Agreement also reduced the aggregate commitments thereunder to $150 million, all of which is available for letters of credit; provided, that only $70 million of the Aggregate Commitment (as defined in the Postpetition Financing Agreement) can be used for hedging purposes in accordance with the Trading Protocol and only $50 million of the Aggregate Commitment (as defined in the Postpetition Financing Agreement) can be used for borrowings.

An agreement has been negotiated with the Postpetition Lenders to further extend the maturity date of the Postpetition Financing Agreement to the later of the Effective Date or November 30, 2009 pursuant to the terms and provisions of the Seventh Amendment to the Postpetition Financing Agreement, which the Debtors are seeking to have approved by the Bankruptcy Court at a hearing on September 24, 2009.

The obligations of SemCrude under the Postpetition Financing Agreement are guaranteed by all of the other Debtors (other than SemGroup Holdings) and are secured by substantially all of the assets of SemCrude and the other Debtors (other than SemGroup Holdings). As security for the obligations under the Postpetition Financing Agreement, SemCrude and the other Debtors provided the DIP Agent and the Postpetition Lenders thereunder with (i) an allowed administrative claim having priority over all administrative expenses, (ii) a perfected first priority Lien on all property of SemCrude and the other Debtors that was unencumbered by any Lien as of the Petition Date, (iii) a perfected first priority, senior priming Lien securing any obligations owing under the Prepetition Credit Agreement and (iv) a perfected Lien upon all property of SemCrude and the other Debtors (other than the property referred to in clause (iii) above), junior to existing valid, perfected, enforceable and unavoidable Liens on such property.

## E.    PRODUCERS' CLAIMS AND LITIGATION

### 1.    *Producers' Litigation*

In the course of their businesses, certain Debtors (SemCrude, Eaglwing, and SemGas) purchased oil and gas products from third parties in several states, including, but not limited to, Colorado, Kansas, Mississippi, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming. As a result of the commencement of the Chapter 11 Cases, the payment for June and July 2008 oil and gas product was not made.

Following the Petition Date, Debtors were inundated by motions for temporary restraining orders and motions for relief from automatic stay from third parties, which included certain Producers. The Producers' Claims include statutory lien and trust claims based on state law and Twenty-Day Claims based on section 503(b)(9) of the Bankruptcy Code (discussed below).

### a.    Producer State-Specific Adversary Proceedings

Given the similar threshold issues of law raised in these cases, the Debtors sought to establish omnibus procedures for handling these claims. Pursuant to the Lien Procedures Order, certain Producers filed single consolidated declaratory judgment actions—one per state—to adjudicate the threshold questions of law regarding such state's applicable lien or trust statute. Actions were filed for the following states: Colorado, Kansas, Missouri, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming. As filed, the actions raised the following claims: (a) a request that the Bankruptcy Court require the Debtors to provide an accounting regarding oil and gas production sold to the Debtors, including its disposition and the receipt of any cash or other proceeds from the disposition; (b) a declaration regarding the validity, extent, and priority of the state statutory lien and/or trust and other security interests in the oil and gas production; (c) a reservation of the Producers' rights under the Postpetition Financing Order; and (d) a request for attorneys' fees and costs in those states where an applicable state statute may provide for recovery of those fees and costs. The approximate dollar amount associated with the Producers' statutory lien and trust claims according to the Debtors' books and records is approximately $414 million. On December 2, 2008, a scheduling order was entered in the Producers' litigation. The stipulation staying the accounting claims also stayed fact discovery. Expert discovery was completed in mid-April 2009. On December 10, 2008, the parties entered

into a stipulation staying the claims for an accounting, attorneys' fees, and costs and the reservation of rights under the Postpetition Financing Order.

While the actions for Kansas, New Mexico, Oklahoma, Texas, and Wyoming are based on statutes in those respective states, the actions for Colorado, Missouri, and North Dakota are based on the Texas lien statute, which the Producers for those states argue applies to their production under a contractual choice of law theory. Accordingly, because adjudication of the Colorado, Missouri, and North Dakota actions is necessarily dependent upon the declaration regarding the validity, extent, and priority of the Texas lien statute, the parties entered into a stipulation staying these three actions until after the threshold issues of Texas law are determined.

In March and April 2009, certain of the Debtors' customers, including J. Aron, BP and Conoco, intervened in the Producers' litigation. These customers are asserting rights of setoff and netting against amounts they owe to the Debtors for prepetition purchases of crude oil. The Producers have asserted that their alleged lien and trust rights have priority over these customers' setoff claims.

> b.  Summary Judgment Proceedings and Related Appeals

On April 17, 2009, certain parties to the Producers' litigation filed motions for summary judgment on the Texas, Kansas and Oklahoma lien and Oklahoma trust claims. These motions were heard on May 13 and 14, 2009. The Bankruptcy Court issued its ruling on the motions for summary judgment on June 19, 2009. Therein, the Bankruptcy Court granted summary judgment in favor of the Administrative Agent for the Prepetition Lenders and against the Producers in the states of Oklahoma, Texas and Kansas.

In the Oklahoma action, the Bankruptcy Court found that as a matter of law the Oklahoma Production Revenue Standards Act does not impose a resulting, implied or constructive trust in favor of the Oklahoma Producers. The Bankruptcy Court further held that to the extent any Oklahoma Producer can demonstrate that it complied with the requirements of the Oklahoma Oil and Gas Owners Lien Act, such Oklahoma Producer would have liens on the Oklahoma oil or gas and its proceeds, which liens would be junior to those of the Prepetition Lenders but senior to the unsecured creditors. The Bankruptcy Court certified its decision for direct appeal to the United States Court of Appeals for the Third Circuit.

In the Texas action, applying the choice of law rules of the forum state (Delaware), the Bankruptcy Court determined that Delaware's choice of law rules regarding perfection and priority of Uniform Commercial Code security interests apply to the claims of the Texas Producers and held that, as a result, either Delaware or Oklahoma law governs perfection, not Texas law. The Bankruptcy Court found that under either Delaware or Oklahoma law, the Texas Producers would have had to file Uniform Commercial Code financing statements in those states to perfect their security interests in the Texas product and proceeds. The Bankruptcy Court concluded that unless the Texas Producers can show that they have properly filed financing statements in Delaware or Oklahoma, as applicable, they do not have perfected security interests in the Texas product or the proceeds thereof. The Bankruptcy Court certified its decision for direct appeal to the United States Court of Appeals for the Third Circuit.

In the Kansas action, applying the choice of law rules of the forum state (Delaware), the Bankruptcy Court determined that Delaware's choice of law rules regarding perfection and priority of Uniform Commercial Code security interests apply to the claims of the Kansas Producers and held that, as a result, either Delaware or Oklahoma law governs perfection, not Kansas law. The Bankruptcy Court found that under either Delaware or Oklahoma law, the Kansas Producers would have had to file Uniform Commercial Code financing statements in those states to perfect their security interests in the Kansas product and proceeds. The Bankruptcy Court concluded that unless the Kansas Producers can show that they have properly filed financing statements in Delaware or Oklahoma, as applicable, they do not have perfected security interests in the Kansas product or the proceeds thereof. The Bankruptcy Court certified its decision for direct appeal to the United States Court of Appeals for the Third Circuit.

The Producers in the Oklahoma, Texas and Kansas actions have filed notices of appeal of these decisions in the Bankruptcy Court and the United States Court of Appeals for the Third Circuit. The Oklahoma Producers have also filed a motion with the United States Court of Appeals for the Third Circuit requesting that the Third Circuit certify certain questions of law raised in the appeal regarding the Oklahoma Production Revenue Standards Act to the Oklahoma Supreme Court. On August 11, 2009, the Third Circuit issued a scheduling order setting expedited briefing in each of the appeals. The Appellants' briefs were filed on August 27, 2009, and the Appellees' briefs were filed on September 16, 2009.

The Third Circuit was scheduled to hear oral argument on the merits of the appeals and the Oklahoma Producers' motion to certify certain questions of law to the Oklahoma Supreme Court on October 7, 2009, but pursuant to the Producers' Settlement, discussed below, the parties requested on September 16, 2009 that the hearing be adjourned to no earlier than November 11, 2009. On September 17, 2009, the Third Circuit granted the parties' request.

On June 19, 2009, Producer Samson Resources Company filed motions for summary judgment in the New Mexico and Wyoming actions. On July 20, 2009, the Prepetition Lenders and J. Aron filed cross-motions for summary judgment in those actions. The Bankruptcy Court heard oral argument on all of the motions for summary judgment on August 13, 2009. The Bankruptcy Court has not yet ruled on these motions.

On September 14, 2009, after lengthy negotiations spanning nineteen hours, the Debtors, the Administrative Agent, the Lender Steering Committee, the Producers' Committee, and the Producer Plaintiffs agreed to a resolution of their outstanding disputes regarding the Producers' statutory lien and trust claims under the Plan. For details related to the Producers' Settlement, see Section IV.G., "Producers' Settlement."

c.     Turnover Actions

In addition to intervening in the Producers' litigation, J. Aron, BP, Conoco, Plains Marketing, and Coffeyville Resources Refining & Marketing, LLC ("Coffeyville") have each filed separate adversary proceedings, which overlap (at least in part) with issues raised in the Producers' litigation. For example, in its complaint, J. Aron seeks declarations that, among other things, (i) its trading agreement with the Debtors is valid and enforceable, (ii) the trading agreement provides rights of netting, recoupment and contractual setoff, (iii) J. Aron has no

obligation to pay more than the netted amount, and (iv) the Producers have no Lien or trust rights nor any other actionable claims against J. Aron. BP, Conoco, Plains Marketing, and Coffeyville filed complaints requesting similar declarations. Certain Producers have filed motions to dismiss these adversary proceedings. These motions have not yet been set for hearing. The Debtors filed motions for turnover of estate property in each of these actions with regard to the net amount owed the estates (with the exception of Coffeyville which is not in a net-payable position). The Debtors have resolved the turnover motions with J. Aron, BP, and Conoco, with the net amount owed to the Debtors' estates being deposited into a segregated account until further order of the Bankruptcy Court. J. Aron deposited approximately $89.8 million; BP deposited approximately $10.7 million; and Conoco deposited approximately $21.6 million. The turnover motion against Plains Marketing is still pending.

On September 15, 2009, Debtors filed motions requesting release of the escrowed turnover funds for use in funding the Plan. Debtors also requested that the Bankruptcy Court hear the motions on an expedited basis on September 24 2009, but the motions are not currently set for hearing. Release of the escrowed funds pursuant to an order that is acceptable to counsel for the Administrative Agent and counsel for the Producers' Committee is a condition precedent to the Effective Date of the Plan. If the escrowed turnover funds are not released, then the Plan cannot be confirmed.

d.    Downstream Purchaser Litigation

Certain Producers have pursued claims against J. Aron, BP and Conoco outside of these bankruptcy proceedings. To date 30 actions, including a purported class action, have been filed against J. Aron, BP, Conoco and other companies that purchased crude oil from the Debtors. An action has also been filed against Coffeyville Resource Refining and Marketing LLC, which is a customer of J. Aron. These actions are pending in the state and federal courts of Texas, Oklahoma, New Mexico and Delaware. While the Debtors are not formal parties to these actions, the Debtors filed a motion to enforce the automatic stay or, in the alternative, for a temporary restraining order and preliminary injunction to enjoin prosecution of these actions because of the effect the actions would have on the orderly administration of the Debtors' estates. On January 21, 2009, the Debtors' request for a temporary restraining order and preliminary injunction was denied without prejudice to the Debtors' right to renew this request at a later date. If such Producers are successful in their claims against J. Aron, BP, Conoco and other customers of the Debtors, those parties may assert a breach of warranty Claim against the Debtors, which could potentially increase the total amount of the General Unsecured Claims. If any such Claims are asserted, the Debtors intend to vigorously defend them; however, there is no assurance that such Claims would not ultimately impact the recoveries for the other holders of General Unsecured Claims.

**F.    TWENTY-DAY CLAIMS**

As part of the Debtors' efforts to streamline creditor litigation following the commencement of the Chapter 11 Cases, the Debtors also sought an omnibus order with respect to claims asserted pursuant to Section 503(b)(9) of the Bankruptcy Code, often referred to as Twenty-Day Claims. That section provides a creditor with an administrative expense for "the value of any goods received by the debtor within 20 days before the commencement of a case . . .

in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

The Court entered its Order Establishing Procedures for the Resolution of Administrative Claims Asserted Pursuant to Section 503(b)(9) of the Bankruptcy Code and Regarding Payments for Post-Petition Purchases [Docket No. 1376] (the "Twenty-Day Claims Procedures Order") on September 15, 2008. That Order established a process for Debtors, claimants, and other parties-in-interest to resolve the Twenty-Day Claims.

