net Cash proceeds from the realization of receivables or inventory of SemFuel or SemMaterials (other than net Cash proceeds referred to in Section 5.5(b)(y) of the Plan), (iii) Cash distributions from SemGroup Holdings or net Cash proceeds from the sale of Equity Interests in SemGroup Holdings (to the extent allocable to the Working Capital Obligations (as defined in the Prepetition Credit Agreement)), (iv) any Cash proceeds of Undisputed Production Receivables, (v) the Litigation Trust Funds or (vi) any Cash released from reserves for Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Non-Tax Claims or Priority Tax Claims.

**Estimated Amount of Claims:**     **$2,128 million**

**Projected Percentage Recovery:**     **56.1%**

5.     *Classes 96 through 121 – Secured Revolver/Term Lender Claims (Impaired)*

    a.     Classification

Classes 96 through 121 consist of all Secured Revolver/Term Lender Claims against each of the individual Debtors.

    b.     Impairment and Voting

Classes 96 through 121 are impaired by the Plan. Each holder of a Secured Revolver/Term Lender Claim is entitled to vote to accept or reject the Plan. The vote by each holder of a Secured Revolver/Term Lender Claim in favor of or against the Plan is deemed to be a vote in favor of or against the Canadian Plans, respectively.

    c.     Distributions

The Secured Revolver/Term Lender Claims are Allowed Claims, not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Secured Revolver/Term Lender Claim will receive on account of their Claims against the Debtors and their estates, its Pro Rata Share of (i) the Revolver/Term Lender Effective Date Cash in the estimated approximate amount of $93 million, (ii) 42.0% (or $126 million in principal amount) of the Second Lien Term Loan Interests, (iii) 38.70% (or 16,023,247 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock) and (iv) the US Term Lender Group Fees; provided, however, that the US Term Lender Group Fees will be paid to the professionals of the US Term Lender Group in accordance with Section 2.6 of the Plan, and (y) subsequent distributions in accordance with Section 13.1 of the Plan to the extent, if any, the Reorganized Debtors (or the Prepetition Administrative Agent, in the case of the Auriga Revolver/Term Lender Distribution) receive, after the Effective Date, (i) net Cash proceeds from the sale of any property, plant and/or equipment of SemMaterials, (ii) net Cash proceeds in excess of $51 million from the sale of assets of SemFuel other than inventory and receivables, (iii) net Cash proceeds from the sale of Equity Interests in SemGroup Holdings (to the extent allocable to the Revolver Obligations (as defined in the Prepetition Credit Agreement) or the U.S. Term Obligations (as defined in the Prepetition Credit Agreement)) or (iv) the Auriga Revolver/Term Lender Distribution.

**Estimated Amount of Claims:**     **$811 million**

**Projected Percentage Recovery:**     **75.6%**

6.     *Class 122 – White Cliffs Credit Agreement Claim (Impaired)*

      a.     <u>Classification</u>

Class 122 consists of the White Cliffs Credit Agreement Claim against SemCrude Pipeline.

      b.     <u>Impairment and Voting</u>

Class 122 is impaired by the Plan. Each holder of a White Cliffs Credit Agreement Claim is entitled to vote to accept or reject the Plan.

      c.     <u>Distributions</u>

On the Effective Date, the White Cliffs Credit Agreement will be amended, extended, or refinanced on terms to be agreed to by the holders of the White Cliffs Credit Agreement Claims and to be contained in the Plan Supplement.

**Estimated Amount of Claims:**     **$120 million**

**Projected Percentage Recovery:**     **100%**

7.     *Classes 123 through 148 – Other Secured Claims (Unimpaired)*

      a.     <u>Classification</u>

Classes 123 through 148 consist of all Other Secured Claims against each of the individual Debtors.

      b.     <u>Impairment and Voting</u>

Classes 123 through 148 are unimpaired by the Plan. Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

      c.     <u>Distributions</u>

On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Other Secured Claim will receive on account of their Claims against the Debtors and their estates, one of the following distributions: (i) the payment of such holder's Allowed Secured Claim in full in Cash; (ii) the sale or disposition proceeds of the property securing any Allowed Other Secured Claim to the extent of the value of its interest in such property; (iii) the surrender to the holder or holders of any Allowed Other Secured Claim of the property securing such Claim; or (iv) such other distributions as will be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code. The manner and treatment of each Allowed Other Secured Claim

will be determined by the Debtors and transmitted, in writing, to the holder of such Other Secured Claim on or prior to the deadline to vote to accept or reject the Plan.

**Estimated Amount of Claims:**    **Up to $5 million**

**Projected Percentage Recovery:**    **100%**

## 8.    *Classes 149 through 174 – Senior Notes Claims (Impaired)*

### a.    Classification

Classes 149 through 174 consist of all Senior Notes Claims against each of the individual Debtors.

### b.    Impairment and Voting

Classes 149 through 174 are impaired by the Plan. Each holder of a Senior Notes Claim is entitled to vote to accept or reject the Plan. The vote by each holder of a Senior Notes Claim in favor of or against the Plan is deemed to be a vote in favor of or against the Canadian Plans, respectively.

### c.    Distributions

Since holders of Senior Notes Claims have the same Claim against most of the Debtors as a result of the guarantees of the Senior Notes, if one Class of Senior Notes Claims approves the Plan, then each holder of Senior Notes Claims will receive its Pro Rata Share of the New Common Stock, Warrants and the Litigation Trust Interests as discussed below.

#### (i)    Distributions If Any Class Accepts the Plan

The Senior Notes Claims are Allowed Claims in the aggregate amount of $609,770,833.33, and are not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever. On the Effective Date, or as soon thereafter as is practicable, if any of Classes 149 through 174 approve the Plan, then each holder of an Allowed Senior Notes Claim will be entitled to receive, on account of their Claims against the Debtors and their estates and any related claim(s) under the Canadian Plans, its Pro Rata Share of (a) 3.75% (or 1,552,500 shares) of New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (b) Warrants to purchase 3.75% (or 1,634,210 shares) of New Common Stock (assuming full exercise and subject to dilution of ownership percentage from the Management Stock), (c) 30% of the Litigation Trust Interests and (d) the Senior Notes Indenture Trustee Fees; provided, however, that the Senior Notes Indenture Trustee Fees will be paid to the Senior Notes Indenture Trustee pursuant to Section 2.5 of the Plan.

#### (ii)    Potential Additional Distribution

In addition, if all of Classes 201 through 226 vote to reject the Plan and any of Classes 149 through 174 accept the Plan, each holder of an Allowed Senior Notes Claim will be entitled to receive its Pro Rata Share of the New Common Stock and Warrants that would have been

distributed to the holders of Claims in Classes 201 through 226 as a result of the Creditors' Settlement.

**Estimated Amount of Claims:**     **$610 million**

**Projected Percentage Recovery:**     **8.34%**

      (iii)     <u>Distributions If All Classes Reject the Plan</u>

On the Effective Date, or as soon thereafter as is practicable, if all of Classes 149 through 174 reject the Plan, each holder of an Allowed Senior Notes Claim will be entitled to receive, on account of their Claims against the Debtors and their estates and any related claim(s) under the Canadian Plans, its Pro Rata Share of (a) 0.26% (or 106,498 shares) of the New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock), (b) 30% of the Litigation Trust Interests, and (c) the Senior Notes Indenture Trustee Fees; <u>provided, however,</u> that the Senior Notes Indenture Trustee Fees will be paid to the Senior Notes Indenture Trustee in accordance with Section 2.5 of the Plan.

**Estimated Amount of Claims:**     **$610 million**

**Projected Percentage Recovery:**     **0.44%**

      (iv)     <u>Distribution Mechanics</u>

All distributions to holders of Allowed Senior Notes Claims will be made to (a) the Senior Notes Indenture Trustee or (b) with the prior written consent of the Senior Notes Indenture Trustee, through the facilities of the DTC. The Senior Notes Indenture Trustee will administer the distributions in accordance with the Plan and the Senior Notes Indenture Trustee, will be compensated in accordance with Section 2.5 of the Plan, without further Bankruptcy Court approval, for all services related to distributions pursuant to the Plan (and for the related reasonable fees and expenses of counsel or professionals engaged by the Senior Notes Indenture Trustee with respect to administering or implementing such distributions in accordance with Section 2.5 of the Plan). The Senior Notes Indenture Trustee will not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions.

    **9.**     *Classes 175 through 200 – Lender Deficiency Claims (Impaired)*

      a.     <u>Classification</u>

Classes 175 through 200 consist of all Lender Deficiency Claims against each of the individual Debtors.

      b.     <u>Impairment and Voting</u>

Classes 175 through 200 are impaired by the Plan. Each holder of a Lender Deficiency Claim is entitled to vote to accept or reject the Plan. The vote by each holder of a Lender

Deficiency Claim in favor or against the Plan is deemed to be a vote in favor of or against the Canadian Plans, respectively.

      c.      Distributions

     The Lender Deficiency Claims other than in respect of a Swap Contract (as defined in the Prepetition Credit Agreement) that is not a Lender Swap Obligation (as defined in the Prepetition Credit Agreement) are Allowed Claims, and are not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Lender Deficiency Claim will be entitled to receive, on account of their Claims against the Debtors and their estates and any related claim(s) under the Canadian Plans, its Pro Rata Share of 60% of the Litigation Trust Interests. In addition, if all Classes 149 through 174 and all Classes 201 through 226 vote to reject the Plan, each holder of an Allowed Lender Deficiency Claim will be entitled to receive its Pro Rata Share of the additional New Common Stock (but not the Warrants) that would have been distributed to the holders of Claims in Classes 149 through 174 and Classes 201 through 226 as a result of the Creditors' Settlement.

            **Estimated Amount of Claims:**    **$1,072 million**

            **Projected Percentage Recovery:**    **0.00% (No value has been attributed to the Litigation Trust Interests)**

### 10.    *Classes 201 through 226 – General Unsecured Claims (Impaired)*

      a.      Classification

Classes 201 through 226 consist of all General Unsecured Claims against each of the individual Debtors.

      b.      Impairment and Voting

Classes 201 through 226 are impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

      c.      Distributions

On the Effective Date, or as soon thereafter as is practicable, each holder of a General Unsecured Claim against a Debtor will be entitled to receive:

              (i)      Distributions If Any Class in Classes 201 through 226 Accepts the Plan

If the Class in which such General Unsecured Claim exists accepts the Plan, each holder of an Allowed General Unsecured Claim against a Debtor in a Class of General Unsecured Claims which accepts the Plan will be entitled to receive, on account of its Claims against the Debtors and their estates, its Pro Rata Share (calculated among all General Unsecured Claims which accept the Plan) of (a) 1.25% (or 517,500 shares) of New Common Stock (subject to

dilution of ownership percentage from the Warrants and the Management Stock), (b) Warrants to purchase 1.25% (or 544,737 shares) of New Common Stock (assuming full exercise and subject to dilution of ownership percentage from the Management Stock), and (c) 10% of the Litigation Trust Interests.

(ii)     Potential Additional Distribution

In addition, if all of Classes 149 through 174 vote to reject the Plan, each holder of an Allowed Claim in any of the Classes 201 through 226 that votes to accept the Plan will be entitled to receive its Pro Rata Share (calculated among all Classes of General Unsecured Claims which accept the Plan) of the additional New Common Stock and Warrants that would have been distributed to the holders of Claims in Classes 149 through 174 as a result of the Creditors' Settlement.

**Estimated Amount of Claims:**     **$583 million**

**Projected Percentage Recovery:**     **2.91% (assuming that all classes of General Unsecured Creditors approve the Plan)**

(iii)     Distributions If Any Class in Classes 201 through 226 Rejects the Plan

If any Class in Classes 201 through 226 rejects the Plan, each holder of an Allowed General Unsecured Claim in such rejecting Class will be entitled to receive, on account of their Claims against the Debtors and their estates, its Pro Rata Share (calculated among all Classes of General Unsecured Claims) of (a) 0.06% (or 25,327 shares) of the New Common Stock (subject to dilution of ownership percentage from the Warrants and the Management Stock) and (b) 10% of the Litigation Trust Interests. In such event, each holder of an Allowed General Unsecured Claim in any accepting Classes in Classes 201 through 226 will be entitled to receive its Pro Rata Share of the additional New Common Stock and Warrants that would have been distributed to the holders of Claims in Classes 201 through 226 that rejected the Plan as provided in Section 5.10(b) of the Plan.

**Estimated Amount of Claims:**     **$583 million**

**Projected Percentage Recovery:**     **0.11% (assuming that all classes of General Unsecured Creditors reject the Plan)**

## 11.     *Classes 227 through 252 – Intercompany Claims (Impaired)*

a.     Classification

Classes 227 through 252 consist of all Intercompany Claims against each of the individual Debtors.

b.    Impairment and Voting

Classes 227 through 252 are impaired by the Plan. Notwithstanding the foregoing, each holder of an Allowed Intercompany Claim is conclusively presumed to have accepted the Plan by virtue of proposing the Plan and is not required to submit a ballot accepting the Plan.

c.    Treatment

On the Effective Date, or as soon thereafter as is practicable, each Debtor which is a holder of an Allowed Intercompany Claim will be deemed to be entitled to receive on account of such Allowed Intercompany Claim the New Common Stock it would receive if such Allowed Intercompany Claim were an Allowed General Unsecured Claim, which New Common Stock will be redistributed to holders of Allowed Secured Working Capital Lender Claims in accordance with the provisions of the Plan.

**Estimated Amount of Claims:**     **$7,270 million**

**Projected Percentage Recovery:**   **N/A**

*12.    Classes 253 through 278 – Intercompany Equity Interests (Unimpaired)*

a.    Classification

Classes 253 through 278 consist of all Intercompany Equity Interests of the individual Debtors.

b.    Impairment and Voting

Classes 253 through 278 are unimpaired by the Plan. Each holder of an Allowed Intercompany Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

c.    Distributions

Subject to Section V.E., "Implementation of the Plan," on the Effective Date or as soon thereafter as is practicable, each Allowed Intercompany Equity Interest will be retained.

**Estimated Amount of Claims:**     **N/A**

**Projected Percentage Recovery:**   **N/A**

*13.    Class 279 – SemGroup Equity Interests (Impaired)*

a.    Classification

Class 279 consists of all SemGroup Equity Interests.

b.    Impairment and Voting

Class 279 is impaired by the Plan.  Notwithstanding the foregoing, each holder of an Allowed SemGroup Equity Interest is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

c.    Treatment

Each holder of an Allowed SemGroup Equity Interest will receive no distribution for and on account of such SemGroup Equity Interest and such SemGroup Equity Interest will be cancelled on the Effective Date.

**Estimated Amount of Claims:**     **N/A**

**Projected Percentage Recovery:**   **0%**

## D.    Acceptance or Rejection of the Plan

### 1.    *Impaired Classes to Vote*

Each holder of a Claim or Equity Interest in an impaired Class, not otherwise deemed to have rejected the Plan, will be entitled to vote separately to accept or reject the Plan.  The Claims included in Classes 53 through 55, 70 through 122, and 149 through 226 are impaired and therefore are entitled to vote to accept or reject the Plan.  The Classes of Intercompany Claims and Intercompany Equity Interests are deemed to have accepted the Plan by virtue of proposing the Plan.

