b. **Interest**

The Reorganized SemGroup Companies will pay interest at market rates.

c. **Representations, Covenants, Events of Default, etc.**

The Exit Facility will contain customary representations and warranties, affirmative and negative covenants, events of default and other terms and provisions to be agreed upon.

d. **Fees**

The Exit Facility will contain customary provisions to be agreed upon by SemGroup and the Exit Facility lenders.

*2.* **Second Lien Term Loan Facility**

The following summary of certain provisions of the Second Lien Term Loan Facility does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the definitive Second Lien Term Loan Facility.

a. **General**

On the Effective Date, the Prepetition Lenders will be deemed to have loaned to certain of the Reorganized SemGroup Companies $300 million in aggregate principal amount under the Second Lien Term Loan Facility. The Second Lien Term Loan Facility will constitute Plan Currency and, as a result, the Second Lien Term Loan Facility will be deemed to have been fully drawn on the Effective Date. The Second Lien Term Loan Facility will be secured by a second lien on all of the assets pledged under the Exit Facility.

The Second Lien Term Loan Facility will terminate on the seventh anniversary of the Effective Date. On the termination date, all amounts outstanding under the Second Lien Term Loan Facility will be due and payable, together with any and all accrued and unpaid interest thereon to such date.

The Second Lien Term Loan Facility will be governed by New York law.

b. **Borrower**

Certain of the Reorganized SemGroup Companies will be borrowers under that certain Second Lien Term Loan Facility.

c. **Interest; PIK Interest**

The principal amount of the Second Lien Term Loan Facility will bear interest at the rate of 9% per annum, with such interest accruing from the Effective Date. Interest will be paid quarterly in arrears. The Borrowers will have the option to pay-in-kind (PIK) all interest payments for the first two years of the Second Lien Term Loan Facility, in which case the interest rate will be increased from 9% to 11% for any such PIK payment. The terms of the Exit

Facility may impact the ability of the Reorganized SemGroup Companies to make the cash interest payments on the Second Lien Term Loan Facility. In the event the option to PIK interest is elected, the deferred interest will be payable at the end of the first interest payment date occurring five years following the Effective Date.

### d. Scheduled Amortization Payments; Mandatory Prepayments

The Borrowers will not be required to make any fixed amortization payments with respect to the borrowings under the Second Lien Term Loan Facility. However, commencing at the beginning of the third anniversary of the Effective Date, the Borrowers will be required to make annual payments from excess cash flow in an agreed amount, subject to the terms of the Exit Facility.

### e. Representations, Covenants, Events of Default, etc.

The Second Lien Term Loan Facility will contain customary representations and warranties, affirmative and negative covenants, events of default and other terms and provisions to be agreed upon.

### 3. White Cliffs Financing

SemCrude Pipeline, the immediate parent of White Cliffs, is the borrower under the White Cliffs Credit Agreement. SemCrude Pipeline owns 99.17% of White Cliffs and the funds borrowed under the White Cliffs Credit Agreement were used to fund the project costs associated with the White Cliffs pipeline. There are no guarantors under the White Cliffs Credit Agreement.

On the Effective Date, the outstanding balance under the White Cliffs Credit Agreement will be refinanced by new lenders at market terms.

Although the definitive terms of the White Cliffs Financing have not been fully negotiated, set forth below is a summary of certain terms which the Debtors believe will be incorporated into the White Cliffs Financing. However, it is possible that such terms may be modified on or prior to the Effective Date and the definitive terms of the White Cliffs Financing may ultimately be different than that described below. The following summary of certain provisions does not purport to be complete, and is subject to, and is qualified in its entirety by reference to, the provisions of the definitive White Cliffs Financing.

### a. General

The White Cliffs Financing will consist of a Term Loan Facility in the principal amount of $125 million. It will be secured by SemCrude Pipeline's ownership interest in White Cliffs. It is anticipated that the facility will have a maturity of up to seven years. The White Cliffs Financing will be used to repay the outstanding amounts under the White Cliffs Credit Agreement, and (together with other amounts held by White Cliffs available for application) fees associated with the White Cliffs Financing, as well as any other potential requirements under the White Cliffs Financing.

b.    **Borrower**

SemCrude Pipeline will be the borrower under the White Cliffs Financing.

c.    **Interest**

Interest will be at market rates.

d.    **Representations, Covenants, Events of Default, etc.**

The White Cliffs Financing will contain customary representations and warranties, affirmative and negative covenants, events of default and other terms and provisions to be agreed upon.

e.    **Fees**

The White Cliffs Financing will contain customary provisions to be agreed upon by SemGroup and the White Cliffs Financing lenders.

f.    **Mandatory Amortization Payments and Optional Prepayment**

The White Cliffs Financing will contain required amortization and optional prepayment provisions to be agreed upon by SemGroup and the White Cliffs Financing lenders.

g.    **Mandatory Prepayment**

The White Cliffs Financing will contain customary mandatory prepayment provisions to be agreed upon by SemGroup and the White Cliffs Financing lenders.

*4.*    **SemEuro Financing**

SemEuro Limited is the borrower under SemEuro Credit Agreement and the parent of SemLogistics Milford Haven Limited. SemEuro is the wholly-owned indirect subsidiary of SemGroup. Both SemEuro Limited and SemLogistics Milford Haven Limited are private limited companies under the laws of England and Wales.

The Plan contemplates that the outstanding balance of approximately $45 million on the SemEuro Credit Agreement will be paid down with approximately $4 million in cash available at SemEuro and $41 million (British pound 25 million) will be refinanced by members of the existing lender group.

Although the definitive terms of the SemEuro Financing have not been fully negotiated, set forth below is a summary of certain terms which the Debtors believe will be incorporated into the SemEuro Financing. However, it is possible that such terms may be modified on or prior to the Effective Date and the definitive terms of the SemEuro Financing may ultimately be different than that described below. The following summary of certain provisions does not purport to be complete, and is subject to, and is qualified in its entirety by reference to, the provisions of the definitive SemEuro Financing.

a.    **General**

The SemEuro Financing will consist of a Term Loan Facility.   It is anticipated that the facility will be secured by a lien on, and security interest in, substantially all of the assets of SemLogistics Milford Haven Limited.  It is anticipated that the facility will have a maturity of up to four years.  The SemEuro Financing will be used to repay/refinance (together with other amounts held by SemEuro available for application) the outstanding amounts under the SemEuro Credit Agreement.

b.    **Borrower**

It is anticipated that SemLogistics Milford Haven Limited will be the borrower under the SemEuro Financing.

c.    **Interest**

Interest will be at market rates.

d.    **Representations, Covenants, Events of Default, etc.**

The SemEuro Financing will contain customary representations and warranties, affirmative and negative covenants, events of default and other terms and provisions to be agreed upon.

e.    **Fees**

The SemEuro Financing will contain customary provisions to be agreed upon by SemGroup and the SemEuro Financing lenders.

f.    **Mandatory Amortization Payments and Optional Prepayment**

It is anticipated that the SemEuro Financing will contain required amortization and optional prepayment provisions to be agreed upon by SemGroup and the SemEuro Financing lenders.

g.    **Mandatory Prepayment**

It is anticipated that the SemEuro Financing will contain customary mandatory prepayment provisions to be agreed upon by SemGroup and the SemEuro Financing lenders.

*5.*    **SemMexico Facility**

From time to time, SemMexico may need to enter into a local credit facility to fund its working capital needs.  It is believed that SemMexico will be able to enter into a credit facility on terms reasonably satisfactory to SemMexico.

## 6. New Common Stock

Upon filing the New Holdco Certificate of Incorporation, which will be filed with the Secretary of State of Delaware on the Effective Date, New Holdco will be authorized to issue 100 million shares of New Common Stock, $0.01 par value per share. Shares of Class A New Common Stock will be issued under the Plan, unless a prospective stockholder requests shares of Class B New Common Stock. The following summary of certain provisions of the New Common Stock does not purport to be complete, is subject to and is qualified in its entirety by reference to, the provisions of the New Common Stock, a complete statement of which is set forth in the New Holdco Certificate of Incorporation, substantially in the form to be included in the Plan Supplement.

### a. General

All of the shares of New Common Stock issuable in satisfaction of any Claims will be, when issued pursuant to the Plan, duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights. The holders of the New Common Stock will be entitled to participate, in proportion to the number of shares of New Common Stock held, in the net assets of New Holdco available for distribution to the holders of shares of New Common Stock in the event of liquidation, dissolution or winding up of the affairs of New Holdco. The holders of shares of New Common Stock will not be entitled to any preemptive, subscription, conversion or redemption rights.

### b. Classes

The Class A New Common Stock and the Class B New Common Stock will be identical in all respects, except that the Class B New Common Stock will not be eligible for trading on a national securities exchange or a national market system. The Class B New Common Stock is expected to be held by entities that are restricted from holding margin securities. The Class B New Common Stock will automatically convert into Class A New Common Stock upon the transfer of such stock to an entity which is permitted to hold margin securities or at the request of the holder.

### c. Voting Rights

The holders of the shares of New Common Stock will be entitled to one vote per share of New Common Stock held and will not be entitled to cumulative voting rights. The holders of shares of Class A New Common Stock and Class B New Common Stock, voting together as a single class, will have the right to vote on the election of directors and on all other matters requiring stockholder action.

### d. Dilution

The New Common Stock issued upon the Effective Date will be subject to dilution by the exercise of the Warrants (if any), the shares of New Common Stock reserved or issued under the Management Incentive Plan, and any additional shares of New Common Stock that may be issued after the Effective Date.

e.     **Dividends**

The holders of the shares of New Common Stock will be entitled to receive dividends, if, as and when declared by the Board out of funds legally available therefor. However, New Holdco does not presently intend to pay any dividends on the New Common Stock. Further, dividends may be restricted by the terms of the Exit Facility and the Second Lien Term Loan Facility.

f.     **Transfer Agent**

The transfer agent and registrar for shares of New Common Stock will initially be New Holdco and will be an independent transfer agent at the time that the Class A New Common Stock becomes listed on a recognized national securities exchange or market system. There is no assurance that the Class A New Common Stock will be listed on any stock exchange as of the Effective Date or any time thereafter. The Class B New Common Stock will not be listed on any stock exchange.

7.     **Warrants**

New Holdco will issue Warrants to purchase a number of shares of New Common Stock equal to 5.0% of the number of fully diluted shares of New Common Stock as of the Effective Date, subject to dilution of ownership percentage from the issuance of New Common Stock under the Management Incentive Plan. The Warrants will be exercisable for shares of Class A New Common Stock or, upon a holder's request, Class B New Common Stock. The summary below describes the anticipated principal terms of the Warrants. The following summary of certain provisions of the Warrants does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Warrants, substantially in the form to be included in the Plan Supplement.

a.     **General**

Each Warrant will be exercisable to acquire one share of New Common Stock. The strike price will be $25.00. The Warrants will expire on the fifth year anniversary of the Effective Date.

b.     **Change of Control**

Upon a change of control of New Holdco, each holder of Warrants will receive a payment equal to the value of the Warrants, which will be determined in accordance with the Black Scholes model utilizing the following assumptions: (i) risk free interest rate of the corresponding treasury at the time of change of control, (ii) volatility of 30% and (iii) a tenor equal to the remaining unexpired term of the Warrants.

c.     **Dilution**

The Warrants issued upon the Effective Date will be subject to dilution by the shares of New Common Stock reserved or issued under the Management Incentive Plan and any shares of New Common Stock that may be issued after the Effective Date.

