# Exhibit D

## Liquidation Analysis

# LIQUIDATION ANALYSIS

## INTRODUCTION

Pursuant to section 1129(a)(7) of the Bankruptcy Code,[1] each holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test"). In connection with this requirement, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared by Debtors. The purpose of the Liquidation Analysis is to provide information so that the Bankruptcy Court may determine that the Plan is in the best interests of all Classes impaired by the Plan.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS' MANAGEMENT AND THEIR ADVISORS. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS WILL RESULT IN THE PROCEEDS WHICH WOULD BE REALIZED WERE THE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA").

---

[1] All capitalized terms used in this liquidation analysis that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## GENERAL ASSUMPTIONS

General assumptions underlying the Liquidation Analysis are described below. It is assumed for purposes of this analysis that the case is converted to a proceeding under chapter 7 of the Bankruptcy Code on November 1, 2009, a trustee is appointed to oversee the liquidation, and the liquidation occurs over a period of nine months.

METHODOLOGY

It is assumed the appointed chapter 7 trustee will retain lawyers, financial advisors and investment bankers to assist in the liquidation. Further, it is assumed that the Debtors obtain authorization to use a certain level of "cash collateral" (as defined in section 363 of the Bankruptcy Code) to fund a minimum baseline level of operation of the business during the liquidation in order to fund asset sales and wind-down of the estate.

The Liquidation Analysis further assumes the business units are marketed as going concerns on an accelerated timeline and sale transactions are consummated within a relatively short time from commencement of liquidation. Given the accelerated time frame, erosion of value is assumed driven by, among other things: (a) negative customer and supplier reaction; (b) the loss of key personnel; (c) lack of meaningful financing to fund working capital or provide letters of credit; (d) predatory actions of competitors; (e) the interruption of construction and capital improvement projects; and (f) the general forced nature of the sale.

ESTIMATE OF GROSS PROCEEDS AVAILABLE FOR DISTRIBUTION

The Debtors have already undertaken a marketing process for the substantial majority of its assets and the results of the marketing process have formed the basis for the estimate of proceeds that would be realized in the liquidation. In arriving at the estimates of cash proceeds which might be realized from a liquidation of the assets, the Debtors have valued each business unit separately.[1]

The gross sale proceeds assumed realizable from each business unit in a liquidation was based in part upon formal indications of interest received during the marketing process for the Debtors' assets, and to the extent formal indications were not received, either informal feedback provided by bidders during the sale processes, or by reference to individual asset Plan values. The Debtors also considered the forced sale nature of liquidation, and the negative impact it would have on realizable value. For the high recovery case, Blackstone referenced the higher end of the final indications of interest received for the assets excluding working capital (or Plan value, as adjusted), and for the low recovery case, assumed a 25% discount to the high value. To such hard asset value, an estimate was added for the projected working capital balances at net realizable values. Projected realizable working capital values considered, among other things, projected volumes, forward price curves, and forced sale discounts.

---

[1] Business units include (i) SemCrude, which consists of the Kansas and Oklahoma Pipeline and the Cushing Storage; (ii) White Cliffs; (iii) SemCAMS; (iv) SemCanada Crude, which consists of the SemCanada Crude business, and which includes the SemCrude North Dakota assets; (v) SemStream, which consists of the SemStream Arizona Propane business and the SemStream business; (vi) SemGas, which consists of the SemGas terminals and Wyckoff; (vii) SemEuro; and (viii) SemMexico. The SemFuel sale transaction is projected to close prior to the commencement of the chapter 7 process, and cash proceeds from the sale are included in cash.

2

Additional value from litigation recoveries are anticipated, however these recoveries have not been estimated or reflected in the analysis.

ESTIMATE OF COSTS OF LIQUIDATION

The Debtors' costs of liquidation under chapter 7 would include fees payable to a chapter 7 trustee as well as fees payable to attorneys, investment bankers, and other professionals retained by the trustee. Additional costs include compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by any statutory committee of secured or unsecured creditors appointed by the trustee pursuant to section 705 of the Bankruptcy Code and costs and expenses of the members of any statutory committee of secured or unsecured creditors so appointed. Costs related to accrued and unpaid professional fees incurred during the Chapter 11 Cases and covered under the Carve Out (as defined in the Postpetition Financing Order) have been included in the Liquidation Analysis. Costs related to corporate support of the business units during the liquidation process, as well as other wind-down costs have also been included in the Liquidation Analysis. Finally, the costs of the liquidation also include the estimated amount of operating losses to be incurred by the Debtors during the liquidation.

