## Exhibit E

## Historical Financial Statements

SemGroup, L.P
Consolidated Balance Sheets
*($ in thousands)*

| Assets | | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2005 | | 2006 | | 2007 | | 2008 |
| **Current Assets:** | | | | | | | | |
| Cash and cash equivalents | $ | 56,968 | $ | 78,774 | $ | 33,325 | $ | 605,350 |
| Accounts receivable [1] | | 1,690,691 | | 1,371,407 | | 1,419,823 | | 119,723 |
| Receivable from Affiliate | | - | | - | | 323,832 | | 71,179 |
| Inventories, net | | 495,814 | | 697,524 | | 751,356 | | 92,598 |
| Derivative assets | | 70,411 | | 51,446 | | 101,259 | | 24,536 |
| Margin deposits | | 230,550 | | 659,260 | | 245,164 | | 8,601 |
| Current assets of discontinued operations | | - | | - | | 354,178 | | 123,606 |
| Other current assets | | 12,358 | | 31,057 | | 168,461 | | 22,593 |
| **Total Current Assets** | | 2,556,792 | | 2,889,468 | | 3,397,398 | | 1,068,186 |
| **Non-Current Assets:** | | | | | | | | |
| Property, plant and equipment [2] | | 673,612 | | 1,063,855 | | 1,141,304 | | 715,193 |
| Other Receivables [3] | | - | | - | | - | | 651,240 |
| Investment in unconsolidated subsidiaries | | - | | - | | - | | 102,598 |
| Goodwill | | 82,002 | | 126,080 | | 141,893 | | 43,607 |
| Long-term derivative assets | | 81,247 | | 20,915 | | 52,390 | | - |
| Investment in affiliates | | 4,122 | | 153,335 | | 15,975 | | - |
| Notes Receivable | | - | | - | | - | | 132,571 |
| Long-term assets of discontinued operations | | - | | - | | 392,238 | | 26,248 |
| Other long-term assets, net | | 156,779 | | 194,952 | | 203,236 | | 37,393 |
| **Total Assets** | $ | 3,554,554 | $ | 4,448,605 | $ | 5,244,434 | $ | 2,777,036 |
| **Liabilities and Partners' Capital** | | | | | | | | |
| **Current liabilities:** | | | | | | | | |
| Accounts payable | $ | 1,615,925 | $ | 1,300,380 | $ | 1,485,454 | $ | 35,296 |
| Accrued liabilities | | 191,616 | | 185,193 | | 234,096 | | 60,957 |
| Book overdrafts | | 960 | | - | | - | | - |
| Deferred income taxes | | 699 | | 745 | | 18,089 | | 102 |
| Derivative liabilities | | 325,490 | | 714,673 | | 464,650 | | 13,202 |
| Current liabilities of discontinued operations | | - | | - | | 273,584 | | 8,407 |
| Current portion of long-term debt | | 8,180 | | 9,974 | | 5,331 | | 179,720 |
| **Total Current Liabilities** | | 2,142,870 | | 2,210,965 | | 2,481,204 | | 297,684 |
| Liabilities Subject to Compromise | | - | | - | | - | | 5,249,979 |
| **Non-Current Liabilities:** | | | | | | | | |
| Long-term debt | | 942,127 | | 1,671,614 | | 2,574,660 | | 430 |
| Deferred income taxes | | 117,621 | | 127,812 | | 113,968 | | 34,327 |
| Long-term liabilities of discontinued operations | | - | | - | | 478 | | 701 |
| Other long-term liabilities | | 66,547 | | 78,725 | | 96,655 | | 461 |
| Investment in unconsolidated subsidiary | | - | | - | | - | | 613,935 |
| Minority interest | | - | | - | | 319,611 | | 2,212 |
| **Partners' Capital:** | | | | | | | | |
| Limited partners' capital | | 253,198 | | 307,824 | | (424,168) | | (3,316,902) |
| General partner's capital | | 8,413 | | 9,252 | | (6,011) | | (65,720) |
| Accumulated other comprehensive income | | 23,778 | | 42,413 | | 88,037 | | (40,071) |
| **Total partners' capital** | | 285,389 | | 359,489 | | (342,142) | | (3,422,693) |
| **Total liabilities and partners' capital** | $ | 3,554,554 | $ | 4,448,605 | $ | 5,244,434 | $ | 2,777,036 |

Notes:
2005, 2006 and 2007 financial statements reflect audits performed by PricewaterhouseCoopers

2006 results reflect the Restated Financial Results

2008 financial statements reflect the audit performed by BDO Seidman

[1] Accounts receivable are net of allowance of $1,728, $1,653, $3,587 and $4,889 at December 31, 2005, 2006, 2007 and 2008

[2] Property, plant and equipment are net of accumulated depreciation of $70,096, $128,440, $196,907 and $96,415 at December 31, 2005, 2006, 2007 and 2008

[3] Other receivables are net of allowance of $18,664 at December 31, 2008

1. **ORGANIZATION AND BASIS OF CONSOLIDATION AND PRESENTATION**

**ORGANIZATION** – SemGroup, L.P. and Subsidiaries (Debtor-in-Possession) (collectively, the "Partnership") is an Oklahoma limited partnership, which provides gathering, transportation, storage, distribution, marketing and other midstream services primarily to independent producers and refiners of petroleum products located along the North American energy corridor from the Gulf Coast region and Mexico to central Canada. The Partnership has a significant asset base consisting primarily of pipelines, gathering systems, processing plants, storage facilities, terminals and other distribution facilities located between North American production and supply areas including the Gulf Coast, Mid-Continent and Alberta and areas of high demand such as the Midwest region of the United States. The Partnership also has storage, terminal and marine facilities at Milford Haven in the United Kingdom with pipeline connectivity to nearby refiners that enables the Partnership to supply product to the United States East or Gulf Coast markets.

**SEMGROUP ENERGY PARTNERS, L.P. ("SGLP")** – Effective July 23, 2007, SemGroup Holdings, L.P. ("Holdings"), a wholly owned subsidiary of the Partnership, closed the initial public offering of 14,375,000 of SGLP's common units, including 1,875,000 common units issued to the underwriters in connection with the exercise of their over-allotment option. The common units offered to the public represented an aggregate 52.3% limited partner interest in SGLP. The Partnership, which remains a privately held company, contributed approximately $108.0 million in crude oil assets. SemGroup Energy Partners G.P., L.L.C., a wholly owned subsidiary of Holdings, is the general partner of SGLP.

From the issuance of 12,500,000 common units of SGLP, Holdings received net proceeds of $256.1 million. The net proceeds of $256.1 million along with net proceeds of $136.5 million distributed to Holdings from borrowings under SGLP's credit facility and proceeds of $200.0 million from the new U.S. term loan were used to repay $141.6 million of outstanding borrowings under the current U.S. term loan, $171.1 million of outstanding borrowings under the Canadian term loan, $187.0 million of outstanding borrowings under the revolving credit facility and to fund offering related expenses.

On July 23, 2007, SGLP issued 1,875,000 of its common units associated with the underwriters' over-allotment option and received net proceeds of $38.0 million, which were used to repay outstanding borrowings under SGLP's credit facility.

On February 20, 2008, SGLP purchased 46 liquid asphalt cement and residual fuel oil terminalling and storage facilities from a subsidiary of the Partnership for $378.8 million. Concurrently, SGLP issued 6,000,000 common units, receiving proceeds, net of underwriting discounts, of $136.1 million. SGLP's general partner also made a capital contribution of $2.9 million to maintain its 2.0% interest in SGLP. On March 5, 2008, SGLP issued an additional 900,000 common units, receiving proceeds, net of underwriting discounts, of $20.6 million, in connection with the underwriters' exercise of their over-allotment option in full. SGLP's general partner made a corresponding capital contribution of $0.4 million to maintain its 2.0% interest in SGLP. On May 12, 2008, SGLP purchased a pipeline system in Oklahoma from a subsidiary of the Partnership for $45.0 million by using funds available under SGLP's revolving credit facility. On May 30, 2008, SGLP purchased eight crude oil storage tanks located in Oklahoma from a subsidiary of the Partnership for $90.0 million by using funds available under SGLP's revolving credit facility.

Through July 22, 2008, the Partnership retained controlling interest in SGLP through its indirect ownership of a 36.4% limited partner interest represented by 12,570,504 subordinated units,

1

690,725 general partner units and incentive distribution rights. The Partnership consolidated SGLP in accordance with Emerging Issues Task Force ('EITF') Issue No. 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights". As such, no gain or loss was recognized for the initial public offering of SGLP or the sale of assets to SGLP, and the ownership of the public common units was reflected as a minority interest in the consolidated balance sheet.

On July 22, 2008, the creditors of Holdings exercised their option under Holdings' credit facility to take control of Holdings' Management Committee. As such, the Partnership lost the elements of control and deconsolidated Holdings as of July 22, 2008 (see "Basis of Consolidation and Presentation").

**BASIS OF CONSOLIDATION AND PRESENTATION** – The accompanying consolidated financial statements include the accounts of SemGroup, L.P. and its wholly-owned, majority owned and controlled subsidiaries and present the Partnership's consolidated financial position as of December 31, 2008, 2007, 2006 and 2005, and the results of operations, changes in partners' capital (deficit) and cash flows for the years then ended. All intercompany transactions have been eliminated except sales and purchases with discontinued operations, which are expected to be replaced by sales and purchases with third parties.

The accompanying consolidated financial statements have been prepared in accordance with Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("SOP 90-7"), which requires that financial statements, for periods subsequent to the Chapter 11 filings, distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Accordingly, certain income, expenses, realized gains and losses and provisions for losses that are realized or incurred in the Chapter 11 cases are recorded in reorganization expense on the Partnership's consolidated statements of operations and comprehensive loss. In addition, prepetition obligations impacted by the Chapter 11 cases have been estimated and classified as liabilities subject to compromise in the accompanying consolidated balance sheet.

On July 22, 2008, the Partnership's Canadian subsidiaries (collectively, "Canada") filed an application for creditor protection under the Companies' Creditors Arrangement Act ("CCAA") in Canada. The administration of the CCAA proceedings in a jurisdiction other than that of the U.S. debtors resulted in a loss of the elements of control. On July 23, 2008, the Partnership assigned control of Wyckoff Gas Storage Company, L.L.C. ("Wyckoff") to Kaiser-WGSP Company, L.L.C. ("Kaiser"). The Partnership owns 51% of the membership interests in Wyckoff; however due to filing for bankruptcy, the Partnership was no longer able to operate Wyckoff and therefore assigned control to Kaiser.

The Partnership does not control Holdings (see "SemGroup Energy Partners, L.P."), Canada, or Wyckoff and has deconsolidated these subsidiaries as of July 22, 2008. The Partnership has accounted for its investments in Holdings, Canada and Wyckoff under the cost method and as such, the accounts of Holdings, Canada and Wyckoff are not included in the consolidated financial position as of December 31, 2008, but are included in the Partnership's consolidated financial position as of December 31, 2007, 2006 and 2005. Income (loss) and cash flows of Holdings, Canada and Wyckoff through the date of the change in control is included in the statements of operations and cash flows for the year ended December 31, 2008.

In accordance with the provisions related to discontinued operations within Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal

2

of Long-Lived Assets" ("SFAS 144"), the accompanying consolidated financial statements and notes reflect the results of operations and financial position of the Partnership's asphalt and international refined products marketing businesses as discontinued operations. Unless otherwise indicated, the information in the notes to consolidated financial statements relates to the Partnership's continuing operations.

2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

CASH AND CASH EQUIVALENTS - Cash includes cash on-hand, demand and time deposits and funds invested in highly liquid debt instruments with maturities of three months or less at date of purchase. Balances at financial institutions may, at times, exceed federally insured limits.