## 1. The Debtors' Schedules of Assets and Liabilities

The Twenty-Day Claims Procedures Order required the Debtors to include in Schedule E to their Schedules of Assets and Liabilities a listing of estimated amounts, based on their books and records, owed to vendors who delivered goods within the 20 days prior to the Petition Date. The Debtors filed their original Schedules of Assets and Liabilities on October 20, 2008, and amended those schedules on October 30, 2008, January 16, 2009, January 26, 2009, and, most recently, on August 13, 2009.

After Debtors filed their original Schedules on October 20, 2008, the Twenty-Day Claims Procedures Order allowed any party in interest 30 days to file objections to the Schedules. The Administrative Agent, Creditors' Committee, and Producers' Committee all filed timely objections to Debtors' Schedules of Assets and Liabilities. The objection of the Producers' Committee has been resolved, and changes to the Schedules stemming from that objection are reflected in the January 26, 2009 amendments to the Schedules of Assets and Liabilities. In addition, the Creditors' Committee withdrew its objection to Schedule E on August 7, 2009.

Because of the contested legal issues related to the Twenty-Day Claims that are discussed below, the Debtors filed their Fourth Amended Schedules of Assets and Liabilities on August 13, 2009, reclassifying as disputed the Twenty-Day Claims that may be impacted by the Bankruptcy Court's rulings on the legal issues. The Fourth Amended Schedules also corrected the scheduled amounts for a small number of Twenty-Day claimants. Accordingly, the Fourth Amended Schedules reflect that the estimate of Twenty-Day Claims is $307 million, excluding any intercompany amounts. Of the $307 million, approximately $143 million overlaps with the Producers' statutory lien and trust claims discussed in Section E above.

On September 9, 2009, Debtors agreed to stipulate that all Twenty-Day claimants will be treated as though they filed Proofs of Claim in the amounts listed in Debtors' Fourth Amended Schedules. As a result, no Twenty-Day claimant is required to file a Proof of Claim in response to the Fourth Amended Schedules of Assets and Liabilities. Moreover, the March 3, 2009 Bar Date is only extended for the eleven claimants whose claim amounts were substantively changed by the filing of the Fourth Amended Schedules. The Court entered an order approving the stipulations on September 22, 2009 [Docket No. 5751].

## 2. Individual Creditor Objections

In addition to the objection procedure discussed above, any creditor who disputed the treatment of its Claim on the Debtors' Third Amended Schedules of Assets and Liabilities was

required to file a Proof of Claim on or before March 3, 2009. The Debtors received 5,455 timely Proofs of Claim.

After the Debtors received and had a chance to review the Proofs of Claim, the Twenty-Day Claims Procedures Order required them to file a Notice listing (i) each Section 503(b)(9) Proof of Claim, (ii) the amount the Debtors have determined to be valid for each Claim, and (iii) the amount of each Claim that the Debtors dispute and the reason for the Debtors' objection. Debtors filed Notices (the "Notices") on July 17, 2009 in accordance with the record of the June 2, 2009 hearing and the Bankruptcy Court's Order Granting *Nunc Pro Tunc* Relief From Order Establishing Procedures for the Resolution of Administrative Claims Asserted Pursuant to Section 503(b)(9) of the Bankruptcy Code and Regarding Payments for Post-Petition Purchases [Docket No. 4178] entered June 2, 2009.

After analyzing and valuing the Proofs of Claim that asserted a Twenty-Day Claim value, the Debtors do not believe the net amount due to claimants will be materially higher than the $307 million scheduled in Debtors' Fourth Amended Schedules. Indeed, these Twenty-Day Claims are subject to legal objections filed by the Debtors and the Administrative Agent for the benefit of the Prepetition Lenders regarding, among other things, the proper valuation of such Claims. If the Bankruptcy Court rules in favor of the Debtors and the Prepetition Administrative Agent on the outstanding section 503(b)(9) global legal objections, the amount due to claimants will be substantially less than the amount scheduled. Moreover, the Twenty-Day Claims are subject to factual objections filed by the Debtors, the Prepetition Administrative Agent, and the Creditors' Committee. Thus, although the gross Section 503(b)(9) amount asserted by claimants in their Proofs of Claim is approximately $351.3 million and although many other claimants referred to Section 503(b)(9) in their Proofs of Claim without asserting a specific amount, the Debtors believe the net amount due for the Twenty-Day Claims will not be materially higher, and may be much lower, than the $307 million scheduled.

In addition, certain claimants filed contingent, unliquidated Section 503(b)(9) Claims alleging that those Claims will be valid if their setoff claims are disallowed. The Debtors believe these contingent Section 503(b)(9) Claims are invalid for a variety of reasons as detailed in the Notices.

Pursuant to the Twenty-Day Claims Procedures Order, any party who disagreed with the treatment of any Claim in the Notices was required to object to the Notices by August 6, 2009. If no objection to a given Claim was received by the deadline, the Claim was to be resolved in the manner stated in the Notices. The Creditors' Committee and the Administrative Agent, however, filed timely objections to all Claims listed on the Notices.

For additional information regarding resolution of certain Twenty-Day Claims, see Section IV.H. below.

### 3.    *Resolution of Global Legal Objections*

While the Debtors were preparing the Notices, the Debtors, the Administrative Agent, the Creditors' Committee, and the Producers' Committee negotiated procedures to resolve the Administrative Agent's objection to Debtors' Third Amended Schedule E. In its objection, the

Administrative Agent asserts that the value of the Twenty-Day Claims listed in Schedule E was not calculated correctly. The objection raises unresolved questions of law regarding the proper interpretation of Section 503(b)(9).

To resolve the contested legal questions, and in accordance with the parties' agreement, the Bankruptcy Court entered its Order Establishing Procedures for the Resolution of Contested Issues of Law Related to the Twenty-Day Claims Under Section 503(b)(9) [Docket No. 4645] (the "Twenty-Day Objections Procedures Order") on July 17, 2009. The Order established a schedule for filing briefs addressing the contested issues of law and set a hearing date.

In accordance with the Twenty-Day Objections Procedures Order, the Administrative Agent and the Debtors filed briefs regarding the contested legal issues, on August 7, 2009. As discussed above, Debtors subsequently filed their Fourth Amended Schedules reclassifying the Twenty-Day Claims that might be impacted by the resolution of the contested legal issues as disputed.

The Producers' Committee filed its response brief on August 21, 2009, and approximately 45 other claimants filed responsive briefs thereafter. The Administrative Agent and the Debtors filed their reply briefs on September 4, 2009. The Bankruptcy Court heard oral argument regarding the Section 503(b)(9) legal issues on September 9, 2009, but it has not yet ruled on the issues.

On September 14, 2009, after lengthy negotiations spanning nineteen hours, the Debtors, the Administrative Agent, the Lender Steering Committee, the Producers' Committee, and the Producer Plaintiffs agreed to a resolution of their outstanding disputes regarding the Producers' Twenty-Day Claims and their treatment under the Plan. Pursuant to said settlement, the Debtors and the Administrative Agent have resolved their legal objections to the First Purchaser Producer Twenty-Day Claims and will not pursue their fact-based objections to such claims. For additional detail related to the Producers' Settlement, see Section IV.G., "Producers' Settlement."

The Producers' Settlement did not resolve the disputes regarding the Other Twenty-Day Claims. If the Bankruptcy Court rules in favor of the Administrative Agent and the Debtors on the 503(b)(9) legal issues, then the total amount of Other Twenty-Day Claims could be significantly reduced. For a discussion of the Debtors' proposed Other Twenty-Day Claims Settlement, see Section IV.H.

## G. PRODUCERS' SETTLEMENT

### 1. Overview

The Bankruptcy Court ordered the parties to a judicial mediation held on September 13, 2009 that was conducted by the Honorable Kevin Gross, United States Bankruptcy Court Judge for the District of Delaware. On September 14, 2009, after lengthy negotiations spanning nineteen hours, the Debtors, the Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs agreed to a resolution of their outstanding disputes and the treatment of the Producers' Twenty-Day Claims under the Plan. The Producers' Settlement, which also has the support of the Creditors' Committee, provides for the following

payments under the Plan and the resolution of certain litigation involving the Producers as described below.

2.    **Payment to Producer Representative**

      a.    Payment to Producer Representative.

On the Effective Date, Cash in the total amount of $172.5 million shall be distributed to the Producer Representative who shall be responsible for making distributions to Producers in accordance with the Plan, including Section 3.1 of the Plan. Notwithstanding anything to the contrary in the Plan or elsewhere, the Producers shall not be entitled to any further payment from the Debtors, the Prepetition Administrative Agent or the Prepetition Lenders on account of their claims other than the distributions payable to the holders of Unsecured First Purchaser Producer Claims as holders of General Unsecured Claims.

3.    **First Purchaser Producer Twenty-Day Claims**

Pursuant to the Producers' Settlement, on the Effective Date, the Producer Representative shall make distributions to holders of Allowed First Purchaser Producer Twenty-Day Claims in accordance with Section 3.1 of the Plan. Each holder of a First Purchaser Producer Twenty-Day Claim shall be deemed, as of the Effective Date, to have an Allowed First Purchaser Producer Twenty-Day Claim equal to the amount listed on Schedule 1 of the Plan, plus any additional amount, if any, agreed to in writing by the Producers' Committee, the Producer Representative or Allowed by Final Order. Pursuant to the September 15 Order, only holders of First Purchaser Producer Twenty-Day Claims which timely filed objections to the Notice may seek allowance of its Claim in an amount different than listed on Schedule 1 of the Plan, which disputes shall be resolved pursuant to the September 15 Order by the Producer Representative in accordance with Section 8.3 of the Plan. Notwithstanding anything to the contrary in the Plan or elsewhere, the sum of (1) the payments for 100% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Debtors other than Eaglwing set forth on Schedule 1 of the Plan plus (ii) the payments for 65% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Eaglwing set forth on Schedule 1 attached to the Plan shall not exceed $125.5 million.

4.    **Secured First Purchaser Producer Claims**

The parties further agreed that as soon as practicable after the Effective Date, the Producer Representative shall pay each holder of an Allowed Secured First Purchaser Producer Claim, its Pro Rata Share of Cash in an amount equal to $47 million less the sum of (i) the aggregate amount of Cash paid or to be paid in respect of Allowed First Purchaser Producer Twenty-Day Claims against Eaglwing in excess of 65% of the aggregate amount of the First Purchaser Producer Twenty-Day Claims against Eaglwing set forth on Schedule 1 of the Plan until the Allowed First Purchaser Producer Twenty-Day Claims against Eaglwing are paid in full, (ii) the amount of Cash paid or to be paid pursuant to Section 3.1(d) of the Plan, (iii) the fees and expenses incurred by the Producer Representative and its professionals paid or to be paid and (iv) the amount of Cash, if any, paid or to be paid to the holders of Allowed First Purchaser Producer Twenty-Day Claims in excess of $125.5 million, exclusive of Cash distributed pursuant to Section 3.1(c)(i) of the Plan. No portion of any unpaid Secured First Purchaser Producer

Claim is released, compromised, or discharged under the Plan solely for the purposes of any Downstream Claims against Downstream Purchasers, which Downstream Claims Producers shall be free to assert in courts of competent jurisdiction.

### 5. *Reimbursement of Professional Fees*

In addition, subject to allowance by the Producers' Committee or by the Producer Representative, as soon as practicable after the Effective Date, the Producer Representative will reimburse the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings for the Active States in Cash for payment of reasonable fees and out-of-pocket costs incurred in connection with the Producer State-Specific Adversary Proceedings for the Active States or in the Other Proceedings, as applicable. The Producers' Committee estimates that the total fees and expenses at the Effective Date will be approximately $4 million. In addition, the Producer Representative will pay any professional fees and expenses of the Producers' Committee to the extent that the fees and expenses exceed the cap amount contained in Section 1.127 of the Plan. For the avoidance of doubt, all amounts payable pursuant toSection 3.1(d) of the Plan will be payable solely from the $172.5 million distributed to the Producer Representative pursuant to Section 3.1(a) of the Plan.

### 6. *Producer Deficiency Claims*

No portion of any Secured First Purchaser Producer Claim will be an Unsecured Claim for any purpose under the Plan. Each holder of an Unsecured First Purchaser Producer Claim shall vote as a holder of a General Unsecured Claim under the Plan and shall be treated for all purposes as the holder of a General Unsecured Claim under the Plan.

### 7. *Producer State-Specific Adversary Proceedings*

Pursuant to the Producers' Settlement, the Debtors, the Debtors, the Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs have agreed to take, and in some cases have already taken, the following actions with respect to the Producer State-Specific Adversary Proceedings.

#### a. Third Circuit Appeals

The Debtors, the Prepetition Administrative Agent and the Producer Plaintiffs jointly submitted a request on September 16, 2009 to the Third Circuit Court of Appeals to adjourn the oral argument on the Third Circuit Appeals to a date after the anticipated Effective Date, which request was granted on September 17, 2009. To the extent the Third Circuit Appeals are not remanded pursuant to Section 3.1(f)(iii) of the Plan, the Debtors, the Prepetition Administrative Agent and the Producer Plaintiffs shall no later than the Effective Date voluntarily dismiss with prejudice the Third Circuit Appeals, against, but only against, the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders.