### 2.    *Acceptance by Class of Creditors*

An impaired Class of holders of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

### 3.    *Cramdown*

In the event that any impaired Class of Claims or Equity Interests fails to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 4.    *Controversy Concerning Impairment*

In the event of a controversy as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court will, after notice and a hearing, determine such controversy.

**E.    Implementation of the Plan**

    *1.    Non-Substantive Consolidation*

On the Effective Date, the Debtors' estates will not be deemed to be substantively consolidated for purposes of the Plan. Any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety, or otherwise, of Claims against another Debtor will be treated as separate and distinct Claims against the estates of the respective Debtors and will be entitled to the treatment provided for under the Plan's provisions concerning distributions.

    *2.    Restructuring Transactions*

On the Effective Date, the following transactions will be effectuated in the following order:

        a.    Transfer of Obligations

The Debtors will transfer to SemGroup, and SemGroup will assume, all of the Debtors' outstanding obligations related to Secured Claims and Unsecured Claims that are being discharged pursuant to the Plan.

        b.    New Holdco

SemGroup Finance will adopt the New Holdco Certificate of Incorporation pursuant to which it will change its name to SemGroup Corporation and increase its authorized number of shares of capital stock. The adoption of the New Holdco Certificate of Incorporation and increase in capital stock is hereby authorized without any further need for any corporate action

        c.    Contribution of New Entities to New Holdco.

SemGroup will contribute all of its ownership interests in its directly-owned subsidiaries to SemGroup Finance in exchange for (i) 41,400,000 shares of New Common Stock, (ii) Warrants to purchase 2,178,948 shares of New Common Stock, and (iii) the Second Lien Term Loan Interests. The issuance of the New Common Stock, Warrants and Second Lien Term Loan Interests by New Holdco to SemGroup is hereby authorized without any further need for any corporate action

        d.    Distributions to Holders of Allowed Claims.

Following SemGroup's receipt of the New Common Stock, the Warrants and the Second Lien Term Loan Interests, SemGroup will distribute the Plan Currency to the Disbursing Agent for the holders of Allowed Claims.

        e.    Vesting of SemGroup's Assets in New Holdco.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, all assets in SemGroup's estate will vest in New Holdco and New Holdco

may operate its business and use, acquire or dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

   f.  <u>Tax Matters</u>.

   In connection with the transfer of assets from SemGroup to New Holdco, New Holdco will prepare and deliver to SemGroup a copy of Form 8594, along with any required exhibits thereto, allocating the purchase price of the transferred assets among such assets in accordance with Section 1060 of the Tax Code and the Treasury Regulations promulgated thereunder. SemGroup and New Holdco will prepare and file all tax returns and reports in a manner consistent with such allocation.

## 3.  Producer Representative

   Prior to the Confirmation Hearing, the Producers' Committee will select an individual to serve as the Producer Representative, who will be an estate representative for the purpose of objecting to: (i) First Purchaser Producer Twenty-Day Claims, (ii) proofs of claim filed in respect of Secured First Purchaser Producer Claims, and (iii) requests for reimbursement by Producer Plaintiffs for the Active States for reimbursement of fees and out-of-pocket costs incurred in connection with the Producer State-Specific Adversary Proceedings for the Active States or in the Other Proceedings. The Producer Representative will be entitled to employ professionals of its choosing. The fees and expenses of the Producer Representative and any professionals hired by the Producer Representative will be paid solely in accordance with Section 3.1(c) and 3.1(d) of the Plan and Debtors will have no responsibility therefor. The Producer Representative will have any and all rights of the Debtors and the Reorganized Debtors: (i) to object to First Purchaser Producer Twenty-Day Claims in accordance with the Notices filed by the Debtors on July 17, 2009, (ii) to object to the Secured First Purchaser Producer Claims pursuant to Section 10.1 of the Plan, and (iii) to object to professional fee reimbursement requests of Producer Plaintiffs. The Producers' Committee will endeavor to reach agreement in writing with Producer Plaintiffs for reimbursement of fees and out-of-pocket costs. In the event agreement is not reached with a specific Producer Plaintiff, that party will be required to file a request for reimbursement in accordance with section 503(b) of the Bankruptcy Code and the Producer Representative will have the right to object to such applications. The Reorganized Debtors will cooperate with and provide reasonable assistance to representatives of the Producer Representative for the purpose of prosecuting the objections herein to Claims. Notwithstanding anything in the Plan to the contrary, the Producer Representative will not be permitted to commence or participate in any Claim or Cause of Action that will be transferred to the Litigation Trust pursuant to the Plan or reserved to the Prepetition Lenders or the Prepetition Administrative Agent as provided in Section 10.1(b) of the Plan.

## 4.  Litigation Trust Arrangements

   On the Effective Date, New Holdco will enter into the Litigation Trust Agreement pursuant to which the Litigation Trust Funds will be advanced to the Litigation Trust. The Litigation Trust Funds will be secured by all of the assets of the Litigation Trust and will be paid

to the holders of the Secured Working Capital Lender Claims before the holders of the Litigation Trust Interests receive any distributions on account of such interests.

5.     **Section 1145 Securities**

To the extent provided in section 1145 of the Bankruptcy Code and under applicable nonbankruptcy law, the issuance under the Plan of the New Common Stock and Warrants will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

6.     **Corporate Action**

Upon the Effective Date, the following transactions will be deemed to occur:

a.     **General**

All actions contemplated by the Plan will be deemed authorized and approved in all respects, including (i) the execution and entry into the Litigation Trust Agreement, (ii) the execution and entry into the Exit Facility, (iii) the execution and entry into the Second Lien Term Loan Facility, (iv) the distribution of the New Common Stock, (v) the distribution of the Warrants, (vi) adoption of the Management Incentive Plan, (vii) selection of the Board and the officers of New Holdco and (vii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the structure of the Debtors or the Reorganized Debtors and any action required by the Debtors or the Reorganized Debtors in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or New Holdco. On or prior (as applicable) to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or New Holdco, as applicable, will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including (i) the Litigation Trust Agreement, (ii) the Exit Facility, (iii) the Second Lien Term Loan Facility, (iv) the Warrant Agreement, and (v) any and all other agreements, documents, securities, and instruments relating to the foregoing. Acceptance of the Plan by the holders of Claims will be deemed to constitute approval of the Management Incentive Plan for purposes of Sections 162(m) and 422 of the Internal Revenue Code of 1986, as amended, as well as Section 16 of the Securities Exchange Act and any stock exchange listing requirement.

b.     **New Holdco Certificate of Incorporation and New Holdco Bylaws**

On the Effective Date, SemGroup Finance will adopt the New Holdco Certificate of Incorporation and the New Holdco Bylaws and will file the New Holdco Certificate of Incorporation with the Secretary of State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Holdco Certificate of Incorporation will satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting

forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. On the Effective Date, the boards of directors of each Reorganized Debtor will be deemed to have adopted the restated bylaws for such Debtor.

7. **Existence**

Except as otherwise provided in the Plan, each Reorganized Debtor will continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Reorganized Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

8. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in the Debtors' estates, the Litigation Trust Assets, and any property acquired by any of the Debtors pursuant to the Plan will vest in the Reorganized Debtors or the Litigation Trust, as the case may be, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the repayment of the Litigation Trust Funds, the Exit Facility, the Second Lien Term Loan Interests, and Claims pursuant to the Postpetition Financing Agreement that by their terms survive termination of the Postpetition Financing Agreement). On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Retained Causes of Action or interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9. **Cancellation of Debt and Equity Securities and Related Obligations**

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is Allowed under the Plan, on the Effective Date, any instruments or documents evidencing any Claims or Equity Interests will be deemed automatically cancelled and deemed surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under the agreements, instruments, and other documents, indentures, and certificates of designations governing such Claims and Equity Interests, as the case may be, will be discharged; provided, however, that such instruments or documents will continue in effect solely for the purpose of (x) allowing the holders of such Claims to receive

their distributions under the Plan and (y) allowing the Disbursing Agent to make such distributions to be made on account of such Allowed Claims; provided, further, that if the Senior Notes Indenture Trustee Fees have not been paid on the Effective Date, Section 8.8 of the Plan will be of no force and effect with respect to the Senior Notes Indenture Charging Lien; provided, further, that the provisions of the Prepetition Credit Agreement governing the relationship of Bank of America, N.A., in its capacity as administrative agent to the Prepetition Lenders under the Prepetition Credit Agreement, and the Prepetition Lenders, including but not limited to those provisions relating to the rights of the Prepetition Administrative Agent, to expense reimbursement, indemnification and other similar amounts, will not be affected by and will survive the Plan, entry of the Confirmation Order and the occurrence of the Effective Date. SemGroup will recognize and report on its final federal, state, local and foreign income tax returns any and all cancellation of indebtedness or similar income arising as a result of the Plan. In addition, none of SGGP, the general partner of SemGroup, nor any of the Debtors will make an election to treat any of the Debtors (or their subsidiaries) as an association taxable as a corporation for any tax purposes unless such election is effective the day after the Effective Date.

### *10.* **Effectuating Documents and Further Transactions**

On and after the Effective Date, the Reorganized Debtors, the Board, and the officers of New Holdco are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

### *11.* **Compensation and Benefit Plans**

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, or unless subject to a motion for approval of rejection that has been filed and served prior to the Confirmation Date, the Compensation and Benefit Plans shall be deemed to be, and shall be treated as though they are, executory contracts that are deemed assumed under the Plan on the same terms, and the Debtors' obligations under the Compensation and Benefit Plans shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, shall survive confirmation of the Plan, shall remain unaffected thereby, and shall not be discharged in accordance with section 1141 of the Bankruptcy Code. Any default existing under the Compensation and Benefit Plans shall be cured promptly after it becomes known by the Reorganized Debtors.

### F. **Preservation and Prosecution of Causes of Action Held by the Debtors**

In accordance with section 1123(b) of the Bankruptcy Code, (a) the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, and (b) the Litigation Trust may enforce all rights to commence and pursue, as appropriate, any and all Litigation Trust Claims, and the Reorganized Debtors' rights to commence, prosecute, or settle their Retained Causes of Action will be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue

their Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Litigation Trustee, as applicable, will not pursue any and all available Causes of Action against them. The Reorganized Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Debtors or the Litigation Trustee, as the case may be, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such Causes of Action upon, after, or as a consequence of the Confirmation Order. The Reorganized Debtors reserve and will retain the Retained Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity will vest in the Reorganized Debtors or the Litigation Trustee, as the case may be. As of the Effective Date, the Reorganized Debtors will have assigned the Litigation Trust Claims to the Litigation Trust. The Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**G.      Provisions for Treatment of Disputed Claims or Asserted Administrative Expenses Under the Plan**

      *1.*      **Objections to Claims; Prosecution of Disputed Claims**

            a.      The Reorganized Debtors, or the Prepetition Administrative Agent (solely with respect to Other Twenty-Day Claims) or the Producer Representative (solely with respect to First Purchaser Producer Twenty-Day Claims and Secured First Purchaser Producer Claims) or the Prepetition Lenders (solely with respect to Causes of Action referred to in Section 10.1(b)(ii)), will object to the allowance of Claims or Equity Interests filed with the Bankruptcy Court with respect to which they dispute liability, priority, and/or amount; provided, however, that the foregoing will not in any way limit the ability or the right of the Litigation Trustee to assert, commence, or prosecute any Cause of Action that is a Litigation Trust Claim against any holder of such Claim. All objections, affirmative defenses, and counterclaims will be litigated to Final Order; provided, however, that except as set forth in Section 10.1 of the Plan, the Reorganized Debtors (within such parameters as may be established by the Board), or the Prepetition Administrative Agent (solely with respect to Other Twenty-Day Claims) or the Producer Representative (solely with respect to First Purchaser Producer Twenty-Day Claims and Secured First Purchaser Producer Claims) will have the authority to file, settle, compromise, or

withdraw any objections to Claims or Equity Interests; provided, further, that the foregoing will not in any way limit the ability or the right of the Litigation Trustee to assert, commence, or prosecute any Cause of Action that is a Litigation Trust Claim against any holder of such Claim. Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors, or the Prepetition Administrative Agent (solely with respect to Other Twenty-Day Claims) or the Producer Representative (solely with respect to First Purchaser Producer Twenty-Day Claims and Secured First Purchaser Producer Claims) or the Prepetition Lenders (solely with respect to Causes of Action referred to in Section 10.1(b)(ii)), will file and serve all objections to Claims as soon as practicable, but, in each instance, not later than 180 days following the Confirmation Date or such later date as may be approved by the Bankruptcy Court or 60 days in the case of the Prepetition Lenders for Causes of Action referred to in Section 10.1(b)(ii). All orders of the Bankruptcy Court regarding procedures to resolve certain Claims or Administrative Expenses, including the Twenty-Day Claims, that have been entered prior to the Effective Date will continue to govern the resolution of such Claims and Administrative Expenses after the Effective Date.

b.  Notwithstanding anything to the contrary in Section 10.1(a):

   (i)  The Prepetition Administrative Agent will have the authority to file, settle, compromise, or withdraw any objections to Other Twenty-Day Claims. With respect to any period after the Effective Date, the Prepetition Administrative Agent will be reimbursed solely from the net savings resulting from the successful prosecution of such objections prior to the distribution of any additional monies to the holders of the Secured Working Capital Lender Claims under the Plan; provided that $1 million of Plan Cash will be distributed to the Prepetition Administrative Agent on the Effective Date and used to initially fund the Prepetition Administrative Agent for purposes of this Section 10.1(b)(i).

   (ii)  Notwithstanding anything to the contrary in the Plan, any Prepetition Lender will, at its own expense, have the authority to file, not later than 60 days following the Confirmation Date, a Cause of Action against a Prepetition Lender with a Claim under a Swap Contract (as defined in the Prepetition Credit Agreement) or a holder of a Swap Claim solely to determine whether or not such Swap Contract Claim qualifies as a Lender Swap Obligation under the Prepetition Credit Agreement, and any such Cause of Action will be settled, compromised or otherwise resolved or determined pursuant to a Final Order of the Bankruptcy Court. Any Cause of Action described by this Section 10.1(b)(ii) will not constitute a Released Action and is not subject to the release found in Section 20.11.

## 2. No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, on the Effective Date, distributions will be made to each Prepetition Lender in respect of its Secured Working Capital Lender Claims that are not derived from Lender Swap Obligations (as defined in the Prepetition Credit Agreement) based on a ratio where the numerator is the amount of such Prepetition Lender's Secured Working Capital Lender Claims and the denominator is the aggregate amount of all Secured Working Capital Lender Claims, including any derived from Lender Swap Obligations (as defined in the Prepetition Credit Agreement), regardless of whether any Claims with respect to Lender Swap Obligations (as defined in the Prepetition Credit Agreement) are Disputed on the Effective Date. If a Claim with respect to any Lender Swap Obligation (as defined in the Prepetition Credit Agreement) is not Allowed on the Effective Date, distributions with respect to such Lender Swap Obligation (as defined in the Prepetition Credit Agreement) will be held in reserve by the Disbursing Agent until such Claim becomes Allowed or disallowed.