### d. **Dividends**

The holders of Warrants will not be entitled to receive any dividends or distributions payable to holders of New Common Stock.

### e. **Adjustments**

Proportionate adjustments to the exercise price and the number of shares of New Common Stock issuable upon the exercise of the Warrants will be made for stock dividends or share distributions, stock splits, combinations and reclassifications.

### f. **Transfer Agent**

The transfer agent and registrar for the Warrants will initially be New Holdco and will be an independent transfer agent at the time that the Warrants become listed on a recognized national securities exchange or market system. There is no assurance that the Warrants will be listed on any stock exchange as of the Effective Date or any time thereafter.

### *8.* **Certificate of Incorporation and Bylaws**

On the Effective Date of the Plan, the New Holdco Certificate of Incorporation, substantially in the form to be included in the Plan Supplement, and the New Holdco Bylaws, substantially in the form to be included in the Plan Supplement, will be automatically authorized and approved and New Holdco will file the New Holdco Certificate of Incorporation with the Secretary of State of Delaware on the Effective Date of the Plan.

The New Holdco Certificate of Incorporation and New Holdco Bylaws will be filed with the Bankruptcy Court at least five days prior to the deadline to object as established by the Bankruptcy Court. The New Holdco Certificate of Incorporation will, among other things: (i) authorize the issuance of 100 million shares of New Common Stock, issuable as either Class A New Common Stock or Class B New Common Stock, (ii) include, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities of New Holdco, (iii) to the extent necessary or appropriate, include any restrictions on transfer of the New Common Stock and (iv) to the extent necessary or appropriate, include effectuating provisions of the Plan.

On the Effective Date, the existing SemGroup equity securities, including, without limitation, any options issued under SemGroup's existing key management option plan, will be cancelled and be of no further force and effect. See Section V, "The Plan."

The New Holdco Bylaws will provide for the corporate governance of New Holdco.

## VII. LITIGATION TRUST

### A. **ESTABLISHMENT OF THE TRUST; LITIGATION TRUST AGREEMENT**

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of the holders of Allowed Lender Deficiency Claims, Allowed

Senior Notes Claims, and Allowed General Unsecured Claims, will execute the Litigation Trust Agreement and will take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Plan. The Debtors or the Reorganized Debtors will transfer to the Litigation Trust all of their right, title, and interest in the Litigation Trust Assets, including any Litigation Trust Claims being prosecuted by the Creditors' Committee prior to the Effective Date. The Plan Supplement will include a list of all Causes of Action being prosecuted as of the date thereof that will be transferred to the Litigation Trust. On the Effective Date, all of the rights, title to, and interests in the Contributing Lenders' Claims will be deemed to be transferred to the Litigation Trust by the Contributing Lenders who voted to approve the Plan, without any further act or writing, and such Contributing Lenders' Claims will be included as part of the Litigation Trust Assets; provided, however, that any Prepetition Lender or holder of a Swap Claim who did not vote to approve the Plan will not be deemed to have transferred any rights until it has executed a Contributing Lender Assignment transferring its rights, title to, and interest in the Contributing Lenders' Claims in connection with its receipt of any distributions from the Litigation Trust. No Contributing Lender will have the right to bring any Cause of Action with respect to any Contributing Lenders' Claims, and only the Litigation Trust will have such right. Any recoveries on account of the Litigation Trust Assets will be distributed to holders of Litigation Trust Interests in accordance with the Plan and the Litigation Trust Agreement. In connection with the above-described rights and Causes of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) will be transferred to the Litigation Trust and will vest in the Litigation Trustee and its representatives. The Debtors or the Reorganized Debtors, as the case may be, the Debtors in Possession, the Litigation Trustee and the Creditors' Committees are authorized to take all necessary actions to effectuate the transfer of such privileges. The Confirmation Order will provide that the Litigation Trustee's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates. Notwithstanding any agreement or order entered by the Bankruptcy Court to the contrary, the Creditors' Committee will be permitted to share any discovery obtained prior to and after the Effective Date with the Litigation Trustee and the Litigation Trust Board.

## B.   PURPOSE OF THE LITIGATION TRUST

The Litigation Trust will be established for the sole purpose of liquidating the Litigation Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

## C.   FUNDING EXPENSES

In accordance with the Litigation Trust Agreement, upon the creation of the Litigation Trust, the Debtors or the Reorganized Debtors, as the case may be, will transfer the Litigation Trust Funds to finance the operations of the Litigation Trust, which funding, subject to the Litigation Trust Fund Reserve Account, will be repaid to the holders of the Secured Working Capital Lender Claims from the first Cash received by the Litigation Trust. The Debtors and the Reorganized Debtors will have no further obligation to provide any funding with respect to the Litigation Trust. After payment in full of the Litigation Trust Funds pursuant to the preceding sentence, any Cash received in respect of any Litigation Trust Assets (excluding the Litigation

Trust Funds themselves) will be first allocated to replenish the Litigation Trust Fund Reserve Amount prior to being distributed to holders of Litigation Trust Interests in accordance with the Plan and the Litigation Trust Agreement.

## D. TRANSFER OF ASSETS

The transfer of the Litigation Trust Assets to the Litigation Trust will be made, as provided in the Plan, for the benefit of the holders of Allowed Lender Deficiency Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims. Immediately thereafter, on behalf of the holders of Allowed Lender Deficiency Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, the Debtors or the Reorganized Debtors, as the case may be, will transfer such Litigation Trust Assets to the Litigation Trust in exchange for Litigation Trust Interests for the benefit of, as applicable, holders of Allowed Lender Deficiency Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims in accordance with the Plan. Upon the transfer of the Litigation Trust Assets, the Debtors or the Reorganized Debtors, as the case may be, will have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust will not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Notwithstanding anything to the contrary in the Plan, the transfer of the Litigation Trust Claims and the Contributing Lenders' Claims to the Litigation Trust does not diminish, and fully preserves, any defenses a defendant would have if such Litigation Trust Claims or Contributing Lenders' Claims had been retained by the Debtors or the Contributing Lenders, as applicable. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets will be deemed to have been retained by the Reorganized Debtors or the Contributing Lenders, as applicable, and the Litigation Trustee will be deemed to have been designated as a representative of the Reorganized Debtors or the Contributing Lenders, as applicable, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtors or the Contributing Lenders, as applicable. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets will be transferred to the Litigation Trust to be distributed to holders of the Secured Working Capital Lender Claims and holders of the Litigation Trust Interests consistent with the terms of the Plan and the Litigation Trust Agreement.

## E. VALUATION OF ASSETS

As soon as possible after the creation of the Litigation Trust, but in no event later than 60 days thereafter, the Litigation Trust Board will inform, in writing, the Litigation Trustee of the value of the assets transferred to the Litigation Trust, based on the good faith determination of the Litigation Trust Board, and the Litigation Trustee will apprise, in writing, the beneficiaries of the Litigation Trust and the holders of the Secured Working Capital Lender Claims of such valuation. The valuation will be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Litigation Trustee, and the beneficiaries of the Litigation Trust) for all federal income tax purposes. The costs of the valuation will be paid for with Litigation Trust Funds.

## F.   LITIGATION; RESPONSIBILITIES OF LITIGATION TRUSTEE

The Litigation Trustee, upon direction by the Litigation Trust Board and in the exercise of their collective reasonable business judgment, will, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Litigation Trust, make timely distributions, and not unduly prolong the duration of the Litigation Trust. The liquidation of the Litigation Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment, or dismissal of any or all Claims, rights, or Causes of Action, or otherwise. The Litigation Trustee, upon direction by the Litigation Trust Board, will have the absolute right to pursue or not to pursue any and all Litigation Trust Assets as it determines is in the best interests of the beneficiaries of the Litigation Trust, and consistent with the purposes of the Litigation Trust, and will have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash and will be reimbursed in accordance with the provisions of the Litigation Trust Agreement.

No later than fifteen days prior to the date the hearing to confirm the Plan is commenced, the Litigation Trustee will be selected by the Creditors' Committee and the Lender Steering Committee, named in the Confirmation Order or in the Litigation Trust Agreement, and have the power to (i) prosecute for the benefit of the Litigation Trust all Claims, rights, and Causes of Action transferred to the Litigation Trust (whether such suits are brought in the name of the Litigation Trust or otherwise) and (ii) otherwise perform the functions and take the actions provided for or permitted in the Litigation Trust Agreement or in any other agreement executed by the Litigation Trustee pursuant to the Plan. Any and all proceeds generated from the Litigation Trust Assets will be the property of the Litigation Trust.

## G.   INVESTMENT POWERS

The right and power of the Litigation Trustee to invest assets transferred to the Litigation Trust, the proceeds thereof, or any income earned by the Litigation Trust will be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 11.8 of the Plan) only in Cash and Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; provided, however, that (a) the scope of any such permissible investments will be further limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, and (b) the Litigation Trustee may expend the assets of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and maintain the value of the assets of the Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement.

## H.    ANNUAL DISTRIBUTION; WITHHOLDING

The Litigation Trustee will distribute at least semi-annually, as applicable, to the holders of the Secured Working Capital Lender Claims until the Litigation Trust Funds have been repaid and thereafter to the holders of Litigation Trust Interests all net Cash income plus all net Cash proceeds from the liquidation of Litigation Trust Assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Litigation Trust or in respect of the assets of the Litigation Trust), (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement, and (iv) as determined by the Litigation Trust Board, to fund the operations of the Litigation Trust.  All such distributions to be made under the Litigation Trust Agreement will be made to the Disbursing Agent who will distribute them to the holders of the Secured Working Capital Lender Claims until the Litigation Trust Funds have been repaid and thereafter to the holders of the Litigation Trust Interests based on the number of Litigation Trust Interests held by a holder compared with the aggregate number of Litigation Trust Interests, in each case in accordance with the terms of the Plan and the Litigation Trust Agreement.  The Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, to be required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

## I.    REPORTING DUTIES

### 1.    Litigation Trust Assets Treated as Owned by Creditors

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Litigation Trustee, and the beneficiaries of the Litigation Trust) will treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the beneficiaries of the Litigation Trust, whether their Claims are Allowed on or after the Effective Date, as (a) a transfer of the Litigation Trust Assets directly to those holders of Allowed Claims receiving Litigation Trust Interests (other than to the extent allocable to Disputed Claims), followed by (b) the transfer by such Persons to the Litigation Trust of the Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust (and in respect of the Litigation Trust Assets allocable to the Disputed Claims Reserve, as a transfer to the Disputed Claims Reserve).  Accordingly, those holders of Allowed Claims receiving Litigation Trust Interests will be treated for federal income tax purposes as the grantors and owners of their respective shares of the Litigation Trust Assets.  The foregoing treatment also will apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 2.    Tax Reporting

a.    The Litigation Trustee will file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 11.9(a)(ii) of the Plan.  The Litigation Trustee also will annually send to each holder of a Secured Working Capital Lender Claim

or a holder of a Litigation Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns. The Litigation Trustee also will file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any governmental unit.

b.     As soon as possible after the Effective Date, the Litigation Trustee will make the valuation of the Litigation Trust Assets prepared by the Litigation Trust Board under Section 11.5 of the Plan available from time to time, to the extent relevant, and such valuation will be used consistently by all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Litigation Trustee, and the beneficiaries of the Litigation Trust) for all federal income tax purposes.

c.     Allocations of Litigation Trust taxable income among the holders of the Secured Working Capital Lender Claims or the holders of Litigation Trust Interests will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued at their tax book value) to the holders of the Secured Working Capital Lender Claims or the holders of Litigation Trust Interests, up to the tax book value of the assets treated as contributed by such holders, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable tax regulations, and other applicable administrative and judicial authorities and pronouncements.

d.     The Litigation Trustee will be responsible for payments, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or its assets.

e.     The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

## J. TRUST IMPLEMENTATION

On the Effective Date, the Litigation Trust will be established and become effective for the benefit of the holders of Allowed Lender Deficiency Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims. The Litigation Trust Agreement will be included in the Plan Supplement and will contain provisions similar to those contained in trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust for federal income tax purposes. All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Litigation Trustee, and holders of Allowed Lender Deficiency Claims, Allowed Senior Notes Claims and Allowed General Unsecured Claims) will execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Litigation Trust.