DISTRIBUTION OF NET PROCEEDS UNDER ABSOLUTE PRIORITY RULE

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 7 priority, secured and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule and have been analyzed through a value allocation model that, among other things, considers assets and claims (including intercompany claims) at each Debtor and non-Debtor subsidiary.

CONCLUSION

THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING CHART, THAT CONFIRMATION OF THE PLAN WILL PROVIDE ALL CREDITORS A RECOVERY THAT IS NOT LESS THAN THEY WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

In addition, the Debtors believe that the value of distributions, to the extent available, from the liquidation proceeds would be further reduced because such distributions in a chapter 7 case may not occur until after the nine month period assumed in the analysis. Moreover, in the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased. THE EFFECTS OF THIS DELAY ON THE VALUE OF DISTRIBUTIONS UNDER THE HYPOTHETICAL LIQUIDATION HAVE NOT BEEN CONSIDERED.

A detailed summary of the Liquidation Analysis is described below.

# DETAILED LIQUIDATION ANALYSIS

The table below provides the detailed calculation of the recoveries under a chapter 7 liquidation and should be read in conjunction with the accompanying footnotes.

## SemGroup, L.P. et al.
### Liquidation Analysis – Proceeds
*($ in millions)*

|  | Recovery | |
|---|---|---|
|  | Low | High |
| **Gross Proceeds Available for Distribution** | | |
| Cash | $ 1,054 | $ 1,054 |
| Asset Values: | | |
| SemCrude L.P. | 195 | 250 |
| White Cliffs Pipeline LLC | 165 | 220 |
| Subtotal - U.S. Crude Operations | 360 | 470 |
| SemCAMS ULC | 120 | 160 |
| SemCanada Crude Company | 90 | 120 |
| Subtotal - Canadian Operations | 210 | 280 |
| SemStream L.P. | 165 | 205 |
| SemGas L.P. | 35 | 50 |
| SemLogistics Milford Haven Limited (Net of Local Debt) | 55 | 75 |
| SemMexico LLC | 10 | 15 |
| Subtotal - Gross Proceeds from Business Units | 835 | 1,095 |
| Litigation Recoveries | - | - |
| Total Gross Proceeds | $ 1,890 | $ 2,149 |
| **Costs Associated with Liquidation** | | |
| Chapter 7 Trustee Fees | $ (80) | $ (90) |
| Professional Fees | (65) | (50) |
| Business Unit Operating Costs | (81) | (66) |
| Overhead | (15) | (13) |
| Total Liquidation Costs | (241) | (219) |
| **Net Proceeds Available for Distribution** | $ 1,649 | $ 1,931 |
| **Mid-Point of Net Proceeds Available for Distribution** | $ 1,790 | |

## SemGroup, L.P. et al.
## Liquidation Analysis – Allocation of Proceeds
*($ in millions)*

|  | Allowable Claim | Midpoint Recovery | Midpoint Recovery |
|---|---:|---:|---:|
| **Net Proceeds Available for Distribution** |  | $ 1,790 |  |
| **Post-Petition Secured Claims** |  |  |  |
| Professional Fee Carve-Out | $ 24 | $ 24 | 100% |
| Super Priority Administrative (DIP) | 95 | 95 | 100% |
| Total Unclassified | 119 | 119 | 100% |
| *Proceeds Available for Remaining Claims* |  | 1,671 |  |
| **Pre-Petition Secured Claims** |  |  |  |
| Revolver | $ 668 | $ 357 | 53% |
| Working Capital Facility | 1,734 | 875 | 50% |
| Term B Notes | 143 | 76 | 53% |
| GECC Construction Project Financing | 120 | 120 | 100% |
| Secured Financial Trades | 480 | 242 | 50% |
| Total Secured Claims | 3,146 | 1,671 | 53% |
| *Proceeds Available for Administrative / Priority Claims* |  | - |  |
| **Administrative / Priority Claims** |  |  |  |
| Administrative Claims | 5 | - | 0% |
| 503(b)9 Claims | 295 | - | 0% |
| Post-Petition Trade and Other | 96 | - | 0% |
| Total Administrative / Priority Claims | 396 | - | 0% |
| *Proceeds Available for Unsecured Claims* |  | - |  |
| **General Unsecured Claims** |  |  |  |
| Producer Claims[1] | 274 | - | 0% |
| Accounts Payable | 277 | - | 0% |
| Senior Notes | 610 | - | 0% |
| Unsecured Financial Trades | 29 | - | 0% |
| Litigation Claims | TBD | - | 0% |
| SERP Claims | 13 | - | 0% |
| Rejection Claims (Estimated) | 100 | - | 0% |
| Intercompany Claims | 7,270 | - | 0% |
| Total General Unsecured | 8,573 | - | 0.0% |
| *Proceeds Available for Equity Interests* |  | - | 0.0% |
| **Total Distributions** |  | $ 1,671 |  |

---

[1] Excluding Producer claims included in 503(b)(9) Claims above.