ACCOUNTS RECEIVABLE – Accounts receivable included in the consolidated balance sheets are reflected net of the allowance for doubtful accounts. Management's assessment of the allowance for doubtful accounts is based on the overall creditworthiness of the customers, existing economic conditions and the amount and age of past due accounts. The Partnership enters into netting arrangements with a significant number of its counterparties which helps mitigate credit risk. However, receivables subject to netting are presented as a gross receivable until such time as the balances are net settled. Receivables are considered past due if full payment is not received by the contractual due date. Past due accounts are generally written off against the allowance for doubtful accounts only after all collection attempts have been exhausted.

RECEIVABLE FROM AFFILIATES – Receivable from affiliates includes amounts due from Canada, Holdings and Wyckoff as they are no longer consolidated subsidiaries and the receivable from an entity owned by an ex-officer of the Partnership. At December 31, 2008, the Partnership has an allowance for doubtful accounts of $285.5 million related to the receivable from the entity and an additional allowance of $36.9 million related to the receivable    from    Canada    for prepetition amounts due to the Partnership. At December 31, 2007, receivables from affiliates includes amounts due from the entity owned by an ex-officer and does not include an allowance for doubtful accounts.

INVENTORIES - Inventories consist of crude oil, refined products, asphalt, natural gas and natural gas liquids in pipelines and storage tanks, which are valued at the lower of cost or market, with costs generally determined using the weighted average cost method. The cost of inventory also includes applicable transportation costs to move the commodity to storage. Non-cash charges of $140.1 million to reduce inventory to market value were recorded for the year ended December 31, 2008. There were no non-cash charges to reduce inventory to market value recorded for the year ended December 31, 2007, but non-cash charges of $39.6 million and $11.6 million to reduce inventory to market value were recorded for the years ended December 31, 2006 and 2005.

The Partnership enters into exchanges with third parties whereby the Partnership acquires products that differ in terms of geographic location, grade of product or scheduled delivery date from products the Partnership has available for sale. These exchanges are valued at cost, and although a transportation, location or product differential may be recorded, generally no gain or loss is recognized.

3

**PROPERTY, PLANT AND EQUIPMENT** – Property, plant and equipment are recorded at cost. The Partnership also capitalizes expenditures for the replacement of partially or fully depreciated assets in order to maintain the service capability, level of production, and/or functionality of its existing assets. As a component of the cost of property, plant and equipment, the Partnership capitalizes interest related to costs incurred while an asset is being constructed and prior to being placed in service. The Partnership capitalized $11.0 million, $6.2 million, $8.2 million and $1.7 million in interest costs during the years ended December 31, 2008, 2007, 2006 and 2005, respectively. Expenditures for maintenance and repairs that do not add capacity or extend the useful life of an asset are expensed as incurred. The carrying value of the assets is based on estimates, assumptions and judgments relative to useful lives and salvage values. As assets are disposed of, the cost and related accumulated depreciation are removed from the accounts, and any resulting gain or loss is included in other expenses in the consolidated statements of operations and comprehensive loss.

Depreciation is calculated primarily on the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Pipelines and facilities | 10 – 31 years |
| Storage and terminal facilities | 10 – 25 years |
| Transportation equipment and injection stations | 3 – 10 years |
| Office property and equipment and other | 3 – 15 years |

**PIPELINE LINEFILL** – Pipeline linefill consists of linefill used to pack a pipeline such that when an incremental barrel enters a pipeline, a barrel is forced out at another location, as well as the minimum requirements necessary to operate the storage and terminal facilities. Linefill in pipelines operated by the Partnership is recorded at historical cost and is included in property, plant and equipment in the consolidated balance sheets. The Partnership also has pipeline linefill in third party pipelines, which is recorded at historical cost and is included in inventory in the consolidated balance sheets.

**ASSET RETIREMENT OBLIGATIONS** – SFAS No. 143, "Accounting for Asset Retirement Obligations" ("SFAS 143"), establishes accounting requirements for retirement obligations associated with tangible long-lived assets. SFAS 143 requires that the cost for asset retirement be capitalized as part of the cost of the related long-lived asset.

The Partnership's asset retirement obligation resulted from its ownership in natural gas processing facilities and compression and gathering systems in Canada. As a result of the deconsolidation of Canada as of July 22, 2008, the Partnership no longer has an asset retirement obligation recorded in the consolidated balance sheet. The net present value of cash flows required to settle the Partnership's asset retirement obligation of approximately $32.8 million at December 31, 2007, is reported in other long-term liabilities on the consolidated balance sheet. The net present value of cash flows required to settle the Partnership's asset retirement obligation of approximately $28.2 million and $27.8 million at December 31, 2006 and 2005, respectively, is reported in other long-term liabilities on the consolidated balance sheet.

4

**OTHER RECEIVABLES** – The Partnership has many counterparties that are both customers and suppliers, which have both accounts receivable and accounts payable with the Partnership. As a result of the Partnership's petition for relief under Chapter 11, these counterparties have filed damage claims or have claimed offsetting liabilities reflected in liabilities subject to compromise and believe these payables should be netted against amounts owed to the Partnership consistent with industry practice. However, the Producer Committee claims the receivables should not be offset against the payables. The accounts receivable and accounts payable from these counterparties are presented in the consolidated balance sheet on a gross basis in other receivables and liabilities subject to compromise. The other receivables are shown as long-term receivables due to uncertainty regarding the timing of collection or possible offset against related payables. The Partnership cannot determine when the bankruptcy court will rule on the netting of accounts receivable and accounts payable.

Other receivables included in the consolidated balance sheet are reflected net of the allowance for doubtful accounts. Management's assessment of the allowance for doubtful accounts is based on the overall creditworthiness of the customers, existing economic conditions and the amount and age of past due accounts. Management's assessment of the allowance for doubtful accounts was performed on the gross receivable, before consideration of any possible payables offset. The Partnership had an allowance of $18.7 million recorded at December 31, 2008, which is included as bad debt within reorganization expense in the consolidated statement of operations and comprehensive loss.

Other receivables from two customers were approximately 81% of total other receivables at December 31, 2008.

**IMPAIRMENT OF LONG-LIVED ASSETS** - Long-lived assets with recorded values that are not expected to be recovered through future cash flows are written down to their estimated fair value in accordance with SFAS No. 144. Under SFAS 144, an asset must be tested for impairment when events or circumstances indicate that its carrying value may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value exceeds the sum of the undiscounted cash flows, an impairment loss equal to the amount of the carrying value in excess of the fair value of the asset is recognized. Fair value is generally determined from estimated discounted future net cash flows.

The Partnership performed an analysis of its long-lived assets as of December 31, 2008 as a result of the Partnership's petition for relief under Chapter 11. The Partnership tested for impairment in accordance with the provisions of SFAS 144 and the results of the analysis indicated that the long-lived assets of the Partnership's refined products subsidiary were impaired. As such, the Partnership recorded an impairment loss of $13.7 million for the year ended December 31, 2008. As a result of bankruptcy the Partnership abandoned, discontinued or otherwise disposed of or plans to dispose of several projects resulting in an additional impairment loss of $58.2 million for the year ended December 31, 2008. Impairment losses related to the Partnership's long-lived assets are reflected in reorganization expense in the consolidated statement of operations and comprehensive loss. The Partnership also abandoned certain projects prior to bankruptcy resulting in an impairment loss of $4.8 million for the year ended December 31, 2008 which is reflected in asset impairments in the consolidated statement of operations and comprehensive loss.

As of December 31, 2005, the Partnership terminated a long-term supply contract with a customer. Accordingly, the unamortized portion of the acquired contract, $4.2 million, was charged to amortization expense. The Partnership continues to supply this customer under separate contracts. There have been no other events or circumstances indicating that the carrying

5

value of the Partnership's assets may not be recoverable.

**GOODWILL AND INTANGIBLES** – Goodwill represents the excess of an acquisition's purchase price over the fair value of acquired net assets, which is recorded as an asset and evaluated annually for impairment or whenever an event or change in circumstances indicates the carrying amount may not be recoverable, as required by SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142").

The Partnership evaluated its goodwill for impairment as of December 31, 2008. The Partnership utilized a five year financial forecast ("Business Plan"), which was prepared in conjunction with the Partnership's bankruptcy proceedings. The Partnership applied a discounted cash flow analysis to the Business Plan to determine the business enterprise value. The analysis indicated that the Partnership's goodwill for certain subsidiaries was impaired as of December 31, 2008. As such, the Partnership recorded an impairment loss of $40.5 million for the year ended December 31, 2008, of which, $26.7 million and $13.8 million is reflected in reorganization expense and asset impairments, respectively, in the consolidated statement of operations and comprehensive loss.

As a result of the bankruptcy filing, the Partnership also evaluated its intangibles as of December 31, 2008. Similar to the goodwill analysis, the Partnership used a discounted cash flow analysis to determine the business enterprise value, which was then compared to the carrying values of the intangibles. The evaluation indicated that the Partnership's intangibles for certain subsidiaries were also impaired. Therefore, the Partnership recorded an impairment loss of $35.2 million for the year ended December 31, 2008, of which, $14.4 million and $20.8 million is reflected in reorganization expense and asset impairments, respectively, in the consolidated statement of operations and comprehensive loss.

Goodwill of $22.9 million, $41.6 million and $51.0 million was recorded in the years ended December 31, 2007, 2006 and 2005, respectively, as a result of the Partnership's acquisitions. The Partnership's wholly-owned subsidiaries, which are subject to income taxes, have no deductible goodwill for tax purposes.

**INVESTMENTS IN UNCONSOLIDATED SUBSIDIARIES AND NOTE RECEIVABLE** – As of July 22, 2008, the Partnership does not control Holdings, Canada and Wyckoff, and has deconsolidated these subsidiaries. In the accompanying consolidated balance sheet as of December 31, 2008, the Partnership has accounted for its investments in these subsidiaries using the cost method. The statements of operations and cash flows include the earnings of Holdings, Canada and Wyckoff for the period ended July 22, 2008. Holdings is reflected as a negative investment in subsidiary in the consolidated balance sheet as a result of the cash received from Holdings in excess of the assets sold or contributed to Holdings and its subsidiaries.

Under the cost method, the Partnership records an investment in its subsidiaries at cost, and recognizes as income dividends received that are distributed from net accumulated earnings of the subsidiaries since the date of loss of control. Cost for deconsolidated entities was determined as the net book value of the entity's net assets on the date of deconsolidation. Declines in value associated with investments, which are other than temporary, are recognized in income.

As a result of the bankruptcy filing, the Partnership performed an analysis of its investments in unconsolidated subsidiaries as of December 31, 2008. The Partnership used a discounted cash flow analysis to determine the business enterprise value, which was then compared to the carrying values of the investments.

6

Utilizing the discounted cash flow analysis to determine the business enterprise value, the Partnership determined its investment in Wyckoff was fully impaired as of December 31, 2008. As such, the Partnership recorded an impairment loss of $28.0 million for the year ended December 31, 2008, which is reflected in asset impairments in the consolidated statement of operations and comprehensive loss.

Utilizing the discounted cash flow analysis to determine the business enterprise value, the Partnership determined its total investment in SemCAMS ULC ("CAMS"), including a $222.5 million note receivable from CAMS, and $59.1 million of other intercompany receivables was partially impaired. As a result of the analysis, the Partnership concluded its investment and note receivable were impaired and recorded an impairment loss of $128.5 million for the year ended December 31, 2008, of which $46.9 million reduced the Partnership's investment in subsidiary and $81.6 million was recorded as an allowance related to the note receivable. The impairment and allowance are reflected in reorganization expense in the consolidated statement of operations and comprehensive loss.