#### b. Bankruptcy Court Proceedings

On the Effective Date, to the extent that the Third Circuit Appeals are not remanded to the Bankruptcy Court pursuant to Section 3.1(f)(iii) of the Plan, the Producer Plaintiffs will file

all papers necessary to voluntarily dismiss with prejudice the Producer State-Specific Adversary Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders. With the exception of (i) any Bankruptcy Court proceedings with respect to the Bankruptcy Court decision on global legal objections to Twenty-Day Claims argued on September 9, 2009 and (ii) any Bankruptcy Court proceedings with respect to Other Twenty-Day Claims, all Producer-related litigation commenced in the Bankruptcy Court or to which the Debtors or the Prepetition Administrative Agent is a party shall be abated as to all parties until November 11, 2009. Each applicable Producer Plaintiff will file all papers necessary to voluntarily dismiss with prejudice the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders from all such Producer-related litigation commenced in the Bankruptcy Court on the Effective Date concurrently with the payment by the Debtors to the Producer Representative described in Section 3.1(a) of the Plan. Each of the Producer Plaintiffs, the Debtors, the Prepetition Administrative Agent and the applicable Prepetition Lenders will take all such actions, including executing stipulations, as are reasonably required to effect the foregoing dismissals with prejudice.

      c.     <u>Producer Decisions</u>.

If the Plan is confirmed and the Producer Plaintiffs submit an application to the Third Circuit Court of Appeals requesting that it remand to the Bankruptcy Court and an application to the Bankruptcy Court requesting that the Bankruptcy Court vacate the Producer Decisions, then neither the Prepetition Administrative Agent nor the Debtors will oppose any such applications.

      d.     <u>Other Proceedings</u>.

Each of the Debtors, the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings, the Prepetition Administrative Agent, the Prepetition Lenders and their respective affiliates, as applicable, will abate all Other Proceedings to which it is a party until November 11, 2009. On the Effective Date, the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings will file all papers necessary to voluntarily dismiss with prejudice the Other Proceedings with respect to the Debtors, the Prepetition Administrative Agent, and the applicable Prepetition Lenders and/or their affiliates, as applicable. Each of the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings, the Debtors, the Prepetition Administrative Agent and the applicable Prepetition Lenders and/or their affiliates will take all such actions, including executing stipulations, as are reasonably required to effect the foregoing dismissals with prejudice.

### 8.   *Twenty-Day Claims*

The Debtors, the Prepetition Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs have agreed as follows with respect to the Twenty-Day Claims:

      a.     <u>Global Legal Objections</u>

The Producers' Settlement resolves the global legal objections with respect to the First Purchaser Producer Twenty-Day Claims. The Producers' Settlement shall have no effect on any legal objections with respect to Other Twenty-Day Claims.

b.    Factual-Based Objections

The Debtors, the Prepetition Administrative Agent, and the Lender Steering Committee, as applicable, shall (A) abate their fact-based objections to First Purchaser Producer Twenty-Day Claims until November 11, 2009 and (B) voluntarily dismiss with prejudice any fact-based objections to the First Purchaser Producer Twenty-Day Claims on the Effective Date. After the Effective Date the Producer Representative shall be permitted to pursue the disputes against any First Purchaser Producer regarding certain Twenty-Day Claims that were set forth in the Notices in accordance with the Producer claims resolution process described in section 8.3 of the Plan; provided, however, that the expenses incurred by the Producer Representative in connection with pursuing such disputes will be paid out of the $47 million referred to in Section 3.1(c) of the Plan. The Producers' Settlement shall have no effect on the ability of the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders to pursue any and all fact-based objections with respect to the Other Twenty-Day Claims. The Debtors and the Administrative Agent reserve all rights to pursue their fact-based objections with respect to the Other Twenty-Day Claims.

c.    Payments by Operators

Operators receiving payments under the Plan will be responsible for disbursing payment to Owners entitled to payment thereto, if any. The Debtors will provide data in their possession related to certain Owners to the Producer Representative, on which the Operators can rely in making distributions pursuant to the Plan.

d.    No Impact on Litigation Trust

Notwithstanding anything in this Section 3.1 or the Plan to the contrary, and without the express written consent of the Litigation Trust Board, no Entity or Creditor (including but not limited to the Prepetition Administrative Agent, the Postpetition Administrative Agent, the Producer Representative, the holder of a Secured Lender Claim, any Operator, or any Owner), will be permitted to assert, bring, institute, commence, or participate in any Litigation Trust Claim (other than distributions, if any, in its capacity as a holder of Litigation Trust Interests).

9.    *Conditions to Effectiveness*

The Producers' Settlement is subject to the following conditions precedent.

a.    Producers' Settlement Payments

(i)    The sum of (A) the total payments with respect to the First Purchaser Producer Twenty-Day Claims plus (B) the total payments with respect to the Secured First Purchaser Producer Claims (including payments pursuant to Sections 3.1(c)(i), (ii), (iii) and (iv) of the Plan) shall not exceed $172.5 million in the aggregate.

(ii)    The sum of (A) the total payments with respect to the Other Twenty-Day Claims paid by the Debtors to the Settling Parties under the Other Twenty-Day Claims Settlement plus (B) the total reserve funded by the Debtors

with respect to Other Twenty-Day Claims held by Non-Settling Parties shall not exceed $154 million in the aggregate. (iii) The sum of (i) the amount of the total payments in Section 18.1(b)(i) of the Plan plus (ii) the amount of the total payments in Section 18.1(b)(ii) of the Plan plus the payment with respect to the Alon Claim shall not exceed $337 million in the aggregate.

      b.    Adversary Proceedings

(i) The Producer Plaintiffs will voluntarily dismiss with prejudice the Producer State-Specific Adversary Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders by no later than the Effective Date. (ii) The parties to the Producer State-Specific Adversary Proceedings shall have filed papers, in a form acceptable to the Debtors and the Prepetition Administrative Agent, voluntarily dismissing with prejudice the Third Circuit Appeals by no later than the Effective Date. (iii) The Producer Plaintiffs will voluntarily dismiss with prejudice the Other Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders and/or their affiliates, as applicable, by no later than the Effective Date.

      c.    Twenty-Day Claims

The Debtors and the Prepetition Administrative Agent shall have voluntarily dismissed with prejudice all fact-based objections to First Purchaser Producer Twenty-Day Claims by no later than the Effective Date of the Plan; provided, however, that the Producers' Committee or the Producer Representative is permitted to pursue the disputes regarding certain First Purchaser Twenty-Day Claims that were set forth in the Notices filed by the Debtors on July 17, 2009.

      d.    Other Producer-Related Litigation

With the exception of (i) any Bankruptcy Court proceedings with respect to the Bankruptcy Court decision on global legal objections to Twenty-Day Claims argued on September 9, 2009 and (ii) any Bankruptcy Court proceedings with respect to Other Twenty-Day Claims, all Producer-related litigation commenced in the Bankruptcy Court and to which the Debtors or the Prepetition Administrative Agent are currently parties shall have been voluntarily dismissed with prejudice as to the Debtors, the Prepetition Administrative Agent, and the Prepetition Lenders.

      e.    Release of Restricted Cash

The Clerk of the Bankruptcy Court shall have entered an order, in form and substance acceptable to counsel for the Administrative Agent and counsel for the Producers' Committee, authorizing the release from escrow of the Restricted Cash for use to fund the Plan.

## H.    OTHER TWENTY-DAY CLAIMS SETTLEMENT

### 1.    *Overview*

The holders of the Other Twenty-Day Claims are not parties to the Producers' Settlement. In order to resolve the outstanding issues related to the ongoing litigation with respect to the

Other Twenty-Day Claims, the Debtors will seek agreement of the holders of the Other Twenty-Day Claims to the Other Twenty-Day Claims Settlement as provided below.

        a.    Settling Parties.

The Debtors have prepared a schedule (Schedule 3 to the Plan) that lists the Other Twenty-Day Claims. Schedule 3 provides the name of the claimant, the amount that the Debtors scheduled on the Notice or the Fourth Amended Schedules, as applicable, for that claimant, which amount is subject to the global legal objections and fact-based objections discussed abovein above in Section I.B.3, and a column entitled "Proposed Settlement Amount" that represents 66% of the amount on Schedule 3 of the Plan for that claimant. Any holder of an Other Twenty-Day Claim that elects to participate in the Other Twenty-Day Claims Settlement will be deemed to have an Allowed Claim equal to the Proposed Settlement Amount for that claimant and will receive in payment for its Other Twenty-Day Claim, Cash on the Effective Date equal to the Proposed Settlement Amount.

As part of the Other Twenty-Day Claims Settlement, the Debtors and the Prepetition Administrative Agent will not pursue any objections to the Other Twenty-Day Claims of such Settling Party, and any decisions that the Bankruptcy Court reaches with regard to the global legal objections will not affect a Settling Parties' entitlement to payment on the Effective Date as described above.

In exchange for this payment, the Other Twenty-Day claimant will release certain parties as described in Section IV.H.2 below, including the Prepetition Lenders or holders of Swap Claims (excluding J. Aron & Company, Bank of Oklahoma and their respective affiliates), the Prepetition Administrative Agent, the Postpetition Administrative Agent, the Postpetition Lenders and the Catsimatidis Group. The claimant will not receive a mutual release from the parties who the claimant is releasing under the Plan.

        b.    Non-Settling Parties.

On the Effective Date, the Debtors will reserve in Cash an amount equal to the amount of the Other Twenty-Day Claims of each Non-Settling Party (at that date) set forth on Schedule 3 of the Plan (or such lesser amount as shall be approved by the Bankruptcy Court) and hold such reserve until the status of such Claim has been Allowed by agreement of the Prepetition Administrative Agent and the holder of such Other Twenty-Day Claim or Final Order. Each of the Debtors (solely prior to the Effective Date), the Creditors' Committee (solely as prior to the Effective Date and solely as to Avoidance Actions) and Prepetition Administrative Agent will be free to pursue any objections, including both fact-based objections and global legal objections, with respect to such Other Twenty-Day Claims of Non-Settling Parties.

        c.    Election Notices.

Each holder of an Other Twenty-Day Claim will receive an Election Notice concurrently with the Debtors' solicitation of votes to accept the Plan. The Election Notice will contain information regarding the terms of the Other Twenty-Day Claims Settlement, including the deadline for returning such notice.

**TO CONSENT AND AGREE TO THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, A HOLDER MUST COMPLETE ITS ELECTION NOTICE AND RETURN IT TO THE BALLOTING AGENT BY THE SPECIFIED DEADLINE. IF A HOLDER ELECTS TO ACCEPT THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, SUCH HOLDER WILL BE DEEMED TO HAVE CONSENTED AND AGREED TO RECEIVE TREATMENT FOR SUCH CLAIM THAT IS DIFFERENT FROM THAT SET FORTH IN SECTION 503(B)(9) OF THE BANKRUPTCY CODE AND WILL BE BOUND BY THE TERMS OF SUCH SETTLEMENT, INCLUDING THOSE SET FORTH ABOVE.**

**IF AN ELECTION NOTICE IS NOT RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE, OR IF THE HOLDER ELECTS NOT TO PARTICIPATE ON ITS ELECTION NOTICE, SUCH HOLDER WILL BE A NON-SETTLING PARTY AND SUBJECT TO THE TREATMENT DESCRIBED IN SECTION I.B.11(B) HEREIN.**

### 2.   *Release of Litigation*

In addition to the provisions of Section 20.11 of the Plan, upon the Effective Date, each Creditor that elects to participate in the Other Twenty-Day Claims Settlement forever discharges the Debtors, the Prepetition Lenders (excluding J. Aron & Company and its affiliates), and the Prepetition Administrative Agent, jointly and as to each of them, from and against any and all liability that they now have, had, or may have arising out of or relating to such Creditor's Other Twenty-Day Claim. The Creditor agrees to voluntarily dismiss with prejudice any motions, objections, or other pleadings regarding such Other Twenty-Day Claim from the Bankruptcy Court's consideration. The Creditor also agrees not to aid, assist, support, or otherwise participate with any other party in prosecuting Other Twenty-Day Claims against the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent and/or the Prepetition Lenders (excluding J. Aron & Company and its affiliates) or to take any positions contrary to the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent and/or Prepetition Lenders (excluding J. Aron & Company and its affiliates). The release of Other Twenty-Day Claims is specifically intended to include and does include Other Twenty-Day Claims that the Creditor might not now know or expect to exist in their favor at the Effective Date, even if knowledge of such claims might have otherwise materially affected the granting of this release. The Creditor understands and agrees that the release of Other Twenty-Day Claims will be treated as a full and complete defense to, and will forever be a complete bar to the commencement or prosecution of, any and all Claims released in Section 3.2(d) of the Plan. The Creditor intends that the release of Other Twenty-Day Claims and the release contained in Section 20.11 of the Plan be complete and not subject to a claim of mistake of fact and that such release and delivery according to the terms of the Other Twenty-Day Claims Settlement present a FULL AND COMPLETE SETTLEMENT of the Claims released in Section 3.2(d) of the Plan. Regardless of the adequacy or inadequacy of the consideration paid, the release included in Section 3.2(d) of the Plan and in

Section 20.11 of the Plan is intended to settle or avoid litigation and/or settle the claims released herein, and to be final and complete.