## 3. Estimation of Claims

Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtors, or, the Producer Representative (solely with respect to First Purchaser Producer Twenty-Day Claims and Secured First Purchaser Producer Claims), may at any time request that the Bankruptcy Court estimate for final distribution purposes any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that if the estimate constitutes the maximum limitation on such Claim, the Debtors, the Prepetition Administrative Agent, the Reorganized Debtors, or the Producer Representative, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim, and; provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

## 4. Payments and Distributions on Disputed Claims

### a. Disputed Claims Reserve

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Disbursing Agent or, as applicable, the Producer Representative will reserve and hold in escrow for the benefit of each holder of a

Disputed Claim and any dividends, gains, or income attributable thereto, in an amount equal to distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim will be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, will constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtors, or the Prepetition Administrative Agent (solely with respect to Other Twenty-Day Claims) or the Producer Representative (solely with respect to First Purchaser Producer Twenty-Day Claims and Secured First Purchaser Producer Claims). Any Plan Currency reserved and held for the benefit of a holder of a Disputed Claim will be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in other Plan Currency in the event the Disputed Claim ultimately becomes an Allowed Claim. In the event that a Disputed Claim is not Allowed, in whole or in part, the holders of Allowed Claims in the same Class as the holder of the Claim that is not Allowed will receive their Pro Rata Share of any Plan Currency reserved on account of the Claim that is not Allowed. Such Cash and any dividends, gains, or income paid on account of other Plan Currency reserved for the benefit of holders of Disputed Claims will be either (x) held by the Disbursing Agent in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan. No payments or distributions will be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

      b.    **Allowance of Disputed Claims**

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent or as applicable, the Producer Representative will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any interest which has accrued on the amount of Cash and any dividends or distributions attributable to the Plan Currency so reserved (net of any expenses, including any taxes on the escrow, relating thereto), but only to the extent that such interest is attributable to the amount of the Allowed Claim. Such distribution, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing or disallowing such Disputed Claim becomes a Final Order but in no event more than ninety (90) days thereafter; provided, however, for matters affecting Disputed Claims that are First Purchaser Producer Twenty-Day Claims or Secured First Purchaser Producer Claims, the Producer Representative may in its sole discretion waive the requirement of a Final Order. The balance of any Cash previously reserved will be included in Plan Cash and the balance of any Plan Currency previously reserved will be included in future calculations of Plan Currency to holders of Allowed Claims in accordance with the terms and provisions of the Plan. For the avoidance of doubt, any Cash released from reserves for Administrative Expense Claims (other than amounts distributed to the Producer Representative pursuant to Section 3.1(a) of the Plan), Professional Compensation and Reimbursement Claims, Priority Non-Tax Claims or Priority Tax Claims will be paid to the

Prepetition Administrative Agent for distribution to holders of Allowed Secured Working Capital Lender Claims.

### c.   Tax Treatment of Escrow

Subject to the receipt of contrary guidance from the IRS or a court of competent jurisdiction (including the receipt by the Disbursing Agent of a private letter ruling requested by the Disbursing Agent, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent, or a condition imposed by the IRS in connection with a private letter ruling requested by the Debtor), the Disbursing Agent will (i) treat the escrow as one or more discrete trusts (which may be composed of separate and independent shares) for federal income tax purposes in accordance with the trust provisions of the Tax Code (Sections 641 et seq.) and (ii) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All holders of Allowed Claims will report, for tax purposes, consistent with the foregoing.

### d.   Funding of Escrow's Tax Obligation

If the Disputed Claims Reserve created in accordance with Section 10.4(a) of the Plan has insufficient funds to pay any applicable taxes imposed upon it or its assets, subject to the other provisions contained in the Plan, the Reorganized Debtors will advance to the escrow the funds necessary to pay such taxes (a "Tax Advance"), with such Tax Advances repayable from future amounts otherwise receivable by the escrow pursuant to Section 10.4 of the Plan or otherwise. If and when a distribution is to be made from the escrow, the distributee will be charged its pro rata portion of any outstanding Tax Advance (including accrued interest). If a cash distribution is to be made to such distributee, the Disbursing Agent will be entitled to withhold from such distributee's distribution the amount required to pay such portion of the Tax Advance (including accrued interest). If such Cash is insufficient to satisfy the respective portion of the Tax Advance, the distributee will, as a condition to receiving such other assets, pay in Cash to the Disbursing Agent an amount equal to the unsatisfied portion of the Tax Advance (including accrued interest). Failure to make such payment will entitle the Disbursing Agent to reduce and permanently adjust the amounts that would otherwise be distributed to such distributee to fairly compensate the Disputed Claims reserve created in accordance with Section 10.4(a) of the Plan for the unpaid portion of the Tax Advance (including accrued interest).

## H.   Litigation Trust

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, will execute the Litigation Trust Agreement and take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Plan. See Section VII for a more complete discussion of the Litigation Trust.

## I.   Provisions Regarding Distributions

### 1.   Time and Manner of Distributions

Distributions under the Plan will be made as follows:

a. **Initial Distributions of Cash**

On or as soon as practicable after the Effective Date, the Disbursing Agent will distribute, or cause to be distributed, (i) to the Producer Representative as provided in Section 3.1 of the Plan on behalf of holders of Disputed and Allowed First Purchaser Producer Twenty-Day Claims and Disputed and Allowed Secured First Purchaser Producer Claims, (ii) to the Disputed Claims Reserve on behalf of holders of Disputed Claims, (iii) to each holder of Allowed Priority Non-Tax Claims, Allowed Secured Tax Claims, and Allowed Secured Lender Claims, Allowed Other Secured Claims and (iv) to each Settling Party, such Creditor's share, if any, of Cash as determined pursuant to the Plan.

b. **Subsequent Distributions of Cash**

On the first (1st) Business Day that is after the close of two (2) full calendar quarters following the date of the initial Effective Date distributions and, thereafter, on each first (1st) Business Day following the close of two (2) full calendar quarters, the Disbursing Agent will distribute, or cause to be distributed, to the Disputed Claims Reserve on behalf of holders of Disputed Claims, and to each holder of Allowed Priority Non-Tax Claims, Allowed Secured Tax Claims, Allowed Secured Lender Claims and Allowed Other Secured Claims, an amount equal to such Creditor's share of Cash as determined pursuant to the Plan, until such time as there is no longer any potential Cash.

c. **Distributions of New Common Stock and Warrants**

Notwithstanding anything contained in the Plan to the contrary, commencing on or as soon as practicable after the Effective Date, the Disbursing Agent will commence distributions, or cause to be distributed, to the Disputed Claims Reserve on behalf of holders of Disputed Claims, and to each holder of Allowed Secured Lender Claims, Allowed Senior Notes Claims, Allowed Lender Deficiency Claims, and Allowed General Unsecured Claims, an amount equal to such Creditor's share, if any, of New Common Stock and Warrants, as determined pursuant to the Plan, and semi-annually thereafter until such time as there is no longer any potential New Common Stock and Warrants to distribute; provided, however, that during the period of retention of the New Common Stock and the Warrants, the Disbursing Agent will distribute, or cause to be distributed, to the Disputed Claims Reserve on behalf of holders of Disputed Claims, and to each holder of Allowed Secured Lender Claims, Allowed Senior Notes Claims, Allowed Lender Deficiency Claims, and Allowed General Unsecured Claims, an amount equal to such Creditor's share, if any, of dividends declared and distributed with respect to the New Common Stock and the Warrants; and, provided, further, that until such time as all Disputed Claims have been resolved by Final Order, in whole or in part, the Disbursing Agent will hold in reserve at least one percent (1%) of the New Common Stock and the Warrants to be distributed in accordance with Article IV of the Plan. The Class A New Common Stock and the Class B New Common Stock will be identical in all respects, except that the Class B New Common Stock will not be eligible for trading on a national securities exchange or a national market system. The Class B New Common Stock will convert automatically into Class A New Common Stock upon the transfer of such stock to an Entity that is permitted to hold margin securities or at the request of the holder.

### d. Distributions of Second Lien Term Loan Interests

The Disbursing Agent will distribute to each holder of an Allowed Secured Lender Claim evidence of such Creditor's Second Lien Term Loan Interests as determined pursuant to Article IV hereof.

### e. Distributions of the Litigation Trust Interests

The Disbursing Agent will commence distributions, or cause to be distributed, to the Disputed Claims Reserve on behalf of holders of Disputed Claims, and to each holder of Allowed Senior Notes Claims, Allowed Lender Deficiency Claims, and Allowed General Unsecured Claims, such Creditor's share, if any, of Litigation Trust Interests as determined pursuant to Article IV of the Plan, and semi-annually thereafter until such time as there are no longer any Litigation Trust Interests to distribute. All Litigation Trust Interests will be deemed to have been issued as of the Effective Date, whether or not held in reserve.

### f. Distributions from the Litigation Trust

The Litigation Trustee will pay all distributions to be made under the Litigation Trust to the Prepetition Administrative Agent to repay the Litigation Trust Funds to the holders of Allowed Secured Working Capital Lender Claims and/or in respect of the Litigation Trust Interests to the Disbursing Agent. Promptly after receipt of any such distribution (x) in respect of the repayment of the Litigation Trust Funds, the Prepetition Administrative Agent will distribute the same to the holders of Allowed Secured Working Capital Lender Claims (or to the Disputed Claims Reserve on behalf of holders of Disputed Claims that are Secured Working Capital Lender Claims) and (y) in respect of distributions to holders of the Litigation Trust Interests, the Disbursing Agent will distribute the same to the holders of the Litigation Trust Interests, in each case in accordance with the Plan; provided, however, that any Prepetition Lender or holder of a Swap Claim who did not vote to accept the Plan will not be entitled to receive any distributions until it has executed a Contributing Lender Assignment.

### 2. Timeliness of Payments

Any payments or distributions to be made pursuant to the Plan will be deemed to be made timely if made within thirty (30) days after the dates specified in the Plan. Whenever any distribution to be made under the Plan will be due on a day other than a Business Day, such distribution will instead be made, without interest, on the immediately succeeding Business Day, and will be deemed to have been made on the date due.

### 3. Distributions by the Disbursing Agent

Except as provided in Section 13.1(f) of the Plan, all distributions under the Plan will be made by the Disbursing Agent. All distributions made to the holders of the Secured Lender Claims will be paid by the Disbursing Agent to the Prepetition Administrative Agent which will make all distributions to the holders of the Secured Lender Claims. All distributions made to the Producers (other than distributions with respect to Unsecured First Purchaser Producer Claims which are provided for in Section 5.10 of the Plan) will be paid by the Disbursing Agent to the Producer Representative who will make all distributions (other than distributions with respect to

Unsecured First Purchaser Producer Claims which are provided for in Section 5.10 of the Plan) to the Producers. All distributions made to the holders of the Senior Notes Claims will be paid by the Disbursing Agent to the Indenture Trustee which will make all distributions to the holders of the Senior Notes Claims. The Disbursing Agent and as applicable, the Producer Representative will be deemed to hold all property to be distributed hereunder in trust for the Persons entitled to receive the same. The Disbursing Agent and as applicable, the Producer Representative will not hold an economic or beneficial interest in such property.

### 4. Manner of Payment under the Plan

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent will be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payments will be made to a holder of an Allowed Claim until such time as the amount payable thereto is equal to or greater than Ten Dollars ($10.00); provided, further, that all payments in Cash to the Prepetition Administrative Agent will be made by wire transfer.

### 5. Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 9010, distributions and deliveries to holders of Allowed Claims will be made at the address of such holders as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on proofs of claim filed by such holders, or at the last known address of such holders if no proof of claim is filed or if the Debtors have been notified in writing of a change of address.

### 6. Fractional New Common Stock / Warrants

No fractional shares of New Common Stock or Warrants will be issued. Fractional shares of New Common Stock and Warrants will be rounded to the next greater or next lower number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater will be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) will be rounded to the next lower whole number. The total number of shares or interests of New Common Stock and Warrants to be distributed to a Class hereunder will be adjusted as necessary to account for the rounding provided for in Section 13.6 of the Plan.

### 7. Undeliverable Distributions

#### a. Holding of Undeliverable Distributions

If any distribution to any holder is returned to the Reorganized Debtors or, as applicable, the Prepetition Administrative Agent or the Producer Representative, as undeliverable, no further distributions will be made to such holder unless and until the Reorganized Debtors or the Prepetition Administrative Agent or the Producer Representative, as applicable, are notified, in writing, of such holder's then-current address. Undeliverable distributions will remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable. All Entities ultimately receiving undeliverable Cash will not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan will require the Reorganized Debtors or, as

applicable, the Prepetition Administrative Agent or the Producer Representative, to attempt to locate any holder of an Allowed Claim.

b. **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within five (5) years from and after the Effective Date will have its entitlement to such undeliverable distribution discharged and will be forever barred from asserting any entitlement pursuant to the Plan against the Reorganized Debtors or, as applicable, the Prepetition Administrative Agent or the Producer Representative, or their respective property. In such case, any consideration held for distribution on account of such Claim will revert to the Reorganized Debtors.

*8.* **Time Bar to Cash Payments**

Checks issued by the Disbursing Agent or, as applicable, the Prepetition Administrative Agent or the Producer Representative, on account of Allowed Claims will be null and void if not negotiated within 180 days from and after the date of issuance thereof. Requests for re-issuance of any check will be made directly to the Disbursing Agent or, as applicable, the Prepetition Administrative Agent or the Producer Representative, by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check will be made on or before the later of (a) the fifth (5th) anniversary of the Effective Date or (b) 180 days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks will be discharged and forever barred and the Disbursing Agent or the Producer Representative, as applicable, will retain all monies related thereto.

*9.* **Distributions after Effective Date**

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, will be deemed to have been made in accordance with the terms and provisions of Section 13.1 of the Plan.

*10.* **Setoffs**

Other than with respect to Claims of the Prepetition Lenders, the Postpetition Financing Claims, and the Senior Notes Claims (as to which any and all rights of setoff or recoupment have been waived), the Reorganized Debtors may, pursuant to applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights, and causes of action of any nature the Debtors or the Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors, the Debtors in Possession, the Reorganized Debtors, or the Litigation Trustee of any such claims, rights, and causes of action that the Debtors, the Debtors in Possession, or the Reorganized Debtors or the Litigation Trustee may possess against such holder, and; provided, further, that, unless otherwise provided by order of the Bankruptcy Court, nothing contained in the Plan is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the

provisions of sections 553, 555, 556, 559, 560, or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment.

### *11.* **Allocation of Plan Distributions between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### *12.* **Record Date**

On the Record Date, registers of the Senior Notes Indenture Trustee will be closed and the Senior Notes Indenture Trustee will have no obligation to recognize any transfers of Claims arising under or related to the Senior Notes Indenture occurring from and after the Record Date. Distributions to holders of Senior Notes Claims administered by the Senior Notes Indenture Trustee will be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable. In connection with such book-entry exchange, the Senior Notes Indenture Trustee will deliver instructions to the DTC directing the DTC to effect distributions on a pro rata basis as provided under the Plan with respect to Senior Notes Claims.

### *13.* **Senior Notes Indenture Trustee as Claim Holder**

Consistent with Bankruptcy Rule 3003(c), the Debtors will recognize the master proof of claim (Claim No. 2614) filed by the Senior Notes Indenture Trustee in respect of the Senior Notes Claims. Accordingly, any Proof of Claim filed by a holder of a Senior Notes Claim may be disallowed as duplicative of the Senior Notes Indenture Trustee master proof of claim, without further action or Bankruptcy Court order.