## K. REGISTRY OF BENEFICIAL INTERESTS

The Litigation Trustee will maintain a registry of the holders of the Secured Working Capital Lender Claims and the holders of Litigation Trust Interests. Litigation Trust Interests may not be transferred or assigned, except by operation of law or by will or the laws of descent and distribution.

## L. TERMINATION

The Litigation Trust will terminate no later than the fifth anniversary of the Effective Date; provided, however, that, on or prior to the date that is 90 days prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust if it is necessary to the liquidation of the Litigation Trust Assets. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least 90 days prior to the expiration of each extended term; provided, however, that in no event will the term of the Litigation Trust extend past the tenth anniversary of the Effective Date.

## M. NET LITIGATION TRUST RECOVERY

In the event that a defendant in a litigation brought by the Litigation Trustee for and on behalf of the Litigation Trust (i) is required by a Final Order to make payment to the Litigation Trust (the "Judgment Amount") and (ii) is permitted by a Final Order to assert a right of setoff under sections 553, 555, 556, 559, 560 and 561 of the Bankruptcy Code or applicable non-bankruptcy law against the Judgment Amount (a "Valid Setoff"), (y) such defendant will be obligated to pay only the excess, if any, of the amount of the Judgment Amount over the Valid Setoff and (z) none of the Litigation Trust or the holders or beneficiaries of Litigation Trust Interests will be entitled to assert a claim against the Debtors or the Reorganized Debtors with respect to the Valid Setoff.

# VIII.  SECURITIES LAW MATTERS

## A.    ISSUANCE AND RESALE OF 1145 SECURITIES

In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of the 1145 Securities to the holders of Allowed Claims in Classes 53 through 121 and 149 through 226 will be exempt from the registration requirements of the Securities Act and equivalent provisions in state securities laws.  Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied:  (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor, or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property.  The Debtors believe that the exchange of 1145 Securities for Claims against the Debtors under the circumstances provided in the Plan will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code, or a Statutory Underwriter (described below).  In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.  However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.

An entity is not deemed to be an "underwriter" under section 2(a)(11) of the Securities Act with respect to securities received under section 1145(a)(1) which are transferred in "ordinary trading transactions" made on a national securities exchange or a NASDAQ market.  What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC.  Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto, and reports filed

by the issuer with the SEC under the Securities Exchange Act, or (iii) payment of special compensation to brokers or dealers in connection with the sale.

However, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as Statutory Underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a Statutory Underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

Resales of 1145 Securities by persons deemed to be Statutory Underwriters would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of 1145 Securities deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the Securities and Exchange Commission. The Debtors cannot assure, however, that adequate current public information will exist with respect to any issuer of 1145 Securities and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available.

Pursuant to the Plan, certificates evidencing 1145 Securities received by restricted holders or by a holder that the Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

**THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH**

**REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

Any person or entity entitled to receive 1145 Securities who the issuer of such securities determines to be a Statutory Underwriter that would otherwise receive legended securities as provided above, may instead receive certificates evidencing 1145 Securities without such legend if, prior to the distribution of such securities, such person or entity delivers to such issuer, (i) an opinion of counsel reasonably satisfactory to such issuer to the effect that the 1145 Securities to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for 1145 Securities for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder delivers to the issuer of such securities an opinion of counsel reasonably satisfactory to the issuer to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the issuer an opinion of counsel reasonably satisfactory to such issuer to the effect that (x) such securities are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## B.    LISTING

The Debtors will use commercially reasonable efforts to cause New Holdco to prepare and file a registration statement under the Securities Exchange Act with the SEC with respect to the registration of the New Common Stock and Warrants and to obtain and maintain approval for the listing of the Class A New Common Stock on a recognized national securities exchange or market system on or as soon as reasonably practicable after the Effective Date. However, neither New Holdco nor any of its shareholders will be required to issue or sell any New Common Stock or Warrants to satisfy the requirements to obtain any such listing. The other 1145 Securities will not be listed on any securities exchange.

## IX. CERTAIN FACTORS AFFECTING THE DEBTORS

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THE DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN, THE FINANCIAL PROJECTIONS AND OTHER RISKS THAT COULD IMPACT THE REORGANIZED SEMGROUP COMPANIES' FUTURE FINANCIAL CONDITION AND OPERATIONS. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A. CERTAIN RISKS RELATED TO THE PLAN

#### 1. Undue delay in confirmation of the Plan may significantly disrupt operations of the Debtors

The impact a continuation of the Chapter 11 Cases may have on operations of the Debtors and their businesses cannot be accurately predicted or quantified. Since the filing of the Chapter 11 Cases, the Debtors have suffered disruptions in operations, including losses of customers and suppliers. The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could further adversely affect the Debtors' operations and relationships with the Debtors' customers, vendors, suppliers, employees and regulators. If confirmation of the Plan does not occur expeditiously, the Chapter 11 Cases could result in, among other things, increases in costs, professional fees and similar expenses. In addition, prolonged Chapter 11 Cases may make it more difficult to retain and attract management and other key personnel, and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses. Further delays could also impair the ability of the Reorganized Debtors to obtain its post-emergence financing.

In addition, in connection with the Postpetition Financing Agreement, the Debtors have committed to the achievement of certain milestones by certain dates, including the following:

| ACTION/MILESTONE | DATE |
|---|---|
| Commence Hearing on Approval of Disclosure Statement | September 24, 2009 |
| Confirmation of Plan | October 26, 2009 |
| Effective Date of Plan | November 30, 2009 |

The failure of the Debtors to achieve these milestones by the dates required under the Postpetition Financing Agreement would (unless duly waived) constitute an event of default under the Postpetition Financing Agreement and Postpetition Financing Order. This default could give rise to termination of the Postpetition Financing Facility and the Debtors' ability to use cash collateral as well as the exercise of remedies by the Postpetition Lenders with respect to

some or all of the Debtors' assets, which would adversely affect the business and results of operations of the Debtors.

The Fourth Amended Joint Plan is expected to be confirmed or effective by the above dates. There can, however, be no assurance that the Fourth Amended Joint Plan will be confirmed or effective by the above dates.

## 2. The Debtors may not be able to obtain confirmation

The Debtors cannot ensure that they will receive the requisite Plan and Settlement acceptances to confirm the Plan. Even if the Debtors receive the requisite Plan and Settlement acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting Creditor may challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (i) a finding by a bankruptcy court that a plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (ii) confirmation is not likely to be followed by a liquidation or a need for further financial reorganization and (iii) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan does not unfairly discriminate and is fair and equitable, will not be followed by a need for further financial reorganization, and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code.

It is possible that the Debtors will have to liquidate their assets, in which case, as set forth in the Liquidation Analysis, it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan. In the event that the Debtors have to liquidate under Chapter 7 of the Bankruptcy Code, then only those holders of Administrative Expense Claims that benefit from the Carve Out (as defined in the Postpetition Financing Order), which Claims do not include any Section 503(b)(9) Claims, will likely receive distributions.

## 3. Parties in interest may object to the Debtors' classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such class or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there is no assurance that the Bankruptcy Court will necessarily hold that the Claims classification scheme complies with the Bankruptcy Code, which could delay or prevent the confirmation of the Plan.

**4.** **Certain tax consequences of the Plan raise unsettled and complex legal issues and involve various factual determinations**

Some of the material consequences of the Plan regarding United States federal income taxes are summarized in Section X. Some of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, that raise additional uncertainties. The Debtors cannot ensure that the IRS will not take a contrary view and no ruling from the IRS has been or will be sought regarding the tax consequences described in Article X. In addition, the Debtors cannot ensure that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to various tax issues, or that a court would not sustain such a challenge. FOR A MORE DETAILED DISCUSSION OF RISKS RELATING TO THE SPECIFIC POSITIONS THE DEBTORS INTEND TO TAKE WITH RESPECT TO VARIOUS TAX ISSUES, PLEASE SEE SECTION X.

## B.   RISKS RELATED TO THE CAPITALIZATION OF THE REORGANIZED SEMGROUP COMPANIES

*The Reorganized SemGroup Companies' future financial and operating flexibility may be adversely affected by their significant leverage as a result of the Exit Facility and the Second Lien Term Loan Facility, the significant working capital needs associated with their current operations and projected future capital expenditures, and recent disruptions in the financial markets.*

The Reorganized SemGroup Companies will have substantial indebtedness. On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized SemGroup Companies will, on a consolidated basis, have approximately $585 million (including $66 million in outstanding of letters of credit) in secured indebtedness and expect to have the ability to borrow up to an additional $380 million under the Exit Facility. Significant amounts of cash flow will be necessary to make payments of interest and repay the principal amount of such indebtedness.

The degree to which the Reorganized SemGroup Companies are leveraged could have important consequences because:

- it could affect the Reorganized SemGroup Companies' ability to satisfy their obligations under the Exit Facility, the Second Lien Term Loan Facility and other obligations;

- a substantial portion of the Reorganized SemGroup Companies' cash flow from operations will be required to be dedicated to interest and principal payments and may not be available for operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- the Reorganized SemGroup Companies' ability to obtain additional financing in the future may be impaired;

- the Reorganized SemGroup Companies may be more highly leveraged than some of their competitors, which may place the Reorganized Debtors at a competitive disadvantage;

- the Reorganized SemGroup Companies' flexibility in planning for, or reacting to, changes in their business may be limited; and

- it may make the Reorganized SemGroup Companies more vulnerable in the event of another downturn in their business or the economy in general.

The Reorganized Debtors' ability to make payments on and to refinance their debt, including the Exit Facility and the Second Lien Term Loan Facility, will depend on their ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory, and other factors that are beyond the control of the Reorganized SemGroup Companies.

There can be no assurance that the Reorganized SemGroup Companies will be able to generate sufficient cash flow from operations or that future borrowings will be available under credit facilities in an amount sufficient to enable the Reorganized SemGroup Companies to pay their debt obligations, including obligations under the Exit Facility and the Second Lien Term Loan Facility, or to fund their other liquidity needs. The Reorganized SemGroup Companies may need to refinance all or a portion of their debt on or before maturity. There can be no assurance that the Reorganized SemGroup Companies will be able to refinance any of their debt on commercially reasonable terms or at all.