5

RLF1-3397230-1

# DISCUSSION OF LIQUIDATION PROCEEDS

CASH

Cash represents the total projected cash balance at October 31, 2009 for U.S. and Canadian entities, including restricted cash. As noted above, the cash balance includes the anticipated proceeds from the sale of SemFuel and the wind-down of SemMaterials.

BUSINESS UNIT SALE PROCEEDS

The gross sale proceeds assumed realizable from each business unit in a liquidation was based in part upon formal indications of interest received during the marketing process for the Debtors' assets, and to the extent formal indications were not received, either informal feedback provided by bidders during the sale processes, or by reference to individual asset Plan values. The Debtors also considered the forced sale nature of liquidation, and the negative impact it would have on realizable value. For the high recovery case, Blackstone referenced the higher end of the final indications of interest received for the assets excluding working capital (or Plan value, as adjusted), and for the low recovery case, assumed a 25% discount to the high value. To such hard asset value, an estimate was added for the projected working capital balances at net realizable values. Projected realizable working capital values considered, among other things, projected volumes, forward price curves, and forced sale discounts.

As currently contemplated by the Debtors, the SemFuel sale transaction will close prior to the commencement of the chapter 7 proceeding. As such, the cash balance in the Liquidation Analysis reflects the estimated proceeds of approximately $75 million. Further, the Debtors are in the process of liquidating the SemMaterials business. It is anticipated that the SemMaterials assets will be completely liquidated prior to the assumed date the chapter 7 liquidation would begin. As such, the cash balance in the Liquidation Analysis reflects net proceeds expected to be realized from the SemMaterials liquidation of approximately $76 million. All other assets are presumed sold as soon as possible to minimize, to the extent possible, negative impacts to value.

CHAPTER 7 TRUSTEE FEES

Trustee fees include costs associated with the appointment of a chapter 7 trustee and are calculated as follows: 25% of the first $5 million in gross proceeds, 10% on the next $45 million, 5% on the next $950 million, and 3% on all gross proceeds thereafter. This fee amount is consistent with section 326 of the U.S. Bankruptcy Code.

PROFESSIONAL FEES

Professional fees include the cost of attorneys, accountants and other professionals retained by the chapter 7 trustee, the Prepetition Lenders and the Creditors' Committee retained in the cases. Total professional fees assumed incurred during the chapter 7 are estimated to be approximately $45 million based on an anticipated monthly run-rate, including the costs of winding down the operations and making all required distributions. Further, it is assumed both the secured creditors and the unsecured creditors will each retain an advisor. The advisory fees for the first three months of the chapter 7 proceeding are assumed consistent with the historical

fees incurred in the Chapter 11 Cases and decrease incrementally every three months. In the low recovery case, a 20% increase has been applied to the total professional fees (exclusive of the M&A fees).

BUSINESS UNIT OPERATING COSTS

The business unit operating costs include the operating expenses of the business units and the expenses associated with the wind-down of the estate throughout the chapter 7 proceeding. All business units except for SemStream and Wyckoff are assumed to be sold four months after the conversion to a chapter 7 proceeding. During these four months, the business unit operating costs consist of the operating expenses and the general and administrative expenses for each business unit. For the five months after the consummation of the sale transactions, it is assumed there will be wind-down costs associated with each business unit. These costs are estimated at half of the monthly general and administrative expenses incurred by the business unit during the four months of operations during the chapter 7 proceeding.

SemStream is assumed to be sold within one month of the conversion of the case to a chapter 7 proceeding. Operating costs for SemStream assume an immediate 80% reduction in its workforce with one month's severance. Operating expenditures are assumed to decrease over November and December. The remaining 20% of employees continue to be employed for November, December, and January to assist in the wind-down of the estate. Wyckoff is assumed to be transferred to Kaiser Fancis in exchange for forgiveness of the outstanding debt.