The Partnership utilized an alternative approach to value its investment in SemCanada Energy Company ("Canada Energy"). Canada Energy was shut down subsequent to filing bankruptcy and deconsolidation due to a lack of available credit, which rendered it inoperable, indicating that the subsidiary no longer had a business enterprise value. However, subsequent to shutting down the business, a substantial sum of cash was accumulated by the subsidiary from the collection of accounts receivable. The subsidiary is in bankruptcy proceedings in Canada and a motion has been filed in the Canadian courts to transfer the majority of the cash collected back to the Partnership to be used to settle the Partnership's outstanding liabilities to its secured creditors in the United States. Therefore, the Partnership concluded that the value of its investment at December 31, 2008 is equal to the amount of cash to be transferred to the United States (approximately $73.5 million), resulting in an impairment loss of $13.1 million which is reflected in reorganization expense in the consolidated statement of operations and comprehensive loss.

**INVESTMENTS IN UNCONSOLIDATED AFFILIATES** – The Partnership's investments in affiliates are accounted for using the equity method. The Partnership adjusts the carrying amount of its investments by recording its share of income or loss of the affiliates and periodic contributions to and distributions from its affiliates. Declines in value associated with investments, which are other than temporary, are recognized in income. Earnings and losses on investments in affiliates are included in other income in the consolidated statements of operations and comprehensive loss.

In February 2008, the Partnership sold its approximate 18.75% equity ownership interest in Niska Gas Storage ("Niska") to a unitholder for proceeds of $146.2 million, which investment is recorded in other current assets on the consolidated balance sheet at December 31, 2007.

In August 2007, the Partnership purchased 50% of the membership interests of WesPac Energy, L.L.C. ("WesPac") from Kealine Holdings, L.L.C. for $15.5 million. In December 2007, the Partnership made an additional investment in WesPac of $0.5 million. Effective August 29, 2008, the Partnership assigned its 50% membership interests of WesPac to Kealine Holdings, L.L.C. and recorded a loss on sale of $18.4 million, which is reflected as a reorganization expense in the consolidated statement of operations and comprehensive loss.

From its investments in affiliates, the Partnership recognized a loss of $2.0 million for the year ended December 31, 2007. The loss of $2.0 million in 2007 includes a reduction of $13.8 million in the carrying value of the Niska investment to reflect the amount realized upon its sale in 2008.

**INVESTMENT IN MARKETABLE SECURITIES** - In accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities", the Partnership's security investments are classified as available-for-sale securities. Available-for-sale securities are recorded at fair value in other assets on the consolidated balance sheet, with the change in fair value during the period excluded from earnings and recorded as a component of other comprehensive loss. At December 31, 2007, the fair value of the securities was $20.0 million, which was included in other assets in the consolidated balance sheet. On September 8, 2008, the Partnership sold its investment in marketable securities for $12.2 million, resulting in a loss of $6.3 million, which is reflected in other expenses in the consolidated statement of operations and comprehensive loss.

**LIABILITIES SUBJECT TO COMPROMISE** – The amounts represent the Partnership's estimates of known or potential pre-petition date claims that are likely to be resolved in connection with the bankruptcy filings. Such claims remain subject to future adjustments. Adjustments may result from negotiations, actions of the Bankruptcy Court, determination as to the value of any collateral securing claims, or other events. Differences between liability amounts estimated by the Partnership and claims filed by creditors are being investigated and the Bankruptcy Court will make a final determination of the allowable claim. The determination of how liabilities will ultimately be treated cannot be made until the Bankruptcy Court approves a Chapter 11 plan for reorganization. The estimates made by the Partnership may be materially different than the amounts ultimately allowed in the Chapter 11 proceedings. Liabilities subject to compromise consist of the following:

|  | As of December 31, 2008 | |
|---|---|---|
| Current liabilities: | | |
| Accounts payable | $ | 922,981 |
| Accrued liabilities | | 1,138,307 |
| Note payable to affiliate | | 150,000 |
| Total current liabilities | | 2,211,288 |
| Long-term debt | | 3,038,691 |
| Total liabilities subject to compromise | $ | 5,249,979 |

**DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES** – The Partnership utilizes various derivative instruments to: (1) manage exposure to commodity price risk; (2) establish proprietary positions; (3) manage exposure to currency exchange rate risk; and (4) manage exposure to interest rate risk. The Partnership records all derivative instruments on the consolidated balance sheet as derivative assets and derivative liabilities measured at their fair value under the provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended by SFAS No. 137, SFAS No. 138 and SFAS No. 149 (collectively "SFAS 133"). The Partnership recognizes changes in the fair value of derivative instruments in the statement of operations unless either specific hedge accounting criteria are met, in which case, changes in fair value are recorded in other comprehensive loss and reclassified into earnings when the underlying transactions occur or the derivatives are owned under an agency agreement as described in the related party footnote.

The fair value of the Partnership's derivative contracts is determined based on the nature of the transaction and the market in which transactions were executed. Quoted market prices, when available, are used to value the Partnership's transactions. In situations where quoted market prices are not readily available, the Partnership estimates the fair value of contracts using

8

proprietary models and other valuation techniques that reflect the best information available under the circumstances.

**UNIT BASED COMPENSATION** – The Partnership has a unit-based compensation plan. Since January 1, 2006, the Partnership accounts for equity-based compensation awards under the fair value recognition provisions of SFAS No. 123(R), "Share-Based Payment" ("SFAS 123R"). For equity-based compensation awards, compensation expense based on the fair value on the date of grant or modification will be recognized in the Partnership's financial statements over the vesting period. SFAS 123R requires use of valuation techniques to estimate the fair value of the employee awards. The Partnership currently uses the Black-Scholes option-pricing model in estimating the fair value of the employee options. Compensation expense is recorded as general and administrative expenses in the consolidated statements of operations and comprehensive loss.

**REVENUE RECOGNITION** – Sales and purchases of crude oil, natural gas, natural gas liquids, refined products and asphalt products, as well as gathering and marketing revenues, are accrued at the time title to the product transfers to the purchaser, which typically occurs upon receipt of the product by the purchaser. Terminal and storage revenues are recognized at the time the service is performed. Revenue for the transportation of crude oil is recognized based upon regulated and non-regulated tariff rates and the related transport volumes. Shipping and handling revenues are included in the price of product charged to customers and, thus, are classified as revenues. Certain revenue transactions are reported on a net basis, including derivative instruments considered held for trading purposes and certain buy/sell transactions (see "Purchases and Sales of Inventory with the Same Counterparty").

**COST OF SALES AND OPERATING EXPENSES** – Cost of sales consists of the cost of crude oil, natural gas, natural gas liquids, refined products, asphalt cement, transportation and storage fees. Operating expenses consist primarily of fuel and power costs, telecommunications, labor costs for operating personnel, maintenance, utilities, insurance and property taxes.

**PURCHASES AND SALES OF INVENTORY WITH THE SAME COUNTERPARTY** – The Partnership accounts for buy/sell transactions in accordance with EITF Issue No. 04-13, "Accounting for Purchases and Sales of Inventory with the Same Counterparty" ("EITF 04-13"). Under the provisions of EITF 04-13, inventory purchases and sales to the same counterparty that are deemed to be in contemplation of one another are recorded net as inventory exchanges. This standard impacts the Partnership's reporting of buy/sell transactions associated with the marketing of crude oil, refined products, NGLs and natural gas. The adjustments made to reduce sales and cost of sales for the years ended December 31, 2008 and 2007 were $5.3 billion and $12.3 billion, respectively.

**FOREIGN CURRENCY TRANSLATION** – The financial position and results of operations of the Partnership's foreign subsidiaries are measured using the currency of the primary economic environment in which the entity operates as the functional currency in accordance with SFAS No. 52, "Foreign Currency Translation." The statements of operations and cash flows of those subsidiaries have been translated into U.S. dollars at average exchange rates prevailing for each month. Assets and liabilities have been translated using period end exchange rates. The resulting translation adjustments are reported in other comprehensive loss. The transactions of the foreign subsidiaries that are denominated in a currency other than the functional currency are remeasured into the functional currency of the foreign subsidiary. Transaction gains and losses that arise from exchange rate fluctuations on transactions and balances denominated in a currency other than the functional currency are included in the results of operations and cash flows as incurred.

INCOME TAXES - The Partnership is a flow-through entity for federal and state income tax purposes; accordingly, a provision for U.S. federal and state income taxes has not been recorded in the consolidated financial statements. Partnership distributions and income or loss are reflected in each unitholder's Schedule K-1 in accordance with the taxable income allocation requirements of the Second Amended and Restated Agreement of Limited Partnership of SemGroup, L.P., an Oklahoma Partnership (the "Partnership Agreement"), and the Internal Revenue Code. The operating partnerships have corporate subsidiaries, which are directly subject to federal and state income taxes. Accordingly, the consolidated financial statements reflect income taxes related to the corporate subsidiaries.

The Partnership's wholly-owned, foreign subsidiaries are subject to foreign federal and local income taxes. The Partnership records foreign income taxes in accordance with SFAS No. 109, "Accounting for Income Taxes" ("SFAS 109"). This statement requires recognition of deferred tax liabilities and assets for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax liabilities and assets are determined based on the temporary differences between the financial statement and tax basis of assets and liabilities. SFAS 109 was applied to Canada until its deconsolidation on July 22, 2008.

USE OF ESTIMATES - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts and disclosure of contingencies. The Partnership makes significant estimates including: (1) allowance for doubtful accounts receivable; (2) estimated useful lives of assets, which impacts depreciation; (3) estimated fair values inherent in long-lived asset impairment tests under SFAS 144; (4) estimated undiscounted cash flows and fair values inherent in goodwill, intangible and investment in unconsolidated affiliates impairment tests under SFAS 142; (5) estimated fair value of assets and liabilities acquired and identification of associated intangible assets; (6) accruals related to revenues and expenses including mark-to-market estimates pursuant to SFAS 133; (7) liability and contingency accruals; and (8) liabilities subject to compromise. Although management believes these estimates are reasonable, actual results could differ from these estimates.

RECLASSIFICATIONS - The Partnership adopted Financial Accounting Standards Board ("FASB") Staff Position FIN 39-1, "Amendment of FASB Interpretation No. 39" ("FIN 39-1") effective January 1, 2008. FIN 39-1 requires a reporting entity to offset fair value amounts recognized for the right to reclaim or the obligation to return margin deposits against fair value amounts recognized for derivative instruments executed with the same counterparty under the same master netting arrangement. FIN 39-1 requires retrospective application and accordingly, December 31, 2007 balances have been reclassified to conform to current presentation. The consolidated balance sheets reflect the offsetting of net derivative positions with fair value amounts for margin deposits with the same counterparty when management believes a legal right of setoff exists. As of December 31, 2008, the Partnership did not have any margins netted against net derivative positions as it transferred its New York Mercantile Exchange ("NYMEX") transactions in its commodity futures brokerage accounts on July 15, 2008. As of December 31, 2007, the Partnership offset net fair value margin deposits of $1.3 billion against net derivative positions.

Additionally, certain reclassifications have been made to conform prior year balances to the current year presentation. The most significant reclassification was the amount due from an entity owned by an ex-officer of the Partnership was reclassified from accounts receivable to receivable from affiliates.

**RECENT ACCOUNTING PRONOUNCEMENTS** – In September 2005, the EITF issued Issue No. 04-13, "Accounting for Purchases and Sales of Inventory with the Same Counterparty" ("EITF 04-13"). Under the provisions of EITF 04-13, inventory purchases and sales to the same counterparty that are deemed to be in contemplation of one another are recorded net as inventory exchanges. This standard impacts the Partnership's reporting of buy/sell transactions associated with the marketing of crude oil, refined products, NGLs and natural gas. Prior to the adoption of EITF 04-13, such transactions were recorded in both revenue and cost of sales as separate buy/sell transactions. EITF 04-13 was effective April 1, 2006, and was applied prospectively. The adoption of EITF 04-13 had no effect upon gross margin or net income.