## I.   RECLAMATION CLAIMS

To further streamline creditor litigation following the commencement of the Chapter 11 Cases, the Debtors sought an omnibus order with respect to section 546(c) Claims—also referred to as reclamation claims.  Section 546(c) of the Bankruptcy Code provides that a seller of goods that sold goods to the debtor in the ordinary course of such seller's business may reclaim such goods if the debtor received the goods while insolvent within 45 days of commencement of a bankruptcy case.  Section 546(c) requires that the seller demand—in writing—reclamation of such goods not later than 45 days after the date of receipt of such goods by the debtor or not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.

Under the Reclamation Claims Procedure Order, the Debtors were required to file a schedule containing information concerning the potential value of the Reclamation Claims, including (1) a list of Reclaiming Vendors who timely filed, served, or delivered Reclamation Notices; (2) the date of each timely Reclamation Notice; (3) the amounts asserted, if any, by the Reclaiming Vendors in their Reclamation Notices; and (4) the estimated value of the inventory remaining in the Debtors' possession, as of the date each Reclamation Notice was filed, served, or delivered.  Thereafter, the Debtors filed a motion asking the Bankruptcy Court to establish reclamation claims processing procedures on January 20, 2009.  The Debtors listed approximately 435 Reclamation Notices in the Reclamation Schedules and estimate the maximum value of these Claims to be approximately $53 million.  However, pursuant to section 546(c) of the Bankruptcy Code, the Reclamation Claims are subject to the prior perfected liens on inventory of the Prepetition Lenders and the Debtors believe that no valid Reclamation Claims exist.

## J.   APPOINTMENT OF OFFICIAL COMMITTEES

### 1.   *Creditors' Committee*

On August 1, 2008, the United States Trustee overseeing the SemGroup Chapter 11 Cases appointed the Creditors' Committee to represent the general unsecured creditors of the Debtors.  The Creditors' Committee currently is comprised of the following entities:

- Central Crude Corporation

- ConocoPhillips Company

- Crude Marketing & Transport Inc.

- HSBC Bank USA, National Association

- Pacific Investment Management Company LLC

- Western Asset Management Company

## 2. Producers' Committee

On October 24, 2008, the United States Trustee appointed the Producers' Committee to represent the interests of certain producers and suppliers of oil and gas to certain SemGroup related entities. The Producers' Committee is comprised of the following entities:

- Samson Resources Company

- Kerr-McGee Oil & Gas Onshore LP

- Altex Energy Corporation

- New Dominion, LLC

- Special Energy Corporation

- McCoy Petroleum Corporation

- Williams Production RMT Company

- Chesapeake Energy Marketing, Inc.

## K. ASSET DISPOSITIONS

The Debtors have worked with Blackstone to conduct sales processes in accordance with section 363 of the Bankruptcy Code with respect to substantially all of SemGroup's assets. The sales processes have consisted of marketing the assets, soliciting bids and, in certain circumstances, selecting a bidder to be the "stalking horse" bidder, negotiating and signing a purchase agreement, conducting a public auction, and closing the sale transaction with the successful bidder.

Due in large part to significant working capital requirements for which financing was not available, SemMaterials' operations were wound down and certain assets were transferred to SGLP pursuant to the global settlement as described below in Section I.1, with the remaining SemMaterials assets excluded from the global settlement being sold at auction. Certain of those remaining assets have been sold, as described below. Further, the Debtors have entered into agreements with respect to the sale of a substantial majority of the assets of its SemFuel business unit. Sales processes for other assets and businesses of the Debtors did not result in bids that met the Debtors' desired terms, including value, and, in consultation with representatives of the Prepetition Lenders and the Creditors' Committee, the Debtors chose not to pursue such transactions. However, the Debtors did dispose of certain de minimus assets through various transactions during the Chapter 11 Cases.

## 1. SemMaterials Disposition and SGLP Settlement

With respect to the SemMaterials business unit, the Debtors began discussions with SGLP after the commencement of the Chapter 11 Cases regarding the possibility of jointly marketing the liquid asphalt assets of both entities. The Debtors were unable to reach an

agreement with SGLP on a joint marketing process and instead began independently marketing their respective assets to third parties. Although the Debtors received bids from six potential buyers in October 2008, they were unable to sign a purchase agreement with a stalking horse bidder due to, among other things, the credit market conditions that made obtaining financing difficult for potential buyers and the need for any potential purchasers to negotiate revised operating agreements with SGLP given the shared, co-dependent facilities. Due to the difficulties in signing a purchase agreement with a stalking horse bidder, the Debtors filed a motion on February 6, 2009 requesting that SemMaterials' domestic business be sold pursuant to a naked auction (an auction without a stalking horse bid) or, in the alternative, the Debtors be allowed to wind down SemMaterials' domestic business to avoid the significant capital requirements and carrying costs of the business.

The naked auction was unsuccessful and the Debtors proceeded with an orderly wind-down of the SemMaterials business. In pursuing the wind-down, the Debtors reached a global settlement with SGLP. On March 6, 2009, the Debtors executed a binding term sheet with SGLP outlining the global settlement, pursuant to which, *inter alia*, the Debtors agreed to transfer to SGLP certain domestic liquid asphalt assets connected to SGLP's liquid asphalt assets; SGLP agreed to transfer to SemCrude certain assets related to SemCrude's Kansas and Oklahoma pipeline; and the parties agreed to enter into certain agreements to facilitate the wind-down of the SemMaterials business. The Bankruptcy Court entered an order on March 19, 2009 approving the terms of the global settlement. On April 7, 2009, SemGroup, SGLP, and certain of their subsidiaries executed the Master Agreement formalizing the global settlement and related transaction documents, to be effective as of March 31, 2009. The Bankruptcy Court entered an order approving the Master Agreement and related transactions on April 7, 2009.

Pursuant to the Master Agreement, SemGroup and SGLP and certain of their subsidiaries entered into several agreements to separate their respective businesses. To eliminate instances where the companies had co-located, co-dependent or interconnected assets, SemGroup transferred certain liquid asphalt assets to SGLP and SGLP transferred certain crude oil assets to SemGroup. The parties terminated their crude oil and liquid asphalt services agreements; entered into a new market-based throughput agreement for crude oil; and entered into short-term contracts to facilitate the wind-down of the SemMaterials business. The parties also entered into various services agreements whereby SemCrude agreed to provide certain crude oil services to SGLP on a long-term basis; SGLP agreed to lease office space to SemCrude on a long-term basis; and certain of the SemGroup Companies agreed to provide services on a short-term basis to facilitate the separation of operations between the two companies.

The Debtors pursued the sale of certain other assets of SemMaterials, including SemMaterials' residual oil business and its intellectual property which included SemMaterials' branded asphalt products. On April 7, 2009, the Bankruptcy Court approved the sale of SemMaterials' residual oil business for a purchase price of $2.5 million, subject to customary purchase price adjustments, and the sale closed on April 24, 2009. On May 11, 2009, the Bankruptcy Court approved the sale of SemMaterials' intellectual property for $6.5 million, subject to customary purchase price adjustments, and the sale closed on May 18, 2009.

## 2. SemFuel

SemFuel is a refined petroleum product business with operations predominantly serving the Mid-Continent, Upper Midwest, and Gulf Coast regions of the United States. SemFuel's operations are focused on throughput, marketing, storage, and other fee-based operations.

The SemFuel sales process began in Fall 2008. After receiving bids for various combinations of assets from multiple bidders, SemGroup negotiated and entered into stalking horse agreements with U.S. Oil Co., Inc. and QuikTrip Corporation on June 16, 2009 and with Magellan Pipeline Company, L.P. on June 18, 2009, for the sale of a majority of the SemFuel assets. The Debtors conducted an auction with respect to the assets included in the stalking horse bids and certain other remaining assets of SemFuel. At the auction, SemFuel received a higher bid from Noble Americas Corp. of $65.35 million for the purchase of a substantial majority of the assets of SemFuel. The Bankruptcy Court approved the sale to Noble Americas Corp. on August 13, 2009, and the Debtors expect to consummate the transaction on or about September 30, 2009.

## L. EMPLOYEE INCENTIVE AND SEVERANCE PLANS

### 1. Incentive Plan

Prior to the Petition Date, the Debtors had maintained, in the ordinary course of their businesses, certain annual performance-based cash incentive plans both on a company-wide and business-unit basis. The Debtors did not seek authority to continue their domestic bonus programs after the Petition Date, nor did the Debtors seek to make any payments to domestic employees for the 2008 calendar year under the prepetition bonus programs. Rather, after commencing the Chapter 11 Cases, the Debtors sought to develop a new incentive program intended to provide awards to domestic employees commensurate with the value that each employee contributed to the Debtors' ongoing operations and the success of the Debtors' reorganization.

After significant negotiations with the various constituencies in the Chapter 11 Cases, the Debtors proposed the Employee KEIP and the Executive KEIP, which were approved by the Bankruptcy Court on September 17, 2008 and January 13, 2009, respectively. The KEIPs were designed to provide cash bonuses to certain key employees, contingent upon the achievement of either successful asset sales or reorganization of specific business units of the Debtors. As of June 1, 2009, the KEIPs included approximately 250 of the Debtors' employees who occupy positions critical to SemGroup's successful reorganization and ongoing business and certain former SemMaterials and SemCrude employees who worked for SemManagement prior to the global settlement with SGLP and the divestitures of SemMaterials assets. The KEIPs were based on varying percentages of employees' base salaries. As of September 1, 2009, the Debtors have paid approximately $6.6 million in bonuses to 125 employees under the KEIPs. Future KEIP payments are estimated to total approximately $6.9 million.

### 2. Severance Program

Prior to the Petition Date, the Debtors had an *ad hoc* severance program. Shortly after the Petition Date, the Debtors began to develop a formal severance program. The Debtors

sought to create a severance program that was structured to avoid unnecessary or excessive benefits and was narrowly tailored to provide severance benefits that were within the norm of benefits provided to employees in similar chapter 11 cases. After negotiations with the various constituencies in the cases, the Debtors proposed the Severance Program, which was approved by the Bankruptcy Court on August 19, 2008.

The Severance Program, as approved, provides severance benefits to all full-time employees without written employment agreements and whose employment is terminated involuntarily with or without cause. Under the Severance Program, an employee receives payment equivalent to two weeks salary and one month of outplacement services. Each employee also receives payment for any earned but unused vacation time. Finally, employees may elect to receive outplacement services at the time of their termination. As of September 1, 2009, the Debtors have spent approximately $1.4 million under the Severance Program.

## M. EXCLUSIVITY

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of its chapter 11 case. In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of its chapter 11 case. A debtor's exclusive rights may be either terminated or extended for "cause."

On November 18, 2008, the Debtors filed a motion to extend their exclusive period to file a chapter 11 plan and solicit acceptances thereof to March 19, 2009 and May 19, 2009, respectively. On December 8, 2009, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods and by decision and order dated December 8, 2008, the Bankruptcy Court granted the Debtors an extension of the Debtors' exclusivity to propose a chapter 11 plan and solicit acceptances thereof to March 19 and May 19, 2009, respectively.

On March 19, 2009, the Debtors filed a motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to June 17, 2009 and August 17, 2009, respectively. On April 7, 2009, the Producers' Committee and Calyon New York Branch objected to the Debtors' motion. As part of an agreement to extend the maturity date of the Postpetition Financing Agreement, the Debtors agreed to file a chapter 11 plan by May 15, 2009 and solicit acceptances thereof by September 18, 2009. On April 14, 2009, the Bankruptcy Court held a hearing on the Debtors' motion, following which the Bankruptcy Court granted the Debtors an extension of the Debtors' exclusivity to propose a chapter 11 plan and solicit acceptances thereof to May 15 and September 18, 2009, respectively. The Debtors plan to seek an extension of the period to solicit acceptances through October 23, 2009.

## N. ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 365 of the Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the counterparty to the agreement may file a

claim for damages incurred by reason of the rejection. In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

On September 10, 2008, the Bankruptcy Court approved an order providing for certain procedures governing the rejection of executory contracts and unexpired leases on limited notice. This procedure alleviated additional expense to the Debtors' estates and the attendant delay that would have resulted if the Debtors had been required to proceed by separate motion and hearing for every executory contract and unexpired lease they determined to reject. Under the rejection procedures, as of May 31, 2009, the Debtors have rejected in excess of 1,600 unnecessary and economically burdensome contracts. The Debtors have also determined that it would be beneficial to assume various executory contracts and unexpired leases, which the Bankruptcy Court authorized pursuant to various orders.