### *14.* **Limited Recoveries**

Notwithstanding anything contained in the Plan to the contrary, in the event that the sum of distributions from Plan Currency, including distributions from Litigation Trust Interests and distributions under the Canadian Plans, are equal to or in excess of one hundred percent (100%) of any holder's Allowed Claim, then distributions from the Litigation Trust to be distributed to such holder in excess of such one hundred percent (100%) will be deemed redistributed to holders of Litigation Trust Interests for and on behalf of holders of other Litigation Trust Interests and accordingly will be distributed in accordance with the provisions of the documents, instruments and agreements governing such Litigation Trust Interests and the Bankruptcy Code.

## J. **Treatment of Executory Contracts and Expired Leases**

### *1.* **Assumption or Rejection of Executory Contracts and Unexpired Leases**.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any Person or Entity will be

deemed rejected by the Debtors, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be assumed on Schedule 1(A) (executory contracts) or Schedule 1(B) (unexpired leases), which Schedules will be contained in the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 1(A) and 1(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, as applicable, assumed or rejected. The Debtors will provide notice of any amendments to Schedules 1(A) and 1(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 1(A) or 1(B) will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

## 2.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 16.1 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the unexpired leases specified in Section 16.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 16.1 of the Plan.

## 3.    Inclusiveness

Unless otherwise specified on Schedules 1(A) and 1(B), each executory contract and unexpired lease listed or to be listed on Schedules 1(A) and 1(B) will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on Schedules 1(A) and 1(B).

## 4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Except as may otherwise be agreed to by the parties, within thirty days after the Effective Date, the Reorganized Debtors will cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured will be cured either within thirty days of the entry of a Final Order determining the amount, if any, of

the Reorganized Debtors' liability with respect thereto, or as otherwise may be agreed to by the parties.

### 5. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 16.1 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors (or, on and after the Effective Date, Reorganized Debtors) no later than 30 days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule 1(A) or 1(B). All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

### 6. Insurance Policies

Notwithstanding anything contained in the Plan to the contrary, unless subject to a motion for approval or rejection that has been filed and served prior to the Confirmation Date, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, will be treated as executory contracts under the Plan and will be assumed pursuant to the Plan, effective as of the Effective Date. Nothing contained in Section 16.6 of the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

## K. Conditions Precedent to Effective Date of the Plan

### 1. Conditions Precedent to Effective Date of the Plan

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

#### a. Entry of the Confirmation Order

The Clerk of the Bankruptcy Court will have entered the Confirmation Order in form and substance acceptable to the Debtors, the Lender Steering Committee, and the Creditors' Committee and the effectiveness of which will not have been stayed ten days following the entry thereof.

#### b. Producers' Settlement Payments

The sum of (A) the total payments with respect to the First Purchaser Producer Twenty-Day Claims plus (B) the total payments with respect to the Secured First Purchaser Producer Claims (including payments pursuant to Sections 3.1(c)(i), (ii), (iii) and (iv) of the Plan) will not exceed $172.5 million in the aggregate. The sum of (A) the total payments with respect to the Other Twenty-Day Claims paid by the Debtors to the Settling Parties under the Other Twenty-Day Claims Settlement, or otherwise, plus (B) the total reserve funded by the Debtors with respect to Other Twenty-Day Claims held by Non-Settling Parties will not exceed $154 million in the aggregate. The sum of (A) the amount of the total payments referred to in Section

18.1(c)(i) of the Plan plus (B) the amount of the total payments and reserved referred to in Section 18.1(c)(ii) of the Plan plus (C) the payment with respect to the Alon Claim will not exceed $337 million in the aggregate.

### c. **Producer State-Specific Adversary Proceedings**

The Producer Plaintiffs will have voluntarily dismissed with prejudice the Producer State-Specific Adversary Proceedings with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders by no later than the Effective Date. The parties to the Producer State-Specific Adversary Proceedings will have filed papers, in a form acceptable to the Debtors and the Prepetition Administrative Agent, voluntarily dismissing with prejudice the Third Circuit Appeals by no later than the Effective Date. Each of the Producers named as plaintiffs in the Producer State-Specific Adversary Proceedings will have voluntarily dismissed with prejudice the Other Proceedings to which it is a party with respect to the Debtors, the Prepetition Administrative Agent and the Prepetition Lenders and/or their affiliates, as applicable, by no later than the Effective Date.

### d. **Twenty-Day Claims**

The Debtors and the Prepetition Administrative Agent will have voluntarily dismissed with prejudice all fact-based objections to First Purchaser Producer Twenty-Day Claims by no later than the Effective Date of the Plan; provided, however, that the Producers' Committee or the Producer Representative is permitted to pursue the disputes regarding certain First Purchaser Producer Twenty-Day Claims that were set forth in the Notices filed by the Debtors on July 17, 2009.

### e. **Other Producer-Related Litigation**

Other than the legal and fact-based objections to the Other Twenty-Day Claims held by any Non-Settling Parties, all Producer-related litigation commenced in the Bankruptcy Court and to which the Debtors or the Prepetition Administrative Agent are currently parties will have been voluntarily dismissed with prejudice as to the Debtors, the Prepetition Administrative Agent, and the Prepetition Lenders.

### f. **Release of Restricted Cash**

The Clerk of the Bankruptcy Court will have entered an order, in form and substance acceptable to counsel for the Prepetition Administrative Agent and counsel for the Producers' Committee, authorizing the release from escrow of the Restricted Cash for use to fund the Plan.

### g. **Execution of Documents; Other Actions**

All other actions and documents necessary to implement the Plan will have been effected or executed and will be reasonably acceptable to the Lender Steering Committee and the Creditors' Committee.

### h. Consents Obtained

The Debtors will have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan and that are required by law, regulation, or order.

### i. Exit Facility

An Exit Facility, the terms and conditions of which will be reasonably satisfactory to the Debtors, the Lender Steering Committee, and the Creditors' Committee, will have been provided.

### j. Approval and Consummation of the Certain Canadian Plans

The SemCAMS ULC Plan and the SemCanada Nova Scotia Plan will have been approved and consummated concurrently with the effectiveness of the Plan and the aggregate amount of Canadian Distributions made on or prior to the Effective Date will have been no less than $160 million.

### k. Litigation Trust

The Litigation Trust Agreement will have been executed and all steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Plan will have occurred in a manner reasonably satisfactory to the Lender Steering Committee and the Creditors' Committee.

### l. New Securities

The New Common Stock and Warrants will have been authorized in the amounts set forth in the Plan and on terms reasonably satisfactory to the Lender Steering Committee and the Creditors' Committee.

### 2. Failure of Conditions Precedent

In the event that one or more of the conditions specified in Section 18.1 of the Plan have not occurred or have been waived as permitted by Section 18.3 of the Plan on or before November 15, 2009, (i) the Confirmation Order will be vacated, (ii) no distributions under the Plan will be made, (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed to be a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors. For the avoidance of doubt, and notwithstanding anything in this Disclosure Statement or the Plan to the contrary, if the Plan is not confirmed or does not become effective, nothing in this Disclosure Statement or the Plan will be construed as a waiver of any rights or Claims of the Debtors, the Lender Steering Committee, the Creditors' Committee, the Producers' Committee or the Producer Plaintiffs.

### 3. Waiver of Conditions Precedent

The Debtors, subject to receipt of consent of the Lender Steering Committee and the Creditors' Committee, which consent will not be unreasonably withheld, and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent to effectiveness of the Plan set forth in Section 18.1 of the Plan.

## L. Effect of Confirmation

### 1. Title to and Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the estates of the Debtors will vest in the Reorganized Debtors or the Litigation Trust, as the case may be, free and clear of all Claims, Liens, encumbrances, and other interests, except as provided in the Plan, and the Confirmation Order will be a judicial determination of discharge of the liabilities of the Debtors and the Debtors in Possession except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

### 2. Discharge of Claims and Termination of Equity Interests

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan will be in exchange for and in complete satisfaction and discharge of all existing debts and Claims other than the SemCanada Energy Claim, and will terminate all Equity Interests, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, on the Effective Date, all existing Claims against the Debtors other than the SemCanada Energy Claim and Equity Interests in the Debtors, will be, and will be deemed to be satisfied and discharged, and all holders of Claims other than the SemCanada Energy Claim and Equity Interests will be precluded and enjoined from asserting against the Reorganized Debtors or the Litigation Trust, or any of their respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest.

### 3. Discharge of Debtors

Upon the Effective Date and in consideration of the Distributions to be made under the Plan, except as otherwise expressly provided in the Plan, the Debtor will be discharged of all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date, the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, other than the SemCanada Energy Claim. Upon the Effective Date, all Persons and Entities will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from asserting against the Debtors, the Debtors in Possession, the Litigation Trust, or their respective successors

or assigns, including, without limitation, the Reorganized Debtors, the Litigation Trust, or their respective asset properties or interests in property, any discharged Claim or Equity Interest in the Debtors, any other or further Claims, other than the SemCanada Energy Claim, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefore were known or existed prior to the Confirmation Date regardless of whether a proof of Claim or Equity Interest was filed, whether the holder thereof voted to accept or reject the Plan, or whether the Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest.

## 4. Injunction on Claims

Except as otherwise expressly provided in the Plan, the Confirmation Order, or such other order of the Bankruptcy Court that may be applicable, all Persons or Entities who have held, hold, or may hold Claims or other debt or liability that is discharged or Equity Interests or other right of equity interest that is discharged pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Debtors in Possession, or the Reorganized Debtors, the Debtors' estates, or properties or interests in properties of the Debtors, the Reorganized Debtors, the Disbursing Agent, the Prepetition Administrative Agent, the Producer Representative or the Litigation Trust, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Debtors in Possession, or the Reorganized Debtors, the Debtors' estates or properties, the Disbursing Agent, the Prepetition Administrative Agent, the Producer Representative, the Litigation Trust, or interests in properties of the Debtors, the Debtors in Possession, or the Reorganized Debtors, or the Litigation Trust, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors in Possession, or the Reorganized Debtors, the Debtors' estates or properties, the Disbursing Agent, the Prepetition Administrative Agent, the Producer Representative, the Litigation Trust, or interests in properties of the Debtors, the Debtors in Possession, or the Reorganized Debtors, or the Litigation Trust, (d) except to the extent provided, permitted, or preserved by sections 553, 555, 556, 559, 560 or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Debtors in Possession, or the Reorganized Debtors, the Debtors' estates or properties, the Disbursing Agent, the Prepetition Administrative Agent, the Producer Representative, the Litigation Trust, or interests in properties of the Debtors, the Debtors in Possession, the Reorganized Debtors, or the Litigation Trust with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, and (e) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that such injunction will not preclude the United States of America, any State, or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, provided, further, that except in connection with a properly filed proof of claim, the foregoing proviso does not permit the United States of America, any state, or any of their respective police or regulatory agencies from obtaining any monetary recovery from the Debtors, the Debtors in Possession, or the Reorganized Debtors, or their respective property or interests in property with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity

interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power. Such injunction will extend to all successors of the Debtors and Debtors in Possession, including the Litigation Trust, the Creditors' Committee and its respective members, the Producers' Committee and its respective members, the Lender Steering Committee and its respective members, the Prepetition Administrative Agent, the Postpetition Administrative Agent, the Disbursing Agent, the Producer Representative and the respective properties and interests in property of all of the foregoing; provided, however, that such injunction will not extend to or protect members of the Creditors' Committee, the Producers' Committee, and the Lender Steering Committee, and their respective properties and interests in property for actions based upon acts outside the scope of service on the Creditors' Committee, the Producers' Committee, or the Lender Steering Committee, and is not intended, nor will it be construed, to extend to the assertion, the commencement, or the prosecution of any claim or cause of action against any present or former member of the Creditors' Committee, Producers' Committee, or the Lender Steering Committee, and their respective properties and interests in property arising from or relating to such member's pre-Petition Date acts or omissions or any current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, members of the Management Committee or auditors relating to acts or omissions occurring prior to the Petition Date.

## 5. Term of Existing Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

## 6. Exculpation

None of the Debtors, the Reorganized Debtors, the Lender Steering Committee and its members, the Prepetition Administrative Agent, the Postpetition Administrative Agent, the Creditors' Committee and its members, the Producers' Committee and its members, the Examiner (other than those functions defined by the Investigative Order), the Litigation Trustee, the Disbursing Agent, the Producer Representative and any of their respective directors, officers, employees, members, attorneys, consultants, advisors, and agents (but solely in their capacities as such), will have or incur any liability to any holder of a Claim or Equity Interest of any other Entity for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, confirmation, approval, or administration of the Plan or any compromises or settlements contained therein, the Disclosure Statement related thereto, the property to be distributed under the Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of Section 20.6 of the Plan will not affect the liability of (a) any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, (b) the professionals of the Debtors, the Reorganized Debtors, the Lender Steering Committee, the Creditors'

Committee, the Producers' Committee, the Examiner, the Litigation Trustee, the Disbursing Agent or the Producer Representative to their respective clients pursuant to applicable codes of professional conduct, (c) any of such Persons with respect to any act or omission prior to the Petition Date, except as otherwise expressly set forth elsewhere in the Plan or (d) any Entity with respect to their obligations pursuant to the Plan. Any of the foregoing parties in all respects will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

7.     **Preservation of Causes of Action / Reservation of Rights**

Except with respect to Released Actions, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver, release, or the relinquishment of any rights or Causes of Action that the Debtors, the Reorganized Debtors, or the Litigation Trust may have or which the Reorganized Debtors or the Litigation Trust may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives, (ii) the turnover of any property of the Debtors' estates, and (iii) Causes of Action against current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, members of the Management Committee, or auditors relating to acts or omissions occurring prior to the Petition Date.

Except with respect to Released Actions, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver, release, or relinquishment of any Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors or the Litigation Trust, as the case may be, will have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced or the Litigation Trust Claims had not been transferred to the Litigation Trust in accordance with the Plan, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

8.     **Injunction on Causes of Action**

Except as provided in the Plan, as of the Effective Date, all non-Debtor entities are permanently enjoined from commencing or continuing in any manner, any Causes of Action, whether directly, derivatively, on account of or respecting any debt or Cause of Action of the Debtors, the Debtors in Possession, or the Reorganized Debtors which the Debtors, the Debtors in Possession, the Reorganized Debtors, or the Litigation Trust, as the case may be, retain sole and exclusive authority to pursue in accordance with Section 10.1 of the Plan or which has been released pursuant to the Plan, including, without limitation, pursuant to Sections 20.9, 20.10, 20.11, 20.12, 20.13 or 20.14 of the Plan and the Confirmation Order will provide for such injunctions.