*The SemGroup Companies' subsidiary indebtedness, including their ability to maintain or refinance certain indebtedness, may adversely affect the Reorganized SemGroup Companies' future financial and operational results.*

SemEuro, White Cliffs, and Wyckoff have entered into, and SemMexico may need to enter into, separate credit facilities. The Plan does not contemplate that any of the existing credit facilities with respect to these entities will be refinanced through the Exit Facility. There can be no assurance that these entities will be able to satisfy their obligations under their respective existing or future credit facilities, refinance any expired or expiring credit facilities on acceptable or market based terms, or procure new credit facilities. If these entities are unable to satisfy their obligations under such credit facilities or refinance such credit facilities on reasonable and acceptable terms it could have an adverse impact on the Reorganized SemGroup Companies' financial and operating results.

*The covenants in the Exit Facility and the Second Lien Term Loan Facility could hinder the Reorganized SemGroup Companies' business activities and operations.*

The Exit Facility and the Second Lien Term Loan Facility will contain various provisions which may limit the Reorganized SemGroup Companies ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of its assets. These provisions will include an

obligation for the Reorganized SemGroup Companies to comply with the Risk Management Policy.

In addition, it is expected that the Exit Facility and the Second Lien Term Loan Facility will require New Holdco to meet certain financial ratios. Covenants in the Exit Facility and the Second Lien Term Loan Facility may also require New Holdco to use a portion of its cash flow and the proceeds it receives from certain asset sales and specified debt or equity issuances and upon the occurrence of other events to repay outstanding borrowings under the Exit Facility and the Second Lien Term Loan Facility.

Any failure to comply with the restrictions of the Exit Facility and the Second Lien Term Loan Facility or any other such subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If New Holdco and the other Reorganized SemGroup Companies are unable to repay amounts outstanding under the Exit Facility and the Second Lien Term Loan Facility when due, the lenders thereunder could, subject to the terms of the relevant agreements, seek to sell or otherwise transfer the assets that are pledged to secure the indebtedness outstanding under those facilities and notes. Substantially all of the assets of the Reorganized SemGroup Companies will be pledged as security under the Exit Facility and the Second Lien Term Loan Facility. In addition, the Exit Lenders may choose to terminate any commitments they then have made to supply the Reorganized SemGroup Companies with further funds.

*An active market for Class A New Common Stock and Class A Warrants may not develop and there will be no active market for Class B New Common Stock or Class B Warrants, which may hinder or prevent the holders of the New Common Stock and Warrants from trading shares and warrants.*

There currently is no trading market for New Common Stock and Warrants.

New Holdco can make no assurance that a regular trading market for Class A New Common Stock or Class A Warrants will develop following confirmation of the Plan or, if a trading market does develop, that it will be sustainable. Accordingly, New Holdco cannot ensure any level of liquidity in the market for Class A New Common Stock or Class A Warrants, the ability to sell shares of Class A New Common Stock or Class A Warrants when desired, or at all, or the prices that may be obtained for shares of Class A New Common Stock or Class A Warrants. New Holdco will not be able to list the Class A New Common Stock and Class A Warrants on a national securities exchange until such time as the Class A New Common Stock and Class A Warrants are registered under the Securities Exchange Act. While there can be no assurance, it is anticipated that such registration and listing will occur by mid-2010. Prior to the listing of the Class A New Common Stock and the Class A Warrants on a national securities exchange, the Class A New Common Stock and the Class A Warrants may be traded on an electronic quotations system, such as the system known as the "Pink Quote" system. However, there can be no assurance that any active trading market will develop in any over-the-counter market.

It is not intended that the Class B New Common Stock and Class B Warrants will be listed on a securities exchange and as a result New Holdco does not expect that any significant trading market will develop for this class of stock.

*The initial valuation of New Common Stock is not intended to represent the trading or market value of New Common Stock and there is no assurance that a holder will be able to sell the New Common Stock at a reasonable price or at all.*

The valuation analysis used to determine the initial price of New Common Stock was based on the Reorganized SemGroup Companies' financial projections developed by the Debtors' management and on certain generally accepted valuation principles and was not intended to represent the trading values of New Common Stock in public or private markets. Several factors may cause the price of New Common Stock to vary including:

- changes in the Reorganized SemGroup Companies' financial performance and prospects or in the financial performance and prospects of companies engaged in businesses that are similar to its business;

- changes in laws or regulations, or new interpretations or applications of laws and regulations, that are applicable to the Reorganized SemGroup Companies' businesses;

- changes in prices of commodities associated with the Reorganized SemGroup Companies' businesses;

- significant trading or sales of New Common Stock or actions by New Holdco's stockholders;

- limitations on New Holdco's ability to pay dividends on the New Common Stock;

- general economic trends and other external factors, including those resulting from financial markets, weather, catastrophic events, war, incidents of terrorism or responses to these events;

- speculation in the press or investment community regarding the Reorganized SemGroup Companies' businesses, officers, employees or factors or events that may directly or indirectly affect its businesses; and

- adverse market reaction to any indebtedness the Reorganized SemGroup Companies may incur or securities New Holdco may issue in the future.

Additionally, the stock market has experienced extreme volatility in recent months and this volatility has often been unrelated to the operating performance of particular companies. All of the above factors, among others, may cause the price of the New Common Stock to fluctuate after trading commences and the New Common Stock may not be able to be sold at a reasonable price, or at all.

## C. RISKS RELATED TO THE FINANCIAL AND OPERATIONAL RESULTS OF THE REORGANIZED SEMGROUP COMPANIES

*Reduced demand for petroleum and natural gas based products could adversely affect the financial and operating results of the Reorganized SemGroup Companies.*

Any long-term, sustained decrease in demand for petroleum or natural gas based products in the markets served by the Reorganized SemGroup Companies' pipelines, terminals, storage facilities, plants or operations may result in a marked decrease in its storage and terminal utilization, pipeline throughputs, plant processing volumes, or sales volumes, thereby negatively affecting its financial and operating results. Factors that could lead to a decrease in market demand for petroleum or natural gas based products in the markets the Reorganized SemGroup Companies operate within include:

- recessions or other adverse or uncertain economic conditions;

- higher taxes, including federal excise taxes, crude oil severance taxes or sales taxes or other governmental or regulatory actions that increase, directly or indirectly, the cost of petroleum and natural gas based products;

- increases in technology or product efficiency where less petroleum or natural gas based products are needed to achieve the same results;

- replacement of petroleum or natural gas based products with alternative sources of energy as a result of consumer preferences, development of alternative fuels or supplies or technological advances;

- energy conservation or structural changes in the midstream energy industry;

- changes in the market price of crude oil, natural gas, petroleum or natural gas based products, or alternatives to petroleum or natural gas based products;

- laws or statutory mandates enacted by governmental bodies that impact petroleum and natural gas based products or other energy commodities; and

- effects of weather, natural phenomena, terrorism, war, or other similar acts.

*A decrease in the demand for services the Reorganized SemGroup Companies provide could cause a reduction in their financial or operational results.*

A decrease in demand for the Reorganized SemGroup Companies' services could result in a reduction of throughputs in the pipelines, storage, terminals or plants of the Reorganized SemGroup Companies and could cause revenues to decline and adversely affect financial and operational results. A decrease in throughputs could result from a temporary or permanent decline in the amount of petroleum or natural gas based products transported and stored by customers or provided by suppliers. Factors that could result in such a decline include:

- a material decrease in the supply or demand for petroleum or natural gas based products globally or in the markets in which the Reorganized SemGroup Companies operate for any reason;

- operational problems or catastrophic events affecting the Reorganized SemGroup Companies, its suppliers or its customers;

- competitors' cost to provide the same or similar services as the Reorganized SemGroup Companies;

- proceedings or regulations that impact Reorganized SemGroup Companies, its suppliers or its customers; or

- decisions by Reorganized SemGroup Companies' customers or suppliers to use alternate service providers for a portion or all of their needs, operate in different markets not served by Reorganized SemGroup Companies, reduce operations or cease operations entirely.

*The Reorganized SemGroup Companies may be unable to generate sufficient or positive gross margins from the purchase, transportation, storage, distribution and sale of petroleum and natural gas based products to adequately support their financial or operational results.*

The Reorganized SemGroup Companies' marketing results depend upon their ability to generate sufficient or positive gross margins from the purchase and sale of petroleum and natural gas based products. The Reorganized SemGroup Companies' gross margin, which is the difference between the sales price of their products and services and the cost to purchase or provide such product or service, as applicable, is affected by many factors beyond their control, including:

- availability of parties willing to enter into purchase and sale transactions with the Reorganized SemGroup Companies;

- increases in operational or capital costs which result in the Reorganized SemGroup Companies being uncompetitive;

- availability of crude oil, natural gas or petroleum and natural gas based products to the Reorganized SemGroup Companies for any reason;

- volatility in the price of crude oil, natural gas, or petroleum and natural gas based products due to any reason;

- availability of funds from operations and credit facilities of the Reorganized SemGroup Companies to support marketing and trading activities;

- availability of counterparties willing to offer credit to the Reorganized SemGroup Companies;

- reductions in demand for petroleum and natural gas based products for any reason;

- stability, performance and strength of financial markets and economies globally, in the United States and localities in which the Reorganized SemGroup Companies operate;

- prices for petroleum and natural gas based products at various production locations and points of sale as well as purchase and sale transactional costs, including hedging costs and futures contracts on the NYMEX and OTC markets; and

- technical and structural changes in the crude oil, natural gas, and/or petroleum and natural gas based products markets.

*The Reorganized SemGroup Companies' Risk Management Policy governing trading and marketing policies cannot eliminate all risks associated with trading and marketing nor can the Reorganized SemGroup Companies ensure compliance with the Risk Management Policy by its employees, both of which could impact financial and operational results.*

It is expected the Reorganized SemGroup Companies' Risk Management Policy will have limits for trading and marketing exposures including requirements that the Reorganized SemGroup Companies maintain a substantially balanced position between purchases on the one hand, and sales or future delivery obligations on the other hand. The Reorganized SemGroup Companies' Risk Management Policy will not allow acquiring and holding physical inventory, futures contracts or derivative products for the purpose of speculating on commodity price changes. These policies and practices, however, cannot eliminate all risks. If the Reorganized SemGroup Companies enter into derivatives contracts or sale contracts for the delivery of products at a future date, they are subject to the risk of non-delivery under product purchase contracts or the failure of gathering and transportation systems. For example, any event that disrupts the Reorganized SemGroup Companies' anticipated physical supply of products could expose them to risk of loss resulting from price changes.

Moreover, the Reorganized SemGroup Companies are exposed to price movements on products that are not hedged, including certain of their inventory, such as linefill, which must be maintained to operate pipeline and gathering lines. The Reorganized SemGroup Companies are also exposed to certain price risks that cannot be hedged, such as price risks for "basis differentials." "Basis differential" can be created to the extent that the Reorganized SemGroup Companies' sales contracts call for delivery of a petroleum product of a grade or location that differs from the specific delivery terms of publicly traded futures contracts. If this occurs the Reorganized SemGroup Companies may not be able to use the public markets to fully hedge their price risk. Even though the Reorganized SemGroup Companies will engage only in limited trading as allowed under the Risk Management Policy, they will be exposed to price risks within predefined limits and authorizations which could impact their operational and financial results of the Reorganized SemGroup Companies.

The Reorganized SemGroup Companies also have a risk that employees involved in their trading and marketing operations may not comply with the Risk Management Policy. The Reorganized SemGroup Companies cannot ensure that all violations of the Risk Management

Policy, particularly if deception or other intentional misconduct is involved, will be detected prior to their businesses being materially affected.