As SemMexico and SemEuro have not filed for bankruptcy and have continued to operate as going concerns throughout the Chapter 11 Cases, it is presumed that this will continue until a sale. It is assumed that no material capital expenditures are incurred during the chapter 7 proceeding. For these two business units, operating costs net of revenues are approximated by the projected operating cash flow through February 28, 2010, the assumed sale date.

The low recovery scenario assumes a 20% increase to the business unit operating costs.

OVERHEAD

The wind-down of the estate is projected to last from November 1, 2009 through July 31, 2010. As the liquidation of the estate includes the sale of the business units, it is assumed the employees of the business units remain employed until the sale date of each business unit. The cost of these employees is included in the business unit operating costs above. However, upon conversion to chapter 7 proceeding, a reduction in the Debtor's workforce will affect 50% of corporate employees as of November 1, 2009. It is assumed that WARN will not be triggered and employees are paid two month's severance. Benefits for remaining employees will continue to be equal to 30% of wages. It is assumed that there will be retention bonuses equal to 30% of wages distributed to corporate employees upon completion of the wind-down of the estate. There are no additional bonuses or any stock-based compensation assumed in the analysis. The wind-down costs include the fees for tax and accounting advisors in the first four months of 2010. Bank fees have recently been zero due to lack of activity; the assumption is that these fees will remain zero throughout the projection period. It is assumed that sales and use tax consultants will be used throughout the chapter 7 process, totaling $50,000 per month. IT license

7

fees are assumed to transfer over to the individual business unit buyers upon completion of the liquidation.

The overhead costs assume that SemGroup consolidates to one floor of the SemGroup office building after three months in chapter 7; property taxes and utilities are reduced accordingly. It is assumed that insurance contracts and premiums remain in place throughout the liquidation. Expenses for office supplies and other miscellaneous costs are reduced by half immediately upon the reduction in the Debtor's workforce.

The low recovery scenario assumes that these costs are increased 20%.

# DISCUSSION OF ALLOCATION OF PROCEEDS

POSTPETITION SECURED CLAIMS

Per the Postpetition Financing Order, the Debtors' advisors and the Creditors' Committee's advisors are entitled to a fee carve-out in the event of a chapter 7 liquidation. These advisors are entitled to $4 million in addition to all unpaid professional fees and disbursements allowed by the Bankruptcy Court that were incurred prior to the occurrence of the chapter 7 conversion. The fees that are projected to be allowed by the Bankruptcy Court are estimated at $20 million. As these are administrative claims of the chapter 7 proceeding, the $24 million in professional fees are assumed to be paid in full.

The Postpetition Financing Claims are secured by a first priority lien on all of the restricted assets of SemGroup L.P and its subsidiaries. The Postpetition Financing Agreement has been used primarily for the issuance of letters of credit during the Chapter 11 Cases and for cash draws for margin collateral required to be posted. It is assumed all letters of credit are fully drawn upon at the time a liquidation would commence. The Postpetition Financing Agreement will have administrative status in the chapter 7 proceeding and therefore will be paid in full.

PREPETITION SECURED CLAIMS

It is assumed that all secured debt claims at non-Debtor entities are paid in full upon the sale of their collateral. Accordingly, the White Cliffs Credit Agreement and the SemEuro Credit Agreement are assumed to be paid in full from the respective sale proceeds. It has been assumed that Wyckoff will be transferred to Kaiser-WGSP in settlement of secured construction debt outstanding of Wyckoff.

It is assumed that the Prepetition Lenders are paid the Pro Rata Share of their collateral value. The Prepetition Lenders holding Working Capital Lender Claims would receive their Pro Rata Share of the value of the working capital collateral, which totals approximately $1,117 million. The Prepetition Lenders holding Revolver/Term Lender Claims would receive their Pro Rata Share of the value of the fixed assets, which totals approximately $434 million.

Further, there are approximately $2 million of undrawn prepetition letters of credit. It is assumed that upon conversion to a chapter 7 proceeding, these letters of credit would be immediately drawn and included in the Working Capital Lender Claims.

ADMINISTRATIVE / PRIORITY CLAIMS

Chapter 11 administrative and priority claims (other than those described above in Postpetition Secured Claims) receive no recovery under the Liquidation Analysis.

GENERAL UNSECURED CLAIMS

Chapter 11 general unsecured claims receive no recovery under the Liquidation Analysis.