In June 2006, the FASB issued FIN No. 48, "Accounting for Uncertainty in Income Taxes – An Interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS 109. The Interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. In addition, FIN 48 provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. Under the provisions of FASB Staff Position No. FIN 48-3, the Partnership has deferred adoption of FIN 48 until 2009. The Partnership evaluates its uncertain tax positions in accordance with SFAS No. 5, "Accounting for Contingencies". As such, the Partnership recognizes a loss contingency when it is probable that a liability has been incurred as of the date of the financial statements and the amount of the loss can be reasonably estimated. The amount recognized is subject to estimate and management judgment with respect to the likely outcome of each uncertain tax position. The amount that is ultimately sustained for an individual uncertain tax position or for all uncertain tax positions in the aggregate could differ from the amount recognized. The Partnership does not expect the adoption of FIN 48 to have a material impact on its consolidated results of operations, cash flows or financial position.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities - including an amendment of FAS 115" ("SFAS 159"). SFAS 159 allows entities to choose, at specified election dates, to measure eligible financial assets and liabilities at fair value in situations in which they are not otherwise required to be measured at fair value. If a company elects the fair value option for an eligible item, changes in that item's fair value in subsequent reporting periods must be recognized in current earnings. The Partnership adopted SFAS 159 on January 1, 2008 and elected not to measure at fair value any of its eligible assets and liabilities, which had not previously been measured at fair value. Therefore, the adoption of SFAS 159 did not have a material impact on the Partnership's consolidated financial position, results of operations or cash flows.

In December 2007, the FASB issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an amendment of Accounting Research Bulletin No. 51" ("SFAS 160"). This statement requires an entity to separately disclose non-controlling interests as a separate component of equity in the balance sheet and clearly identify on the face of the income statement net income related to non-controlling interests. SFAS 160 is effective for financial statements issued for fiscal years beginning after December 15, 2008. The Partnership does not expect the adoption of SFAS 160 to have a material impact on its consolidated financial position, results of operations or cash flows. The Partnership is currently assessing the impact, if any, the adoption of SFAS 160 will have on its results of operations, cash flows or financial position.

In December 2007, the FASB issued SFAS No. 141(R), "Business Combinations." This statement requires assets acquired and liabilities assumed to be measured at fair value as of the acquisition date, acquisition related costs incurred prior to the acquisition to be expensed and

contractual contingencies to be recognized at fair value as of the acquisition date. This statement is effective for financial statements issued for fiscal years beginning after December 15, 2008. The Partnership does not expect the adoption of this statement to have a material impact on its consolidated financial position, results of operations or cash flows.

In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities" ("SFAS 161"). SFAS 161 requires entities to provide enhanced disclosures about its use of derivative instruments and accounting for derivatives and the impact of derivative instruments and hedging activity on the entity's financial statements. Entities are required to disclose the fair value of derivative instruments and their gains and losses in a tabular format. SFAS 161 is effective for fiscal years beginning after November 15, 2008. The Partnership does not anticipate that the adoption of SFAS 161 will have a material impact on its consolidated financial position, results of operations or cash flows.

## 3.  PETITION FOR RELIEF UNDER CHAPTER 11 AND GOING CONCERN

On July 22, 2008, the Partnership and certain of its North American subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code as well as an application for creditor protection under the CCAA in Canada. Under Chapter 11, certain claims against the Partnership in existence prior to the filing of the petitions for relief under the federal bankruptcy laws are stayed while the Partnership continues business operations as a Debtor-in-Possession ("DIP"). Additional claims may arise subsequent to the filing date resulting from rejection of executory contracts, including leases, and from the determination by the court (or agreed to by the parties of interest) of allowed claims for contingencies and other disputed amounts. Claims secured against the Partnership's assets also are stayed, although the holders of such claims have the right to move the court for relief from the stay. Many claimants have filed liens, including but not limited to, tax and mechanics liens, against the Partnership's assets. As with the other claims, the liens that have been filed are also stayed. Secured claims are secured by substantially all the assets held by the Partnership.

The Partnership received approval from the Bankruptcy Court to pay or otherwise honor certain of its prepetition obligations, including employee wages and benefits. The Court also approved the Partnership's use of cash collateral, meaning that the Partnership will be able to use its existing cash and cash generated through normal business operations to meet the Partnership's obligations post-Chapter 11 filing, including trade payables and wages and benefits.

The Court also approved the Partnership's initial request for $50 million to support its Supplier Protection Program. Under the Program, certain suppliers who contractually commit to continue doing business with the Partnership, on the same terms as before the Chapter 11 filing, will be eligible to receive full payment, as due, for goods and services that were delivered before the filing, but for which the supplier has not yet been paid.

On August 8, 2008, the Bankruptcy Court approved an interim order authorizing the Partnership to obtain up to $250.0 million in DIP financing. On September 17, 2008 the Bankruptcy Court approved a final order authorizing up to $175.0 million in DIP financing.

On October 22, 2008, Holdings and one additional subsidiary of the Partnership filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

Reorganization items represent the direct and incremental costs related to the Partnership's petition for relief under Chapter 11, such as professional fees and impairment charges, net of interest income earned on accumulated cash during the Chapter 11 process. The Partnership's reorganization expense consists of the following:

|  | | Year Ended December 31, 2008 |
|---|---|---|
| Professional fees | $ | 70,993 |
| Write down of finance fees | | 28,735 |
| Bad debts | | 57,535 |
| Impairment charges | | 266,285 |
| Loss on sale of assets | | 20,253 |
| Other | | 32,976 |
| Total reorganization expense | $ | 476,777 |

There is substantial doubt about the Partnership's ability to continue as a going concern as a result of filing Chapter 11 The Partnership has extended its DIP credit agreement to September 30, 2009. Part of the negotiated DIP extension includes the Partnership agreeing to submit a plan of reorganization by May 15, 2009. However, it is uncertain at this time exactly which entities will be included in the reorganization and if the reorganization plan will be confirmed. The Partnership continues to market certain of its subsidiaries, which if a reasonable price is achieved, will be sold. As of this date, only the Partnership's UK operations, crude oil business and Mexican asphalt operations are certain to be included in the reorganization plan.

The Partnership's ability to continue as a going concern, including its ability to meet its ongoing operational obligations is dependent on, among other things, the Partnership's ability to maintain adequate cash, its ability to generate cash from operations, the cost, duration and outcome of the restructuring process, its ability to comply with DIP and cash collateral requirements, its ability to obtain new financing as part of the restructuring process and its ability to achieve profitability following restructuring. These challenges are in addition to the operational and competitive challenges the Partnership faces in connection with its business. The Partnership continues to work towards restructuring and its ability to continue as a going concern, however, there can be no assurance as to the success of these efforts. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might result from the outcome of these uncertainties.

**U.S. DEBTORS CONDENSED CONSOLIDATED FINANCIAL STATEMENTS** – Condensed consolidated financial statements of the U.S. Debtors are set forth below.

Condensed Consolidated Balance Sheet

| | | As of December 31, 2008 |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 590,250 |
| Receivable from affiliates, net of allowance of $322,439 | | 130,766 |
| Other current assets, net | | 237,796 |
| Property, plant and equipment, net of accumulated depreciation of $61,807 | | 304,877 |
| Other receivables | | 651,240 |
| Other assets, net | | 613,678 |
| Assets of discontinued operations | | 137,359 |
| **Total assets** | $ | 2,665,966 |
| **Liabilities and Partners' Capital (Deficit)** | | |
| Liabilities not subject to compromise | | |
| Current liabilities | $ | 217,680 |
| Long-term debt | | 430 |
| Other long-term liabilities | | 292 |
| Investment in unconsolidated subsidiary | | 613,935 |
| Liabilities of discontinued operations | | 8,507 |
| Liabilities subject to compromise | | 5,249,979 |
| Partners' capital (deficit) | | (3,424,857) |
| **Total liabilities and partners' capital (deficit)** | $ | 2,665,966 |

14

Condensed Consolidated Statement of Operations

|  | | Year Ended December 31, 2008 |
|---|---|---|
| Revenue | $ | 7,356,991 |
| Cost of sales | | 8,698,298 |
| Gross margin | | (1,341,307) |
| Operating expenses, including depreciation and amortization | | 84,304 |
| General and administrative | | 51,050 |
| Asset impairments | | 321,219 |
| Operating loss | | (1,797,880) |
| Interest expense | | 92,503 |
| Other expenses, net | | 14,636 |
| Reorganization expense | | 482,453 |
| Loss from continuing operations | | (2,387,472) |
| Loss from discontinued operations | | (509,387) |
| Net loss | $ | (2,896,859) |

Condensed Consolidated Statement of Cash Flows

|  | | Year Ended December 31, 2008 |
|---|---|---|
| Net cash provided by (used in): | | |
| Operating activities | $ | (192,750) |
| Investing activities | | 261,826 |
| Financing activities | | 501,714 |
| Net increase in cash and cash equivalents | | 570,790 |
| Cash and cash equivalents, beginning of period | | 19,460 |
| Cash and cash equivalents, end of period | $ | 590,250 |
| Cash paid for reorganization items included in operating activities | $ | 45,104 |

*Basis of Presentation* – The accompanying condensed consolidated financial statements include the accounts of the U.S. Debtors and present the Debtors' consolidated financial position as of December 31, 2008, and the results of operations and cash flows for the year then ended. Holdings was deconsolidated as of July 22, 2008 and as such, the accounts of Holdings are not included in the Debtors' consolidated financial position as of December 31, 2008. Income (loss) and cash flows of Holdings through the date of deconsolidation is included in the condensed statement of operations and cash flows for the year ended December 31, 2008. Transactions and balances of receivables and payables between U.S. Debtors are eliminated in consolidation; however, the U.S. Debtors' condensed consolidated balance sheet includes receivables from related non-U.S. Debtor parties.

*Interest Expense* – The Partnership has recorded interest expense through the petition date on debt which is subject to compromise. Contractual interest for the period from the petition date through December 31, 2008, related to the debt subject to compromise, which is not reflected in the Partnership's consolidated financial statements is $105.3 million.

4. **DISCONTINUED OPERATIONS**

SemMaterials, L.P. ("SemMaterials") purchases, manufactures and sells asphalt products in the United States and Mexico. Subsequent to filing its petition for relief under Chapter 11, management evaluated the asphalt business and began a marketing strategy to sell the U.S. assets of SemMaterials due to continued losses from operations, high working capital requirements of the business and the seasonal nature of its cash flow. Effective March 31, 2009, the Partnership entered into an agreement to settle certain matters between SGLP and the Partnership (the "Settlement Agreement"), under which the Partnership transferred to SGLP its asphalt assets that are connected to SGLP's asphalt assets. Subsequent to the Settlement Agreement, even though the Partnership has continued its efforts to sell its remaining assets, it began a process to wind down and liquidate the remaining asphalt assets retained by the Partnership, in the event it is not successful in selling such remaining assets.

The Partnership recognized a total impairment loss of $179.3 million which is reflected in loss from discontinued operations in the consolidated statement of operations and comprehensive loss. The loss of $179.3 million includes impairment charges of $84.0 million of fixed assets transferred to SGLP, $22.0 million of fixed assets retained by the Partnership, which will either be abandoned or liquidated, $14.4 million of goodwill, $26.1 million of intangibles, $21.6 million of inventory and $11.2 million of other assets and liabilities.

SemMaterials was included in the Partnership's bankruptcy filing and therefore has liabilities classified as subject to compromise. Management believes that the liabilities subject to compromise, which are associated with SemMaterials, will remain with the Partnership subsequent to the liquidation of SemMaterials. As such, these liabilities are included in liabilities subject to compromise in the consolidated balance sheet.

SemEuro Supply Limited ("SES") was an international refined products marketing business, which was operated out of Geneva, Switzerland. Management's evaluation of the business indicated that it was not profitable and as such, the Partnership discontinued the operations and closed the Geneva office in October 2008.