There is a dispute between the Debtors and Koch Materials, LLC, KMC Enterprises, LLC, and Koch Materials Mexico, B.V. (collectively, the "Koch Entities") concerning the Purchase and Sale Agreement, dated April 15, 2005, by and between SemGroup and the Koch Entities, as amended (the "PSA"). The Koch Entities assert that there are material obligations remaining under the PSA on both sides and that the PSA is an executory contract that must be assumed or rejected under the Plan. The Debtors do not believe that their remaining obligations under the PSA are material. Therefore, the Debtors maintain that the PSA is not an executory contract and do not intend to reject or assume such agreement.

The Debtors have further advised the Koch Entities that they expect the Koch Entities to perform their obligations under the PSA, including environmental and indemnification obligations, but that the Debtors do not intend to perform their obligations under the PSA. The Koch Entities maintain that to the extent the Debtors want to continue receiving the benefits under the PSA, whether executory or non-executory, the Debtors must assume and continue to perform their obligations under the PSA.

## O.    INVESTIGATIONS

The SEC, CFTC and DOJ have served SemGroup with requests for voluntary production and/or subpoenas. The DOJ stayed its requests, and the Debtors have actively been working with both the SEC and CFTC to respond to their inquiries.

Additionally, the Special Committee of the Management Committee of SGLP (described below) requested that an internal investigation be conducted to, among other things, prepare itself to respond to inquiries from governmental entities, the Examiner, and the Creditors' Committee and consider certain claims against former and current officers.

### 1.    SEC

On August 5 and September 5, 2008, SemGroup received letters from the SEC including requests for voluntary production. On October 24, 2008, the SEC also served SemGroup with a subpoena seeking further documents. SemGroup has worked with the SEC to provide information responsive to the SEC document requests and the document production is currently ongoing. The SEC has also interviewed several current and former SemGroup employees.

## 2.    CFTC

On June 19, 2008, SemGroup received a letter from the CFTC that included a request for voluntary production. On August 14, 2008, the CFTC sent another letter that included an additional request for voluntary production. The CFTC has also served subpoenas upon the Debtors requiring that they produce various documents. SemGroup continues to cooperate with the CFTC and respond to the CFTC's document requests.

### 3.    Special Committee

The Special Committee retained WGM to conduct an internal investigation of the events leading up to the filing of the Chapter 11 Cases. In the course of this investigation, WGM collected and preserved documents from SemGroup employees, reviewed numerous documents, and interviewed over 30 current and former employees and vendors.

### 4.    Examiner Appointment

On October 14, 2008, the Bankruptcy Court appointed Louis J. Freeh as Examiner. The Examiner issued his final report on April 15, 2009 and concluded that SemGroup's trading activities included speculative aspects that exposed SemGroup to increased risk and ultimately resulted in the Chapter 11 Cases. As described in Section IV.A. above, these speculative aspects of the trading activities were in violation of SemGroup's risk management policy and the Prepetition Credit Agreement.

## P.    CREDITORS' COMMITTEE'S COMPLAINT

The Creditors' Committee is asserting claims on the Debtors behalf, including claims the Debtors may have against Messrs. Kivisto and Wallace and Westback. On March 16, 2009, the Bankruptcy Court entered an order authorizing the Creditors' Committee to assert claims on behalf of the Debtors, and the Creditors' Committee filed, for and on behalf of the Debtors, its complaint against Messrs. Kivisto and Wallace and Westback. The Debtors assisted the Creditors' Committee in obtaining information for such complaint by providing access to documents, responding to specific informational requests, and providing certain information gathered as part of the internal investigation.

On March 18, 2009, the Administrative Agent filed a motion to intervene in the action to protect its interests, along with those of other pre- and postpetition secured parties. SemGroup did not object to that motion. The Bankruptcy Court granted the Administrative Agent's motion to intervene on April 14, 2009.

On June 8, 2009, the Creditors' Committee amended its complaint to add Brent Cooper, Kevin L. Foxx, and Alex G. Stallings as defendants and added allegations related to the findings in the Examiner's report.

On August 7, 2009, Defendants Kivisto, Wallace, Westback, Cooper, Foxx, and Stallings, each filed a motion to dismiss all or some portion of the amended complaint. In addition, Westback filed an answer to the amended complaint.

The Litigation Trust will continue to pursue such claims after the Effective Date.

## Q.   MANAGEMENT COMMITTEE

Under the SGGP Operating Agreement, the general partner of SemGroup, the Management Committee of SGGP has certain specified authority to manage the business and affairs of SGGP, except to the extent such authority is delegated to the officers of SGGP. Pursuant to the SGGP Operating Agreement, there are nine members of the Management Committee. Prior to the commencement of the Chapter 11 Cases, the right to appoint the nine members was divided equally among three groups: (i) three members were appointed by Mr. Kivisto, the former CEO of SemGroup; (ii) three members were appointed by Ritchie Capital; and (iii) three members were appointed by Carlyle/Riverstone. Although Carlyle/Riverstone has the right to appoint three members, as of the date hereof it has appointed only two members, and although Ritchie Capital has the right to appoint three members, as of the date hereof it has appointed only one member. Therefore, the two appointed Carlyle/Riverstone members are each entitled to exercise 1.5 votes and the one appointed Ritchie Capital member is entitled to 3 votes on the Management Committee. In addition, although Mr. Kivisto has the right to appoint three members, as of the date hereof, he has appointed only two members with each such member entitled to exercise 1 vote on the Management Committee. Mr. Kivisto retains the right to appoint one additional member to the Management Committee. Therefore, as of the date hereof, 8 of the 9 authorized seats on the Management Committee are filled and one seat is vacant. Under the SGGP Operating Agreement, the Management Committee cannot take any action with respect to certain enumerated matters without at least one vote by Carlyle/Riverstone.

In connection with the filing of the Chapter 11 Cases, SGGP passed resolutions granting broad authority to the authorized officers of SemGroup to take such actions as may be necessary or desirable to effect a successful resolution of the Chapter 11 Cases.

### 1.   *Adversary Proceedings*

In early December 2008, TEA, an Oklahoma limited liability company created by Mr. Catsimatidis, executed contemporaneous agreements with Mr. Kivisto and Ritchie Capital regarding the appointment of members to the Management Committee. Mr. Kivisto agreed to appoint three of Mr. Catsimatidis' designees to the Management Committee through the end of 2009. Mr. Catsimatidis' designees included (i) James C. Hansel; (ii) Martin R. Bring; and (iii) Matthew F. Coughlin, III, who is also Executive Vice President of TEA and a Director of UREC, a company controlled by Mr. Catsimatidis. Ritchie Capital agreed to appoint Mr. Catsimatidis to the Management Committee through October 2009, and, without a formal agreement, also appointed J. Nelson Happy, an attorney for UREC, to the Management Committee. Mr. Kivisto and Ritchie Capital each agreed to transfer their equity interests in SGGP and SemGroup to TEA.

On February 11, 2009, the Debtors filed an adversary proceeding against the Catsimatidis Group, UREC, and TEA. The Catsimatidis Adversary Proceeding sought relief relating to the Catsimatidis Group's repeated breaches of fiduciary duties and violations of a confidentiality agreement executed by Mr. Catsimatidis in November 2008 in connection with his interest in purchasing certain SemGroup assets, as well as the conflicts of interest of the members of the

Catsimatidis Group arising out of their dual roles as bidders for the Debtors' assets and purported members of the Management Committee, having obtained their Management Committee positions in part through transactions with Mr. Kivisto.

On April 2, 2009, purporting to be acting on behalf of SGGP, the Catsimatidis Group filed a lawsuit in the United States District Court for the Northern District of Oklahoma against the Debtors' CEO, Terrence Ronan. The lawsuit alleged, *inter alia*, that as members of the Management Committee, the Catsimatidis Group is entitled to direct Mr. Ronan with regard to the reorganization of the Debtors. The Catsimatidis Group also alleged that Mr. Ronan breached his fiduciary duties to SGGP by failing to comply with previous resolutions issued by the Catsimatidis Group relating to the Debtors' reorganization.

On April 13, 2009, the Debtors filed a second adversary proceeding (Adversary No. 09-50892) in the Bankruptcy Court against the Catsimatidis Group, seeking injunctive relief relating to the Oklahoma Lawsuit. On April 14, 2009, the Debtors filed a motion to enforce the automatic stay and for injunctive relief against the Catsimatidis Group in relation to the Oklahoma Lawsuit. The Bankruptcy Court granted the relief sought by the Debtors in the April 14, 2009 motion. On May 9, 2009, the Bankruptcy Court granted a request by the Administrative Agent to intervene as a plaintiff in the Catsimatidis Adversary Proceeding.

The Catsimatidis Group asserted that the filing of the Debtors' prior Disclosure Statement and Plan were not properly authorized by the Management Committee and that the Debtors did not have the authority for such filing without the approval of the Catsimatidis Group. The Debtors denied this assertion and believe that said Disclosure Statement and Plan were properly authorized under the resolutions approved by the Management Committee in connection with the commencement of the Chapter 11 Cases. The Debtors believe that the Catsimatidis Group did not have any authority to rescind grants of authority to the Debtors' management because Carlyle/Riverstone did not approve such rescission, as required under the terms of the SGGP Operating Agreement. As noted above, this dispute was the subject of the Catsimatidis Adversary Proceedings.

### 2. *Settlement*

The Catsimatidis Settling Parties have entered into stipulations of settlement (the "Settlement") to resolve various outstanding disputes. The Settlement resolves the following matters:

- Adversary proceeding No. 08-51404 (BLS) between United Refining and SemMaterials, L.P., (the "Vulcan Action");

- Adversary No. 09-50121 among SemGroup, Ronan, Catsimatidis, Bring, Coughlin, Happy, Turfitt, Hansel, UREC, and TEA (the "Catsimatidis Action");

- Case No. 09 CV-179 GKF-PJC, filed by SGGP against Ronan in the Northern District of Oklahoma (the "Oklahoma Action");

- The Verified Complaint for Injunctive Relief and Violation of the Automatic Stay in Adversary No. 09-50892 against Catsimatidis, Coughlin, Bring, Happy, and Hansel (the "Debtors' Preliminary Injunction Action");

- The Objection of Certain Members of the Management Committee to Disclosure Statement for Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "June 17 Objection"); and,

- The Objection of Certain Members of the Management Committee to Motion of the Debtors for an Order (i) Approving the Notice of the Disclosure Statement Hearing; (ii) Approving the Disclosure Statement; (iii) Fixing the Voting Record Date, (iv) Approving the Notice and Objection Procedures in Respect of Confirmation of Plan; (v) Approving Solicitation Packages and Procedures for Distribution Thereof; (vi) Approving the Forms of Ballots and Establishment of Procedures for Voting on the Plan, (vii) Approving the Forms of Notices to Non-Voting Classes Under the Plan; (viii) Fixing the Voting Deadline to Accept or Reject the Plan, and (ix) Approving the Procedure for Vote Tabulations in Connection Therewith (together, with the June 17 Objection, the "Catsimatidis Disclosure Statement Objections").

Pursuant to the Settlement and in connection with the Vulcan Action, United Refining agreed to pay $3.9 million in full and final satisfaction of any and all amounts owed by United Refining to Debtors. The Settlement also includes a release of all Claims and Causes of Action by the Catsimatidis Settling Parties, arising out of or relating to the Debtors' Chapter 11 Cases, the Vulcan Action, the Oklahoma Action, the Catsimatidis Action, the Debtors' Preliminary Injunction Action, and/or the Catsimatidis Disclosure Statement Objections. Pursuant to the Settlement, Messrs. Catsimatidis, Bring, Coughlin, Happy, and Hansel agreed to resign from the Management Committee and have done so. The Settlement also contains a release of all Claims and Causes of Action related to Messrs. Catsimatidis, Bring, Coughlin, Happy, Hansel, and Turfitt's service on the Management Committee of SGGP.

### 3. *Kivisto Designees*

In September 2009, Mr. Kivisto purportedly appointed two new designees to serve on the Management Committee of SGGP: Mr. Warren F. Kruger and Mr. Gary Adams.

## R. OTHER ADVERSARY PROCEEDINGS

The Debtors are named parties in many adversary proceedings pending as part of the Debtors' Chapter 11 Cases. Below is a brief description of the material adversary proceedings to which the Debtors are party.