## 9. Limited Release of Officers and Employees

No claims of the Debtors' estates against their present and former officers, Management Committee members, employees, consultants, and agents and arising from or relating to the period prior to the Petition Date are released by the Plan. As of the Effective Date, the Debtors and the Debtors in Possession will be deemed to have waived and released its officers, employees, consultants, and agents who were officers, employees, consultants, or agents, respectively, at any time during the Chapter 11 Cases, from any and all claims of the Debtors' estates arising from or relating to the period from and after the Petition Date; provided, however, that, except as otherwise provided by prior or subsequent Final Order of the Bankruptcy Court, this provision will not operate as a waiver or release of (a) any Person (i) named or subsequently named as a defendant in any action commenced by or on behalf of the Debtors in Possession, including any actions prosecuted by the Creditors' Committee and the Prepetition Administrative Agent on behalf of the Prepetition Lenders or any Litigation Trust Claim prosecuted by the Litigation Trust, (ii) identified or subsequently identified in a report by the Examiner as having engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtors, or (iii) adjudicated or subsequently adjudicated by a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtors or (b) any claim (i) with respect to any loan, advance, or similar payment by the Debtors to any such Person, (ii) with respect to any contractual obligation owed by such Person to the Debtors, (iii) relating to such Person's knowing fraud, or (iv) to the extent based upon or attributable to such Person gaining in fact a personal profit to which such Person was not legally entitled; and, provided, further, that the foregoing is not intended, nor will it be construed, to release any of the Debtors' claims that may exist against the Debtors' directors and officers liability insurance.

## 10. Releases by the Debtors

On the Effective Date, effective as of the Confirmation Date, to the fullest extent permissible under applicable law, for consideration received, the sufficiency of which is hereby acknowledged, the Debtors will release and be permanently enjoined from any prosecution or attempted prosecution of the Released Actions; provided, however, that the foregoing will not operate as a waiver of or release from any Causes of Action filed as of the Effective Date against any Prepetition Lender with a Claim under a Swap Contract (as defined in the Prepetition Credit Agreement) or a holder of a Swap Claim solely to determine whether or not such Swap Contract Claim qualifies as a Lender Swap Obligation under the Prepetition Credit Agreement. Solely for purposes of the definition of Released Actions, "Prepetition Lenders" and "holders of Swap Claims" will be limited to those Entities who were Prepetition Lenders and/or holders of Swap Claims at 5:00 p.m., Eastern Daylight Time, on May 14, 2009.

## 11. Releases by Holders of Claims and Equity Interests

On the Effective Date, effective as of the Confirmation Date, to the fullest extent permissible under applicable law, each Person who votes to accept the Plan, any Person who receives a distribution under the Plan and each Settling Party will be deemed to (i) consensually forever release and be permanently enjoined from any prosecution or attempted prosecution of any Released Actions which such Person has or may have against (A) the Prepetition Lenders or holders of Swap Claims (excluding J. Aron, Bank of Oklahoma and their respective affiliates),

the Prepetition Administrative Agent, the Postpetition Administrative Agent, and the Postpetition Lenders under the Postpetition Financing Agreement or (B) the Catsimatidis Group and (ii) agree not to aid, assist, support, or otherwise participate with any other party in prosecuting Twenty-Day Claims against the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent and/or the Prepetition Lenders (excluding J. Aron and its affiliates) or to take any positions contrary to the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent and/or the Prepetition Lenders (excluding J. Aron and its affiliates). Solely for purposes of the definition of Released Actions, "Prepetition Lenders" and "holders of Swap Claims" will be limited to those Entities who were Prepetition Lenders and/or holders of Swap Claims at 5:00 p.m., Eastern Daylight Time, on May 14, 2009.

## 12. Releases by Members of Creditors' Committee

On the Effective Date, effective as of the Confirmation Date, to the fullest extent permissible under applicable law, the members of the Creditors' Committee, in their individual capacities as such, will be deemed to consensually forever release and be permanently enjoined from any prosecution or attempted prosecution of any Released Actions which such Person has or may have had against (i) the Prepetition Lenders or holders of Swap Claims (excluding J. Aron, Bank of Oklahoma and their respective affiliates), the Prepetition Administrative Agent, the Postpetition Administrative Agent, and the Postpetition Lenders under the Postpetition Financing Agreement or (ii) the Catsimatidis Settling Parties.

## 13. Releases by Members of Producers' Committee

On the Effective Date, effective as of the Confirmation Date, to the fullest extent permissible under applicable law, the members of the Producers' Committee, in their individual capacity as such, will be deemed to consensually forever release and be permanently enjoined from any prosecution or attempted prosecution of any Released Actions which such Person has or may have had against the Prepetition Lenders or holders of Swap Claims (excluding J. Aron and its affiliates), the Prepetition Administrative Agent, the Postpetition Administrative Agent, and the Postpetition Lenders under the Postpetition Financing Agreement. For the avoidance of doubt, this release will not affect, prejudice, or release any claims of a Producer with respect to any Claims or Causes of Action relating to or with respect to any parties other than the Prepetition Lenders or holders of Swap Claims (excluding J. Aron and its affiliates), the Prepetition Administrative Agent, the Postpetition Administrative Agent, and the Postpetition Lenders under the Postpetition Financing Agreement

## 14. Release of Guarantors

The Plan will operate as a full release of all Entities (regardless of whether such Entities are Debtors) that are Guarantors (as such term is defined in the Prepetition Credit Agreement) other than an Entity in the SemCanada Group or Guarantors (as such term is defined in the Senior Notes Indenture) other than an Entity in the SemCanada Group from any liability arising out of or relating to the Prepetition Credit Agreement and the Senior Notes Indenture, respectively.

## M. Modification, Revocation or Withdrawal of the Plan

### 1. Modification of the Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan, the Plan Supplement, or any exhibits to the Plan at any time prior to entry of the Confirmation Order, including, without limitation, to exclude one or more Debtors from the Plan; provided, however, that any such amendments or modifications will be subject to the consent of each of the Lender Steering Committee, the Creditors' Committee and the Producers' Committee, which consents will not be unreasonably withheld. The Debtors are evaluating, in consultation with the Lender Steering Committee and the Creditors' Committee, whether certain Debtors (such as Eaglwing, L.P.) should be removed from the Plan and possibly converted to liquidation cases under Chapter 7 of the Bankruptcy Code. Upon entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, including, without limitation, to exclude one or more Debtors from the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; provided, however, that any such amendments or modifications will be reasonably acceptable in form and substance to the Lender Steering Committee, the Creditors' Committee and the Producers' Committee. A holder of a Claim that has adopted the Plan will be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 2. Revocation or Withdrawal of the Plan

a. The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors; provided, however, that the Lender Steering Committee and the Creditors' Committee consent.

b. If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, the Plan will be deemed null and void. In such event, nothing contained herein or in the Plan will be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## N. Miscellaneous Provisions

### 1. Dissolution of Creditors' Committee and Producers' Committee

On the Effective Date, the Creditors' Committee and the Producers' Committee will be dissolved and the members thereof and the professionals retained by the Creditors' Committee and the Producers' Committee in accordance with section 1103 of the Bankruptcy Code will be released and discharged from their respective fiduciary obligations; provided, however, that the Creditors' Committee will not be dissolved for the following limited purposes: (i) seeking approval of any application of a Professional Compensation and Reimbursement Claim; (ii) objecting to any application of a Professional Compensation and Reimbursement Claim; and (iii) any appeals of the Confirmation Order; provided, further, that the Producers' Committee will not

be dissolved for the limited purpose of prosecuting any application of a Professional Compensation and Reimbursement Claim submitted by the Producers' Committee. All reasonable fees and expenses of members of the Lender Steering Committee, the reasonable fees and expenses of the Prepetition Administrative Agent's professionals for post-Effective Date activities referred to in clauses (i), (ii) and (iii) of the preceding sentence, the reasonable fees and expenses of members of the Creditors' Committee, the reasonable fees and expenses of the Creditors' Committee's professionals for post-Effective Date activities authorized under Section 17.1 of the Plan and the reasonable fees and expenses of the Producers' Committee's professionals for post-Effective Date activities authorized under Section 17.1 of the Plan will be paid without further Bankruptcy Court approval upon the submission of invoices to the Reorganized Debtors. Following the Effective Date, none of the Creditors' Committee's professionals will be precluded from representing any Entity acting for the Litigation Trust or other Entities created by the Plan, including, without limitation, the Litigation Trustee or the Litigation Trust.

## 2. Plan Supplement

The Exit Facility commitment letter, the Litigation Trust Agreement, the Management Incentive Plan, the New Holdco Bylaws, the New Holdco Certificate of Incorporation, the Second Lien Term Loan Facility term sheet, the Contributing Lender Assignment, the Warrant Agreement, the terms and conditions of the refinancing of the White Cliffs Credit Agreement, Schedules 1(A) and 1(B), the identity of the Persons who will serve as executive officers of New Holdco (if known by the date the Plan Supplement is filed), the identity of the Producer Representative and any other appropriate documents will be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least ten days prior to the last day upon which holders of Claims may vote to accept or reject the Plan; provided, however, that the Debtors may amend (a) Schedules 1(A) and 1(B) through and including the Confirmation Date and (b) each of the other documents contained in the Plan Supplement, subject to Section 22.1 of the Plan, through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement. Each of the documents contained in the Plan Supplement as to form and substance will be subject to the consent of each of the Lender Steering Committee and the Creditors' Committee, which consents will not be unreasonably withheld. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement on the Debtors' website at www.kccllc.net/SemGroup.

## 3. Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code will be paid as and when due or otherwise pursuant to an agreement between the Reorganized Debtors and the United States Department of Justice, Office of the United States Trustee, until such time as a Chapter 11 Case for a Debtor will be closed in accordance with the provisions of Section 23.14 of the Plan.

### 4. Expedited Tax Determination

The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, such Reorganized Debtors for all taxable periods through the Effective Date.

### 5. Post-Confirmation Date Fees and Expenses

From and after the Confirmation Date, the Reorganized Debtors and the Litigation Trust will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, (a) retain professionals and (b) pay the reasonable fees and expenses (including reasonable professional fees and expenses) incurred by the Debtors, the Reorganized Debtors, or the Litigation Trust, as the case may be, related to implementation and consummation of or consistent with the provisions of the Plan.

### 6. Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 7. Severability

If, prior to the Confirmation Date, any term or provision of the Plan will be held by the Bankruptcy Court to be invalid, void, or unenforceable, including, without limitation, the inclusion of one or more Debtors in the Plan, the Bankruptcy Court will, with the consent of the Debtors, the Lender Steering Committee, and the Creditors' Committee, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 8. Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit to the Plan or document contained in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York, without giving effect to principles of conflicts of laws.

### 9. Closing of the Chapter 11 Cases

The Reorganized Debtors will, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court.

### 10. No Effect on Downstream Claims

No provision of the Plan is intended to and no provision will compromise, affect, discharge, or otherwise impact the Downstream Claims against any Downstream Purchasers and nothing contained herein will release Producers' Downstream Claims against Downstream Purchasers for amounts due to Producers. The Producer Plaintiffs contend, and the Downstream Purchasers dispute, that such Downstream Claims are not property of the Debtors or their estates and are not administered under the Plan, nor will the Downstream Claims constitute Litigation Trust Assets. Neither the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent nor the Prepetition Lenders will oppose or otherwise contest the Producers' prosecution of any Downstream Claims asserted as of September 21, 2009, including, but not limited to, Downstream Claims against J. Aron & Company, nor oppose efforts of First Purchaser Producers to seek remand or transfer of asserted Downstream Claims in litigation which has been or may hereinafter be transferred to the Bankruptcy Court. Section 23.18 of the Plan will control in case of a conflict with any other provision in the Plan.

## VI. REORGANIZED DEBTORS

## A. FINANCIAL INFORMATION AND VALUATIONS

### 1. Historical Financial Information

The Historical Financial Statements are contained in <u>Exhibit E</u> to this Disclosure Statement. *Please be aware that prior to the Petition Date, the SemGroup Companies conducted substantial trading and marketing activities, which were the largest factors in the EBITDA of the SemGroup Companies during the periods covered by the Historical Financial Statements. Since the Petition Date, the SemGroup Companies have conducted limited trading and marketing activities and have, or will have, disposed of their SemMaterials domestic business unit and their SemFuel business unit. In addition, the SemGroup Companies will be subject to the fresh-start accounting rules after the Effective Date. Accordingly, the financial condition, results of operations and cash flows of the SemGroup Companies from and after the Effective Date will not be comparable to the financial condition, results of operations or cash flows reflected in the Historical Financial Statements.*

### 2. Projections

#### a. Responsibility for and Purpose of the Projections

For the purpose of demonstrating the feasibility of the Plan, the following financial projections for the five years ending on December 31, 2013 (the "Projections") were prepared by the Debtors with the assistance of their retained professionals. The Projections reflect the Debtors' most recent estimates of the financial position, results of operations and cash flows of

the Reorganized SemGroup Companies. Consequently, the Projections reflect the Debtors' judgment as to expectations of market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change.

The Debtors do not, as a matter of course, publish their projections, strategies, or forward-looking projections of the financial position, results of operations and cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to the holders of Claims or Equity Interests after the date of this Disclosure Statement, or to include such information in documents required to be filed with the SEC or to otherwise make such information public. The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections and are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.

The Projections present, to the best of the Debtors' knowledge and belief, the Reorganized SemGroup Companies' projected financial position, results of operations, and cash flows for the five years ending December 31, 2013 and reflect the Debtors' judgment as of September 18, 2009. Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including but not limited to, material changes to the economic environment, underlying commodity prices, transportation fees and spreads, supply and demand of underlying commodities, competitive environment, and other factors affecting the Debtors' businesses. The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Projections. In connection with the development of the Plan, the Projections have not been audited or reviewed by independent accountants. The Projections assume the Plan will be implemented in accordance with its stated terms and that consummation of the Plan will occur on or around November 1, 2009.

The Projections should be read in conjunction with the assumptions and qualifications contained herein, including under Section IX, "Certain Factors Affecting the Debtors."

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.**

**THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER**

**PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THESE PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.**

        b.     **Summary of Significant Accounting Policies and Projection Assumptions**

The Debtors, with the assistance of their retained professionals, prepared the Projections. The Projections represent, to the best of the Debtors' knowledge and belief, the Debtors' projected results of operations, cash flows, and financial position for the five years ending December 31, 2013 and reflect the Debtors' judgment as of September 18, 2009.

        (i)     Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Historical Financial Statements. The Projections do not reflect the implementation of fresh-start accounting pursuant to Statement of Position (SOP) 90-7 as issued by the American Institute of Certified Public Accountants. The implementation of SOP 90-7 could have an impact on the projections in 2009 or 2010 due to potential inventory valuation adjustments as required under SOP 90-7 fresh-start accounting. Overall, the implementation of SOP 90-7 is not anticipated to have a material impact on the underlying economics of the Plan.

        (ii)     General Assumptions

*Methodology.* The Projections were separately prepared for each of the pro forma reorganized business units including SemCrude (including White Cliffs and SemCanada Crude), SemCAMS, SemStream, SemGas, SemEuro, and SemMexico. The Projections assume that the current sale transaction involving SemFuel will be consummated prior to the Effective Date.

*Tax Structure.* As discussed more fully in Section X, "Certain Federal Income Tax Consequences of the Plan," the ultimate parent of the Reorganized SemGroup Companies will be a C-corporation and subject to federal and state taxes as such. Therefore, the Projections for the Reorganized SemGroup Companies include the estimated impact of federal and state taxes. Projected taxes have not been adjusted to reflect any fair value adjustments to basis that may arise as a result of the restructuring transaction. For foreign entities (SemCanada, SemEuro and SemMexico), it is assumed that the earnings are taxed at the higher of the foreign or US tax rates.