*The Reorganized SemGroup Companies are exposed to the creditworthiness and performance of its customers, suppliers and transactional counterparties, and any material nonpayment or nonperformance by one or more of these parties could adversely affect the financial and operational results of the Reorganized SemGroup Companies.*

There can be no assurance that the Reorganized SemGroup Companies have adequately assessed the creditworthiness of their existing or future customers, suppliers or transactional counterparties or that there will not be a rapid and unanticipated deterioration in their creditworthiness, which would have an adverse impact on the Reorganized SemGroup Companies' financial condition and results of operations. Nor is there certainty that counterparties to the Reorganized SemGroup Companies will perform or adhere to existing or future contractual arrangements.

The Reorganized SemGroup Companies intend to manage their exposure to credit risk through credit analysis and monitoring procedures and policies, including credit support requirements such as letters of credit, prepayments and guarantees. However, these procedures and policies cannot fully eliminate counterparty credit risk, and to the extent the Reorganized SemGroup Companies' procedures and policies prove to be inadequate, their financial and operational results could be negatively impacted. Some of the Reorganized SemGroup Companies' counterparties may be highly leveraged and subject to their own operating and regulatory risks and, even if the Reorganized SemGroup Companies' credit review and analysis mechanisms work properly, they may experience financial losses in their dealings with such parties. In addition, volatility in commodity prices might have an impact on many of the Reorganized SemGroup Companies' counterparties, which in turn could have a negative impact on their ability to meet their obligations to the Reorganized SemGroup Companies.

Any material nonpayment or nonperformance by the Reorganized SemGroup Companies' counterparties could require the Reorganized SemGroup Companies to pursue substitute counterparties for their affected operations, reduce operations or provide alternative services. There can be no assurance that any such efforts would be successful or would provide similar financial and operational results.

*The Reorganized SemGroup Companies' operations are subject to substantial regulatory requirements which could impact its financial and operational results.*

The Reorganized SemGroup Companies' operations are subject to substantial regulation from foreign and domestic federal, state, provincial and local authorities. These authorities regulate numerous aspects of the Reorganized SemGroup Companies' operations, including their interstate natural gas storage operations, certain crude oil gathering systems, construction and maintenance of facilities, and rate structures among other things. The Reorganized SemGroup Companies cannot predict the impact of any future revisions or interpretation changes of existing laws or regulations or the adoption of new laws and regulations applicable to their businesses. Revisions, interpretation changes or additional regulations could influence its operating environment and may result in increased costs for the Reorganized SemGroup Companies.

*The nature of the Reorganized SemGroup Companies' assets and operations could expose them to significant environmental compliance costs and liabilities and substantial expenditures may be required to maintain the integrity of pipelines and other assets at acceptable levels all of which could impact financial and operational results.*

The Reorganized SemGroup Companies' operations involving the storage, treatment, processing, and/or transportation of liquid hydrocarbons, including crude oil, refined products, and other petroleum and natural gas based products are subject to stringent foreign and domestic federal, state, provincial, and local laws and regulations including the receipt of approvals, authorizations and permits in the United States, Canada, Mexico and the United Kingdom governing the discharge of materials into the environment or otherwise relating to protection of the environment. Compliance with all of these laws and regulations increases the Reorganized SemGroup Companies' overall cost of doing business, including their capital costs to construct, maintain and upgrade equipment and facilities. Failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, the imposition of investigatory and remedial liabilities, the issuance of injunctions that may subject the Reorganized SemGroup Companies to additional operational requirements and constraints, or may affect their ability to obtain or renew approvals, authorizations and permits. The laws and regulations applicable to their operations are subject to interpretation and revisions by the relevant governmental agencies. Such change or interpretation adverse to the Reorganized SemGroup Companies could have a material adverse effect on their operations, revenues and profitability.

*The Reorganized SemGroup Companies' operations require expenditures for maintenance and capital that if unfunded could negatively impact the financial and operational results of the Reorganized SemGroup Companies.*

The Reorganized SemGroup Companies' assets require ongoing maintenance and capital expenditures to maintain pipeline and mechanical integrity, environmental and other regulatory compliance, operational levels and insure safety of employees which if not undertaken could result in operational failures, reduced asset utilization or asset closures. In addition, the Reorganized SemGroup Companies may experience unanticipated maintenance or capital expenditures due to regulations, mechanical failures, higher utilization, structural failures, or other aspects of operations. The Reorganized SemGroup Companies also expect to undertake

construction of new assets. If the Reorganized SemGroup Companies are unable to fund maintenance and capital expenditures, their financial and operational results could be negatively impacted.

*The Chapter 11 Cases may have negatively affected the businesses of the Reorganized SemGroup Companies including relationships with certain customers, suppliers and vendors, which could adversely impact the Reorganized SemGroup Companies' future financial and operating results.*

Due to the disruptions caused by the bankruptcy, certain of the Debtors' relationships with customers, suppliers and vendors may have been adversely affected and/or terminated. Customers, suppliers or vendors may have entered into alternate relationships with other counterparties or modified their relationship with SemGroup Companies due to performance issues or concerns. In some instances, customers, suppliers and vendors have become Creditors under the Chapter 11 Cases. The effect of the bankruptcy process and the resolution of such Creditors' Claims against the Debtors (including the confirmation of the Plan) may have adversely affected such Creditors' relationship with the Reorganized SemGroup Companies. Changes in relationships with customers, suppliers and vendors could have a material adverse effect on the Reorganized SemGroup Companies' financial and operating results.

*The inability to retain or recruit key officers and employees for the Reorganized SemGroup Companies could disrupt its business operations.*

The purchase, transportation, storage, processing and marketing of petroleum and natural gas based products is complex and requires detailed knowledge of sources of supply, methods and availability of transportation, storage and distribution and the needs and demands of individual counterparties. The Reorganized SemGroup Companies will depend on current and new key officers and employees to meet the challenges and complexities of its businesses. If any officers or employees resign or become unable to continue in their present roles and are not adequately replaced or if the company is unable to fill currently vacant positions, the Reorganized SemGroup Companies' business operations could be materially adversely affected.

*The Reorganized SemGroup Companies may in the future encounter changes to its insurance programs, such as increased costs, changes to terms or loss of insurance, which could affect the financial and operational results of the Reorganized SemGroup Companies.*

The Reorganized SemGroup Companies can give no assurance that they will be able to maintain adequate insurance in the future at rates they consider reasonable or at all. Further, the Reorganized SemGroup Companies' operations are subject to operational hazards, risks incidental to processing, transporting, storing and distributing petroleum and natural gas based products and unforeseen interruptions such as natural disasters, adverse weather, accidents, fires, explosions, hazardous materials releases, terrorism, acts of war, and other events beyond its control. These events might result in a loss of equipment or life, injury, pollution and/or extensive property damage, as well as an interruption in the Reorganized SemGroup Companies' operations which could negatively impact the Reorganized SemGroup Companies' financial and operational results.

*The Reorganized SemGroup Companies have interest rate and foreign currency exchange risks which could impact financial and operational results.*

Certain of the Reorganized SemGroup Companies' debt bears variable interest rates. The Reorganized SemGroup Companies may choose to hedge their variable interest rate exposure which could increase their costs of operations. Increases in unhedged interest rates or hedge costs could negatively impact the financial and operational results of the Reorganized SemGroup Companies.

A portion of the Reorganized SemGroup Companies' revenue is generated from its operations in Canada, the United Kingdom and Mexico, which use the Canadian dollar, British pound and Mexican peso, respectively, as the functional currency. The Reorganized SemGroup Companies will depend, in part, upon the flow of funds from Canada, the United Kingdom and Mexico to repay their debt and other financial obligations, most of which are denominated in United States dollars. Therefore, changes in the exchange rate between the United States dollar, on the one hand, and any of such foreign currencies, on the other hand, could decrease the amount of funds available to service United States dollar denominated financial obligations. If the Reorganized SemGroup Companies are unable to hedge against this currency risk, it could adversely affect the financial and operational results of the Reorganized SemGroup Companies.

*The Reorganized SemGroup Companies' internal controls over financial reporting do not currently meet the standards required by Section 404 of the Sarbanes-Oxley Act, and failure to achieve and maintain effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act could have a material adverse effect on the Reorganized SemGroup Companies' financial and operational results.*

As a public company, New Holdco will be subject to the requirements of the Sarbanes-Oxley Act, including the requirement to achieve and maintain effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. The Debtors' internal controls over financial reporting do not currently meet the standards required by Sarbanes-Oxley. The Debtors have hired an independent consulting firm to assist them in implementing effective internal controls over financial reporting. The Debtors will incur additional costs in order to improve its internal controls over financial reporting and comply with Section 404, including increased auditing and legal fees and costs associated with hiring additional accounting and administrative staff. Ultimately, the Debtors' efforts may not be adequate to comply with the requirements of the Sarbanes-Oxley Act.

Pursuant to Section 404 of the Sarbanes-Oxley Act, New Holdco will be required to deliver a management assessment of the effectiveness of its internal controls over financial reporting as part of its public reporting requirements in 2010. If, as a public company, New Holdco is not able to implement the requirements of Section 404 in a timely manner or with adequate compliance, its independent registered public accounting firm may not be able to attest to the effectiveness of the internal controls over financial reporting of New Holdco. If New Holdco is unable to maintain adequate internal controls over financial reporting, it may be unable to report financial information on a timely basis, may suffer adverse regulatory consequences, may have violations of applicable stock exchange listing rules and may breach its credit facilities

covenants. There could also be a negative reaction in the financial markets due to a loss of investor confidence in New Holdco and the reliability of its financial statements.

*As a public company, New Holdco will become subject to additional financial and other reporting and corporate governance requirements that may be difficult to satisfy and its failure to comply may have a material adverse impact.*

New Holdco will be required to be a public company after the Effective Date due to the number of holders of the New Common Stock. The Debtors have historically operated their business as a private company and may have difficulty satisfying the additional financial and other reporting and corporate governance requirements of a public company. As a public company, New Holdco will be required to file with the SEC annual and quarterly information and other reports that are specified in Section 13 of the Securities Exchange Act and will be required to prepare financial statements that are fully compliant with all SEC reporting requirements on a timely basis.

The Debtors intend to list the Class A New Common Stock on national securities exchange but may not be able to satisfy the reporting and corporate governance requirements on the Effective Date. The SEC and exchange requirements will impose significant compliance obligations upon New Holdco and will require a significant commitment of additional financial and personnel resources.

The Debtors do not have experience in complying with these requirements and may not be successful in implementing them. A failure to comply with the requirements of a public company could impact the ability of the Reorganized SemGroup Companies to report their operating results on a timely and accurate basis, which could adversely affect the business or operating results of the Reorganized SemGroup Companies and expose them to fines or penalties.

*Compliance with or changes in accounting standards or application of accounting standards could have a material adverse impact on financial and operational results of the Reorganized SemGroup Companies.*

The Reorganized SemGroup Companies may be unable to adequately comply with accounting standards which could impact their ability to receive an unqualified audit from their independent registered public accounting firm. Recently issued or future accounting pronouncements or other changes in accounting policies could result in accounting treatments that materially impact financial results. In addition, the Reorganized SemGroup Companies could experience an increase in the cost of operations to implement such changes in accounting standards.

As part of the Reorganized SemGroup Companies' emergence from bankruptcy, they will be required to adopt fresh-start accounting. Under fresh-start accounting, their assets and liabilities will be recorded at fair value as of the fresh-start reporting date. There can be no assurance that the fair value of their assets and liabilities will not differ materially from the recorded values of the assets and liabilities in the Projections. As a result, the financial and operational results of the Reorganized SemGroup Companies could be negatively impacted.