5. **OTHER ASSETS**

Costs incurred in connection with the issuance of long-term debt are capitalized and amortized to interest expense using the straight-line method over the term of the related debt. Use of the straight-line method does not differ materially from the "effective interest" method of amortization. Costs incurred in connection with acquired long-term customer contracts, customer relationships, patents and trade names are capitalized and amortized over useful lives ranging up to 15 years using either the straight-line or an accelerated method depending on the nature of the underlying intangible. Intangible asset amortization expense for the years ended December 31, 2008, 2007 and 2006 was $14.7 million, $16.9 million and $23.0 million, respectively.

The estimated aggregate amortization expense on intangible assets of the Partnership is as follows:

| For twelve months ending: | | |
|---|---|---|
| December 31, 2009 | $ | 2,327 |
| December 31, 2010 | | 2,139 |
| December 31, 2011 | | 1,786 |
| December 31, 2012 | | 2,124 |
| December 31, 2013 | | 1,777 |
| Thereafter | | 6,717 |
| Total estimated aggregate amortization expense | $ | 16,870 |

6. ACQUISITIONS

During 2008, 2007, 2006 and 2005, the Partnership expanded its asset base, services and product offerings through acquisitions. During 2008, the Partnership made 5 acquisitions totaling $79.1 million primarily for three refined products terminals located in Texas, pipelines in Oklahoma and natural gas processing assets. During 2007, the Partnership made 13 acquisitions totaling $115.7 million, including working capital of $8.6 million primarily for storage terminals and propane distribution systems. Certain acquisitions in 2007 were business combinations and were accounted for under the purchase method. Accordingly, the results of operations of the acquired businesses are included in the Partnership's results of operations from the date the Partnership obtained effective control. During 2006, the Partnership made 6 acquisitions totaling $258.1 million, including working capital of $1.4 million primarily for storage terminals, crude oil gathering assets and natural gas processing and gathering assets. During 2005, the Partnership made 9 acquisitions totaling $682.1 million, including working capital of $152.7 million.

On January 14, 2005, the Partnership acquired all the issued and outstanding membership interests of Greyhawk Gas Storage Company, L.L.C. ("Greyhawk"), which was the sole member of Wyckoff. Pursuant to that purchase agreement, on May 1, 2008, Kaiser acquired 49% of the membership interests in Wyckoff for $27.1 million, with Greyhawk retaining the remaining 51% of the membership interests. On July 23, 2008, the operating agreement between Greyhawk and Kaiser was amended allowing Kaiser to act as manager of Wyckoff as the Partnership was no longer able to operate Wyckoff due to bankruptcy.

7. PROPERTY, PLANT AND EQUIPMENT

Property, plant and equipment includes assets under capital lease of $2.5 million, $9.0 million, $10.6 million and $12.4 million net of accumulated depreciation of $1.7 million, $5.3 million, $4.9 million and $4.0 million at December 31, 2008, 2007, 2006 and 2005, respectively. Construction-in-progress primarily consists of the construction of a new pipeline and new storage tanks related to the Partnership's crude oil business. Costs in construction-in-progress are not subject to depreciation until the assets are placed in service. Depreciation expense for the years ended December 31, 2008, 2007, 2006 and 2005 was $78.8 million, $78.3 million, $64.8 million and $41.0 million, respectively.

8. DEBT AND OTHER OBLIGATIONS

A) At December 31, 2008, 2007 and 2006 the Partnership had a $1.7 billion working capital facility with a bank group which was payable on October 18, 2010. Prior to the Partnership's bankruptcy filing, the interest rate was based upon the type of loan outstanding. For Base Rate loans, interest was payable quarterly at the higher of the bank's prime rate or the Federal Funds rate plus 0.50% per annum. For Eurodollar loans, interest was payable quarterly at LIBOR plus 2.00%.

B) At December 31, 2008 and 2007, the Partnership had a $665.0 million revolving credit facility with a bank group which was payable on October 18, 2010. This revolving credit facility had been $450.0 million and $50.0 million at December 31, 2006 and 2005. Prior to the Partnership's bankruptcy filing, the interest rate was based upon the type of loan outstanding. For Base Rate loans, interest was payable quarterly at the higher of the bank's prime rate or the Federal Funds rate plus 0.75% per annum. For Eurodollar loans, interest was payable quarterly at LIBOR plus 2.25%.

C) At December 31, 2008 and 2007, the Partnership had a $200.0 million U.S. term loan with a bank group, which was scheduled to mature on March 16, 2011. Prior to the Partnership's bankruptcy filing, the Partnership used proceeds from the sale of assets to SGLP to repay $56.7 million of outstanding borrowings on the U.S. term loan. The U.S. term loan required quarterly principal payments of $0.5 million from September 30, 2007 to March 31, 2010, $48.6 million from June 30, 2010 to September 30, 2010, and $40.5 million on December 31, 2010. The interest rate was based upon the type of loan outstanding. For Base Rate loans, interest was payable quarterly at the higher of the bank's prime rate or the Federal Funds rate plus 0.50% per annum. For Eurodollar loans, interest was payable quarterly at LIBOR plus 2.00% per annum.

D) At December 31, 2008 and 2007, the Partnership had $600.0 million of 8.75% guaranteed senior unsecured notes which were due November 15, 2015 (the "Senior Notes"). $250.0 million of these notes were issued in 2006 and $350.0 million were issued in 2005. The Partnership recognized interest expense related to the accretion of the discount of $0.3 million and $0.5 million for the years ended December 31, 2008 and 2007, respectively. The Senior Notes yielded approximately 9%, and interest was payable semiannually in arrears on May 15 and November 15 of each year. The Senior Notes are fully and unconditionally guaranteed by the Partnership and its designated subsidiaries. The notes would have been redeemable, in whole or in part, at any time on or after November 15, 2010. The Partnership is in default on it covenants under this credit agreement. As the Senior Notes are unsecured, they are considered a liability subject to compromise and are recorded as such in the accompanying consolidated balance sheet. The Senior Notes are recorded at their full value as of December 31, 2008 as a result of the Partnership's petition for relief under Chapter 11. The remaining discount of $5.6 million was charged to expense and is reflected in reorganization expense in the consolidated statement of operations and comprehensive loss.

E) On August 8, 2008, the Partnership entered into a $250.0 million DIP credit agreement with a bank group, which was reduced to $175.0 million on September 17, 2008. The DIP credit agreement matures no later than April 22, 2009. On April 23, 2009, the Bankruptcy Court approved an amendment, which extended the maturity date to September 30, 2009. The interest rate is based upon the type of loan outstanding. For Base Rate loans, interest is payable monthly at the higher of the bank's prime rate or the Federal Funds rate plus 5.00% per annum (8.25% at December 31, 2008). For Eurodollar loans, interest is payable monthly at LIBOR plus 6.00%. The credit facility is guaranteed by the Partnership's subsidiaries that are debtors in the Chapter 11 filing. Under the credit agreement, the Partnership is limited in its ability to create liens on any of its property, assets and revenues, make investments, incur additional indebtedness, make capital expenditures and dispose of assets. The Partnership had approximately $101.7 million letters of credit outstanding under the DIP facility at December 31, 2008. At December 31, 2008, $63.6 million was available under the DIP facility for either loans or letters of credit.

F)	SemEuro Limited, a subsidiary of the Partnership, has a European credit facility with a bank group payable in U.S. dollars on September 29, 2009. Issued in 2006, this credit facility consists of a $75.0 million revolving credit facility and a $500.0 million working capital facility, which in 2008 was reduced to $46.0 million. Interest on the working capital facility is payable at LIBOR plus 2.25% per annum (3.74% at December 31, 2008). Interest on the revolving credit facility is payable at LIBOR plus 3.50% per annum (4.99% at December 31, 2008). The Partnership had approximately $13.9 million of letters of credit outstanding at December 31, 2007 under this working capital facility. The Partnership did not have any letters of credit outstanding at December 31, 2008. The credit facility is guaranteed by SemEuro Limited, SemEuro Supply Limited, and SemLogistics Milford Haven Limited (collectively, "SemEuro") and substantially all of the assets of SemEuro are pledged as collateral on the credit facility. Under the credit agreement, SemEuro is subject to certain limitations, including limitations on its ability to incur additional indebtedness, dispose of its assets, materially alter the nature of the business, make acquisitions and make distributions. The credit agreement requires SemEuro to maintain, as defined in the credit agreement, a current ratio of not less than 1.05 to 1.00, an interest coverage ratio of not less than 3.00 to 1.00, a leverage ratio of not more than 4.00 to 1.00 and consolidated net worth of more than $95.0 million. At December 31, 2008, SemEuro was in default related to a change in control and its reporting requirements and is not in compliance with certain financial covenant ratios. The Partnership has been unable to obtain a waiver for non-compliance with its covenants. The bank group has a right to demand payment in full; however, the bank group has not exercised that right as of April 30, 2009. Working capital facility availability is subject to the Partnership's borrowing base, as defined in the credit agreement. Per the borrowing base, at December 31, 2008, $8.2 million was available under the working capital facility; however as SemEuro was in default, the likelihood of the bank group allowing SemEuro to draw on the facility is uncertain.

G)	On June 17, 2008, SemCrude Pipeline, L.L.C. ("Pipeline"), a subsidiary of the Partnership, entered into a credit agreement with a bank, consisting of a $60.0 million term loan and a $60.0 million revolving credit facility, which matures on June 17, 2009. The interest rate is based on the type of loan outstanding. For Base Rate loans, interest is payable quarterly at the higher of the bank's prime rate or the Federal Funds rate plus 3.75% per annum (7.00% at December 31, 2008). For Eurodollar loans, interest is payable quarterly at LIBOR plus 5.25%. Borrowings under this agreement are secured by all of Pipeline's units and other rights in White Cliffs Pipeline, L.L.C. Under the credit agreement, Pipeline is subject to certain limitations, including limitations on its ability to incur additional indebtedness, dispose of its assets, and materially alter the nature of the business. The credit agreement requires Pipeline to maintain, as defined in the credit agreement, a leverage ratio of not more than 4.50 to 1.00. Upon the Partnership's petition for protection under Chapter 11, Pipeline was in default on it covenants under the credit agreement. The Partnership has been unable to obtain a waiver for non-compliance with its covenants. The bank has a right to demand payment in full; however, the bank has not exercised that right as of April 30, 2009. The Pipeline debt is classified as current at December 31, 2008, but is not subject to compromise as the debt is adequately secured.

H)	On September 15, 2006, the Partnership entered into a $2.5 million note, which required quarterly principal and interest payments of $0.2 million through June 30, 2009, the maturity date. The interest rate was 6.00% per annum. This note was held by a subsidiary which has been sold and was assumed by the purchaser in September 2008.

1) At December 31, 2007, SGLP had a senior secured credit agreement, which consisted of a $350.0 million revolving credit facility and a $250.0 million term loan and matures on July 20, 2012. Borrowings under the credit agreement are secured by substantially all of the assets of SGLP and its restricted subsidiaries. As a result of the deconsolidation of Holdings, this debt is not included in the consolidated balance sheet as of December 31, 2008.

On April 25, 2008, the Partnership's Mexican subsidiary, which is not a debtor in the Partnership's bankruptcy filing, entered into a senior secured credit agreement with a bank group, which consists of a revolving credit facility of up to the equivalent amount in pesos of $15.0 million and a working capital facility of up to the equivalent amount in pesos of $25.0 million. The working capital facility matures on April 08, 2011 and interest is payable quarterly at Tasa de Interes Interbancaria de Equilibrio ("TIIE") plus 1.75%. Working capital facility availability is subject to the subsidiary's borrowing base, as defined in the credit agreement; however, subsequent to the Partnership's bankruptcy filing, the bank notified the subsidiary that it would not be allowed to borrow on the credit agreement. Interest on the revolving credit facility is payable quarterly at TIIE plus 2.25%. The revolving credit facility requires twelve equal quarterly principal payments from April 8, 2010 to April 8, 2013, the maturity date. Borrowings under the credit agreement are secured by substantially all of the assets of SemMaterials Mexico and its restricted subsidiaries. Effective January 25, 2009, the Partnership's Mexican subsidiaries terminated the credit facilities.