### 1. *Stayed Crude Oil Cases*

*JMA Energy Company L.L.C. v. SemCrude, L.P., Adv. Proc. No. 08-51106*
*LCS Production Co. v. SemCrude, L.P., Adv. Proc. No. 08-51118*
*Samson Resources Company v. Eaglwing, L.P. et al., Adv. Proc. No. 08-51146*
*New Dominion LLC v. SemCrude, L.P., Adv. Proc. No. 08-51147*

*Benson Mineral Group, Inc. v. SemCrude, L.P. et al., Adv. Proc. No. 08-51278*
*Titan Energy, Inc. et al v. SemCrude, L.P., Adv. Proc. No. 08-51279*
*Prima Exploration v. SemCrude, L.P., Adv. Proc. No. 08-51345*
*Rosewood Resources, Inc. v. SemCrude, L.P., Adv. Proc. No. 08-51348*
*Luke Oil Company et al v. SemCrude, L.P. et al., Adv. Proc. No. 08-51407*

The plaintiffs in these actions have each asserted Claims stemming from the Debtors' purchase of crude oil. Each of these actions has been stayed by the Bankruptcy Court through one or more consolidated procedures orders. As discussed herein, the Reclamation Claims Procedures Order, dated September 15, 2008, establishes consolidated procedures for the resolution of the rights and priorities of any party asserting that it is entitled, under Section 546(c) of the Bankruptcy Code, to reclaim goods sold to Debtors in the 45 days preceding the Petition Date. The Order Establishing Procedures for the Resolution of Administrative Claims Asserted Pursuant to Section 503(b)(9) of the Bankruptcy Code and Regarding Payments for Post-Petition Purchases, dated September 15, 2008, establishes consolidated procedures for the resolution of the rights and priorities, under Section 503(b)(9) of the Bankruptcy Code, of sellers of goods who sold goods to the Debtors within 20 days before the Petition Date. The Order Establishing Procedures for the Resolution of Liens Asserted Pursuant to Producers' Statutory Lien or Similar Statutes, dated September 26, 2008, establishes consolidated procedures for the resolution of the rights and priorities of Producers of oil and gas products, operators of oil and gas wells, and interest owners under applicable law, in oil and gas wells, asserting entitlement under various state laws allegedly providing Producers with lien rights and/or constructive trust claims. Pursuant to the procedures set forth in the above-referenced Orders, the Debtors will systematically and efficiently address each group of vendors' claims as opposed to litigating numerous individual vendor actions. The Reclamation and Twenty-Day Claims Procedures Orders lay out a timeline for the resolution of these Claims through a series of schedules, giving the vendors the opportunity to object to the scheduled amount. The Statutory Claims Procedures Order provides for the filing of consolidated declaratory judgment actions—one per state—to resolve threshold questions of law, including the relative priority of that state's Producers vis-à-vis the Administrative Agent.

### 2. *Producers' Litigation Cases*

*Arrow Oil & Gas et al v. SemCrude L.P. et al., (Adversary No. 08-51444)*
*Samson Resources Company et al v. SemCrude L.P. et al., (Adversary No. 08-51445)*
*Mull Drilling Co, Inc. et al. v. SemCrude L.P. et al., (Adversary No. 08-51446)*
*Samson Resources Company et al v. SemCrude L.P. et al., (Adversary No. 08-51448)*
*DE Exploration, Inc. v. SemCrude L.P. et al., (Adversary No. 08-51453)*
*Mull Drilling Co., Inc. v. SemCrude L.P. et al., (Adversary No. 08-51454)*
*Prima Exploration, Inc. v. SemCrude L.P. et al., (Adversary No. 08-51455)*
*Samson Resources Company v. SemCrude L.P. et al., (Adversary No. 08-51458)*

These actions are discussed in Section IV.E., "Producers' Claims and Litigation."

### 3. *Tender Adversary Cases*

*ConocoPhillips Company et al. v. SemCrude L.P. et al., (Adversary No. 08-51457)*

*J. Aron & Company et al. v. SemGroup, L.P. et al., (Adversary No. 09-50038)*
*BP Oil Supply Company et al. v. SemGroup, L.P. et al., (Adversary No. 09-50105)*
*Plains Marketing, L.P. v. Bank of America, N.A. et al., (Adversary No. 09-51003)*
*Coffeyville Resources Refining & Marketing, LLC v. SemCrude, L.P (Adversary No. 09-52015)*

These actions are discussed in Section IV.E., "Producers' Claims and Litigation."

### 4. Catsimatidis Proceedings

*SemGroup, L.P., et al., v. John A. Catsimatidis, et al., (Adversary No. 09-50121)*
*SemGroup, L.P., et al., v. John A. Catsimatidis, et al., (Adversary No. 09-50892)*
*SemGroup, G.P., L.L.C. v. Terrence Ronan (N.D. Okla. 09-CV-179)*

These actions are discussed in Section IV.Q., "Management Committee Changes" and have been settled as part of the Settlement with the Catsimatidis Settling Parties.

### 5. Other Adversary Proceedings

*Vess Oil Corp. v. SemGroup, L.P. and Eaglwing, L.P.*, (Adversary No. 08-51142). On August 6, 2008, Vess Oil Corporation ("Vess") filed an adversary proceeding against Eaglwing, and SemGroup alleging that certain funds Eaglwing received were held in trust for Vess. Vess seeks a declaratory judgment that the funds are not property of the Debtors' estate and for turnover of the funds. The parties have completed discovery and have each filed a motion for summary judgment. On July 13, 2009, the Bankruptcy Court held oral argument on the motions for summary judgment. The Bankruptcy Court has not yet issued a decision on the matter. The amount alleged to be held in trust for Vess is $2,732,607.58. The Debtors have not reserved any funds in connection with such adversary proceeding.

*Bominflot Atlantic, LLC v. SemMaterials, L.P.*, (Adversary No. 08-51145). On August 8, 2008, Bominflot Atlantic ("BAT") filed a complaint against SemMaterials seeking return of approximately 7,500 barrels of oil or payment therefor in the amount of $837,014.89. BAT also filed a motion to lift the automatic stay to allow an action filed in Virginia state court to proceed, as well as a motion for a temporary restraining order related to the adversary proceeding. On August 28, 2008, BAT withdrew its motions to lift the stay and for the temporary restraining order. On October 8, 2008, the parties filed a stipulation agreeing that the deadline for SemMaterials to file its answer to BAT's complaint will be extended indefinitely to "seven (7) days after receipt of written notice . . . that such answer, motion, or other response is due." The Bankruptcy Court issued an order accepting the stipulation on October 10, 2008. As of September 4, 2009, BAT has not provided written notice requiring SemMaterials to respond to its complaint.

*Special Energy Corporation v. SemCrude, L.P.*, (Adversary No. 08-51397). On August 21, 2008, Special Energy Corporation ("Special") commenced an adversary proceeding against SemCrude seeking a declaration that $5,226,371.16 (the "Funds"), representing revenues from the sale of natural gas, are not property of the bankruptcy estate. Special alleges a constructive trust over the Funds. SemCrude contends that Special cannot meet the legal requirements necessary to establish a constructive trust. Litigation of this matter is ongoing.

*United Refining Company v. SemMaterials, L.P.*, (Adversary No. 08-51404). On September 4, 2008, United Refining Company ("United") filed an adversary proceeding against SemMaterials in relation to the parties' interest in a limited liability company called the Vulcan-Koch Asphalt Marketing LLC. In the adversary proceeding, United seeks a declaration that it was entitled to dissolve the LLC as a result of SemMaterials' filing of a petition for bankruptcy relief and requests an order directing SemMaterials to accept a distribution relating to its interest in the LLC. SemMaterials filed a counterclaim asserting a declaration that the LLC did not dissolve on the Petition Date. This matter has been settled as part of the settlement with the Catsimatidis Settling Parties.

*Statewide Crude, Inc. v. SemCrude, L.P. & Bank of America, N.A.* (Adversary No. 08-51456). On October 6, 2008, Statewide Crude Inc. ("Statewide") filed an adversary proceeding against SemCrude and Bank of America, N.A. Statewide alleges in its complaint that SemCrude failed to pay for crude oil that Statewide sold and delivered to SemCrude in June and July 2008. Statewide is seeking declarations, *inter alia*, that it has a valid perfected Lien under Chapter 56 of the Texas Property Code; its Lien trumps any interest of Bank of America; and Statewide is entitled to recover attorneys' fees. SemCrude moved to dismiss the complaint on November 20, 2008 on the grounds that the complaint violated the Statutory Claims Procedures Order and that Statewide failed to state a claim upon which relief can be granted because the statute upon which it relied did not provide Producers of oil and gas with any Lien rights securing payment of their production. Statewide filed an opposition to SemCrude's motion to dismiss on January 19, 2009, and SemCrude filed a reply on March 27, 2009. Bank of America filed a similar motion to dismiss. The hearing on the defendants' motions to dismiss is currently pending. The parties have not begun discovery. According to the Debtors' books and records, the Debtors purchased approximately $2,012,321 that may be subject to the alleged Lien rights of Statewide.

*SemCrude, L.P., et al. v. Brent C. Cooper*, (Adversary No. 08-51601), was filed by Debtors on October 24, 2008 in the Bankruptcy Court. The Debtors assert several Causes of Action against Mr. Cooper, seeking (1) the turnover of Debtors' computer wrongfully held by Mr. Cooper; (2) the turnover of electronic information residing on that computer; (3) a declaratory judgment that Mr. Cooper violated the automatic stay under the Bankruptcy Code; and (4) the payment of Debtors' attorneys' fees and costs associated with bringing the complaint. After the complaint was filed, Mr. Cooper returned Debtors' computer and the parties are currently negotiating the terms of the proceeding's dismissal.

*SemGas, L.P. v. Targa Liquids Marketing and Trade*, (Adversary No. 08-51787). On October 30, 2008, SemGas filed an adversary proceeding against Targa Liquids Marketing and Trade ("Targa") in relation to Targa's purported termination of a purchase contract. In the adversary proceeding, the Debtors seek, *inter alia*, payment of approximately $4.6 million for asphalt products delivered to Targa during the months of June and July 2008 and a declaratory judgment that Targa did not have the right to terminate the purchase contract in relation to SemGas' filing of a petition for bankruptcy relief. The parties are currently conducting discovery.

*SemMaterials, L.P. v. High Sierra Terminaling, LLC and Sierra Asphalt Roofing Company*, (Adversary No. 08-51828). On November 24, 2008, SemMaterials filed an adversary action against High Sierra Terminaling LLC and Sierra Asphalt Roofing (collectively "HST").

SemMaterials asserts claims for declaratory judgment, turnover of property of the estate, breach of contract, and violation of the automatic stay relating to HST's refusal to release approximately $4 million worth of asphalt products stored in HST's facilities pursuant to certain storage contracts. HST refused to release SemMaterials' stored material based on an alleged warehouseman's Lien covering certain prepetition storage fees and expenses. The parties are currently conducting discovery.

*SemGroup, L.P., et al. v. SemGroup, G.P., L.L.C.* (Adv. Proc. 09-52194). On September 8, 2009, the Debtors filed an adversary proceeding against SemGroup, G.P., L.L.C. ("SGGP"). The Debtors sought injunctive and declaratory relief to preclude SGGP from changing SemGroup's federal income tax classification from partnership to corporation. The Debtors contend that the reclassification of SemGroup as a corporation would harm the Debtors' estates and interfere with the reorganization. On September 9, 2009, the Bankruptcy Court granted the Debtors' request for a temporary restraining order against SGGP. The Debtors are currently exploring the possibility of an agreement with SGGP to extend the injunctive relief. If an agreement is not forthcoming, the Debtors will proceed with a hearing on their motion for preliminary injunction.

## S.    CREDITORS' COMMITTEE RULE 2004 MOTIONS

On August 22, 2008, the Creditors' Committee filed a motion seeking the production of documents from various individuals and entities pursuant to 11 U.S.C. §§ 105(a) and 1103(c) and Federal Rule of Bankruptcy Procedure 2004 (the "Original Rule 2004 Motion"). The Original Rule 2004 Motion sought the production of documents from (i) Thomas L. Kivisto, (ii) Westback Purchasing Co., L.L.C./Westback Holdings, L.L.C., (iii) Barclays Bank, PLC ("Barclays"), (iv) Bank of Oklahoma, N.A./BOK Financial Corp., (v) George Kaiser, (vi) Hall, Estill, Hardwick, Gable, Golden & Nelson ("Hall Estill"), (vii) Gregory C. Wallace; (viii) Fortis Bank/Fortis Capital Corp., (ix) Pricewaterhouse Coopers L.L.P. ("PwC"), (x) Carlyle/Riverstone Global Energy and Power Fund II, L.P. ("Carlyle/Riverstone"), and (xi) Ritchie Capital. In light of the Bankruptcy Court's appointment of the Examiner, the overlap between the Examiner's Preliminary Work Plan and the Creditors' Committee's Original Rule 2004 Motion, and the anticipated coordination with the Examiner, the Creditors' Committee adjourned its Original Rule 2004 Motion pending the issuance of the Examiner's Report.