*Plan Consummation Date.* The Projections assume the Plan will be consummated on or around November 1, 2009. The Debtors do not believe a change in the assumed date of the consummation of the Plan by a few months will materially impact the post-confirmation capital structure or the underlying economics of the Plan.

c. **Reorganized SemGroup Companies – Pro Forma Emergence Balance Sheet (Unaudited)**

Below is a reconciliation of the pre-emergence to the post-emergence balance sheet as of October 31, 2009.

**BALANCE SHEET**
($ in thousands)

| | Oct-09 Pre-Emergence(a) | Restructuring Transaction | | | | | Oct-09 Pro Forma |
|---|---|---|---|---|---|---|---|
| | | Cash Settlement(b) | New Debt(c) | Issue Equity(d) | Cancellation of Debt(e) | Other Accounting Adjustments(f) | |
| **ASSETS** | | | | | | | |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents(1) | $ 1,054,264 | $ (977,350) | $ (5,350) | $ - | $ - | $ - | $ 71,563 |
| Accounts Receivable | 206,644 | - | - | - | - | (8,769) | 197,875 |
| Inventories, Net | 136,640 | - | - | - | - | - | 136,640 |
| Receivable from Affiliates | 74,389 | - | - | - | - | (74,389) | - |
| Derivative Assets | 1,174 | - | - | - | - | - | 1,174 |
| Margin Deposits | 28,783 | - | (433) | - | - | - | 28,350 |
| Other Current Assets | 19,199 | - | - | - | - | (961) | 18,238 |
| Intercompany | (169,884) | - | - | - | - | 169,884 | - |
| Total Current Assets | 1,351,209 | (977,350) | (5,783) | - | - | 85,765 | 453,841 |
| | | | | | | | |
| Net Property, Plant and Equipment | 1,013,061 | - | - | - | - | (595) | 1,012,466 |
| Goodwill | 83,250 | - | - | - | - | (83,520) | - |
| Investments in Affiliates | 110,641 | - | - | - | - | (110,641) | - |
| Reorganization Value in Excess of Book Value | - | - | - | - | - | 194,915 | 194,915 |
| Other Long-Term Assets, Net | 64,725 | - | 34,390 | - | - | 14,405 | 113,520 |
| **Total Assets** | $ 2,623,156 | (977,350) | 28,607 | $ - | $ - | $ 100,329 | $1,774,742 |
| **LIABILITIES AND PARTNERS' CAPITAL** | | | | | | | |
| **Current Liabilities** | | | | | | | |
| Accounts Payable | $ 132,653 | $ - | $ - | $ - | $ - | $ - | $ 132,653 |
| Accrued Liabilities | 116,762 | (76,879) | (4,100) | - | - | (404) | 35,379 |
| Book Overdrafts | - | | | | | | |
| Deferred Income Taxes | 5,901 | - | - | - | - | (5,901) | |
| Derivative Liabilities | 8,886 | - | - | - | - | - | 8,886 |
| Current Portion of Long-Term Debt | 69,934 | - | (69,927) | - | - | (7) | - |
| Total Current Liabilities | 334,136 | (76,879) | (74,027) | - | - | (6,312) | 176,918 |
| | | | | | | | |
| Long-Term Debt | 120,684 | - | 46,000 | - | - | (684) | 166,000 |
| Working Capital Facility | - | - | 56,633 | - | - | - | 56,633 |
| Second Lien Term Facility | - | - | 300,000 | - | - | - | 300,000 |
| Deferred Income Taxes | 82,242 | - | - | - | - | (82,242) | - |
| Other Long-Term Liabilities | 37,282 | - | - | - | - | 682 | 37,964 |
| Investment in Subsidiary | 613,918 | - | - | - | - | (613,918) | - |
| Minority Interest | 2,227 | - | - | - | - | - | 2,227 |
| Liabilities Subject to Compromise | 5,095,265 | (900,471) | (300,000) | (1,035,00) | (2,859,793) | - | 0 |
| | | | | | | | |
| **Equity** | | | | | | | |
| Limited Partners' Capital | (3,654,196) | - | - | - | 2,859,793 | 794,402 | - |
| General Partners' Capital | - | | | | | | |
| Accumulated Other Comprehensive Income | (8,401) | - | - | - | - | (8,401) | - |
| Common Stock | - | - | - | 1,035,000 | - | - | 1,035,000 |
| Retained Earnings | - | | | | | | |
| Total Equity | (3,662,597) | - | - | 1,035,000 | 2,859,793 | 802,804 | 1,035,000 |
| | | | | | | | |
| **Total Liabilities and Equity** | $ 2,623,156 | $ (977,350) | $ 28,607 | $ - | | $ 100,329 | $1,774,742 |

(1) Cash and Cash Equivalents assumes approximately $88 million of both prepaids in Canada and accounts receivable related to SemMaterials have been collected prior to October 31, 2009, however, the actual timing of collection is uncertain and may occur post emergence.

(a) The pre-emergence balance sheet reflects actual results through June 30, 2009 and forecasted results for the four months ending October 31, 2009.

(b) Reflects cash payments required pursuant to the Plan, including payment of administrative claims, Prepetition Lender Claims, certain reserve amounts, and Section 503(b)(9) Claims.

(c) Reflects (i) issuance to the Prepetition Lenders of interests in the Second Lien Term Loan Facility; (ii) drawings under the exit financing to pay amounts outstanding under the Postpetition Financing Agreement and fees; (iii) refinancing of SemEuro debt including payment of fees; and (iv) refinancing of White Cliffs debt and payment of fees and accrued interest. Exit financing fees are capitalized on the balance sheet for accounting purposes.

(d) Reflects the distribution of the equity in the Reorganized SemGroup in respect of secured and unsecured Prepetition Lender Claims pursuant to the Plan.

(e) Reflects the cancellation of remaining Liabilities Subject to Compromise.

(f) Reflects the write-off of certain remaining account balances related to businesses that have been sold or wound down. Further reflects reconsolidation of SemCams and SemCanada Crude and related eliminations of intercompany relationships, the write-off of deferred taxes that are eliminated as part of the transaction, and the recording of Reorganization Value in Excess of Book Value

d.    **Reorganized SemGroup Companies' Projected Balance Sheets (Unaudited)**

Below is management's projection of the balance sheets at December 31, 2009 through December 31, 2013.

| BALANCE SHEET ($ in thousands) | December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 |
| **ASSETS** | | | | | |
| Current Assets | | | | | |
| Cash and Cash Equivalents | $ 64,470 | $ 104,499 | $ 162,620 | $ 226,416 | $ 273,770 |
| Accounts Receivable | 227,375 | 357,667 | 399,077 | 418,048 | 444,942 |
| Inventories, Net | 97,214 | 115,062 | 132,963 | 138,256 | 143,969 |
| Derivative Assets | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 |
| Margin Deposits | 14,835 | 13,928 | 15,907 | 16,281 | 16,688 |
| Other Current Assets | 15,952 | 16,010 | 16,069 | 16,127 | 16,185 |
| Total Current Assets | 421,020 | 608,342 | 727,809 | 816,302 | 896,729 |
| | | | | | |
| Net Property, Plant and Equipment | 1,012,830 | 980,626 | 944,827 | 900,735 | 849,376 |
| Reorganization Value in Excess of Book Value | 194,915 | 194,915 | 194,915 | 194,915 | 194,915 |
| Other Long Term Assets, Net | 110,213 | 92,694 | 75,413 | 60,201 | 54,255 |
| **Total Assets** | $ 1,738,978 | $ 1,876,576 | $ 1,942,963 | $ 1,972,153 | $ 1,995,275 |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| | | | | | |
| Current Liabilities | | | | | |
| Accounts Payable | $ 166,911 | $ 303,230 | $ 348,768 | $ 367,623 | $ 391,502 |
| Accrued Liabilities | 33,506 | 46,772 | 58,177 | 63,461 | 73,924 |
| Derivative Liabilities | 8,886 | 8,886 | 8,886 | 8,886 | 8,886 |
| Total Current Liabilities | 209,302 | 358,888 | 415,831 | 439,970 | 474,312 |
| | | | | | |
| Long-Term Debt | 158,682 | 130,708 | 100,897 | 63,676 | 25,931 |
| Working Capital Facility | 2,573 | - | - | - | - |
| Second Lien Term Facility | 300,000 | 300,000 | 300,000 | 300,000 | 270,018 |
| Other Long-Term Liabilities | 38,320 | 38,720 | 39,095 | 39,561 | 40,127 |
| Minority Interest | 2,227 | 2,227 | 2,227 | 2,227 | 2,227 |
| | | | | | |
| Equity | | | | | |
| Common Stock | 1,035,000 | 1,035,000 | 1,035,000 | 1,035,000 | 1,035,000 |
| Retained Earnings | (7,126) | 11,032 | 49,913 | 91,719 | 147,660 |
| Total Equity | 1,027,874 | 1,046,032 | 1,084,913 | 1,126,719 | 1,182,660 |
| | | | | | |
| **Total Liabilities and Equity** | $ 1,738,978 | $ 1,876,576 | $ 1,942,963 | $ 1,972,153 | $ 1,995,275 |

### e. The Reorganized SemGroup Companies' Projected Income Statements (Unaudited)

Below is management's projections of income for the fiscal years 2009 through 2013.

| INCOME STATEMENT[1] | | | | | | | |
|---|---|---|---|---|---|---|---|
| *($ in thousands)* | Jan – Oct 2009 | Nov – Dec 2009 | Year Ended December 31, | | | | |
| | | | 2009 | 2010 | 2011 | 2012 | 2013 |
| Revenue | $ 1,458,265 | $ 344,806 | $ 1,803,071 | $ 3,664,089 | $ 4,399,925 | $ 4,689,185 | $ 4,971,551 |
| Cost of Sales | 1,142,940 | 279,061 | 1,422,001 | 3,224,539 | 3,928,119 | 4,211,592 | 4,471,512 |
| Gross Margin | 315,325 | 65,745 | 381,071 | 439,550 | 471,806 | 477,593 | 500,040 |
| Operating Expenses | | | | | | | |
| Operating | 177,046 | 27,017 | 204,063 | 173,543 | 178,366 | 174,772 | 188,707 |
| Selling, General and Administrative | 76,858 | 20,195 | 97,053 | 86,733 | 95,624 | 98,269 | 100,979 |
| Depreciation and Amortization | 64,264 | 12,423 | 76,686 | 77,436 | 74,598 | 74,439 | 72,985 |
| Total Operating Expenses | 318,167 | 59,635 | 377,802 | 337,712 | 348,588 | 347,479 | 362,672 |
| EBIT | (2,842) | 6,110 | 3,268 | 101,838 | 123,218 | 130,114 | 137,368 |
| Other (Income) / Expenses | | | | | | | |
| Loss on Sale of Assets | (5,752) | - | (5,752) | - | - | - | - |
| Interest Expense | 9,415 | 11,365 | 20,780 | 69,288 | 67,671 | 60,717 | 44,529 |
| Foreign Currency Transaction (Income) | (3,259) | - | (3,259) | - | - | - | - |
| Other, Net | (1,608) | 10 | (1,598) | 60 | 60 | 60 | 60 |
| Total Other (Income) / Expenses | (1,203) | 11,375 | 10,172 | 69,348 | 67,731 | 60,777 | 44,589 |
| Income Before Reorganization Expense, Income Taxes, and Minority Interest | (1,638) | (5,265) | (6,903) | 32,490 | 55,487 | 69,337 | 92,779 |
| Total Reorganization Expense | 231,687 | - | 231,687 | | | | |
| Income Before Income Taxes and Minority Interest | (233,326) | (5,265) | (238,591) | 32,490 | 55,487 | 69,337 | 92,779 |
| Income Tax Expense | 533 | 1,861 | 2,394 | 14,332 | 16,606 | 27,531 | 36,838 |
| Income Before Minority Interest | (233,858) | (7,126) | (240,985) | 18,158 | 38,881 | 41,805 | 55,941 |
| Minority Interest Expense | 15 | - | 15 | - | - | - | - |
| Net Income | $ (233,873) | $ (7,126) | $ (241,000) | $ 18,158 | $ 38,881 | $ 41,805 | $ 55,941 |
| *Memo: EBITDA* | *80,470* | *18,533* | *99,003* | *179,274* | *197,816* | *204,553* | *210,353* |

Note: EBITDA excludes net unrealized gains/ (losses) on derivatives.
[1] Does not include any income, expense, gain or loss items related to the Plan that will not be borne by the Reorganized Debtors.

### (i) Revenues

Consolidated revenues are forecasted to increase from $1,803 million in 2009 to $3,664 million in 2010. This increase is primarily due to (i) $1,083 million increase in SemStream's revenues through the renewal of the pipeline supply business and (ii) $856 million increase in SemCrude's revenues because of the renewal of marketing operations utilizing the Kansas and Oklahoma pipeline, the completion of a number of capital projects, and SemCanada's assumed volume increases on barrels purchased in Canada and North Dakota. SemStream's revenue growth is predicated on volumes increasing 111.0% in 2010 to return SemStream to volumes in line with pre-bankruptcy volumes. The increase in volumes is primarily driven by the renewal of the pipeline supply business which historically is a high-volume but low-margin business. Furthermore, the SemStream forecast includes a contango storage assumption. SemCrude's revenue growth between 2009 and 2010 is driven by the reintroduction of marketing activities utilizing the Kansas and Oklahoma pipeline. Revenue is also projected to increase in 2010 due to the completion of (i) the Cushing storage terminals over the course of 2009; (ii) the Cunningham connection beginning in July 2010; (iii) a new delivery/receipt line in Cushing in December 2009; and (iv) a full year's operations for the White Cliffs pipeline. The Cushing

storage terminal revenue reflects existing third-party storage agreements in place during this time period. The Cunningham connection revenues reflect an incremental 5,000 barrels to flow from the Kansas and Oklahoma pipeline to Cushing via the White Cliffs pipeline. A new delivery/receipt line in Cushing will allow for pump-over fees to be earned on the Cushing storage volumes. White Cliffs pipeline revenue, which reflects its first full year of operations in 2010, includes incremental barrels sourced in excess of the existing contracted amounts. SemCanada Crude's revenues are forecasted to increase as a result of a projected 15% increase in the 15,000 barrels per day purchased in Canada and a projected 5% increase in the 7,000 barrels per day purchased in North Dakota.

From 2010 to 2011, consolidated revenues are projected to increase from $3,664 million to $4,400 million. This increase is primarily due to a (i) $388 million increase in SemStream's revenues because of a projected 18% increase in volumes, (ii) $311 million increase in SemCrude's revenues due to (a) increased marketing activities utilizing the Kansas and Oklahoma pipeline, (b) a full year of operations of the Cushing Storage tanks, (c) a full year of operations of the new delivery / receipt line in Cushing, and (d) SemCanada Crude's incremental barrels purchased in Canada and North Dakota and an additional blending facility that begins operations in 2011.