*If any of New Holdco's subsidiaries were subject to a material amount of additional entity-level taxation by individual states or foreign jurisdictions or United States tax legislation regarding foreign subsidiaries is changed it could materially impact the Reorganized SemGroup Companies' financial and operational results.*

If any entities of the Reorganized SemGroup Companies are subjected to a material amount of entity-level taxation by individual states or foreign jurisdictions in which they operate, the financial and operational results of the Reorganized SemGroup Companies could be negatively impacted.

The Reorganized SemGroup Companies hold interests in foreign entities that are currently treated as disregarded entities for United States federal income tax purposes. President Obama's administration has recently proposed legislation that, if enacted, would (i) require United States corporations to treat certain wholly-owned foreign subsidiaries as corporations, rather than disregarded entities, for United States federal income tax purposes, (ii) defer certain deductions associated with foreign subsidiaries, and (iii) reform the foreign tax credit regime which may prevent the use of foreign tax credits in certain situations. There can be no assurance as to whether, or in what form, these proposals will be enacted. If these proposals are enacted into legislation, it could have adverse tax consequences to the Reorganized SemGroup Companies and negatively impact their financial and operational results.

*New Holdco holds, directly or indirectly, interests in various limited liability companies and partnerships and may depend on distributions from those entities to pay current taxes and other expenses.*

New Holdco will be a holding company and will hold, directly or indirectly, interests in entities that are treated as partnerships for United States federal income tax purposes. These partnerships will not themselves be subject to United States federal income tax. Instead, their taxable income will be allocated to their partners, including New Holdco, in accordance with their respective partnership agreements. Accordingly, New Holdco will incur income taxes on any net taxable income of the partnerships and will also incur expenses related to their operations. To the extent that New Holdco requires funds to pay its taxes or other liabilities or to fund its operations, and the partnerships are restricted from making distributions to it under applicable laws or regulations or do not have sufficient earnings to make those distributions, New Holdco may not have access to sufficient funds to satisfy these obligations.

*The threat or attack of terrorists aimed at Reorganized SemGroup Companies' facilities could adversely affect its business.*

Since the September 11, 2001 terrorist attacks, the United States government has issued warnings that energy assets, specifically the nation's pipeline infrastructure, may be future targets of terrorist organizations. These developments have subjected the Reorganized SemGroup Companies' operations to increased risks. Any future terrorist attack that may target facilities of the Reorganized SemGroup Companies, those of their customers or those of certain other pipelines could have a material adverse effect on their businesses. In addition, any governmental body mandated actions to prepare for or protect against potential terrorist attacks

could require the Reorganized SemGroup Companies to expend money or modify their operations.

## D.    RISKS RELATED TO THE LITIGATION TRUST

Distributions from the Litigation Trust will be dependent upon the success of the Litigation Trust Assets and the proceeds of such Litigation Trust Assets being in excess of the liabilities, obligations, and expenses of the Litigation Trust including reimbursement of the Litigation Trust Funds. The holders of the Litigation Trust Interests will not be able to receive any distributions from the Litigation Trust until the Litigation Trust Funds have been repaid to the holders of the Secured Working Capital Lender Claims. The Debtors can make no assurances regarding the amount of any distributions from the Litigation Trust, or that there will be any distributions at all, with respect to the Litigation Trust Interests.

## X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the United States federal income tax consequences to holders whose Claims are not impaired. In addition, the following summary does not address the United States federal income tax consequences to (i) holders of claims who are unimpaired or otherwise entitled to payment in full in cash under the Plan or (ii) holders of SemGroup Equity Interests as they are deemed to reject the Plan.

The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal income tax consequences described below.

The United States federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the United States federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle or other integrated transaction, and investors in pass-through entities). If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

This discussion also assumes that the Warrants and New Common Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of

the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for United States federal income tax purposes in accordance with their form.

*Accordingly, the following summary of certain United States federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.*

## A.    CONSEQUENCES TO THE DEBTORS

With the exception of SemGroup, SemGroup Finance (which will be New Holdco), SemManagement, and Chemical Petroleum, prior to the Effective Date, each of the Debtors is treated as a "disregarded entity" for United States federal income tax purposes, and neither SemGroup Finance, Chemical Petroleum nor SemManagement has any material assets or liabilities from a United States federal income tax perspective. Accordingly, the United States federal income tax consequences of the Plan will generally not be borne by the Debtors treated as "disregarded entities," but instead will be borne by SemGroup and its owners.

### *1.    Transfer of Property to New Holdco*

In connection with the implementation of the Plan, SemGroup will contribute all of its ownership interests in its directly-owned subsidiaries to New Holdco in exchange for (i) New Common Stock, (ii) Warrants and (iii) the Second Lien Term Loan Interests. Because the directly-owned subsidiaries are disregarded entities, such transfer is treated as a transfer of the assets held by such entities to New Holdco for United States federal income tax purposes. Furthermore, because SemGroup is a Debtor and the New Common Stock will be used to satisfy certain Allowed Claims, the transfer of such property to New Holdco is treated as a taxable exchange under section 351(e)(2) of the Tax Code. Accordingly, New Holdco will have a tax basis in the assets of all of its subsidiaries (other than those that are treated as corporations for United States federal income tax purposes) equal to their respective fair market values.

### *2.    Cancellation of Indebtedness Income*

COD income is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor. Certain statutory or judicial exceptions can apply to limit the amount of COD income. One such exception provides that where the debt discharge occurs in a title 11 (bankruptcy) case, COD income is excluded, in its entirety, from the debtor's gross income. SemGroup and the Reorganized SemGroup Companies intend to take the position that because all of the indebtedness related to

Secured Claims and Unsecured Claims that are being discharged pursuant to the Plan is assumed by SemGroup immediately before the effectiveness of the Plan, SemGroup and not SemGroup Finance (which will become New Holdco on the Effective Date) will recognize any COD income as a result of the Plan. However, it is possible that the IRS may successfully challenge this position. In that event, New Holdco believes that it would be entitled to exclude all of the resulting COD income under the bankruptcy exception. The amount of COD income excluded from gross income under the bankruptcy exception would then be applied to reduce New Holdco's tax basis in its assets and its other tax attributes (if any) by the amount of any COD income. Any reduction in tax attributes in respect of excluded COD income does not occur until the end of the taxable year in which the COD income is incurred.

SemManagement will recognize COD income as a result of the Plan, but because SemManagement is a Debtor, that COD income will be excluded from SemManagement's gross income in its entirety under the bankruptcy exception. The amount excluded from gross income under the bankruptcy exception will reduce SemManagement's tax basis in its assets and its other tax attributes (if any).

### 3. Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining loss carryforwards and certain other tax attributes (including current year NOLs) allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code as a result of the changes in ownership of Reorganized SemGroup and its subsidiaries that are treated as corporations for United States federal income tax purposes as described below. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the potential COD income arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose). Although the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will constitute an "ownership change" of New Holdco and its subsidiaries that are treated as corporations for United States federal income tax purposes, because New Holdco's and such subsidiaries' pre-change losses, if any, are not expected to be material, the effect of any annual limitation of New Holdco's and such subsidiaries' NOL carryforwards, if any, and other tax attributes, if any, should not be material.

## B. CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

### 1. Consequences of Exchanges Pursuant to the Plan to Claim Holders

Pursuant to the Plan and in satisfaction of their Claims, the following exchanges will occur between SemGroup and holders of existing Claims (assuming approval of the Plan by such

Classes): (i) the holders of Secured Lender Claims will receive, in exchange for their Allowed Claims, Cash, Second Lien Term Loan Interests, and New Common Stock, (ii) the holders of the White Cliffs Credit Agreement Claim will receive, in exchange for their Allowed Claims (including accrued but unpaid interest through the Effective Date), a refinanced credit agreement, (iii) the holders of Senior Notes Claims will receive, in exchange for their Allowed Claims, New Common Stock, Warrants, and Litigation Trust Interests; (iv) the holders of the Lender Deficiency Claims will receive, in exchange for their Allowed Claims, Litigation Trust Interests and (v) the holders of the General Unsecured Claims will receive, in exchange for their Allowed Claims, New Common Stock, Warrants, and Litigation Trust Interests.

Each holder of an Allowed Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (x) the "amount realized" by such holder in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). For a discussion of the tax consequences of any Claim for accrued but unpaid interest, see –"Distributions in Discharge of Accrued but Unpaid Interest" below.

A holder's "amount realized" generally will equal the sum of the amount of (i) the Cash, (ii) the fair market value of any New Common Stock and Warrants, and (iii) the fair market value of the interest in the Litigation Trust assets received in exchange for its Allowed Claim.

As discussed below (see below –"Tax Treatment of the Litigation Trust and Holders of Beneficial Interests"), the Litigation Trust has been structured to qualify as a "grantor trust" for United States federal income tax purposes. Accordingly, each holder of an Allowed Claim that receives an interest in the Litigation Trust will be treated for United States federal income tax purposes as directly receiving, and as a direct owner, of its respective interest in the Litigation Trust assets. Pursuant to the Plan, the Trustees will make a good-faith valuation of the Litigation Trust assets and all parties (including the Debtors, the Trustees and the holders of Allowed Claims) must consistently use such valuation for all United States federal income tax purposes.

After the Effective Date, any amount a holder of an Allowed Claim receives as a distribution from the Litigation Trust in respect of its beneficial interest in the Litigation Trust should not be included, for United States federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's beneficial (ownership) interest in the Litigation Trust. See below —"Tax Treatment of the Litigation Trust and Holders of Beneficial Interests."

a.    **Character of Gain or Loss**

Where gain or loss is recognized by a holder in respect of the satisfaction of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Each holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

Holders of claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year, but are allowed to carry back unused capital losses to the three taxable years preceding the capital loss year.

A holder that purchased its existing notes from a prior holder at a "market discount" (relative to the adjusted issue price of the existing notes at the time of acquisition) may be subject to the market discount rules of the Tax Code. Under these rules, any gain recognized on the exchange of such existing notes generally would be treated as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of such notes did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its existing notes, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the holder recognizes in the exchange.

b.      **Tax Basis and Holding Period**

A holder's tax basis in its New Common Stock, Warrants, and interest in the Litigation Trust assets for United States federal income tax purposes will equal the amount taken into account in respect of such notes, stock, warrants or interests in determining the holder's amount realized. A holder's holding period in such notes, stock, warrants or interests generally will begin the day following the Effective Date.

2.      **Distributions in Discharge of Accrued but Unpaid Interest**

Pursuant to the Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for United States federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or OID. There is no assurance, however, that the IRS would respect such allocation for United States federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Claim is received in satisfaction of accrued but unpaid interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a loss to the extent any accrued but unpaid interest claimed, amortized market discount or OID was previously included in its gross income and is not paid in full. The IRS, however, has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear

whether, by analogy, a holder of a Claim of a non-corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for United States federal income tax purposes.

### 3. Ownership and Disposition of Second Lien Term Loan Facility

#### a. Stated Interest and Original Issue Discount

A holder of Second Lien Term Loan Interests will be required to include stated interest on the Second Lien Term Loan Interests (as applicable) in income in accordance with the holder's regular method of tax accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. The 9% portion of the interest payable in cash on the Second Lien Term Loan Facility is qualified stated interest.