The Partnership's Mexican subsidiary has a 25 million peso (approximately US$1.8 million at December 31, 2008) revolving credit facility with a bank payable on June 27, 2009; however, subsequent to the Partnership's bankruptcy filing, the bank informed the subsidiary that it would not be able to use that line of credit. Interest is payable monthly based on the TIIE Rate plus 1.50%. There was not a balance outstanding on this facility at December 31, 2008. Additionally, the Partnership's Mexican subsidiary had an $11.6 million letter of credit outstanding at December 31, 2008, which is secured with a cash deposit and certain assets of the subsidiary.

Substantially all of the Partnership's assets, except for the assets of certain non-guarantor subsidiaries, as defined in the credit agreement, are pledged as collateral on the Partnership's working capital facility, revolving credit facility and term loan discussed in A, B, and C above, respectively. Upon the Partnership's petition for protection under Chapter 11, the Partnership was in default on it covenants under the credit agreement. The Court appointed Examiner filed his Final Report with the Bankruptcy Court on April 15, 2009, which alleges an ex-officer failed to comply with the covenants of the credit agreement. The outstanding balances on the working capital facility, revolving credit facility and term loan are reflected in long-term debt as subject to compromise.

Based upon the borrowing rates currently available to the Partnership for debt with similar terms and maturities, debt classified as not subject to compromise at December 31, 2008, approximates fair value. At December 31, 2008, the fair values of the working capital facility, revolving credit facility, term loan and Senior Notes was $464.0 million, $194.5 million, $56.5 million, and $21.0 million, respectively.

At December 31, 2008, the aggregate amount of debt and other obligations not subject to compromise, which will become due during the ensuing five years and thereafter based on the existing debt agreements, is as follows:

For twelve months ending:

| | | |
|---|---|---:|
| December 31, 2009 | $ | 179,720 |
| December 31, 2010 | | 342 |
| December 31, 2011 | | 12 |
| December 31, 2012 | | 13 |
| December 31, 2013 | | 14 |
| Thereafter | | 49 |
| Total debt and other obligations | $ | 180,150 |

## 9.   INCOME TAXES

Generally, no provision for U.S. federal or state income taxes related to the Partnership's operations is included in the consolidated financial statements because, as a partnership, the Partnership is not subject to federal or state income taxes and the tax effects of its activities accrue to the unitholders. Certain subsidiaries are taxable in Mexico, the United Kingdom or Switzerland to the extent the subsidiaries have a permanent establishment in these countries. Certain subsidiaries in Canada are also taxable. As Canada was deconsolidated as of July 22, 2008, tax liabilities related to Canada are not included in the balance sheet as of December 31, 2008, but the tax expense (benefit) related to Canada for the period ended July 22, 2008 is included in the accompanying consolidated statements of operations and comprehensive loss.

The Partnership's effective tax rate differs from the statutory tax rate mainly due to the Partnership not being subject to U.S. taxes and, accordingly, the Partnership's income tax expense is principally attributable to foreign income taxes applicable to its foreign subsidiaries. For U.S. income tax purposes, only the Partnership's corporate subsidiaries are subject to U.S. taxation, and these amounts are not significant. The other subsidiaries are either flow-through subsidiaries or subsidiaries that do not have a permanent establishment in the U.S. and, as such, are not subject to U.S. taxation.

The significant temporary differences of the Partnership's foreign subsidiaries relate to derivative instruments, foreign exchange transactions and capital assets. As a result of a decrease to the Canadian statutory rate during 2007 and 2006, the Partnership recorded a tax benefit of $13.6 million and $4.7 million related to temporary differences. The United Kingdom statutory rate decreased during 2007, resulting in the Partnership recording a tax benefit of $2.2 million related to temporary differences.

The change in recorded values of the derivative instruments may result in significant changes in the taxable income of the Partnership's foreign subsidiaries. Additionally, tax expense related to Canada for the period ended July 22, 2008 was impacted by the transfer of Canada's NYMEX transactions in its commodity futures brokerage accounts and the settlement of other significant derivative positions. For the years ended December 31, 2008 and 2007, the Partnership recorded tax expense of $48.5 million and benefit of $6.5 million, respectively.

Additionally, the Partnership has net operating loss carryforwards related to its Canadian subsidiaries of $37.7 million at December 31, 2007, which expire in 2027. The Partnership does not have any net operating loss carryforwards related to its United Kingdom subsidiaries at December 31, 2008. The Partnership records a valuation allowance based on the determination that it is more likely than not that the benefits of the deferred tax assets will not be realized. The Partnership did not record a valuation allowance as of December 31, 2007.

21

Net earnings for financial statement purposes may differ significantly from taxable income reportable to unitholders as a result of differences between the tax basis and financial reporting basis of assets and liabilities and the taxable income allocation requirements under the Partnership Agreement. An individual unitholder will have a different investment basis depending upon timing and price of the acquisition of partnership units. Further, each unitholder's tax accounting, which is dependent upon the unitholder's tax position, may differ from the accounting followed in the consolidated financial statements. Accordingly, there could be significant differences between each individual unitholder's tax basis and the unitholder's share of the net assets reported in the consolidated financial statements. The Partnership does not have access to information about each individual unitholder's tax attributes and the aggregate tax basis cannot be readily determined. Accordingly, the Partnership does not believe that in its circumstances the aggregate difference would be meaningful information.

In addition to federal income taxes, unitholders may be subject to other taxes, such as state and local taxes, foreign federal and local taxes and unincorporated business taxes that may be imposed by the various jurisdictions in which the Partnership does business or owns property. Furthermore, unitholders may be required to file foreign federal income tax returns, pay foreign income taxes, file state income tax returns and pay taxes in various states.

10. FINANCIAL INSTRUMENTS AND CONCENTRATIONS OF CREDIT RISK

The Partnership's consolidated results of operations and operating cash flows are impacted by changes in market prices for certain commodities. To mitigate a portion of the exposure to adverse market changes, the Partnership entered into various derivative instruments. As of December 31, 2007, the Partnership's derivative instruments related to these commodities were comprised of swaps, futures, forward contracts and written and purchased options.

The net unrealized gain (loss) related to derivative instrument adjustments to total revenue represent only the derivative side of these transactions and do not take into account any offsetting physical position. The value of outstanding derivatives and associated margin requirements may vary from month to month based on market prices at the end of the month.

The Partnership has not designated any of its commodity derivative instruments as accounting hedges within the definition of SFAS 133, and records the fair value of the derivative instruments on its consolidated balance sheets. Therefore, all changes in the fair value of the derivative instruments not accounted for as accounting hedges are reported in the consolidated statements of operations and comprehensive loss and as net unrealized gain (loss) related to derivative instruments in the consolidated statements of cash flows. Net unrealized gain (loss) related to derivative instruments represents the periodic changes in the fair values of outstanding derivative contracts. Such net unrealized gains (losses) related to derivative instruments reflect the non-cash impact of interim valuations of derivatives and related option premiums paid or received.

On July 15, 2008, the Partnership paid $143.0 million to transfer its NYMEX transactions in its commodity futures brokerage accounts via an ex-pit book transfer. The transfer resulted in a reduction of $2.3 billion in net derivative liabilities and $2.4 billion in margin deposits. The Partnership recorded a loss of $143.0 million related to the transfer, which is recorded in revenue in the accompanying consolidated statement of operations and comprehensive loss.

The Partnership is exposed to market risk for changes in interest rates related to its credit facilities. Interest rate swap agreements were used to manage a portion of the exposure related to changing interest rates by converting floating-rate debt to fixed-rate debt. The interest rate swaps related to the debt outstanding on SGLP are not reflected in the accompanying balance sheet as of

22

December 31, 2008 as a result of the deconsolidation of Holdings. The Partnership's interest rate swaps related to its working capital facility, revolving credit facility and U.S. term loan were closed upon the Partnership's petition for relief under Chapter 11 and the resulting liability is reflected in liabilities subject to compromise in the accompanying consolidated balance sheet. The value of the interest rate swaps at December 31, 2007, 2006 and 2005 was a net liability of $8.6 million and net assets of $1.5 million and $0.7 million, and was recorded in derivative liabilities and derivative assets on the consolidated balance sheet. The interest rate swaps were no longer designated as cash flow hedges under FAS 133 beginning July 1, 2007. Changes in the fair value of these interest rate swaps, including those related to SGLP, were recorded in interest expense in the consolidated statement of operations and comprehensive loss. Prior to July 1, 2007, the interest rate swaps were designated as cash flow hedges and, as such, received hedge accounting treatment under SFAS 133. Changes in the fair value of the interest rate swaps were recorded in other comprehensive loss.

Canada entered into forward currency exchange contracts to minimize the foreign currency exchange risk. As a result of the deconsolidation of Canada as of July 22, 2008, the value of the forward currency exchange contracts is not reflected in the accompanying consolidated balance sheet. The value of the forward currency exchange contracts at December 31, 2007 was a liability of $54.0 million and is recorded in derivative liabilities on the consolidated balance sheet. The change in the fair value of the forward currency exchange contracts for the period ended July 22, 2008 is reported in revenue as net unrealized gain (loss) related to derivative instruments in the consolidated statements of operations and comprehensive loss.

Financial instruments which potentially subject the Partnership to concentrations of credit risk consist principally of derivative assets and trade receivables from businesses concentrated in the oil and gas industry. At December 31, 2008 the Partnership had three counterparties that accounted for approximately 46% of derivative assets. There were no counterparties greater than 10% of the Partnership's derivative assets at December 31, 2007. At December 31, 2006 the Partnership had two counterparties that accounted for approximately 12%, of derivative assets. At December 31, 2005, the Partnership had one counterparty that accounted for 35% of derivative assets.

For the years ended December 31, 2008, 2007, 2006 and 2005, the Partnership had one customer that accounted for approximately 18%, 29%, 26% and 26% of gross sales, respectively. There were no customers with accounts receivable balances greater than 10% of the Partnership's total accounts receivable at December 31, 2008. Accounts receivable from one customer was approximately 21%, 33% and 34% of total accounts receivable at December 31, 2007, 2006 and 2005. One vendor accounted for approximately 22%, 19% and 21% of gross purchases for the year ended December 31, 2007, 2006 and 2005. There were no vendors that accounted for more than 10% of gross purchases for the year ended December 31, 2008.

As of December 31, 2008, the Partnership's cash is collateralized pursuant to the requirements of title 11 of the United States Code, the Local Rules for the United States Bankruptcy Court for the District of Delaware, the United States Trustee Guidelines, and/or various orders of the Bankruptcy Court, and therefore, is not at risk. Also at December 31, 2008 the Partnership had $8.6 million held in uninsured brokerage accounts and by counterparties, and $11.6 million held in foreign banks in excess of insured limits. At December 31, 2007, the Partnership had a bank balance of $48.7 million at financial institutions in excess of federally insured limits, $1.6 billion held in uninsured brokerage accounts and by counterparties, and $17.9 million held in foreign banks in excess of insured limits.

At December 31, 2006, the Partnership had bank balances of $60.6 million at financial institutions in excess of federally insured limits, $659.3 million held in uninsured brokerage accounts and by counterparties, $22.5 million of deposits in Canadian banks, $10.5 million of deposits in European banks, and $8.4 million of deposits in Mexican banks. At December 31, 2005, the Partnership had bank balances of $54.4 million at financial institutions in excess of federally insured limits, $230.6 million held in uninsured brokerage accounts and by counterparties, $18.2 million of deposits in Canadian banks and $4.0 million of deposits in Mexican banks.