On May 14, 2009, approximately one month after the Examiner filed his Final Report with the Bankruptcy Court summarizing the findings of his investigation, the Creditors' Committee filed a motion to renew its Original Rule 2004 Motion as to the following respondents: (i) PwC, (ii) Barclays, (iii) Hall Estill, (iv) Carlyle/Riverstone, and (v) Ritchie Capital (the "Renewed Rule 2004 Motion"). The Creditors' Committee also filed on May 14, 2009, a supplemental Rule 2004 Motion as to J. Aron and Goldman (the "Supplemental Rule 2004 Motion"). At the May 28, 2009 hearing, the Bankruptcy Court granted the Creditors' Committee's Renewed Rule 2004 Motion and its Supplemental Rule 2004 Motion. The Bankruptcy Court's orders granting the motions were entered on June 5, 2009.

On July 10, 2009, the Creditors' Committee filed Rule 2004 Motions against Gavilon L.L.C. f/k/a The ConAgra Trading Group, Inc. ("ConAgra") and Bank of Oklahoma, N.A. ("BOK"). On July 27, 2009, the Bankruptcy Court granted the Creditors' Committee's Rule

2004 Motion as to BOK and on August 14, 2009, the Bankruptcy Court granted the Creditors' Committee's Rule 2004 Motion as to ConAgra.

On August 21, 2009, the Creditors' Committee filed a Rule 2004 Motion against Prudential Bache Commodities, LLC ("PBC") and on September 9, 2009, the Bankruptcy Court granted the Creditors' Committee's Rule 2004 Motion as to PBC. On August 28, 2009, the Creditors' Committee filed a Rule 2004 Motion against Magellan G.P., L.L.C. and Magellan Midstream Partners, L.P. ("Magellan") and on September 16, 2009, the Bankruptcy Court granted the Creditors' Committee's Rule 2004 Motion as to Magellan.

On August 31, 2009, the Creditors' Committee filed Rule 2004 Motions against David L. Murfin, Murfin, Inc., and Murfin Drilling Company, Inc. ("Murfin") and J. Michael Vess and Vess Oil Corporation ("Vess"). It is anticipated that these motions will be heard by the Bankruptcy Court on or before September 24, 2009.

The Creditors' Committee is currently in the process of reviewing the documents produced by the respondents, and conducting meet-and-confers with each of the respondents regarding their objections and responses to the Creditors' Committee's document requests. The Committee may seek relief under Rule 2004 against other Entities, including Entities which received payments within ninety days of the Petition Date and/or assert claims allegedly entitled to priority under 11 U.S.C. § 503(b)(9).

The Creditors' Committee will use the documents produced by the respondents in response to its Rule 2004 Motions to fulfill its statutory mandate to investigate *"any other matter relevant to the case,"* 11 U.S.C. § 1103(c)(2) (emphasis added), and to carry out its fiduciary duty to maximize recoveries for all creditors, including its duty to investigate any claims and causes of action against any party, including the respondents, that may be asserted for and on behalf of the Debtors' estates, and to commence any resulting action, proceeding, litigation, arbitration, for and on behalf of the Debtors' estates.

After the Effective Date, the Rule 2004 Motions will be handled by the Litigation Trust.

Notwithstanding anything to the contrary contained herein or in the Plan, neither the Debtors nor the Contributing Lenders are releasing any Claims or Causes of Action against:

- Thomas L. Kivisto;
- Westback Purchasing Co., L.L.C., Westback Holdings, L.L.C., and their affiliates;
- Barclays Bank, PLC, and its affiliates;
- Bank of Oklahoma, N.A., BPK Financial Corp., and their affiliates;
- George Kaiser;
- Hall, Estill, Hardwick, Gable, Golden & Nelson;
- Gregory C. Wallace;
- PricewaterhouseCoopers L.L.P., and its affiliates;
- Carlyle/Riverstone Global Energy and Power Fund II, L.P., and its affiliates;
- Ritchie Capital, and its affiliates;
- Gavilon, L.L.C., and its affiliates (f/k/a The ConAgra Trading Group, Inc.);
- Prudential Bache Commodities, LLC, and its affiliates;

- Magellan G.P., L.L.C., Magellan Midstream Partners, L.P., and their affiliates;
- David L. Murfin, Inc., Murfin Drilling Company, Inc., and their affiliates;
- J. Michael Vess, Vell Oil Corporation, and their affiliates;
- J. Aron & Co., and its affiliates;
- Goldman Sachs & Co., and its affiliates;
- Brent Cooper;
- Kevin L. Foxx;
- Sharon Pens;
- Greg Price; and
- Alex G. Stallings.

## T.    RELATED CANADIAN INSOLVENCY CASES

### *1.    Amended and Restated Initial Order*

On July 22, 2008, SemCanada Nova Scotia and SemCAMS ULC each sought and obtained protection from their creditors under the CCAA. On July 30, 2008, the Canadian Debtors obtained the Amended and Restated Initial Order, which: (i) consolidated the CCAA proceedings of SemCanada Nova Scotia and SemCAMS ULC; (ii) continued under the CCAA the proceedings of SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. commenced by them on July 24, 2008 under the BIA; (iii) granted CCAA protection to two affiliated companies being 3191278 Nova Scotia Company and 1380331 Alberta ULC; and (iv) appointed Ernst & Young Inc. as the Monitor of the Canadian Debtors.

### *2.    Claims Process and Canadian Bar Date*

Pursuant to an order of the Alberta Court dated October 22, 2008 (the "Canadian Claims Procedure Order"), a creditor asserting a pre-filing claim against any of the Canadian Debtors was required to file a proof of claim with the Monitor by December 1, 2008. Pursuant to the Canadian Claims Procedure Order, the bar date for claims arising as a result of the disclaimer or repudiation of any contract, lease, employment agreement or other agreement or arrangement after (i) July 22, 2008, in the case of SemCanada Nova Scotia and SemCAMS ULC, (ii) July 24, 2008, in the case of SemCanada Energy, CEG Energy Options, Inc. and A.E. Sharp Ltd. and (iii) July 30, 2008, in the case of 3191278 Nova Scotia Company and 1380331 Alberta ULC was the later of December 1, 2008 and 30 days after the date of the applicable notice of repudiation or disclaimer.

Under the Canadian claims process, the Prepetition Lenders are not required to file claims against the Canadian Debtors.

If any of the Canadian Debtors, with the consent of the Monitor, disagrees with a filed proof of claim, the Monitor may issue a notice of revision or disallowance. Creditors are allowed to dispute the revision or disallowance of their claim by delivering a notice of dispute to the Monitor within 14 days of receipt of the notice of revision or disallowance. If a disputed claim cannot be resolved consensually, the information is to be forwarded to a claims officer appointed by the Alberta Court, or if no claims officer is appointed, an application is to be brought before the Alberta Court.

### 3. Cross Border Restructuring

Since filing for protection from its creditors under the CCAA, SemCAMS ULC and SemCanada Nova Scotia have considered various structures and transactions aimed at selling or restructuring their respective businesses in Canada as stand alone operations without further connection with SemGroup and its U.S. affiliates. However, SemCAMS ULC did not receive any acceptable bids pursuant to a court-sanctioned solicitation process, and SemCanada Nova Scotia's business is so closely interconnected with the North Dakota business of SemCrude that a sale of SemCanada Nova Scotia's business in Canada without including the North Dakota business does not appear to maximize value for the potential benefit of stakeholders. Nevertheless, SemCAMS ULC's and SemCanada Nova Scotia's respective businesses remain viable and they continue to carry on business in the ordinary course.

As a result, SemCAMS ULC and SemCanada Nova Scotia are pursuing restructurings in conjunction with the Reorganized SemGroup Companies. To achieve this restructuring, SemCAMS ULC and SemCanada Nova Scotia filed separate Plans of Arrangement and Reorganization in Canada on July 24, 2009, which will, in particular, compromise certain claims and relieve SemCAMS ULC and SemCanada Nova Scotia from their guarantee obligations to the Prepetition Lenders and the holders of Senior Notes Claims.

The SemCanada Energy Group was not able to continue operating as a going concern after the commencement of the CCAA proceedings and has been pursuing an orderly liquidation of its businesses. SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. filed the SemCanada Energy Plan in Canada on July 24, 2009, which will in particular facilitate the liquidations of their remaining assets and make distributions to certain creditors, compromise certain claims and relieve them from their guarantee obligations to the Prepetition Lenders and the holders of Senior Notes Claims. Further, as part of this plan of distribution, SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. will also become subject to bankruptcy proceedings under the BIA.

### 4. The Canadian Plans

Under the Canadian Plans, certain creditors (the "Unaffected Claims Holders"), will continue to be paid in the ordinary course of business or on implementation of the Canadian Plans, have their claims either reserved for or paid in full and, as a result, will receive full recovery in respect of their claims. Such claims consist of, among others, the claims of professionals, employees (including under employee retention plans) and SemCanada Nova Scotia in its capacity as a lender after the Effective Date to SemCAMS ULC. Unaffected Claims Holders will not be entitled to vote on the Canadian Plans.

Certain other creditors are comprised of secured claims (the "Exclusive Canadian Secured Claims"), which principally consist of builders' and carriers' liens that are determined to have priority over the Prepetition Lenders' security, and unsecured claims (the "Exclusive Canadian Unsecured Claims," and together with the Exclusive Canadian Secured Claims, the "Exclusive Canadian Claims"), which principally consist of creditors with supply claims or damage claims for repudiated contracts. The holders of Exclusive Canadian Unsecured Claims, together with the Prepetition Lenders in respect of their unsecured claims and the holders of

Senior Notes Claims will comprise a single class of creditors whose claims are compromised under the Canadian Plans and who are entitled to vote on the Canadian Plans.

The holders of Exclusive Canadian Claims will receive under each of the Canadian Plans cash distributions that will be paid from two cash pools, the secured claims pool and the unsecured claims pool. The holders of Exclusive Canadian Secured Claims will be paid in full. The holders of Exclusive Canadian Unsecured Claims will receive their pro rata share of the applicable unsecured claims pools, which pools are estimated to be approximately CAD$4.9 million for SemCAMS ULC and CAD$11.0 million for SemCanada Nova Scotia. The SemCanada Energy Plan will establish a cash pool of CAD$2 million and also entitle the holders of Exclusive Canadian Unsecured Claims against SemCanada Energy, A.E. Sharp Ltd. or CEG Energy Options, Inc. to share in certain net collections of accounts receivables up to CAD$1 million.

Under the Canadian Plans, recoveries to the Prepetition Lenders in respect of their unsecured claims and to the holders of Senior Notes Claims against SemCAMS ULC, SemCanada Nova Scotia, SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. will be provided for under the Plan and such parties will be deemed to have waived their rights to, and will not be entitled to, receive any distributions provided for under and pursuant to the Canadian Plans in respect of their unsecured claims. Under the SemCanada Nova Scotia Plan and the SemCanada Energy Plan, distributions will be made to the Prepetition Lenders in respect of the portion of the total claim of the Prepetition Lenders that will be treated as a secured claim. Under the SemCAMS ULC Plan, no portion of the total claim of the Prepetition Lenders will be treated as a secured claim and no distributions will be made to Prepetition Lenders. In addition, the Canadian Plans provide that the Prepetition Lenders and the holders of Senior Notes Claims will not be entitled to vote at the Creditors' Meetings. Instead, votes cast by the Prepetition Lenders and the holders of Senior Notes Claims in favor of or against the Plan will be deemed to be votes in favor of or against the Canadian Plans.

On September 29, 2009, SemCAMS ULC, SemCanada Nova Scotia, SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. will be seeking an order from the Alberta Court (the "CCAA Plan Amendment Order") to accept the filing of (a) an amended SemCAMS ULC Plan, as such plan may be further amended, varied or supplemented from time to time, (b) an amended SemCanada Nova Scotia Plan, as such plan may be further amended, varied or supplemented from time to time and (c) an amended SemCanada Energy Plan, as such plan may be further amended, varied or supplemented from time to time.

In the amended SemCAMS ULC Plan and the amended SemCanada Nova Scotia Plan, the implementation of the SemCanada Energy Plan was removed as a condition precedent to the implementation of such CCAA plans. Certain other changes were also made either as a result of the removal of this condition precedent or to correct certain minor errors.

In the amended SemCanada Energy Plan, changes were made to correct certain minor errors. In addition, if the SemCanada Energy Plan is not approved by the required majority of the creditors of SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. or if the SemCanada Energy Plan is not sanctioned by the Alberta Court, then we anticipate that an

application will be made to place SemCanada Energy, A.E. Sharp Ltd. and CEG Energy Options, Inc. into receivership and bankruptcy.