From 2011 to 2013, consolidated revenues are projected to increase from $4,400 million to $4,972 million. This increase is primarily due to a (i) $213 million increase in SemStream's revenues because of a projected 3.5% increase in volumes, (ii) $303 million increase in SemCrude's revenues because of (a) activities related to SemCanada Crude, including incremental barrels purchased in Canada and North Dakota, (b) an additional blending facility that begins operations in 2013, and (c) an increase in revenues of approximately 5% annually related to marketing volumes on the Kansas and Oklahoma pipeline.

Pricing is based on industry standard pricing curves (e.g., NYMEX West Texas Intermediate, NYMEX Mont Belvieu Propane - MBC3, Mont Belvieu Normal Butane- MBNC4, and NYMEX Henry Hub and TETCO M3), existing contracted and projected transportation rates, and existing contracted and projected market storage rates.

(ii)    Cost of Sales

Cost of sales includes, among other things, transportation and marketing volume purchases, storage expenses, leasing costs, and ad valorem taxes. Consolidated cost of sales is forecasted to increase from $1,422 million in 2009 to $3,225 million in 2010. This increase is primarily due to a (i) $1,049 million increase in SemStream's cost of sales through the renewal of the pipeline supply business as volumes increase by 111.0% in 2010 and (ii) $828 million increase in SemCrude's cost of sales because of renewal of marketing operations utilizing the Kansas and Oklahoma pipeline and incremental barrels in Canada and North Dakota where cost of goods sold is largely based on marketing and storage volumes.

From 2010 to 2011, consolidated cost of sales is forecasted to increase from $3,225 million to $3,928 million. This increase is primarily due to a (i) $375 million increase in SemStream's cost of sales because of an assumed 18% increase in volumes, (ii) $302 million increase in SemCrude's cost of sales because of (a) increased marketing activities utilizing the

Kansas and Oklahoma pipeline, and (b) an increase in SemCanada Crude's cost of sales because of a projected increase in barrels purchased in Canada and North Dakota and an additional blending facility that begins operations in 2011.

From 2011 to 2013, consolidated cost of sales is projected to increase from $3,928 million to $4,472 million. This increase is primarily due to a (i) $209 million increase in SemStream's cost of sales because of an assumed 3.5% increase in volumes, (ii) $299 million increase in SemCrude's cost of sales because of (a) activities related to SemCanada Crude, including incremental barrels purchased in Canada and North Dakota, (b) an additional blending facility that begins operations in 2013, and (c) an increase in cost of sales approximately 5% annually related to marketing volumes on the Kansas and Oklahoma pipeline.

(iii)    Operating Expenses

Operating expenses include, among other things, fuel, utilities, payroll, maintenance and repair, outside services, and ad valorem taxes. Consolidated operating expenses are forecasted to decrease from $204 million in 2009 to $174 million in 2010. This decrease is primarily due to a $35 million decrease in operating expenses related to SemMaterials and SemFuel incurred in 2009 but not in 2010 due to the sale and/or wind-down of the businesses, partially offset by a $7 million increase in SemCAMS operating expenses due to a increase in gathering and processing costs from 2009 to 2010.

From 2010 to 2011, consolidated operating expenses are forecasted to increase from $174 million to $178 million. This increase is primarily due to the $3 million increase for SemCAMS' operating expenses related to scheduled refurbishments on plants in 2011. From 2011 to 2013, consolidated operating expenses are projected to increase from $178 million to $189 million. This increase is due to an approximately 3% projected increase in operating expenses across all of the business units.

(iv)    Selling, General, and Administrative

Consolidated selling, general and administrative ("SG&A") expenses include, among other things, salaries, wages, benefits, corporate overhead allocation, annual incentive plan, rent, leases, licenses and permits, and office supplies.

SG&A expenses are forecasted to decrease from $97 million in 2009 to $87 million in 2010. This is primarily due to the sale and wind-down of the SemMaterials and SemFuel businesses which incurred $20 million of SG&A expenses in 2009 and is partially offset by a corresponding SG&A increase across all the business units.

From 2010 to 2011, consolidated SG&A expenses are forecasted to increase at approximately 5% from $87 million to $96 million due to a number of business units hiring employees and building operations, as well as the effects of general inflation. From 2011 to 2013, consolidated SG&A expenses are forecasted to increase at approximately 3% from $96 million to $101 million due to an assumed increase in employee costs and general inflation.

## f.   The Reorganized SemGroup Companies Projected Statements of Cash Flows (Unaudited)

Below is management's projections of cash flows for the fiscal years 2009 through 2013.

| STATEMENT OF CASH FLOWS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan - Oct | Nov - Dec | Year Ended December 31, | | | | |
| ($ in thousands) | 2009 | 2009 | 2009 | 2010 | 2011 | 2012 | 2013 |
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net Income / (Loss) | $ (233,873) | $ (7,126) | $ (241,000) | $ 18,158 | $ 38,881 | $ 41,805 | $ 55,941 |
| Adjustments to Reconcile Net Income / (Loss) to Net Cash Provided By / (Used in) Operating Activities: | | | | | | | |
| Depreciation and Amortization | 64,264 | 12,423 | 76,686 | 77,436 | 74,598 | 74,439 | 72,985 |
| Amortization and Write Down of Debt Issuance Costs | - | - | - | - | - | - | - |
| Deferred Tax Expense / (Benefit) | (523) | - | (523) | - | - | - | - |
| Non-Cash Pension and Asset Retirement (Gain) / Loss | (1,133) | 58 | (1,075) | (1,636) | (1,500) | (1,500) | (1,500) |
| Minority Interest Expense | 15 | - | 15 | - | - | - | - |
| Gain on Cancellation of Debt[1] | - | - | - | - | - | - | - |
| Loss on Sale of Assets | (5,752) | - | (5,752) | - | - | - | - |
| Other | 9,161 | - | 9,161 | - | - | - | - |
| Changes in Assets and Liabilities: | | | | | | | |
| Decrease / (Increase) in Accounts Receivable | 212,072 | (29,499) | 182,573 | (130,292) | (41,410) | (18,971) | (26,894) |
| Decrease / (Increase) in Inventories | 31,964 | 39,426 | 71,390 | (17,848) | (17,900) | (5,293) | (5,713) |
| Decrease / (Increase) in Derivative & Margin Deposits | 15,282 | 13,515 | 28,797 | 906 | (1,978) | (374) | (407) |
| Increase / (Decrease) in Intercompany | 21,955 | - | 21,955 | - | - | - | - |
| Decrease / (Increase) in Other Current Assets | 137,759 | 2,286 | 140,045 | (58) | (58) | (58) | (58) |
| Decrease / (Increase) in Other Assets | 7,147 | 2,211 | 9,358 | 11,018 | 11,018 | 9,463 | 1,596 |
| Increase / (Decrease) in Accounts Payable | 28,515 | 34,258 | 62,772 | 136,319 | 45,538 | 18,855 | 23,880 |
| Increase / (Decrease) in Accrued Liabilities | (31,039) | (1,873) | (32,912) | 13,267 | 11,405 | 5,285 | 10,462 |
| Increase / (Decrease) in Other Long-Term Liabilities | (5,786) | - | (5,786) | (9) | (9) | (9) | (9) |
| Net Cash Provided By / (Used in) Operating Activities | 250,026 | 65,678 | 315,704 | 107,260 | 118,584 | 123,641 | 130,282 |
| **Cash Flows from Investing Activities:** | | | | | | | |
| Capital Expenditures | (97,829) | (11,393) | (109,222) | (36,685) | (30,653) | (22,623) | (15,200) |
| Proceeds from Sale of Assets | 76,490 | - | 76,490 | - | - | - | - |
| Net Cash Provided by / (Used in) Investing Activities | (21,339) | (11,393) | (32,732) | (36,685) | (30,653) | (22,623) | (15,200) |
| **Cash Flows from Financing Activities:** | | | | | | | |
| Debt Repayment Pursuant to Plan of Reorganization | (949,955) | - | (949,955) | - | - | - | - |
| Debt Issuance Costs | - | - | - | - | - | - | - |
| Debt Borrowings / (Repayments) | 13,085 | (7,318) | 5,767 | (27,974) | (29,811) | (37,221) | (37,745) |
| Repayment of Second Lien Term Facility | - | - | - | - | - | - | (29,982) |
| Revolver Activity | 56,633 | (54,061) | 2,573 | (2,573) | - | - | - |
| Net Cash Provided by / (Used in) Financing Activities | (880,237) | (61,379) | (941,615) | (30,546) | (29,811) | (37,221) | (67,728) |
| Net Increase / (Decrease) in Cash and Cash Equivalents | (651,550) | (7,093) | (658,643) | 40,029 | 58,120 | 63,796 | 47,354 |
| Cash and Cash Equivalents at Beginning of Period | 723,113 | 71,563 | 723,113 | 64,470 | 104,499 | 162,620 | 226,416 |
| Cash and Cash Equivalents at End of Period | $ 71,563 | $ 64,470 | $ 64,470 | $ 104,499 | $ 162,620 | $ 226,416 | $ 273,770 |

[1] Does not reflect any Plan effects.

### (i)   Working Capital

The consolidated projections assume that the Reorganized SemGroup Companies will operate both a fee-based transportation business and a marketing business. From 2009 to 2010, the projected net working capital need is forecasted to increase from $158 million to $170 million as the business renews its SemCrude and SemStream marketing operations. From 2010 to 2013, net working capital increases from $170 million to $197 million as volumes increase in its SemCrude and SemStream business units. In addition, the Reorganized SemGroup will require approximately $166 million in letters of credit at December 31, 2009, which includes approximately $11 million in letters of credit for SemMexico. The letter of credit requirement increases to $284 million at year-end 2010 as a result of increased marketing activities and volumes at SemCrude, and then decreases to $144 million by the end of 2013 due to a projected

improvement in trade relationships, thus reducing this requirement. Letters of credit primarily support purchases of inventory and to a lesser extent hedging activities and allow the Reorganized SemGroup to return to normal industry trade terms.

(ii)     Capital Expenditures

Consolidated capital expenditures are forecasted to decrease from $109 million in 2009 to $37 million in 2010 as a number of projects are developed at SemCrude, SemGas, SemCAMS and SemEuro. For SemCrude, total capital expenditures in 2009 are projected to be approximately $56 million for the completion of the White Cliffs pipeline, the Platteville truck station, the additional Cushing Storage, and a new delivery / receipt line in Cushing. For SemGas, total capital expenditures in 2009 are projected to be approximately $16 million, for additional pipeline and gathering expansions in the Eufala, Kansas, Northern Oklahoma, and Sherman systems. For SemCAMS, total capital expenditures in 2009 are projected to be approximately $21 million associated with the required maintenance of its sour gas processing facilities. For SemEuro, total capital expenditures in 2009 are projected to be approximately $10 million associated with refurbishment and maintenance of storage tanks.

From 2010 to 2011, consolidated capital expenditures are projected to increase from $37 million to $31 million. This decrease is primarily due to a $4 million decrease in capital expenditures at SemCrude due to the completion of additional 100,000 bbls tanks at Cushing and the Cunningham connection.

From 2011 to 2013, consolidated capital expenditures are forecasted to decrease from $31 million to $15 million primarily due to the completion of SemEuro's five-year refurbishment and maintenance program for its storage tanks.

(iii)     Debt

See Section VI.C,, "Summary of Capital Structure of the Reorganized SemGroup Companies" for descriptions of the Exit Facility, the Second Lien Term Loan Facility, the White Cliffs Financing and the SemEuro Financing. Furthermore, the Projections assume that the Reorganized SemGroup Companies will pay all interest currently and any additional free cash flow generated from White Cliffs and SemEuro will not be made available to the remaining North American operations. The terms of the Exit Facility may impact the ability of the Reorganized SemGroup Companies to make the cash interest payments on the Second Lien Term Loan Facility.

### 3.     Valuation

In connection with certain matters relating to the Plan, the Debtors requested that Blackstone prepare a valuation analysis of the SemGroup Companies' businesses. The valuation analysis was prepared by Blackstone based on the Projections.

In preparing its analysis, Blackstone has, among other things:

(i) reviewed certain operating and financial forecasts prepared by the Debtors with the assistance of Alix Partners, including the Projections;

(ii) discussed with management and Alix Partners the key assumptions related to the Projections;

(iii) reviewed certain other financial and operating data of the SemGroup Companies;

(iv) discussed with management and Alix Partners the current operations and prospects of the SemGroup Companies;

(v) employed generally accepted valuation techniques, as described below;

(vi) considered the indications of interest received from various third parties regarding a transaction with the SemGroup Companies; and

(vii) considered such other analyses as Blackstone deemed appropriate and necessary under the circumstances.

Blackstone relied upon and assumed, without independent verification, the accuracy and completeness of the financial and other information provided to or discussed with it by the Debtors or obtained by it from public sources. Blackstone has not audited, reviewed, or compiled the accompanying information in accordance with generally accepted accounting principles, or otherwise. With respect to all projections furnished to it, Blackstone has relied on representations that these have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of management of the Debtors as to the expected future performance of the SemGroup Companies. Blackstone has not assumed any responsibility for the independent verification of any such information, including, without limitation, the Projections, and has further relied upon the assurances of management of the Debtors that they are unaware of any facts that would make the information and Projections incomplete or misleading.

As referenced above, Blackstone has employed generally accepted valuation techniques in estimating the reorganization value of the SemGroup Companies. Blackstone performed valuation analysis of the SemGroup Companies on both a consolidated basis and a sum-of-the-parts basis, whereby each individual business was valued separately and the values were aggregated in order to estimate the value of the SemGroup Companies. In preparing its valuation, Blackstone considered each of the following generally accepted valuation techniques:

(i) Discounted Cash Flow Analysis ("DCF") – A DCF analysis estimates the enterprise value of a business based upon the present value of the projection of unlevered after-tax cash flows available to all providers of capital using estimated discount rates. The projection of unlevered free cash flows is discounted using an estimated weighted average cost of capital determined by, among other things, reference to observed costs of capital for companies with reasonably similar characteristics, including, among other

things, lines of business, geography, size and profitability to the Reorganized SemGroup Companies ("Comparable Companies"). Added to the present value of the unlevered free cash flows is an estimate of the present value of the terminal value of the Reorganized SemGroup Companies. The terminal value is estimated by reference to the trading multiples of Comparable Companies and applying those multiples to the relevant earnings metric.

(ii) Comparable Public Company Analysis - The price that an investor is willing to pay in the public markets for a Comparable Company reflects the market's estimate of that company's current and future prospects as well as the rate of return required for an investment in that Comparable Company. In a comparable public company analysis, a subject company is valued by reference to the trading multiples of the Comparable Companies. Specifically, market multiples of EBITDA, EBIT and Net Income were applied to the Projections to determine the ranges of enterprise value. In selecting comparable public companies, Blackstone considered factors such as the focus of the Comparable Companies' businesses as well as such companies' current and projected operating performance.

(iii) Precedent Transactions Analysis - The precedent transactions analysis is based on the enterprise values of Comparable Companies involved in merger and acquisition transactions. Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of EBITDA. The derived multiples were then applied to the SemGroup Companies' EBITDA to determine the Total Enterprise Value ("TEV") or value to a potential buyer.