The borrowers under the Second Lien Term Loan Facility have the option to PIK interest payments for the first two years of the Second Lien Term Loan Facility, in which case the interest rate will be increased by 200 basis points for any such PIK payment. In the event the option to PIK interest is elected, the deferred interest will be payable at the end of the first interest payment date occurring five years following the effective date of the Second Lien Term Loan Facility (the "deferred interest"). Because the interest is not payable at least annually in all events the interest does not qualify as qualified stated interest and the Second Lien Term Loan Interests will be issued with OID.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the facility, other than qualified stated interest.

The "issue price" of the Second Lien Term Loan Interests depends on whether, at any time during the 60-day period ending 30 days after the exchange date, such interests are traded on an "established market". If the Second Lien Term Loan Interests are treated for this purpose as traded on an established market, the issue price of the Second Lien Term Loan Interests will equal (or approximate) the fair market value of such interests, as of the Effective Date. In such event, a Second Lien Term Loan Interest will be treated as issued with OID to the extent that its issue price is less than its principal amount. Depending on the fair market value of the Second Lien Term Loan Interests, the total amount of OID could be substantial.

Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the interests appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, interests are considered to be publicly traded when price quotations for such interests are readily available from dealers, brokers or traders. If the Second Lien Term Loan Interests are not traded on an

established market, the issue price for such interests should be the stated principal amount of the Second Lien Term Loan Interests. There can be no assurance that the Second Lien Term Loan Interests will not be so traded on an "established market" on or after the Effective Date.

A holder of a Second Lien Term Loan Interest that is issued with OID generally will be required to include any OID in income over the term of the facility (for so long as the interests continue to be owned by the holder) in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer and regardless of whether and when the holder receives cash payments of interest on the Second Lien Term Loan Interests (other than cash attributable to qualified stated interest). Accordingly, a holder could be treated as receiving interest income in advance of a corresponding receipt of cash. A holder's tax basis in Second Lien Term Loan Interests will be increased by the amount of any OID included in income. A holder of Second Lien Term Loan Interests will not be separately taxable on any cash payments of interest that have already been taxed under the OID rules, but will reduce its tax basis in such interests by the amount of such payments.

Furthermore, because the Second Lien Term Loan Facility requires the payment of any accrued OID before the end of the accrual period ending five years following the date of issuance, the Second Lien Term Loan Interests should not be treated as applicable high yield discount obligations within the meaning of Section 163(e)(5) of the Tax Code.

> ### b. Sale, Exchange or Other Disposition of the Second Lien Term Loan Interests

Any gain or loss recognized by a holder on a sale, exchange or other disposition of Second Lien Term Loan Interests generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the interests immediately before the sale, exchange, redemption or other disposition (increased for any OID accrued through the date of disposition, which OID would be includible as ordinary income). Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period in its interests is more than one year at that time. As described above, there are certain limitations which apply to the deduction of capital losses.

> ### 4. Ownership and Disposition of New Common Stock

> #### a. Distributions

Distributions, if any, with respect to the New Common Stock will be taxable as dividend income when paid to the extent of New Holdco's current and accumulated earnings and profits as determined for United States federal income tax purposes. To the extent the amount of any distributions exceeds New Holdco's earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis in respect of the stock as to which the distribution was made (but not below zero). Any remaining excess will be treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below in "Sale or Other Disposition."

**Dividends to Non-Corporate Shareholders.** Dividends are generally taxed as ordinary income; however, dividends received by non-corporate holders in taxable years beginning on or

before December 31, 2010, may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied. Non-corporate holders should consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

**Dividends to Corporate Shareholders**. In general, a distribution to a corporate shareholder that is treated as a dividend for United States federal income tax purposes will qualify for the 70% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock not applicable here). A corporate shareholder holding 20% or more of the distributing corporation may be eligible for an 80% dividends received deduction. No assurance can be given that New Holdco will have sufficient earnings and profits (as determined for United States federal income tax purposes) to cause distributions, if any, to be eligible for a dividends received deduction. Dividend income that is not subject to regular United States federal income tax as a consequence of the dividends received deduction may be subject to the United States federal alternative minimum tax.

The dividends received deduction is only available if certain holding periods and taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend were treated as an "extraordinary dividend" under applicable rules.

### b.    Sale or Other Disposition

Subject to the discussion below, any gain or loss recognized by a holder on the sale, exchange, or other disposition of the New Common Stock generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the stockholder and the stockholder's adjusted tax basis in the New Common Stock immediately before the sale, exchange, or other disposition. Any such gain or loss generally should be long-term if the stockholder's holding period for its stock is more than one year at that time. The use of capital losses is subject to limitations (as discussed above).

In the case of a redemption of New Common Stock for cash or property, the United States federal income tax treatment depends on the particular facts relating to such stockholder at the time of the redemption. If the redemption of such stock (i) is "not essentially equivalent to a dividend" with respect to the stockholder, (ii) is "substantially disproportionate" with respect to the stockholder (as defined generally as a greater than 20% reduction in a stockholder's relative voting stock of a corporation where such stockholder owns less than 50% of the voting stock of the corporation immediately following the redemption), or (iii) results in a "complete termination" of all of such stockholder's equity interest in the corporation, then the receipt of cash or property by such stockholder will be respected as a sale or exchange of its stock and taxed accordingly. In applying these tests, certain constructive ownership rules apply to

determine stock ownership. If the redemption does not qualify for sale or exchange treatment, the stockholder will instead be treated as having received a distribution on such stock (in an amount that generally will be equal to the amount of cash and the fair market value of property received in the redemption) with the general consequences described above under "Distributions in Discharge of Accrued but Unpaid Interest." If the stockholder does not retain any actual stock ownership in the company following such redemption, the stockholder may lose its tax basis completely (in that the tax basis would shift to the stock that was treated as constructively owned by the stockholder). If such distribution is taxable as a dividend to a corporate stockholder, it may be subject to the "extraordinary dividend" provisions of the Tax Code.

If a stockholder received the New Common Stock in exchange for an Allowed Claim, any gain recognized by the holder upon a subsequent taxable disposition of the stock (or any stock or property received for it in a later tax-free exchange) would be treated as ordinary income for United States federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Allowed Claim for which stock was received and any ordinary loss deductions incurred upon satisfaction of the Allowed Claim, less any income (other than interest income) recognized by the stockholder upon satisfaction of the Allowed Claim and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the stockholder's Allowed Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 5. Tax Treatment of the Litigation Trust and Holders of Beneficial Interests

Upon the Effective Date, the Litigation Trust will be established for the benefit of holders of Allowed Claims receiving Litigation Trust Interests.

#### a. Classification as Litigation Trust

The Litigation Trust is intended to qualify as a liquidating trust for United States federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for United States federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity).

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for United States federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Trustee and the holders of Allowed Claims receiving Litigation Trust Interests) are required to treat, for United States federal income tax purposes, the Litigation Trust as a grantor trust of which the holders of Allowed Claims receiving Litigation Trust Interests are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for United States federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the United States federal

income tax consequences to the Trust, the holders of claims, and the Debtors could vary from those discussed herein (including the potential for an entity level tax on any income of the Litigation Trust).

b. **General Tax Reporting by the Litigation Trust and Beneficiaries**

For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trustee, the Litigation Trust, the holders of Allowed Claims receiving Litigation Trust Interests and the holders of the Secured Working Capital Lender Claims) must treat the transfer of assets to the Litigation Trust underlying their rights or interests, respectively, as a transfer of such assets directly to the holders of Allowed Claims receiving Litigation Trust Interests, followed by the transfer of such assets by such holders to the Litigation Trust. Consistent therewith, all parties must treat the Litigation Trust as a grantor trust of which such holders are the owners and grantors. Thus, such holders (and any subsequent holders of interests in the Litigation Trust) will be treated as the direct owners of an undivided interest in the applicable assets of the Litigation Trust for all United States federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the Litigation Trust). Pursuant to the Plan, as soon as possible after the creation of the Litigation Trust, but in no event later than 60 days thereafter, the Litigation Trust Board will inform in writing the Litigation Trustee of the value of the Litigation Trust Assets, based on the good faith determination of the Litigation Trust Board and the Litigation Trustee will apprise the beneficiaries of the Litigation Trust Interests and the holders of the Secured Working Capital Lender Claims of such valuation, and all parties must consistently use such valuation for all United States federal income tax purposes (including for determining gain, loss, or tax basis). If any holders of an Allowed Claim are treated as transferring any assets or property to the Litigation Trust in exchange for Litigation Trust Interests, no gain or loss will be recognized by such holders on such exchange because the holders, as owners of the Litigation Trust Interests are treated for federal income tax purposes as continuing to own the Litigation Trust Assets.

Each holder of an Allowed Claim receiving Litigation Trust Interests and each holder of a Secured Working Capital Lender Claim will be required to report on its United States federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Litigation Trust in accordance with its beneficial interest in the trust. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The United States federal income tax obligations of a holder are not dependent upon the Litigation Trust distributing any Cash or other proceeds. Therefore, a holder may incur a United States federal income tax liability with respect to its allocable share of the income of the Trust even if the Litigation Trust has not made a concurrent distribution to the holder. In general, a distribution of Cash or property by the Litigation Trust will not be taxable to the holder as such holder is already regarded for United States federal income tax purposes as owning the underlying assets of the Litigation Trust.

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to

determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its United States federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their United States federal income tax returns. Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

### 6. Ownership, Disposition and Exercise of Warrants

The Warrants will be treated as options to acquire stock for United States federal income tax purposes. Accordingly, a holder generally will not recognize gain or loss when the Warrants are exercised to acquire the underlying New Common Stock and the holder's aggregate tax basis in the New Common Stock acquired generally will equal the holder's aggregate tax basis in the exercised warrants increased by the exercise price. In such instance, a holder's holding period in the New Common Stock received upon exercise of a Warrant will commence on the day following the exercise of such warrant.

Upon the lapse or disposition of a Warrant, the holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the Warrant. In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending on whether the requisite holding period was satisfied.

Any adjustment to the number of shares of New Common Stock for which the Warrants may be exercised (or to the exercise price of the Warrants) may, under certain circumstances, result in constructive distributions that could be taxable to the holder of the Warrants, or possibly to the holders of New Common Stock.

Accordingly, holders of Warrants are urged to consult their tax advisors regarding the United States federal income tax consequences to them of owning, disposing and exercising the Warrants.

## C. INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under United States federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other TIN, (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded by the IRS to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of

transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the United States federal, state and local and foreign tax consequences applicable under the Plan.*

## XI. CLAIMS ALLOWANCE

### A. SCHEDULES OF ASSETS AND LIABILITIES

On October 20, 2008, the First Filed Debtors filed with the Bankruptcy Court the First Filed Debtors' Schedules. The First Filed Debtors amended the First Filed Debtors' Schedules on October 30, 2008 and January 16, 2009.

On December 2, 2008, SemCap filed with the Bankruptcy Court the SemCap Schedules.

### B. CLAIMS BAR DATE AND NOTICE OF BAR DATE

On January 8, 2008, the Bankruptcy Court entered an order (the "Bar Date Order") establishing (a) March 3, 2009 as the last date and time for each person or entity, other than governmental units, to file proofs of claim based on prepetition claims against the Debtors, (b) March 3, 2009 as the last date and time for governmental units to file Proofs of Claim against the First Filed Debtors, and (c) April 20, 2009 as the last date and time for governmental units to file Proofs of Claim against SemCap.