## 11. FAIR VALUE MEASUREMENTS

The Partnership applied SFAS No. 157, "Fair Value Measurements" ("SFAS 157"), effective January 1, 2008, as allowed by FASB Staff Position 157-2, which delayed the effective date of SFAS 157 for nonrecurring fair value measurements associated with the Partnership's nonfinancial assets and liabilities. As of January 1, 2008, the Partnership has applied the provisions of SFAS 157 for financial assets and liabilities measured on a recurring basis. As defined in SFAS 157, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

SFAS 157 establishes the fair value hierarchy that prioritizes inputs to valuation techniques based on observable and unobservable data and categorizes the inputs into three levels, with the highest priority given to Level 1 and the lowest priority given to Level 3, as described below:

Level 1 – Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

Level 2 – Quoted prices in markets that are not active, or inputs which are observable, either directly or indirectly, for substantially the full term of the asset or liability.

Level 3 – Generally unobservable inputs, which are developed based on the best information available and may include the Partnership's own internal data.

As required by SFAS 157, financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. The Partnership's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.
The following table summarizes the valuation of the Partnership's investments and financial instruments by SFAS 157 pricing levels as of December 31, 2008:

| | Fair Value Measurements at Reporting Date Using: | | | | | |
|---|---|---|---|---|---|---|
| | Quoted Prices In Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | | | |
| Commodity derivatives | $ | 10 | $ | - | $ 24,526 | $ 24,526 |
| Cash surrender value | | - | | - | 5,294 | 5,294 |
| Total assets at fair value | | 10 | | - | 29,820 | 29,830 |
| Liabilities: | | | | | | |
| Commodity derivatives | | - | | - | (13,202) | (13,202) |
| Total liabilities at fair value | | - | | - | (13,202) | (13,202) |
| Net assets at fair value | $ | 10 | $ | - | $ 16,618 | $ 16,628 |

Included within Level 1 of the fair value hierarchy are commodity derivatives that are exchange traded. Exchange traded derivative contracts include futures and exchange traded options.

Included within Level 3 of the fair value hierarchy are commodity derivatives that are not exchange traded, interest rate derivatives, foreign currency derivatives and the cash surrender value of corporate-owned life insurance policies. The fair value of Level 3 commodity derivatives, such as forwards, swaps and options, is based on internal valuation models. The fair value of interest rate derivatives and cash surrender value is based on indicative broker or dealer quotations. Level 3 foreign currency derivatives include foreign currency swaps, and forward exchange contracts. The fair value of foreign currency derivatives is based upon Canadian dollar to U.S. dollar forward exchange rates that are obtained from pricing services.

The following table provides a reconciliation of changes in the fair value of the Partnership's net financial assets and liabilities classified as Level 3 in the fair value hierarchy:

| | | |
|---|---|---|
| Balance as of January 1, 2008 | $ | (28,073) |
| Realized and unrealized gains (losses): | | |
| Included in earnings [1] | | 270,540 |
| Included in other comprehensive loss | | 1,281 |
| Purchases, issuances, sales and settlements | | 86,558 |
| Deconsolidation | | (293,435) |
| Transfers to liabilities subject to compromise | | (20,253) |
| Balance as of December 31, 2008 | $ | 16,618 |
| | | |
| Total unrealized gains for the period included in earnings attributable to assets and liabilities still held as of December 31, 2008 | $ | 3,973 |

(1) Gains and losses related to commodity and foreign currency derivatives are reported in revenue as unrealized gain (loss) related to derivative instruments in the consolidated statements of operations and comprehensive loss. Gains and losses related to interest rate derivatives and the cash surrender value of corporate-owned life insurance policies are recorded in interest expense and general and administrative expense, respectively, in the consolidated statements of operations and comprehensive loss.

12. **EMPLOYEE BENEFIT PLANS**

**401(k) PLAN** – The Partnership has a defined contribution retirement plan that complies with Section 401(k) of the Internal Revenue Code. Substantially all full-time employees are eligible to participate in the plan. The Partnership matches 100% of each participant's voluntary contributions, subject to a maximum Partnership contribution of 5% of the participant's compensation. All participants are immediately 100% vested in employer contributions. Partnership contributions during the years ended December 31, 2008, 2007, 2006 and 2005, were $2.0 million, $2.6 million, $3.8 million and $2.4 million, respectively.

**PENSION BENEFIT PLANS AND HEALTH BENEFIT PLAN** – For certain Canadian employees, the Partnership has a Defined Benefit Plan and Supplemental Benefit Plan ("Pension Plans"). The Partnership accrues its obligations and related costs under the Pension Plans in accordance with the provisions of SFAS No. 87, "Employers' Accounting for Pensions," as amended by SFAS 158. Actuarial gains and losses and past service costs are amortized on a straight-line basis over the expected remaining average service life for employees in the plan, which is estimated to be 9 years.

In addition to pension benefits, the Partnership provides post-employment health benefits for eligible Canadian employees ("Health Plan"). The Partnership accrues its obligations and related costs under the Health Plan in accordance with the provisions of SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" ("SFAS 106"), as amended by SFAS 158. Eligibility is based upon 25 years of service and/or 75 points (age plus service) upon termination or retirement. Each participant's benefit consists of an annual allocation into a Health Care Spending Account ("HSA") for the participant's lifetime or a one-time retiring allowance payment in lieu of the ongoing HSA benefit.

Disclosures for the Pension Plans and Health Plan (collectively, the "Plans") are governed by SFAS No. 132(R), "Employers' Disclosures about Pensions and Other Postretirement Benefits," as amended by SFAS 158.

**LONG-TERM INCENTIVE PLAN** – In July 2007, SGLP's general partner adopted the SemGroup Energy Partners G.P. L.L.C. Long-Term Incentive Plan (the "LTIP"). As Holdings was deconsolidated as of July 22, 2008, the following information regarding the LTIP is as of December 31, 2007. The compensation committee of the general partner's Management Committee administers the LTIP. The LTIP authorizes the grant of an aggregate of 1.25 million common units deliverable upon vesting. Although other types of awards are contemplated under the LTIP, currently outstanding awards include "phantom" units, which convey the right to receive common units upon vesting, and "restricted" units, which are grants of common units restricted until the time of vesting. The phantom unit awards also include distribution equivalent rights ("DERs"). Subject to applicable earning criteria, a DER entitles the grantee to a cash payment equal to the cash distribution paid on an outstanding common unit prior to the vesting date of the underlying award. Recipients of restricted units are entitled to receive cash distributions paid on common units during the vesting period which distributions are reflected initially as a reduction of partners' capital (deficit). Distributions paid on units which ultimately do not vest are reclassified as compensation expense.

26

In July 2007, 475,000 phantom units and 5,000 restricted units were approved, which vest ratably over periods of four and three years, respectively. In October 2007, 5,000 restricted units were approved, which vest ratably over three years. These grants are equity awards under SFAS 123R and, accordingly, the fair value of the awards as of the grant date is expensed over the vesting period. The weighted average grant date fair-value of the awards is $22.06 per unit. The value of these award grants was approximately $10.5 million, $0.1 million and $0.1 million on their grant dates, respectively, and the unrecognized estimated compensation cost at December 31, 2007 was $9.5 million, which will be recognized over the remaining vesting periods. As of December 31, 2007, all outstanding awards are expected to fully vest. SGLP's equity-based incentive compensation expense for the year ended December 31, 2007 was $1.2 million.

**OPTION PLANS** – In 2001, the Partnership adopted The Seminole Group, Inc. 2001 Stock Option Plan, and in 2003, the Partnership adopted The Seminole Group, L.P. 2003 Unit Option Plan (the "Option Plans"). Under the 2001 and 2003 option plans, the Management Committee may grant up to 1.5 million and 0.6 million options, respectively, to officers, directors, employees or consultants of the Partnership. The maximum option term is 15 years from the date of grant and the Management Committee determines the exercise price based on the approximate fair value of the Partnership units subject to the option. The options become exercisable at dates determined by the Management Committee.

On July 21, 2006, the Partnership granted 41,254 Partnership unit options with an exercise price of $30.30 per unit which were exercisable immediately. Since that date, no Partnership unit options have been granted. During the year ended December 31, 2008, 1,875 options were forfeited at a weighted average exercise price of $8.00 and during the year ended December 31, 2007, 1,687,054 options were exercised at a weighted average price of $5.62. There were 11,250 options at a weighted average price of $15.43 outstanding and exercisable at December 31, 2008. At December 31, 2007, there were 13,125 options at a weighted average exercise price of $14.37 outstanding and exercisable.

**UNIT APPRECIATION RIGHTS** - In 2003, the Partnership adopted The Seminole Group, L.P. 2003 Partnership Appreciation Rights Plan (the "PARS Plan"), which replaced and superseded The Seminole Group, Inc. Stock Appreciation Plan adopted in 2001. Under the PARS Plan, the Management Committee may grant appreciation rights to officers, directors, employees or consultants of the Partnership. The Management Committee determines the term, vesting period and grant price of the unit appreciation rights. Compensation expense is recorded for the difference between the grant price and the estimated fair market value at the end of the reporting period. Compensation expense of $3.1 million was recorded during the year ended December 31, 2007. There was no compensation expense recorded for the year ended December 31, 2008.

During the year ended December 31, 2008, 5,950 rights were cancelled at a weighted average exercise price of $3.36. During the year ended December 31, 2007, 5,950 rights were exercised at a weighted average exercise price of $3.36. There were 35,450 rights at a weighted average exercise price of $7.00 outstanding and exercisable at December 31, 2008. At December 31, 2007, there were 41,400 rights at a weighted average exercise price of $6.48 outstanding and exercisable.

SERP - The Partnership had a non-qualified supplemental executive retirement plan ("SERP Plan") for certain executives. The Partnership accounts for the SERP Plan under the provisions of APB Opinion No. 12, as amended by SFAS 106. The benefits vest over 5 years, beginning with date of hire. Fixed annual amounts are payable beginning at age 65, or date of disability, if earlier, for a period of 5, 10 or 15 years. The SERP Plan also has a provision for pre-retirement death benefits. Using a discount rate of 5.75% and 6.25%, the accumulated vested benefit at December 31, 2008, 2007, 2006 and 2005, was $9.8 million, $11.5 million, $10.6 million and $7.3 million, respectively, and is included in other long-term liabilities (2007, 2006 and 2005) and liabilities subject to compromise (2008) in the consolidated balance sheets. The Partnership recognized compensation benefit of $1.7 million and expense of $0.9 million, $3.3 million and $1.3 million for the years ended December 31, 2008, 2007, 2006 and 2005, respectively. The Partnership has obtained life insurance on the lives of these executives and the cash surrender value of these policies is included in other assets on the consolidated balance sheets. The cash surrender value of the corporate-owned life insurance policies at December 31, 2008, 2007, 2006 and 2005, was $5.3 million, $6.2 million, $4.0 million and $2.4 million, respectively. The SERP Plan was terminated effective December 31, 2008.

### 13. COMMITMENTS AND CONTINGENCIES

The Partnership has entered into capital and operating lease agreements for office space, office equipment, land, trucks and tank storage. As a result of the deconsolidation of Holdings, Canada and Wyckoff, their commitments are not included below. Future minimum lease payments at December 31, 2008 and all operating leases in effect at the petition date are as follows:

|  | Capital Leases | Operating Leases |
|---|---|---|
| For twelve months ending: |  |  |
| December 31, 2009 | $ 585 | $ 14,643 |
| December 31, 2010 | 361 | 12,234 |
| December 31, 2011 | 18 | 7,186 |
| December 31, 2012 | 18 | 3,466 |
| December 31, 2013 | 18 | 1,795 |
| Thereafter | 53 | 4,778 |
| Total future minimum lease payments | 1,053 | $ 44,102 |
| Less amount representing interest | 103 |  |
| Net future minimum lease payments | 950 |  |
| Less current portion | 520 |  |
|  | $ 430 |  |

Rental expenses relating to all leases for the years ended December 31, 2008, 2007, 2006 and 2005 were $26.3 million, $26.2 million, $28.4 million and $16.0 million, respectively.