Each of the Canadian Plans must be approved by two-thirds in amount and a majority in number of those creditors who vote at the Creditors' Meetings and those creditors who are deemed to have voted on the Canadian Plans including the Prepetition Lenders and the holders of the Senior Notes Claims. Unlike United States bankruptcy law, there is no concept of cramdown under Canadian bankruptcy law. See Section V.D.3., "The Plan – Acceptance or Rejection of the Plan – Cramdown."

To obtain copies of the Canadian Plans, or any additional information or materials related to the Creditors' Meetings, please contact the Monitor at the following address:

> Ernst & Young Inc.
> Monitor
> 1000, 440 - 2nd Avenue S.W.
> Calgary AB T2P 5E9
>
> Attention:   Neil Narfason
> Telephone:  (403) 206-5067
> Fax:         (403) 206-5075

In addition, copies of the Canadian Plans, as amended, the CCAA Plan Amendment Order (if granted) and the orders of the Alberta Court establishing the Creditors' Meetings and adjourning such Creditors' Meetings to October 8, 2009 will be posted on the Monitor's website at www.ey.com/ca/SemCanada. The date of the hearing for the sanction of the Canadian Plans and the court materials for the hearing will also be posted on the Monitor's website. Although there can be no assurance, it is anticipated that the Canadian Plans will be approved, confirmed and consummated substantially concurrently with the Plan.

## V. THE PLAN

*The below summary is provided for the convenience of holders of Claims and Equity Interests. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of Claims and holders of Equity Interests are encouraged to review the full text of the Plan, and to read carefully this entire Disclosure Statement, including all exhibits hereto.*

## A. Overview

The purpose of the Plan is to implement the Debtors' restructuring based on a capital structure that can be supported by cash flows from operations. The Debtors believe that the reorganization contemplated by the Plan is in the best interests of the Creditors. If the Plan is not confirmed, the Debtors believe that they will be forced to either file an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code. In either event, the Debtors

believe that the Creditors would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims.

The Plan seeks to preserve the value of the Debtors for their Creditors while recognizing and balancing the fact that the Prepetition Lenders have direct claims against the Debtors that would result in the Debtors' other Creditors receiving little, if any, value for their Claims. If New Common Stock were to be allocated pro rata among all holders of Secured Claims, the Prepetition Lenders would receive almost all of the New Common Stock. As part of the Compromise and Settlement embodied in the Plan, the Prepetition Lenders' allotment of New Common Stock will be reduced to 95.0% to provide up to 5.0% of the New Common Stock to the holders of Senior Notes Claims and General Unsecured Claims, provided the applicable Classes vote to accept the Plan as described in the Plan.

In addition, the Plan addresses other significant Claims, including those of the Producers. The Debtors, the Administrative Agent, the Lender Steering Committee, the Producers' Committee and the Producer Plaintiffs have reached a settlement that provides for certain payments to Producers under the Plan and resolves certain ongoing litigation concerning the Producers' Claims, including, but not limited to, the First Purchaser Producer Twenty-Day Claims. In light of the Producers' Settlement, the Producers' Committee supports the Plan.

The holders of the Other Twenty-Day Claims are not, however, parties to the Producers' Settlement. With respect to these Claims, the Debtors will seek such holders' agreement to the Other Twenty-Day Claims Settlement by sending each holder of an Other Twenty-Day Claim an Election Notice in connection with the solicitation of votes to accept the Plan.

For a more detailed description of the Producers' Settlement, see Section I.B.10, "The Chapter 11 Cases – Producers' Settlement."

B.     **Treatment Of Administrative Expense Claims, Postpetition Financing Claims, Professional Compensation and Reimbursement Claims and Priority Tax Claims; Payment of Senior Notes Indenture Trustee Fees and US Term Lender Group Fees**

   *1.     Administrative Expense Claims*

On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim (including an Unsecured Claim entitled to priority under section 503(b)(9) of the Bankruptcy Code) will become an Allowed Claim, the Reorganized Debtors, or in the case of the First Purchaser Producer Twenty-Day Claims, the Producer Representative, will (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Debtors or the Reorganized Debtors, as the case may be; provided, however, that the First Purchaser Producer Twenty-Day Claim will be Allowed and paid by the Producer Representative on the Effective Date in accordance with Section 3.1 of the Plan; provided, further, that at the Effective Date the Reorganized Debtors will reserve in Cash an amount equal to the estimated amount of the Other Twenty-Day Claims for any Non-Settling Parties (at that date) set forth on Schedule 3

attached to the Plan or such lesser amount as shall be approved by the Bankruptcy Court and hold such reserve for any such Disputed Other Twenty-Day Claim until the final adjudication or resolution of such Claims; provided, further, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtors in Possession during the Chapter 11 Cases will be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transaction and any agreements relating thereto. Notwithstanding the provisions of the Producers' Committee Retention Order, the amount of Allowed Administrative Expense Claims for Producers' Committee Professional Fees will not reduce any payments under Section 2.1 of the Plan.

For additional information regarding the Twenty-Day Claims, see Section IV.F of the Disclosure Statement, "The Chapter 11 Cases – Section 503(b)(9) Claims."

**Estimated Amount of Claims: Estimated at $255 million (assuming full acceptance of the Other Twenty-Day Claims Settlement, payment of First Purchaser Producer Twenty-Day Claims in accordance with the Producers' Settlement and Payment of the Alon Claim)**

**Projected Percentage Recovery: 100.0%**

### 2. *Postpetition Financing Claims*

On the Effective Date, (a) all outstanding Postpetition Financing Claims will be indefeasibly paid and satisfied, in full, in Cash by the Debtors, (b) all commitments under the Postpetition Financing Agreement will terminate, (c) all letters of credit outstanding under the Postpetition Financing Agreement will either (A) be returned to the issuer undrawn and marked "cancelled," or (B) be cash collateralized (with funds borrowed under the Exit Facility) as and to the extent required by the terms of the Postpetition Financing Agreement or (C) be collateralized by back-to-back letters of credit provided to the issuer in an amount equal to 105% of the face amount of the outstanding letters of credit, in form and substance and from a financial institution acceptable to such issuer, and (d) all money posted by the Debtors in accordance with the Postpetition Financing Agreement and the agreements and instruments executed in connection therewith will be released to the applicable Reorganized Debtors for distribution in accordance with the terms and provisions of the Plan. Nothing in the Plan or in the Confirmation Order, whether under section 1141 of the Bankruptcy Code or otherwise, will discharge any remaining Postpetition Financing Claims.

**Estimated Amount of Claims: $95 million**

**Projected Percentage Recovery: 100.0%**

### 3. *Professional Compensation and Reimbursement Claims*

All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b)(2), (3), (4), or (5) of the Bankruptcy Code will (i) file their respective applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is sixty (60) days after

the Effective Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date that such Professional Compensation and Reimbursement Claim becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon thereafter as is reasonably practicable or (B) upon such other terms as may be mutually agreed upon between such holder of a Professional Compensation and Reimbursement Claim and the Reorganized Debtors. Objections to Professional Compensation and Reimbursement Claims will be filed no later than thirty (30) days after an application or request for such Claim is filed with the Bankruptcy Court.

**Estimated Amount of Claims:**      **$77 million**

**Projected Percentage Recovery:**      **100.0%**

### 4. *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, at the sole option and discretion of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (ii) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to 2.339% per annum, the federal judgment rate on the Petition Date, over a period ending not later than five years after the Petition Date, or (iii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

**Estimated Amount of Claims:**      **$5.5 million**

**Projected Percentage Recovery:**      **100.0%**

### 5. *Senior Notes Indenture Trustee Fees*

The Senior Notes Indenture Trustee Fees will be paid within ten (10) Business Days after the Effective Date as part of the distribution to holders of Senior Notes Claims; provided, however, that the Senior Notes Indenture Trustee will, on or prior to the Effective Date, provide to the Reorganized Debtors and the Lender Steering Committee (both of which preserve their right to dispute the payment of any portion of the invoiced fees and expenses if such fees and expenses are deemed to be unreasonable) fee statements (including reasonable documentation) with respect thereto, which may be reviewed by the Reorganized Debtors and the Lender Steering Committee for a period of up to ten (10) Business Days before payment is made. For the avoidance of doubt, any portion of the Senior Notes Indenture Trustee Fees not paid as part of the distribution to the Senior Notes Claims within ten (10) Business Days after the Effective Date may be satisfied pursuant to the Senior Notes Indenture Charging Lien.

**Estimated Amount of Claims:**     **Up to $750,000**

**Projected Percentage Recovery:**     **100.0%**

### 6.     *US Term Lender Group Fees*

The US Term Lender Group Fees will be paid within ten (10) Business Days after the Effective Date to the relevant professional of the US Term Lender Group as part of the distribution to holders of Secured Revolver/Term Lender Claims; <u>provided</u>, <u>however</u>, the US Term Lender Group will, on or prior to the Effective Date, provide to the Lender Steering Committee (which preserves its right to dispute the payment of any portion of the invoiced fees and expenses if such fees and expenses are deemed to be unreasonable) fee statements (including reasonable documentation) with respect thereto with respect thereto, which may be reviewed by the Lender Steering Committee for a period of up to ten (10) Business Days before payment is made.

**Estimated Amount of Claims:**     **Up to $930,000**

**Projected Percentage Recovery:**     **100.0%**

## C.     Classification and Treatment of Claims and Equity Interests

Claims (other than Administrative Expense Claims, Postpetition Financing Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims) and Equity Interests are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as set forth in Article III of the Plan.

The Plan does not provide for substantive consolidation of the estates of the Debtors into a single estate. As a result, each class of Claims and Equity Interests are classified by each individual Debtor.

### 1.     *Classes 1 through 26 – Priority Non-Tax Claims (Unimpaired)*

    a.     <u>Classification</u>

Classes 1 through 26 consist of all Priority Non-Tax Claims against each of the individual Debtors.

    b.     <u>Impairment and Voting</u>

Classes 1 through 26 are unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    c.     <u>Distributions</u>

Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors, each holder of an Allowed Priority Non-Tax Claim will

receive on account of their Claims against the Debtors and their estates, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

**Estimated Amount of Claims:**   **$0**

**Projected Percentage Recovery:**   **100.0%**

2. *Classes 27 through 52 – Secured Tax Claims (Unimpaired)*

a. <u>Classification</u>

Classes 27 through 52 consist of all Secured Tax Claims against each of the individual Debtors.

b. <u>Impairment and Voting</u>

Classes 27 through 52 are unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

c. <u>Distributions</u>

Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an of an Allowed Secured Tax Claim will receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, or (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at a fixed annual rate equal to 5%, over a period ending not later than five years after the Petition Date, or upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

**Estimated Amount of Claims:**   **$0**

**Projected Percentage Recovery:**   **100.0%**

3. *Classes 53 through 55 – Secured First Purchaser Producer Claims (Impaired)*

a. <u>Classification</u>

Classes 53 through 55 consist of all Secured First Purchaser Producer Claims, which are classified by Debtor and State.

b.      Impairment and Voting

Classes 53 through 55 are impaired by the Plan. Each holder of a Secured First Purchaser Producer Claim is entitled to vote to accept or reject the Plan.

        c.      Distributions

On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Secured First Purchaser Producer Claim will receive on account of their Claims against the Debtors and their estates, its Pro Rata Share of Cash in accordance with Section 3.1(c) of the Plan.

**Estimated Amount of Claims:**        **Estimated at $0 as a result of the June Decisions**

**Projected Percentage Recovery:**     **N/A**

**4.      Classes 70 through 95 – Secured Working Capital Lender Claims (Impaired)**

        a.      Classification

Classes 70 through 95 consist of all Secured Working Capital Lender Claims against each of the individual Debtors.

        b.      Impairment and Voting

Classes 70 through 95 are impaired by the Plan. Each holder of a Secured Working Capital Lender Claim is entitled to vote to accept or reject the Plan. The vote by each holder of a Secured Working Capital Lender Claim in favor of or against the Plan is deemed to be a vote in favor of or against the Canadian Plans, respectively.

        c.      Distributions

The Secured Working Capital Lender Claims are Allowed Claims, not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Secured Working Capital Lender Claim will receive on account of their Claims against the Debtors and their estates, its Pro Rata Share of (x) (i) the Working Capital Lender Effective Date Cash in the estimated approximate amount of $431 million (after distribution of the Litigation Trust Funds), (ii) 58.0% (or $174 million in principal amount) of the Second Lien Term Loan Interests, and (iii) 56.30% (or 23,306,753 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), which distribution of New Common Stock is inclusive of the New Common Stock that holders of Allowed Intercompany Claims are deemed to be entitled to but is being redistributed to holders of Allowed Secured Working Capital Lender Claims pursuant to Section 5.11 of the Plan and (y) subsequent distributions in accordance with Section 13.1 of the Plan to the extent, if any, the Reorganized Debtors (or the Prepetition Administrative Agent, in the case of certain Canadian Distributions) receive, after the Effective Date, (i) a Canadian Distribution (other than an Auriga Revolver/Term Lender Distribution), (ii)