Further, as it relates to Wyckoff[2], Blackstone has assumed in its valuation that the Reorganized SemGroup on a post-emergence basis fulfills its obligations under the Wyckoff debt financing and retains its 51% equity interest in Wyckoff. A failure of Reorganized SemGroup to retain its 51% equity interest in Wyckoff will not have a material impact upon the overall Reorganized SemGroup valuation.

As a result of such analyses, reviews, discussions, considerations, and assumptions, Blackstone provided to the Debtors an estimate that the TEV of the Reorganized SemGroup Companies on a "reorganization value" basis is a range of approximately $1.4 to $1.6 billion, with a midpoint of $1.5 billion. Blackstone reduced the TEV estimate by the estimated pro forma debt of the Reorganized SemGroup Companies as of November 1, 2009, in order to calculate the implied reorganized equity value of the Reorganized SemGroup Companies. This amount was then divided by the number of shares of New Common Stock expected to be outstanding after consummation of the Plan to determine the estimated per share reorganized equity value. Accordingly, Blackstone estimates that the Reorganized SemGroup Companies' mid-point total reorganized equity value is $1.035 billion or $25 per share of New Common

---

[2] The alleged default by Wyckoff on its debt obligations is described in Section III of the Disclosure Statement.

Stock, before the impact of the Warrants issued pursuant to the Plan and New Common Stock issuable pursuant to the Management Incentive Plan.

The above estimated value is a hypothetical value of the Reorganized SemGroup Companies derived through the application of various valuation methodologies. The equity value ascribed in Blackstone's analysis does not purport to be an estimate of a post-reorganization trading value. Trading values may be materially different from the implied equity value associated with Blackstone's valuation analysis. Blackstone's reorganization value estimate is based on economic, market, financial, and other conditions as they exist, and on the information made available to Blackstone as of September 18, 2009. It should be understood that, although subsequent developments may affect Blackstone's conclusions, Blackstone does not have any obligation to update, revise, or reaffirm its estimate.

The summary set forth above does not purport to be a complete description of the analyses performed by Blackstone. The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial results, financial condition and prospects of such a business. As a result, the estimate of implied equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, the estimate of implied equity value does not purport to be an appraisal, nor does it necessarily reflect the value that might be realized if assets were sold. Depending on the results of the Reorganized SemGroup Companies' operations or changes in the financial markets, actual TEV may differ significantly from Blackstone's valuation analysis disclosed herein.

| *($ in millions)* | Mid-Point Value |
|---|---|
| Reorganized SemGroup Companies Total Enterprise Value | $1,500 |
| Less Pro Forma Debt | (465) |
| Reorganized SemGroup Companies Equity Value | $1,035 |

## B.  CORPORATE GOVERNANCE AND MANAGEMENT OF REORGANIZED SEMGROUP

### 1.  Board of New Holdco

The initial Board of New Holdco will consist of seven members, composed of: (a) John Chlebowski, Chairman of the Board, (b) Norm Szydlawski, Chief Executive Officer, (c) Ronald Ballschmiede, (d) Sarah Barpoulis, (e) Stanley Horton, (f) Karl Kurz and (g) Thomas McDaniel. A majority of the Board are independent directors in accordance with the listing requirements of any recognized national securities exchange or market system on which the Class A New Common Stock and Warrants may be listed. A majority of the members of the Board are also experts or have experience in one or more aspects of the Reorganized SemGroup Companies' business. The term of the initial directors listed above will be one year and thereafter the

directors will be elected by the holders of New Common Stock in accordance with the Certificate of Incorporation and Bylaws of New Holdco. Professional experience and related biographical information for the members of the initial Board of New Holdco is as follows:

### a. John Chlebowski, Chairman of the Board

John Chlebowski currently serves as a director on the board of First Midwest Bancorp and NRG Energy. First Midwest Bancorp provides banking services mainly in the suburban Chicago area and NRG Energy is a leading power producer with aggregate generation of 24,709 megawatts. In the past, Mr. Chlebowski has served on the boards of Laidlaw International, Inc., Spectrasite, Inc. and Phosphate Partners. Mr. Chlebowski's appointment to the boards of NRG Energy, Laidlaw International, and Phosphate Partners occurred when each of the companies emerged from chapter 11. He was also President and CEO of Lakeshore Operating Partners, LLC from 1999 through 2004 and GATX Terminals Corporation from 1994 to 1998. Mr. Chlebowski also served as Chief Financial Officer and Vice President of finance at GATX Corporation. Prior to GATX, Mr. Chlebowski worked at other companies in various finance related roles. Mr. Chlebowski holds a MBA from Pennsylvania State University and a BS from University of Delaware.

### b. Norm Szydlawski, Chief Executive Officer

Norm Szydlawski was President and Chief Executive Officer of Colonial Pipeline Company from 2006 to 2008. Colonial Pipeline Company is a midstream energy company which owns a liquid refined products pipeline that transports fuel from the US Gulf Coast to New York Harbor. Prior to Colonial, Mr. Szydlawski worked for the Department of Defense as a Senior Consultant to the Iraqi Ministry of Oil. From 1981 to 2004, Mr. Szydlawski worked for Chevron Corporation in a variety of roles including Vice President of Refining, General Manager of the Pascagoula Refinery, marketing operations, pipeline operations, corporate health/safety/environmental, and other management roles. Prior to 1981, Mr. Szydlawski worked for a variety of companies including Community College of Denver, Samsonite Corporation, Environmental Elements Corporation, and General Motors Corporation. Mr. Szydlawski holds an MBA from Indiana University and a BS from Kettering University.

### c. Ronald Ballschmiede

Ronald Ballschmiede is the Executive Vice President and Chief Financial Officer of Chicago Bridge & Iron Co. N.V since 2006. Chicago Bridge & Iron Co. is a global specialty engineering and construction company that maintains liquefied natural gas tanks, petrochemical and gas processing plants, as well as other applications and equipment. Prior to his current position Mr. Ballschmiede was with Deloitte LLP as partner in Assurance and Advisory from 2002 to 2006 and with Arthur Anderson as partner from 1989 to 2002 and various other positions from 1977 to 1989. Mr. Ballschmiede holds a BA from Northern Illinois University and is a Certified Public Accountant in the Netherlands.

### d. Sarah Barpoulis

Sarah Barpoulis is the president and founder of Interim Energy Solutions, LLC since 2003. Interim provides risk management consulting for the energy industry. Prior to founding

Interim, Ms. Barpoulis worked at Pacific Gas & Electric National Energy Group ("PG&E") from 1991 to 2003 serving in various roles including Senior Vice President of Energy Trading from 2000 to 2003. Prior to PG&E, Ms. Barpoulis worked at other companies in the US and Canada holding various positions in marketing and public policy. Ms. Barpoulis holds a MBA from Dartmouth College and a BS from Princeton University.

e.     **Stanley Horton**

Stanley Horton is the president and founder, principal owner, and CEO of Semoran Holdings, LLC since 2008. Semoran Holdings is involved in various investments and energy consulting services. Prior to founding Semeron, Mr. Horton was President and Chief Operating Officer from 2005 to 2008 of Cheniere Energy, which was developing a liquefied natural gas receiving terminal business, a natural gas pipeline business, and oil and gas exploration. Before 2005, Mr. Horton worked for Southern Union Company and Enron Corporation in various roles including serving as the Chief Executive Officer and on boards of Enron companies. Mr. Horton holds a MS from Rollins College and a BS from University of Central Florida.

f.     **Karl Kurz**

Karl Kurz has been the Chief Operating Officer of Anadarko Petroleum Corporation since 2006 and has been with Anadarko in various other roles since 2000. Anadarko explores, develops, produces, and markets oil, natural gas, natural gas liquids, and related products worldwide. Prior to Anadarko, Mr. Kurz worked for other energy related companies, Vastar Resources, Inc. and Arco Oil and Gas Company, from 1983 to 2000 in various management, trading, marketing, and other roles. Mr. Kurz holds an Advanced Management Program from Harvard University and a BS from Texas A&M University.

g.     **Thomas McDaniel**

Thomas McDaniel currently serves as a director on the board of SunPower Corporation. SunPower Corporation makes solar cells and panels and sells imaging and infrared detector products. Mr. McDaniel spent his career from 1971 to 2008 with Edison International. Edison is an energy company whose largest subsidiary is Southern California Energy, a utility provider in California. Mr. McDaniel served as Edison's Executive Vice President, Chief Financial Officer, and Treasurer from 2004 to 2008. Prior to this role he served as Chairman, Chief Executive Officer, and President of Edison Mission Energy and Chief Executive Officer and President of Edison Capital. Prior to these roles, McDaniel held a variety of positions at Edison. Mr. McDaniel holds a BS from University of California.

*2.*     **Board Committees**

New Holdco will have audit, nominating and governance, and compensation committees, and such committees will comply with the requirements of the Sarbanes-Oxley Act and any recognized national securities exchange or market system on which the Class A New Common Stock and Warrants may be listed. The nominating committee of New Holdco will consist of at least one director nominated by the Prepetition Lenders and at least one director nominated by the Creditors' Committee.

### 3.    Executive Officers

The initial Chief Executive Officer and Chief Financial Officer of New Holdco will be Norm Szydlawski and Phil Reedy, respectively. Professional experience and related biographical information for each is as follows:

#### a.    Norm Szydlawski – Chief Executive Officer, New Holdco

See Section VI.B.1.b. above for professional and biographical information for Norm Szydlawski.

#### b.    Phil Reedy – Chief Financial Officer, New Holdco

Phil Reedy worked for Citgo Petroleum from 1981 to 2009 with his last position being Vice President of Finance and Chief Financial Officer from 2006 to 2009. Mr. Reedy's responsibilities included all traditional financial functions as well as hydrocarbon hedging and risk management, insurance, procurement, asset divestitures and serving as a board member on related businesses. Mr. Reedy's other roles with Citgo included Corporate Treasurer, General Manager of Petrochemicals and Industrial Products, and various other management roles. Mr. Reedy holds a MBA from University of Miami and a BS from Tulsa University as well as a Certified Public Accountant.

### 4.    Management Incentive Plan

The purpose of the Management Incentive Plan is to attract, retain and motivate officers, employees, and non-employee directors providing services to the Reorganized SemGroup Companies and to promote the success of the Reorganized SemGroup Companies' businesses by providing the participants of the Management Incentive Plan with appropriate equity-based incentives to maximize future stockholder value. The Management Incentive Plan will be implemented by the compensation committee of the Board of New Holdco. The Board's compensation committee will have the power under the Management Incentive Plan to grant any one or a combination of the following equity and equity-based grants: (a) stock options, (b) stock appreciation rights, (c) restricted stock, (d) other stock-based awards, and (e) performance-based compensation awards.

On or prior to the Effective Date, New Holdco will adopt the Management Incentive Plan. The solicitation of votes on the Plan is deemed a solicitation of the holders of New Common Stock for approval of the Management Incentive Plan for purposes of sections 162(m) and 422 of the Tax Code as well as section 16 of the Securities Exchange Act, and any stock exchange listing requirements. Entry of the Confirmation Order will constitute such approval, and the Confirmation Order will so provide. The terms of the Management Incentive Plan and the Class A New Common Stock reserved for issuance thereunder will be set forth in the Plan Supplement.

## C. SUMMARY OF CAPITAL STRUCTURE OF THE REORGANIZED SEMGROUP COMPANIES

The following table summarizes the New Common Stock to be issued by New Holdco, the Warrants and certain aspects of the capital structure of the Reorganized SemGroup Companies, including the post-Effective Date financing arrangements the Reorganized SemGroup Companies expect to enter into to fund their obligations under the Plan and provide for their working capital needs. The anticipated principal terms of the following instruments are described in more detail below.

| *Instrument* | Description |
|---|---|
| Exit Facility | $500 million senior secured revolving facility to be entered into by certain of the Reorganized SemGroup Companies, as borrowers, and guaranteed by certain other Reorganized SemGroup Companies |
| Second Lien Term Loan Facility | $300 million secured facility to be entered into by certain of the Reorganized SemGroup Companies, as borrowers, and guaranteed by certain other Reorganized SemGroup Companies |
| White Cliffs Financing | $125 million secured facility entered into by SemCrude Pipeline |
| SemEuro Financing | $41 million (British pound 25 million) secured facility entered into by SemEuro |
| SemMexico Financing | SemMexico intends to seek its own credit facility in the future |
| New Common Stock | 100 million shares authorized; 41.4 million shares to be issued initially under the Plan.

95% of the shares to be initially issued or issuable under the Plan to the Prepetition Lenders, 5% of the shares to be initially issued or issuable under the Plan to the holders of Senior Notes Claims and General Unsecured Claims; each subject to dilution of ownership percentage from the Warrants (if any) and shares reserved or issued under the Management Incentive Plan.

Shares issued or reserved for issuance under the Management Incentive Plan |
| Warrants | 2.18 million shares, representing 5% of the New Common Stock of New Holdco issued or issuable under the Plan, subject to dilution of ownership percentage from the shares reserved or issued under the Management Incentive Plan; any of the Warrants issued under the Plan will be issued to the holders of Senior Notes Claims and/or General Unsecured Claims |

## *1.* **Exit Financing**

It is a condition precedent to the effectiveness of the Plan that, on the Effective Date, New Holdco enters into the Exit Facility. Although the definitive terms of the Exit Facility have not been fully negotiated, set forth below is a summary of certain terms which the Debtors believe will be incorporated into the Exit Facility. However, it is possible that such terms may be modified on or prior to the Effective Date and the definitive terms of the Exit Facility, including, without limitation, any intercreditor agreement, may ultimately be different than that described below. The following summary of certain provisions does not purport to be complete, and is subject to, and is qualified in its entirety by reference to, the provisions of the definitive Exit Facility.

### a. General

The maximum principal amount outstanding at any one time pursuant to the Exit Facility will be up to $500 million. On the Effective Date, the Exit Facility will be undrawn, other than (i) letters of credit issued under the Postpetition Financing Agreement that are currently estimated at up to $66 million, (ii) borrowings utilized to pay facility fees of approximately $28 million and (iii) borrowings utilized to repay approximately $29 million of drawings under the Postpetition Financing Agreement. The Exit Facility will be secured by substantially all of the assets of the Debtors, SemCAMS ULC and SemCanada Nova Scotia.

The Exit Facility will terminate on the three-year anniversary of the Effective Date. On the termination date, all amounts outstanding under the Exit Facility will be due and payable, together with any and all accrued and unpaid interest thereon to such date.

The borrowings under the Exit Facility will be used to: (i) provide working capital to the Reorganized SemGroup Companies on and after the Effective Date for general corporate purposes and approved capital expenditures, (ii) collateralize letters of credit issued under the Postpetition Financing Agreement, (iii) issue letters of credit in the ordinary course of business, and (iv) finance or secure commodity transactions and hedges, consistent with the Risk Management Policy.

The Exit Facility will be a revolving credit facility with availability governed by a borrowing base. The Exit Facility will contain restrictions on business units' ability to utilize the Exit Facility for trading activities.

Due to current market conditions, it is anticipated that the lenders under the Exit Facility will be certain of the Prepetition Lenders. The Prepetition Lenders will own substantially all of the New Common Stock.

The Exit Facility will be governed by New York law.

### a. **Borrower**

It is expected that certain of the Reorganized SemGroup Companies will be the borrowers under the Exit Facility.