Pursuant to the terms of the Bar Date Order, the Debtors timely mailed a notice of the Bar Date and a Proof of Claim form to all known holders of Claims in connection with the preparation and filing of the Schedules. In addition, they also published the same notice in the following newspapers: *The Denver Post, Wichita Eagle, Billings Gazette, Albuquerque Journal, Casper Star Tribune, Bismarck Tribune, Kansas City Star, New York Times, Wall Street Journal, Tulsa World, The Oklahoman, The Houston Chronicle, The Dallas Morning News, Times-Picayune,* and *World-Herald.*

### C. ALLOWANCE AND IMPAIRMENT OF CLAIMS

To be entitled to receive a distribution under the Plan, a Creditor must have an Allowed Claim. To be entitled to vote on the Plan, however, a Creditor must either have an Allowed Claim that is also impaired or a temporarily Allowed Claim that is also impaired. If a Claim is either not allowed or, with respect to voting only, temporarily allowed, the Creditor will not be entitled to vote on the Plan or to receive a distribution. Any Class as to which no distribution is expected to be made under the Plan does not vote on the Plan and is deemed not to have accepted it. Any Class that is not impaired will be deemed to have accepted the Plan.

### *1.* **Allowed Claims**

A Claim is automatically allowed if (i) such Claim has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and no contrary proof of claim has been filed, (ii) a Proof of Claim with respect to such Claim has been timely filed and no objection thereto has been interposed within the time period set forth in Section 10.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or an objection thereto has been interposed and such Claim has been allowed in whole or in part by a Final Order, (iii) such Claim has been expressly allowed by a Final Order or under the Plan, or (iv) such Claim has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 9.1 of the Plan; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan.

### *2.* **Impaired Claims**

Under section 1124 of the Bankruptcy Code, a Class of Claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

### D. **OBJECTIONS TO CLAIMS**

In excess of 6,000 Proofs of Claim asserting Claims against the Debtors have been filed. The Debtors, together with Alix Partners, have begun the process of conducting a comprehensive review and reconciliation of these Claims. This process includes identifying particular categories of Proofs of Claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. To avoid the possibility of double or improper recovery by claimants and to reduce the number of Claims to streamline the voting process, the Debtors intend upon filing a series of omnibus objections to various categories of Claims, including, but not limited to duplicate Claims, amended or superseded Claims, Claims adjudicated by prior Court orders, and Claims fully satisfied or released. The Debtors and Reorganized Debtors reserve their rights to object to assigned Claims and seek the equitable subordination of Claims, if appropriate. Pursuant to Section 10.1 of the Plan, the Debtors will file and serve all objections to Claims within 180 days following the Confirmation Date or such alternate date as may be approved by the Bankruptcy Court.

## XII. VOTING PROCEDURES

### IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN:

All holders of undisputed Claims in Classes 53 through 55, 70 through 122, and 149 through 226 and all holders of Disputed Claims that have been allowed to vote on the Plan by an order of the Bankruptcy Court are entitled to vote on the Plan.

The Debtors have already completed or are in the process of completing the solicitation process with respect to the holders of Claims in Class 122 (White Cliffs Credit Agreement Claim), Classes 149-174 (Senior Notes Claims), or Classes 201-226 (General Unsecured Claims). The treatment under the Plan of the claims of the holders of claims in Class 122 (White Cliffs Credit Agreement Claim), Classes 149-174 (Senior Notes Claims), or Classes 201-226 (General Unsecured Claims) has not been altered from the treatment under the Second Amended Joint Plan of Affiliated Debtors that was approved by the Bankruptcy Court on July 21, 2009.

Holders of Claims in Class 122 (White Cliffs Credit Agreement Claim), Classes 149-174 (Senior Notes Claims), or Classes 201-226 (General Unsecured Claims) have been sent a Ballot for the Second Amended Joint Plan of Affiliated Debtors. If a Ballot for a holder of Claims in Class 122 (White Cliffs Credit Agreement Claim), Classes 149-174 (Senior Notes Claims), or Classes 201-226 (General Unsecured Claims) has been received by the Balloting Agent or is received by the Balloting Agent at the street address set forth below before the voting deadline of 4:00 p.m., Eastern Time, on October 21, 2009, such vote will be counted as a vote in favor of the Plan.

All holders of undisputed Claims in Classes 53-55 (Secured First Purchaser Producer Claims), Classes 70-95 (Secured Working Capital Lender Claims), Classes 96-121 (Secured Revolver/Term Lender Claims) and Classes 175-200 (Lender Deficiency Claims) and all holders of Disputed Claims that have been allowed to vote on the Plan by an order of the Bankruptcy Court are entitled to vote on the Plan and have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. To vote, holders of undisputed Claims in Classes 53-55 (Secured First Purchaser Producer Claims), Classes 70-95 (Secured Working Capital Lender Claims), Classes 96-121 (Secured Revolver/Term Lender Claims) and Classes 175-200 (Lender Deficiency Claims) should use only the Ballot that accompanies this Disclosure Statement and not any Ballot previously received by such holder.

All holders of Other Twenty-Day Claims shall receive an Election Notice in connection with the solicitation of votes to accept the Plan. Holders of Other Twenty-Day Claims are not entitled to vote to accept or reject the Plan. The Election Notice shall contain information regarding the terms of the Other Twenty-Day Claims Settlement, including the deadline for returning the Election Notice.

**TO CONSENT AND AGREE TO THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, A HOLDER MUST COMPLETE ITS ELECTION NOTICE AND RETURN IT TO THE BALLOTING AGENT BY THE SPECIFIED DEADLINE. IF A HOLDER ELECTS TO ACCEPT THE OTHER TWENTY-DAY CLAIMS SETTLEMENT, SUCH HOLDER WILL BE DEEMED TO HAVE CONSENTED AND AGREED TO RECEIVE TREATMENT FOR SUCH CLAIM THAT IS DIFFERENT**

FROM THAT SET FORTH IN SECTION 503(B)(9) OF THE
BANKRUPTCY CODE AND WILL BE BOUND BY THE TERMS OF
SUCH SETTLEMENT, INCLUDING THOSE SET FORTH ABOVE.

IF AN ELECTION NOTICE IS NOT RECEIVED BY THE
BALLOTING AGENT BY THE VOTING DEADLINE, OR IF THE
HOLDER ELECTS NOT TO PARTICIPATE ON ITS ELECTION NOTICE,
SUCH HOLDER WILL BE A NON-SETTLING PARTY AND SUBJECT TO
THE TREATMENT DESCRIBED IN SECTION I.B.11(B) HEREIN.

The Debtors have engaged Financial Balloting Group LLC, as their Balloting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE
RECEIVED BY THE BALLOTING AGENT AT THE STREET ADDRESS SET FORTH
BELOW (OR AS OTHERWISE DIRECTED) BEFORE THE VOTING DEADLINE OF
4:00 P.M., EASTERN TIME, ON OCTOBER 21, 2009.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE
BALLOTING AGENT AT THE NUMBER SET FORTH BELOW.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT EITHER
(A) DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE
PLAN OR (B) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE
PLAN WILL NOT BE COUNTED.

BALLOTS RECEIVED BY FACSIMILE, TELECOPY OR OTHER MEANS OF
ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES,
YOU MAY CONTACT THE BALLOTING AGENT AT:

FINANCIAL BALLOTING GROUP LLC
ATTN: SEMCRUDE, L.P.
757 Third Avenue, 3rd Floor
New York, NY 10017
Telephone: (866) 734-9393

Additional copies of this Disclosure Statement are available upon request made to the Balloting Agent, at the address or telephone number set forth immediately above.

A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Classes 70 through 122 and 149 through 226 are the only Classes under the Plan that are impaired and entitled to vote to accept or reject the Plan. Each holder of a Claim in any of these classes as of July 22, 2009 (the Record Date established in the Disclosure Statement Order for

purposes of this solicitation) or holder of a Disputed Claim that has been allowed to vote on the Plan by an order of the Bankruptcy Court may vote to accept or reject the Plan.

## B.    VOTE REQUIRED FOR ACCEPTANCE BY A CLASS

Under the Bankruptcy Code, a class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class that vote to accept or reject the plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.    VOTING PROCEDURES

### *1.*    **Voting Procedures**

Voting procedures will be as described in the Disclosure Statement Order.

### *2.*    **Withdrawal of Ballot**

Any holder of a Claim that has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Balloting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Balloting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawal.

Any holder that has delivered a valid Ballot may change its vote by delivering to the Balloting Agent a properly completed subsequent Ballot that is received by the Balloting Agent before the Voting Deadline.  In a case where more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted.

## XIII.  CONFIRMATION OF THE PLAN

## A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for October 26, 2009.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon (i) counsel for

the Debtors, Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201 (Attn: Martin A. Sosland), and Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899 (Attn: John H. Knight); (ii) counsel for the Agent Bank, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022-3598 (Attn: Margot B. Schonholtz and Marc D. Rosenberg), and Potter Anderson & Corroon, LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, Delaware 19801 (Attn: Laurie Selber Silverstein); (iii) counsel for the Unsecured Creditors' Committee, Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010 (Attn: Susheel Kirpalani and Joseph G. Minias), and Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801 (Attn: Bonnie Glantz Fatell); (iv) counsel for the Producers' Committee, Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, Texas 77002 (Attn: Hugh M. Ray), and Cole, Schotz, Meisel, Forman & Leonard P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Karen M. McKinley); and (v) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: William K. Harrington), so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on October 21, 2009.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.  REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 1.  Requirements of Section 1129(a) of the Bankruptcy Code

#### a.  General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means proscribed by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the

Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

- With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims installment payments in cash, over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date, equal to the allowed amount of such claims, and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan.

- At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

- Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

- The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

   b.   **Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. The Debtors believe that in a chapter 7 case, holders of General Unsecured Claims would receive no distributions of property. Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of

the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

c.      **Liquidation Analysis**

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in <u>Exhibit D</u> to this Disclosure Statement.

d.      **Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Debtors have prepared the Projections contained in Section VI.A., "Financial Information and Valuations." These projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on November 1, 2009. The projections include balance sheets, statements of operations, and statements of cash flows. Based upon the projections, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

*2.*      **Requirements of Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

a.      **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a chapter 11 plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

b.      **Fair and Equitable Test**

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Secured Claims.* Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- *Claims.* Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- *Equity Interests.* Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 279 is deemed to reject the Plan, because as to Class 279, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

## XIV.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Exhibit D. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a chapter 7 liquidation in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee, and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

### B.    ALTERNATIVE PLAN

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a

different chapter 11 plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets under chapter 11. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to the Plan because of the greater return provided by the Plan.

## C. CONTINUATION OF THE BANKRUPTCY CASE

If the Debtors remain in Chapter 11, they could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted Chapter 11 Cases. In particular, the Debtors could have difficulty obtaining financing, through the Postpetition Financing Agreement or otherwise, to sustain the day-to-day operational requirements of their businesses, including the increased costs due to remaining chapter 11 debtors-in-possession.

## XV. CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 53 through 55, 70 through 122 and 149 through 226 to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than **4:00 p.m. (prevailing Eastern Time) on October 21, 2009**.

Dated:    September 25, 2009
             Wilmington, Delaware

Respectfully submitted,

SEMCRUDE, L.P., et al.,

Debtors

By:  /s/ Terrence Ronan
      Terrence Ronan
      Authorized Officer