Prior to filing for relief under Chapter 11, the Partnership was required to make quarterly distributions to its partners in the event taxable income was generated to its partners and to the extent the Partnership has sufficient cash to make such distributions. Additionally, the Partnership was allowed to distribute to its partners proceeds resulting from certain capital market events. These distributions were recorded in the financial statements in the period in which they were declared. During the years ended December 31, 2008, 2007, 2006 and 2005, the Partnership declared $100.3 million, $132.7 million, $119.0 million and $33.9 million, respectively, in distributions to its partners.

On February 20, 2008, the Partnership entered into a terminalling and storage agreement which requires certain minimum requirements each month, regardless of the amount of such services actually used by the Partnership.

There may be instances when crude oil or refined products leak into the environment from the Partnership's pipelines and storage facilities. The Partnership reduces the risk by removing assets from service and through capital expenditures to upgrade the facilities. The Partnership maintains insurance of various types that it considers adequate to cover its operations and properties. The Partnership is from time to time subject to various legal actions and claims incidental to its business, including those arising out of employment-related matters. All pending litigation prior to the bankruptcy has been stayed. Since the filing of bankruptcy, numerous additional legal actions and claims have been filed against the Partnership. Both the pre-petition and post-petition bankruptcy litigation is disclosed and scheduled with filings in the foregoing pending bankruptcy case. Once management determines that information pertaining to a legal proceeding indicates that it is probable that a liability has been incurred, an accrual is established equal to management's estimate of the likely exposure. The Partnership did not have an accrual for legal settlements as of December 31, 2008, 2007, 2006 or 2005.

At any given point in time, the Partnership has products or services under contract where revenue and cost of sales will not be recognized until some future time period. These contracts represent fixed price product sales and purchases, which the Partnership is committed to fulfill. As of December 31, 2008, the Partnership expects to realize in future time periods approximately $43.4 million in unfulfilled sales commitments and $19.4 million in unfulfilled purchase commitments.

## 14.    RELATED PARTY TRANSACTIONS

As of December 31, 2008, the Partnership owed Holdings $150.0 million. A note payable has not been executed, as such, the balance owed has been recorded as liabilities subject to compromise in the consolidated balance sheet.

The Partnership purchased crude oil from entities owned by unitholders totaling approximately $87.2 million, $91.8 million, $87.3 million and $73.5 million during the years ended December 31, 2008, 2007, 2006 and 2005, respectively. At December 31, 2008, 2007, 2006 and 2005, $24.9 million, $8.9 million, $6.2 million and $6.5 million, respectively, was payable to related parties and is included in accounts payable subject to compromise on the consolidated balance sheets.

During 2007 and 2008, the Partnership acted as an agent for Westback Purchasing Company, L.L.C. ("Westback"), an entity owned by an ex-officer of the Partnership. Under its agency relationship, the Partnership entered into certain derivative transactions with a counterparty or NYMEX broker on behalf Westback. The net open position of these derivative transactions were included in the NYMEX transactions that were transferred through an ex-pit book transfer on July 15, 2008. The Partnership is no longer entering into these transactions. At December 31, 2008, the Partnership recorded on the consolidated balance sheet accounts receivable from Westback of $285.5 million, which was fully reserved and is reflected in asset impairments in the accompanying consolidated statement of operations and comprehensive loss. In addition to the Westback receivable of $285.5 million, the Partnership has demanded payment from Westback for an additional $23.5 million in payments for commissions and certain other transactions during 2007 and 2008. However, the Partnership has not recorded a receivable for these amounts as collection of its demanded amounts is remote. At December 31, 2007, the Partnership recorded on the consolidated balance sheet an accounts receivable from Westback of $255.3 million related to derivative positions transacted on behalf of Westback and a corresponding derivative liability to the counterparty. There was no impact to the consolidated statement of operations and comprehensive loss.

In addition, the Partnership also acted as an agent for Westback where the Partnership purchased and sold commodities on behalf of Westback. As a result of purchases on behalf of Westback, the transaction would result in a payable to a counterparty and a receivable from Westback or vice versa for a sale on behalf of Westback. At December 31, 2007, the Partnership recorded on the consolidated balance sheet, net accounts receivable from Westback of $68.6 million and net accounts payable to a counterparty of $72.6 million for commodity transactions executed on behalf of Westback during 2007.

The Partnership sold its investment in Niska Gas Storage to a unitholder in February 2008 for proceeds of $146.2 million. For the year ended December 31, 2007, the Partnership recognized a loss of $2.0 million from this affiliate, which includes a reduction in the carrying value of the investment to reflect the amount realized upon its sale. Additionally, the Partnership acted as a counterparty to Niska for select physical and financial transactions. During the year ended December 31, 2007, the Partnership had sales to Niska totaling $5.5 million and purchases from Niska of $18.6 million. At December 31, 2007, no amounts were payable to Niska.

During 2007, an officer of the Partnership served on the Management Committee of an entity from which the Partnership leases transport trucks, trailers and tankers. During the year ended December 31, 2007, the Partnership made payments of $1.4 million to the entity, and as of December 31, 2007, the Partnership had future commitments to the entity totaling $6.6 million. In addition, another officer of the Partnership served on the Management Committee of a financial institution with which the Partnership has a banking relationship. The financial institution entered into commodity derivative transactions and cash flow hedges with the Partnership and is a member of the bank group with which the Partnership has its working capital facility, revolving credit facility and term loan.

As SGLP was deconsolidated, it is considered a related party as of July 22, 2008. Revenues and expenses included below relate to the period from July 22, 2008 to December 31, 2008.

On July 23, 2007, the Partnership entered into a throughput agreement with SGLP related to its crude oil operations, which expires on December 31, 2014. Under the agreement, SGLP charges a fee per barrel for gathering, pipeline transportation, trucking, terminalling and storage services it provides to the Partnership and the Partnership is subject to certain minimum requirements each month. In September 2008, the Partnership renegotiated the agreement with SGLP and eliminated the minimum throughput requirements of the agreement. SGLP does not take title to, or marketing responsibility for, the crude oil it gathers, transports, terminals and stores. For the period from July 22, 2008 to December 31, 2008, the Partnership purchased $12.0 million under the throughput agreement, which is recorded in cost of sales in the consolidated statement of operations and comprehensive loss.

The Partnership also entered into a terminalling and storage agreement on February 20, 2008, with SGLP related to its asphalt operations, which expires on December 31, 2014. Under this agreement, the Partnership pays a fee per ton for terminalling services and a fee per barrel for storage services. SGLP does not take title to, or marketing responsibility for liquid asphalt cement that it terminals and stores. This terminalling and storage agreement is subject to minimum requirements each month, regardless of the amount of such services actually used by the Partnership in a given month. If the Partnership uses these services in excess of the minimum throughput requirements, it pays SGLP a premium for such services. Subsequent to July 22, 2008, the Partnership purchased $26.0 million under the terminalling and storage agreement, which is recorded as operating expenses on the consolidated statement of operations and comprehensive loss. Based on the minimum requirements under the asphalt terminalling and storage agreement, the Partnership is obligated to pay SGLP an aggregate minimum monthly fee totaling $58.9 million annually for SGLP's services, as of December 31, 2008.

The Partnership entered into an omnibus agreement with SGLP on July 23, 2007 which was amended on February 20, 2008, under which SGLP reimburses the Partnership for the provision of various general and administrative services for SGLP's benefit. SGLP pays the Partnership a fixed administrative fee for providing general and administrative services to SGLP. The fee is $7.0 million per year through February 2011 subject to annual increases based on increases in the Consumer Price Index and subject to further increases in connection with expansions of SGLP's operations. After February 2011, SGLP's general partner will determine the general and administrative expenses to be allocated to SGLP in accordance with the partnership agreement. For the period from July 22, 2008 to December 31, 2008, the Partnership recorded $3.0 million for the services provided under the omnibus agreement, which is reflected in general and administrative expense in the consolidated statement of operations and comprehensive loss.

SGLP also reimburses the Partnership for direct operating payroll and payroll-related costs and other operating costs associated with services the Partnership's employees provide to SGLP. For the period from July 22, 2008 to December 31, 2008, the Partnership charged SGLP $11.8 million in compensation costs related to services provided by the Partnership's employees.

Effective March 31, 2009, the Partnership entered into a settlement agreement with SGLP under which it will reject the contracts discussed above and enter into new agreements.

## 15.   SUBSEQUENT EVENTS

Effective March 31, 2009, the Partnership entered into an agreement to settle certain matters, including the termination of throughput and terminalling agreements, between SGLP and the Partnership (the "Settlement Agreement"). Under the Settlement Agreement, SGLP will transfer certain crude oil storage assets located in Kansas to the Partnership and the Partnership will transfer to SGLP its asphalt assets that are connected to SGLP's asphalt assets and 355,000

barrels of crude oil tank bottoms and pipeline linefill located in SGLP assets. The Partnership and SGLP will enter into new throughput and terminalling agreements as well as a shared services and transition services agreements under which the Partnership will provide certain operational services. The Partnership will reject the existing throughput, terminalling and omnibus agreements resulting in an unsecured claim of $55.0 million to SGLP.

In connection with such Settlement Agreement, the Partnership transferred $84.0 million of asphalt assets and $14.9 million of linefill and other crude oil assets to SGLP in exchange for $4.3 million of crude oil assets received from SGLP, resulting in a loss to the Partnership of $94.5 million of which $84.0 million was recorded as reorganization expense in the consolidated statement of operations and comprehensive loss as of December 31, 2008 related to the discontinued operations of the Partnership's asphalt business.

On October 14, 2008, the Bankruptcy Court appointed an Examiner to (1) investigate the circumstances surrounding the Debtors' trading strategy and the transfer of the NYMEX account; (2) investigate the circumstances surrounding insider transactions and the formation of SGLP; (3) investigate the circumstances surrounding the potential improper use of borrowed funds and funds generated from the Debtors' operations and the liquidation of their assets to satisfy margin calls related to the trading strategy for the Debtors and certain entities owned or controlled by the Debtors' officers and directors; (4) determine whether any directors, officers or employees of the Debtors participated in fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtors; and (5) determine whether the Debtors' estates have causes of action against current or former officers, directors, or employees of the Debtors arising from such participation.

On April 15, 2009, the Examiner filed the Final Report with the Bankruptcy Court stating the Debtors' estates have potential claims or causes of action, including, without limitation, the following: 1) negligence and mismanagement by former officers of the Partnership related to options trading, inaccurate or misleading reporting on option activity and failure to develop and operate an effective risk management policy; 2) fraud and false statements made by former officers of the Partnership to the Partnership's lenders and creditors; 3) conversion and corporate waste against a former officer for improperly converting the Partnership's funds and resources for personal use; 4) breach of fiduciary duties and breach of contract of former officers of the Partnership for receiving additional monies and bonuses that were not approved; and 5) misleading and false statements related to the receipt of these monies as well as violation of the officers' employment agreements.

The Partnership does not dispute the potential claims and causes of actions as concluded by the Examiner in the Final Report. The former officers referenced above resigned or were relieved of their duties shortly after the Partnership filed for Bankruptcy. The Examiner's Final Report does not indicate potential claims or causes of action against the Partnership's current officers and employees.

On April 23, 2009, the Bankruptcy Court approved an amendment to the DIP credit facility, which extends the maturity to September 30, 2009. The facility was reduced from $175.0 million to $150.0 million and the interest rates were reduced. For Base Rate loans, interest is payable monthly at the higher of the bank's prime rate or the Federal Funds rate plus 3.00% per annum. For Eurodollar loans, interest is payable monthly at LIBOR plus 4.00%. Under the covenants of the agreement, the Partnership is required to file a reorganization plan and disclosure statement with the Bankruptcy Court by May 15, 2009; commence a hearing seeking approval of the disclosure statement relating to the reorganization plan by June 26, 2009, and diligently seek

approval of such disclosure statement; and obtain entry of a confirmation order from the
Bankruptcy Court with respect to the reorganization plan by September 18, 2009.