**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---

IN RE:                                   ) CHAPTER 11
                                         )
SEMCRUDE, L.P., <u>et al.</u>,          ) Case No. 08-11525 (BLS)
                                         ) (Jointly Administered)
                                         )
                    Debtors.             )
_____         )
                                         )
CONOCOPHILLIPS COMPANY,                  )
                                         )
                    Plaintiff,           ) Adversary No. 08-51457
                                         )
        v.                               ) Related to Docket No. 5
                                         )
                                         )
SEMGROUP, L.P., <u>et. al.</u>,         )
                                         )
                    Defendants.          )
                                         )
J. ARON & COMPANY,                       )
                                         )
                    Plaintiff,           )
                                         )
                                         ) Adversary No. 09-50038
        v.                               )
                                         ) Related to Docket No. 6
                                         )
SEMGROUP, L.P., <u>et. al.</u>,         )
                                         )
                    Defendants.          )
                                         )
B.P. OIL SUPPLY COMPANY,                 )
                                         )
                    Plaintiff,           )
                                         ) Adversary No. 09-50105
        v.                               )
                                         ) Related to Docket No. 9
                                         )
SEMGROUP, L.P., <u>et. al.</u>,         )
                                         )
                    Defendants.          )

PLAINS MARKETING, L.P.,           )
                                  )
                                  )
                  Plaintiff,      )
                                  )
                                  )   Adversary No. 09-51003
        v.                        )
                                  )   Related to Docket No. 5
                                  )
                                  )
BANK OF AMERICA, N.A., <u>et.</u>      )
<u>al.</u>,                            )
                                  )
                                  )
                  Defendants.     )

_____

### <u>OPINION</u>[1]

    Before the Court are motions to dismiss, or, in the
alternative, to abstain (collectively, the "Motions to Dismiss"),
filed by numerous named defendants herein who are producers of
oil and gas (the "Producers").[2]  The Producers are Samson
Resources Company, <u>et. al.</u> ("Samson"),[3] New Dominion, L.L.C.

_____

    [1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.  To the extent that this Court's
jurisdiction is determined to be within the parameters of 28
U.S.C. § 157(c)(1), this Opinion and the accompanying Order shall
be deemed to be the Court's proposed findings of fact and
conclusions of law.

    [2] <u>See</u> Adv. No. 08-51457, Docket No. 5; Adv. No. 09-50038,
Docket. Nos. 7, 80, 184 and 180; Adv. No. 09-50105, Docket Nos. 9
and 17; Adv. No. 09-51003, Docket No. 5.

    [3] The Samson parties are as follows: Samson Resources
Company, Samson Lone Star, LLC, and Samson Contour Energy E&P,
LLC.  <u>See</u> Adv. No. 08-51457, Docket No. 5; Adv. No. 09-50038,
Docket. No. 7; Adv. No. 09-50105, Docket No. 9; Adv. No. 09-
51003, Docket No. 5.

("New Dominion"),[4] and a significant number of other producer-defendants.[5]  The Motions are opposed by plaintiffs who purchased oil and gas (the "Downstream Purchasers") from the Debtors prepetition in the ordinary course of business, including ConocoPhillips Company ("Conoco"), J. Aron & Company ("J. Aron"), B.P. Oil Supply Co. ("B.P."), and Plains Marketing, L.P. ("Plains").  For the reasons detailed below, the Court will deny the Motions to Dismiss.

---

[4] See Adv. No. 09-50038, Docket No. 7; Adv. No. 09-50105, Docket No. 17.

[5] These other producer-defendants are as follows: Arrow Oil & Gas, Inc.; Chesapeake Energy Marketing, Inc.; Special Energy Corporation; DC Energy, Inc.; Thunder Oil and Gas, LLC; Veenker Resources, Inc.; Lance Ruffel Oil & Gas Corp.; JMA Energy Company, LLC; LCS Production, Co.; Murfin Drilling Company, Inc.; Vess Oil Corporation; LD Drilling, Inc.; Davis Petroleum, Inc.; RAMA Operating Co., Inc.; Mull Drilling Company, Inc.; D E Exploration, Inc.; Braden-Deem, Inc.; Dunne Equities, Inc.; Lario Oil & Gas Company; McCoy Petroleum Corporation; W.D. Short Oil Co., L.L.C.; Short & Short, L.L.C.; Tempest Energy Resources, L.P; Calvin Noah; CMX, Inc.; L & J Oil Properties, Inc.; McGinness Oil Company of Kansas, Inc.; Daystar Petroleum, Inc.; F. G. Holl Company, L.L.C.; GRA EX, L.L.C.; V.J.I. Natural Resources, Inc.; J. & D. Investment Company; Landmark Resources, Inc.; Mid-Continent Energy Corporation; Molitor Oil, Inc.; Osborne Heirs Company; Pickrell Drilling Company, Inc.; Platte Valley Oil Company, Inc.; Midwest Energy, Inc.; Red Oak Energy, Inc.; Ritchie Exploration, Inc.; Thoroughbred Associates, L.L.C.; Viking Resources, Inc.; Vincent Oil; Wellstar Corporation; White Exploration, Inc.; and White Pine Petroleum Corporation.
The Court will include with this group another set of producer-defendants who filed separate briefs but whose arguments for present purposes are substantially similar. These include IC-CO, Inc., W.E.O.C., Inc., and Reserve Management.  See Adv. No. 09-50038, Docket No. 80.

# I. __INTRODUCTION__[6]

The Motions presently before the Court raise a simple question:  Does this Court have jurisdiction to hear and decide these four adversary proceedings?  Before that question can be answered, however, attention must be given to the long, complex and convoluted history of the legal battles between the parties in order to place the issues in the proper framework.

The litigation originates from a series of transactions that are not in material dispute.  The Producers own or operate oil and gas wells.  In the summer of 2008 (before the Petition Date), they delivered millions of dollars worth of product to the Debtors.  The Debtors then sold or transferred some of that oil and gas to the Downstream Purchasers.  The Debtors did not pay the Producers for any of the oil and gas delivered in the seven weeks leading up to the Petition Date.

The Producers have asserted that, under various state laws, they have the legal right to seek payment directly from the Downstream Purchasers because they have not been paid for oil and gas they delivered to the Debtors.  In essence, the Producers contend that the transfer of "their" oil and gas from the Debtors to the Downstream Purchasers occurred subject to the Producers' state law lien claims and/or trust rights.

---

[6] Capitalized terms used in this Introduction are defined __infra.__

The Downstream Purchasers contend that they purchased the product free and clear of any liens, claims and encumbrances. They have offset the Debtors' liabilities to them against the amounts they owe the Debtors, and seek to tender the net amounts to the Debtors in full and final satisfaction of their obligations relating to the prepetition sales.  The Downstream Purchasers have commenced these adversary proceedings (hereinafter collectively referred to as the "Tender Adversaries") seeking declaratory judgment that, once these net funds are tendered to the Debtors, they will have no further liability to the Debtors, the Producers or any other party.

The Producers have now moved to dismiss the Tender Adversaries on the ground that they allege that this Court lacks subject matter jurisdiction to adjudicate the respective rights of the Producers and the Downstream Purchasers.  In the alternative, the Producers ask that this Court abstain from hearing the Tender Adversaries in favor of having the dispute addressed in litigation the Producers have commenced in Oklahoma, Texas, Kansas and New Mexico.

The Court concludes that it possesses subject matter jurisdiction to hear and decide the Tender Adversaries.  The Court further determines that abstention is not appropriate. Accordingly, the Motions to Dismiss will be denied.

## II. **BACKGROUND**

A.   General Background

Founded in February 2000, the Debtors were engaged in a number of different businesses, each related to the energy industry.  Included among the Debtors are several corporations which engage in the business of purchasing various forms of energy products, such as crude oil and natural gas, from producers and then subsequently reselling these products to refiners and other resellers in various types of sale and exchange transactions.  The consolidated revenues of the Debtors during fiscal year 2007 (the last full fiscal year before their Chapter 11 cases) were approximately $13.2 billion.

In the ordinary course of their business, several of the Debtors entered into agreements with many Producers located in at least eight different states to purchase oil and gas.  During the months leading up to the commencement of these Chapter 11 cases, the Producers produced, and the Debtors purchased, oil and gas from thousands of wells.  Under general terms between the parties, the Debtors were obligated to pay for this oil and gas production on July 20 and July 25, 2008, for June sales, and on August 20 and 25, 2008, for July sales.

Historically, the amounts owed under these contracts had been paid by the Debtors without incident in accordance with the above payment schedule.  The Debtors' liquidity crisis and

bankruptcy filings in the summer of 2008, however, changed this pattern.[7]  When the Debtors filed their Chapter 11 petitions on July 22, 2008 (the "Petition Date"), the Producers had yet to receive payment for hundreds of millions of dollars worth of oil and gas they had sold to the Debtors between June 1, 2008 and the Petition Date.

The Debtors' failure to pay the amounts owed on these contracts left the Producers demanding payment and seeking to determine in this Court what rights, if any, they had in the oil and gas they had sold to the Debtors (or the proceeds from the Debtors' sale of such product) between June 1 and the Petition Date under the laws of their respective states.

B.   The Producers' Actions in This Court

The Producers sought to assert their claims and interests not only against the Debtors, but also against parties who had purchased oil and gas from the Debtors during the relevant period.  As discussed in greater detail below, the Producers contend that any party acquiring oil and gas from the Debtors did so subject to superior rights and interests of the Producers until and unless the Producers were paid in full for such production.

---

[7] For a more substantial discussion of the facts and circumstances leading up to the filing of the Debtors' Chapter 11 cases, see <u>Samson Resources Co. v. SemCrude, L.P.</u>, 407 B.R. 140, 143-48 (Bankr. D. Del. 2009).

Within the month following the Petition Date alone, hundreds of reclamation demands were made upon the Debtors.  Many separate adversary proceedings relating to these reclamation demands or purported liens on the oil and gas in question were commenced.[8] A number of emergency motions, seeking either injunctive relief to prevent the sale or disposition of the oil and gas in question or a lifting of the automatic stay to proceed to recover it, also were filed in this Court within weeks of the Petition Date.

In order to manage the multiple adversary proceedings and motions filed by Producers seeking essentially identical relief (viz., segregation and payment of proceeds attributable to oil and gas production between June 1, 2008 and the Petition Date), the Court directed that representatives of the Debtors, the Producers and the Debtors' secured lenders (hereinafter, the "Banks") meet and confer to develop a set of procedures that could be used to resolve the priority dispute in an efficient and economical manner.  The parties presented their joint proposal to the Court for approval on September 17, 2008, and the Court subsequently entered two orders (the "Producer Claims Procedure

---

[8] Samson and New Dominion were among those who commenced such actions. Samson Resources v. Eaglwing, L.P., Adv. No. 08-51146, Docket No. 1 ¶ 9; see also New Dominion, L.L.C. v. SemCrude, L.P., Adv. No. 0851147, Docket No. 1.  Asserting that this Court had jurisdiction over the matter as a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2), they asked this Court to direct that the Downstream Purchasers segregate any proceeds attributable to the Producers, and to direct that such funds be paid to them.

Orders")[Case No. 08-11525, Docket Nos. 1425 and 1557].

The structure approved by the Court called for the Producers to initiate one adversary proceeding (each, a "Producer Adversary") against the Debtors for each state in which Producers had sold oil or gas to the Debtors, a total of eight states.  The purpose of these adversary proceedings was to obtain declaratory judgments establishing (i) what rights, if any, are afforded by each respective state's law to a producer of oil or natural gas who sells oil or natural gas to a first purchaser, such as the Debtors here, and (ii) the priority of these rights relative to the Banks' asserted security interests in the Debtors' cash and inventory.  Any party who sold oil and gas to the Debtors was free to participate in this litigation, and the Producer Claims Procedures Orders expressly provided that the results of the litigation would be binding upon all such oil and gas producers irrespective of whether they actively participated in this process.

New Dominion was the lead plaintiff in the Oklahoma action, and Samson was the lead plaintiff in three others.  The Downstream Purchasers moved to intervene in the Producer Adversaries and that motion was granted on February 26, 2009 [Adv. Case No. 08-51445, Docket No. 116].  The Downstream Purchasers sought declaratory relief establishing that they acquired or purchased oil and gas from the Debtors free and clear

of all liens, claims and interests pursuant to, _inter alia_, the terms of their oil and gas sale contracts with the Debtors, industry custom and applicable state and federal law.

Producers from Oklahoma argued that Oklahoma's Production Revenue Standards Act ("PRSA"), Okla. Stat. tit. 52, § 570.1 _et. seq._, imposes a resulting, implied or constructive trust in favor of the Producers for the oil and gas they sold to the Debtors. In an opinion dated June 19, 2009, this Court held that the PRSA does not impose such a trust, and that the Banks' prior perfected security interests are superior to the rights and interests the Producers asserted under the PRSA. See _Samson Resources Co. v. Semcrude, L.P._, 407 B.R. 140 (Bankr. D. Del. 2009).

Certain Producers from Texas argued that § 9.343 of the Texas Business & Commerce Code grants them automatically-perfected purchase money security interests superior to any created under Article 9's usual perfection scheme. Also by opinion dated June 19, 2009, this Court held that a prior duly-perfected security interest is superior to a security interest perfected only in Texas pursuant to § 9.343 of the Texas Business & Commerce Code. See _Arrow Oil & Gas, Inc. v. SemCrude, L.P._, 407 B.R. 112, 139 (Bankr. D. Del. 2009). Finally, in a third opinion, this Court likewise held that a duly perfected security interest arising under Article 9 is superior to one created by a Kansas law purportedly granting automatic perfection to that

state's oil and gas producers.  See Mull Drilling Co., Inc., v. SemCrude, L.P., 407 B.R. 82, 110 (Bankr. D. Del. 2009).

C.    The Commencement of these Adversary Proceedings by J. Aron, Conoco, B.P. and Plains

During the pendency of the Producer Adversaries described above, but more than six months before the Court issued its three opinions determining that the Producers' lien and trust claims were subordinate to the Banks' prior perfected security interests, each of the plaintiffs herein sought to offset their obligations to and from the Debtors, and then to pay over to the Debtors the net amount due.  Because each of the plaintiffs (all of which are Downstream Purchasers) was concerned about potential double liability in the event the Producers were successful in asserting their lien and trust claims, the Downstream Purchasers each sought declarations from this Court that the tender of its net settlement amount to Debtors would constitute full performance and that it would have no other obligation to any other party, including to the Producers, for the oil and gas it received.

The Downstream Purchasers' asserted netting rights arise under their respect contracts with the Debtors.  Each Downstream Purchaser was party to an ISDA master agreement and associated documents (the "Trading Agreements"), which governed the purchase, sale and trading of energy commodities between the

respective Downstream Purchasers and the Debtor. <u>See, e.g.</u>, Case No. 08-11525, Docket No. 3174, Ex. 1. Under the Trading Agreements, all individual transactions between each Downstream Purchaser and the Debtors are aggregated, with the party owing the greater amount in any given month obligated to pay the difference between the amount it owed versus the amount it was entitled to receive for that month. A bankruptcy filing of either party constitutes an event of default and allows the non-defaulting party to terminate the contract and determine a net settlement amount for all outstanding transactions. Upon default, the defaulting party's obligations under the agreements are "accelerated, terminated, or cancelled . . . ." Case No. 08-11525, Docket No. 3174, Ex. 1, Schedule Part 7(e)(i)(B). The Trading agreements also provide rights of indemnification[9] and

---

[9] By way of example, the J. Aron Trading Agreement provides that the defaulting party will:

> on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction including, but not limited to, costs of collection.

Case No. 08-11525, Docket No. 3174, Ex. 1, § 11.

warranties of good title.[10]

The Debtors' bankruptcy filing constituted an event of default under these Trading Agreements.  Through the Tender Adversaries, the Downstream Purchasers now seek declaratory judgment that performance under these agreements -- that is, termination of the agreement and payment of the net amount owed by them to the Debtors -- will free them from any further obligation to any other party, including the Producers.  The Producers oppose such relief and contend that the Downstream Purchasers remain on the hook to pay the Producers for oil and gas transferred to the Downstream Purchasers until the Producers are paid in full.

On October 6, 2008 Conoco filed a complaint (the "Conoco Complaint")[Adv. No. 08-51457, Docket No. 1], initiating the above-captioned adversary proceeding number 08-51457.  The same day, Conoco filed a "Motion to Tender" [Case No. 08-11525, Docket. No. 1666] seeking authority to pay Conoco's net settlement amount of approximately $11.6 million in full satisfaction of Conoco's obligations to the Debtors under their various agreements.  In connection with the Motion to Tender, the

---

[10] The parties adopted, as part of the Trading Agreements, Conoco's General Provisions [for] Domestic Crude Oil Agreements (the "Conoco General Provisions").  They provide that "all crude oil delivered hereunder shall be free from all royalties, liens, encumbrances and all applicable foreign, federal, state and local taxes."  Case No. 08-11525, Docket No. 3174, Ex. 2, Conoco General Provisions ¶B.

Conoco Complaint seeks, inter alia, (i) a declaration from this
Court that tender of the net settlement amount constitutes full
performance under its Trading Agreements, (ii) a determination of
the validity, priority and extent of any interest in the $11.6
million net settlement amount, and (iii) a declaration that
Conoco has "no obligations to any persons or entities other than
SemCrude with respect to [its Trading Agreements] or arising out
of or in connection with the performance thereof." (Conoco
Complaint 12). The Debtors were and are defendants to that
action. The Conoco Complaint was amended on February 2, 2009, to
add Samson as a defendant [Adv. No. 08-51457, Docket No. 3].

B.P. initiated its adversary proceeding on February 4, 2009
[Adv. No. 09-50105, Docket No. 1]. Naming the Debtors and the
Producers as defendants, B.P. likewise sought, inter alia, a
declaration from this Court that the tender of its approximately
$10.6 million net settlement amount to the Debtors would
constitute full performance under its Trading Agreements.

Plains, having already tendered to the Debtors the majority
of the amount it claims it owed under its Trading Agreements,
initiated its adversary proceeding on May 29, 2009, seeking,
inter alia, a declaration that tender of the remaining amounts
due under those Trading Agreements (approximately $2.3 million)
would constitute full performance [Adv. No. 09-51003, Docket No.
1].

-14-

Finally, J. Aron filed a complaint on January 20, 2009, thereby initiating a Tender Adversary (as amended, the "J. Aron Complaint")[Adv. No. 09-50038, Docket No. 2851].  J. Aron sought, <u>inter</u> <u>alia</u>, declarations from this Court that its proposed roughly $90 million tender would absolve it of any further obligation under its Trading Agreement to the Debtors or any other relevant party.

D.    The Tender Orders

The Debtors filed answers and counterclaims to the Downstream Purchasers' complaints on March 30, 3009.[11] The Debtors asserted that this Court has jurisdiction over the Tender Adversaries and that the matter is a "core proceeding under 28 U.S.C. § 157(b)(2) because the matters at issue herein concern, without limitation, the administration of the Debtors' estate, counterclaims by the Debtors' estate, orders to turn over property of the Debtors' estate, and determination of the validity, extent, or priority of liens."  <u>See, e.g.</u>, Adv. No. 09-50105, Docket No. 27 ¶¶ 3-4. The Debtors also counterclaimed that the Downstream Purchasers' failure to immediately tender their respective net settlement amounts harmed the Debtors and constituted breach of contract.

---

[11] <u>See</u> Adv. No. 08-51457, Docket No. 16; Adv. No. 09-50038, Docket No. 30; Adv. No. 09-50105, Docket No. 27; Adv. No. 09-51003, Docket No. 11.

First in the J. Aron Tender Adversary, and then in the other
Tender Adversaries, the parties conferred and ultimately agreed
that the Downstream Purchasers would turn over to Debtors the
amounts they owed under their Trading Agreements.  This Court
entered orders accordingly (the "Tender Orders"), directing each
Downstream Purchaser to turn over such amounts (the "Tendered
Funds").[12]  This was to be done "without prejudice to [the
Downstream Purchasers'] claims against the Debtors for indemnity,
breach of warranty, attorneys fees and other expenses pursuant to
the [parties' Trading Agreements]."  (Tender Orders, 1).  The
Downstream Purchasers retained their rights and priorities in the
Tendered Funds, and the Court ordered that the Tendered Funds
were not to be "released or distributed to any person without
further order of the Court."  (Tender Orders, 2).

Nevertheless, on September 15, 2009, Debtors filed a motion
in aid of confirmation [Case No. 08-11525, Docket No. 5656]
requesting the release of the Tendered Funds to fund
distributions under the Debtors' proposed plan of reorganization
(the "Plan").  The Downstream Purchasers vigorously objected,
arguing that such a release would violate the Tender Order.

---

[12] See Adv. No. 08-51457, Docket No. 51; Adv. No. 09-50038,
Docket No. 77; Adv. No. 09-50105, Docket No. 59; Adv. No. 09-
51003, Docket No. 52.

E.    The Confirmation Order

Shortly before the October 26, 2009 plan confirmation hearing, the Producers, Debtors, B.P., Conoco, and J. Aron reached a settlement.  That settlement is adopted into the confirmation order which this Court entered on October 28, 2009 [Case No. 08-11525, Docket No. 6347](the "Confirmation Order"). Under the settlement, the Downstream Purchasers agreed that the Tendered Funds would be released to fund distributions pursuant to the Plan.  With respect to jurisdiction, the Confirmation Order provides as follows:

> This Court shall retain and have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases or the Fourth Amended Plan . . . including, without limitation, . . . (b) The Court, to the full extent appropriate under applicable law, hereby retains jurisdiction over the Tender Adversar[ies] . . . and the Third Party Producer Litigations . . . and will assume jurisdiction of the District Court Third Party Producer Litigations . . . in the event such litigations were to be transferred to the Court.

Confirmation Order ¶¶ 42 & 65(b).

The Confirmation Order also preserves, as a general unsecured claim against the Debtors, the Downstream Purchasers' claims for "breach of warranty, indemnity, and attorney's fees for which [the Downstream Purchasers] would have a claim against SemGroup under the terms of the [Trading Agreements]."

-17-

(Confirmation Order ¶¶ 65(f), 67(e)).  Finally, the Confirmation Order requires the Debtor to "cooperate in any discovery" in "any other litigation by oil and gas producers against [the Downstream Purchasers] relating to oil and gas [the Downstream Purchasers] purchased from the Debtors."  Id.

F.   Oklahoma and Other State Court Actions

The Producers have now filed nearly 30 separate lawsuits against the Downstream Purchasers (the "Producer-Downstream Purchaser Actions").  These suits have been filed in state and federal courts in Oklahoma, Texas, and New Mexico.  Samson alone has filed 24 such suits.  All have been removed to federal court.  These Producer-Downstream Purchaser Actions seek payment from the Debtors' customers for oil and gas those customers bought from the Debtors and for which production the Debtors have not paid the respective Producers.

The Downstream Purchasers moved in the respective federal district courts to transfer each of the Producer-Downstream Purchaser Actions to this Court.  Each of the courts to rule on those motions -- and the record before the Court reflects that only the New Mexico has not yet ruled -- has granted the motion to transfer the case to this Court.[13]  In so ruling, those courts

_____

[13] See, e.g., Order, New Dominion, L.L.C. v. B.P. Supply Co., Case No. 09-cv-75 (E.D. Okla. May 11, 2009);  Samson Res. Co. v. BP Oil Supply Co., Case No. 08-cv-753 (N.D. Okla. June 11, 2009);  Order, Samson Res. Co. v. Valero Mktg. & Supply Co., Case No.

have cited, among other considerations, the risk of inconsistent rulings and the desirability of efficient administration.  See, e.g., New Dominion, L.L.C. v. B.P. Supply Co., Case No. 09-cv-75 (E.D. Okla. May 11, 2009)(citing "duplication of effort and the risk of inconsistent rulings").

G.   Relief Presently Sought

The Producers now ask this Court to dismiss, or, in the alternative, abstain from presiding over the Tender Adversaries. The Producers would like the courts of Oklahoma, Texas and New Mexico to instead determine the validity of their liens and attendant claims against the Downstream Purchasers.  The Producers argue that this Court lacks subject matter jurisdiction over a dispute between non-debtors, because the matter at hand is neither a "core" proceeding under 28 U.S.C. § 157(b)(2) nor is it "related to" the bankruptcy proceeding under 28 U.S.C. § 1334(b). In the alternative, they urge the Court to abstain from hearing the case, either by operation of mandatory or permissive abstention.

### III. <u>STANDARD OF REVIEW</u>

"When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion."

---

09-cv-807 (W.D. Okla. Nov. 19, 2009); Order Granting Mot. to Transfer, Samson Lone Star LLC v. ConocoPhillips Co., Case No. 09-cv-12 (N.D. Tex. Sept. 2, 2009).

Kehr Packages, Inc. V. Fedelcor, Inc., 926 F.2d 1406, 1409 (3d
Cir. 1991).  The Downstream Purchasers thus bear the burden of
establishing that subject matter jurisdiction is proper in this
Court.

    In the Third Circuit, the leading case on dismissal under
Rule 12(b)(1) is Gould Elecs., Inc. v. United States, 220 F.3d
169 (3d Cir 2000).  Under Gould, "a Rule 12(b)(1) motion may be
treated as either a facial or factual challenge to the court's
subject matter jurisdiction."  Id. at 176.  Facial attacks
challenge the sufficiency of the facts in the complaint, which
the court must accept as true.  Id.  In reviewing a facial
challenge to the court's subject matter jurisdiction, the court
must "accept all well-pleaded allegations in the complaint as
true and view them in the light most favorable to the plaintiff."
In re Kaiser Group Int'l Inc., 399 F.3d 558, 561 (3d Cir. 2005).
Factual attacks go beyond the allegations in the complaint and
challenge the facts upon which subject matter jurisdiction
depends.  Id.  Where there has been a factual attack, a court is
free to "weigh the evidence and satisfy itself as to the
existence of its power to hear the case."  Mortensen v. First
Federal Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

## IV. DISCUSSION

    The Motions to Dismiss require the Court to consider two
questions: (i) whether the Court has subject matter jurisdiction

over the Tender Adversaries; and (ii) if jurisdiction lies with this Court, whether the Court should abstain from hearing the Tender Adversaries in favor of allowing the Producer-Downstream Purchaser Actions to go forward in Oklahoma, Texas and New Mexico.

A.    The Court's Subject Matter Jurisdiction

    1.    Bankruptcy Jurisdiction Generally

The subject matter jurisdiction of bankruptcy courts is governed by 28 U.S.C. § 1334 and 28 U.S.C. § 157.  The general scheme is this: "Section 1334 vests broad primary jurisdiction over bankruptcy proceedings in the District Courts.  District Courts may, however refer bankruptcy matters falling within their jurisdiction to the Bankruptcy Courts under 28 U.S.C. § 157. District Courts have exercised this power by routinely referring most bankruptcy cases to the Bankruptcy Courts."  Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999)(internal citations omitted).[14]

---

[14] In relevant part, 28 U.S.C. § 1334 provides as follows:
    (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
    (b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising

More specifically, § 1334(b) vests jurisdiction in the district court for matters "arising under title 11, or arising in or related to a case under title 11." 28 U.S.C. § 1334(b). Matters "arising under title 11" for purposes of 28 U.S.C. § 1334(b) are those in which "a claim is made under a provisions of title 11."  H.R. Rep. No 595, 95th Cong., 1st Sess. 445 (1977). In other words, the "cause of action is created by title 11."  1 Collier on Bankruptcy § 3.01[3][c][i](Alan N. Resnick et. al. eds., 16th ed. 2009).  Matters "arising in" a bankruptcy case are typically "administrative matters that arise only in bankruptcy cases."  In re Eastport Assocs., 935 F.2d 1071, 1076 (9th Cir. 1991).  Finally, as will be discussed at greater length below, proceedings "related to" a case under title 11 are those whose outcome "could conceivably have any effect on the estate being administered in bankruptcy."  Pacor, Inc. v. Higgins (In re Pacor, Inc.), 743 F.2d 984, 994 (3d Cir. 1984)(overruled on other grounds).

2.   Core Jurisdiction in This Court

Section 157 divides bankruptcy matters into two categories: core and non-core.  A bankruptcy judge has power to "hear, decide and enter final orders and judgments" in a core proceeding. Halper, 164 F.3d at 836 ; see 28 U.S.C. § 157(b)(1).  A bankruptcy judge also has power to hear non-core proceedings: "A

in or related to cases under title 11.

bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). A bankruptcy court's power over non-core proceedings is limited to submitting proposed findings of fact and conclusions of law to the district court. Id.

A non-exhaustive list of core matters is provided in 28 U.S.C. § 157(b)(2). For purposes of this case, the relevant enumerated core matters include "matters concerning the administration of the estate", "determinations of the validity, extent, or priority of liens", and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship . . . ." 28 U.S.C. § 157(b)(2)(A), (K) and (O).

In addition, the Third Circuit has held that a matter is core if it "invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 267 (3d Cir. 1991). A court "must examine each of the [] claims presented to ascertain if it is core, non-core, or wholly unrelated to a bankruptcy case." Halper, 164 F.3d at 837. Thus, the Court must consider whether each claim in the Tender Adversary complaints is a core claim enumerated in 28 U.S.C. § 157(b)(2) or a claim that "could arise only in the context of a bankruptcy case." Any claim failing those tests is

-23-

not core, and must then be analyzed to determine whether it is "related to" the Debtors' bankruptcy case at all.

Taking the J. Aron Complaint as an example, the Downstream Purchasers seek the following declarations:

> (i) "[T]he Trading Agreement is valid and enforceable";
>
> (ii) J. Aron's "rights to deduct from the Tendered Amount and to recover continuing legal fees and costs . . . are valid and enforceable";
>
> (iii) "[T]he Trading Agreement provides rights of netting and recoupment to determine the sum total amount of any and all of J. Aron's financial obligations" to the Defendants, "and that J. Aron has no obligation to pay any more than the Tendered Amount or any portion thereof";
>
> (iv) "Defendants have no lien or trust rights nor any other actionable claims (including, without limitation, claims against sums received by J. Aron upon its sale of oil acquired from SemGroup) as a matter of law and of fact, and that J. Aron has complete defenses to any such lien, trust or other claims, or such claims are unenforceable against J. Aron";
>
> (v) J. Aron's rights arising under its Trading Agreement are "superior to those of any Defendant or other creditor, whether secured or unsecured";
>
> (vi) J. Aron's "Tendered Amount constitutes full and faithful performance under the Trading Agreement, and shall be the sole amount due, in full satisfaction thereof, and thereby extinguishes and resolves without further recourse any contingent or non-contingent claims or any other cause of action against J. Aron by [any other party], that J. Aron has no obligation to pay more than once the Tendered Amount or any portion thereof."

J. Aron Compl. ¶¶ 26-31.

Insofar as each of these counts relate to the Debtors and their secured lenders, they are core matters arising in a bankruptcy case pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2). Each declaration would directly alter the Debtors' obligations to the Downstream Purchasers and would implicate property of the estate. Considering the Downstream Purchasers' counts for declaratory judgments of their rights vis-à-vis the Producers, however, the impact of each of these declarations upon the Debtors' estates is much less direct, and therefore is not a core matter. Turning to the specific claims against the Producers, the Downstream Purchasers seek a declaration that the Producers have no lien or trust rights, or that the Downstream Purchasers have complete defenses to such rights. At first blush, this relief seems to fit within § 157(b)(2)(K)'s "determinations of the validity, extent, or priority of liens." The question of the Producers' lien and trust rights against Debtors and the Banks has largely been resolved by this Court's opinions in the Producer Adversaries. See Mull Drilling Co. v. Semcrude, L.P., 407 B.R. 82 (Bankr. D. Del. 2009); Arrow Oil & Gas, Inc. v. Semcrude, L.P., 407 B.R. 112 (Bankr. D. Del. 2009); Samson Resources Co. v. Semcrude, L.P., 407 B.R. 140 (Bankr. D. Del. 2009)(collectively ruling that the Producers do not possess trust rights over sold oil and gas, and further holding that Texas and Kansas state law gives Producers, at best, lien rights subordinate to duly perfected

article 9 security interests asserted by Banks).  What remains is primarily a determination of the Producers' lien and trust rights vis-à-vis the Downstream Purchasers.  These parties are all non-debtors.  To the extent the dispute could affect Debtors' estates, such a determination may provide a basis for related-to jurisdiction under § 157(a), but it does not constitute a core matter.

The same logic counsels against a broad reading of "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship" in § 157(b)(O) and "matters concerning the administration of the estate" in § 157(b)(A).  An overly broad reading of these sections could result in a standard no different than Pacor's "conceivable effect" standard, which is intended to be a less stringent standard for non-core matters merely "related to" a bankruptcy case.  Pacor, 743 F.3d at 994.  Insofar as they relate to the Producers, the essence of all of the declarations sought by the Downstream Purchasers is that the Downstream Purchasers are not obligated to the Producers for any oil or gas they bought from the Debtors, in excess of the net settlement amount calculated under their respective Trading Agreements. Any relationship this dispute bears to the estate is too attenuated to be called core.

In addition, the Tender Adversaries are not based on claims that could arise only in a bankruptcy case, but theoretically could

arise in a typical purchase and subsequent resale of oil and gas that is purportedly subject to trust rights of liens under the various state laws at issue here. In re Marcus Hook Dev. Park, 943 F.2d at 267. Based upon the foregoing, the Court finds that the claims relating to an adjudication or declaration of the rights of the Downstream Purchasers vis-à-vis the Producers, which are the subject of the pending Motions to Dismiss, are not core proceedings under 28 U.S.C. § 157(b).

     3.   Related-to Jurisdiction

     a.   *Related-to Jurisdiction Generally*

Because the Tender Adversaries involve disputes between non-debtors about state law issues, the Court's subject matter jurisdiction is at best non-core, related-to jurisdiction pursuant to 28 U.S.C. § 1334(b). The Producers argue that this Court lacks subject matter jurisdiction to hear these adversary proceedings. The seminal case in this Circuit on the subject is Pacor, Inc. v. Higgins (In re Pacor, Inc.), 743 F.2d 984 (3d Cir. 1984)(overruled on other grounds). Under Pacor, related-to jurisdiction exists if "the outcome of [a] proceeding could conceivably have any effect on the estate being administered in bankruptcy." Id. at 994. This includes a proceeding "whose outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the

bankrupt estate."  Id.  The Third Circuit has recently clarified that "[b]roadly worded as [the Pacor test] is . . . related-to jurisdiction 'is not without limitation'."  W.R. Grace & Co. V. Chakarian (In re W.R. Grace & Co.), 591 F.3d 164, 171 (3d. Cir. 2009).

      *b.  Time-of-filing*

Before this Court can apply the Pacor test, it must determine the appropriate point in time to which the test should relate.  In other words, should the Court assess the conceivable effect on the estate as it stands today, or the conceivable effect on the estate at the time the Tender Adversaries were filed?

The general rule is that subject matter jurisdiction is based on the state of facts that existed at the time an action is filed.  "It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'  This time-of-filing rule is hornbook law (quite literally) taught to first year law students in any basic course on federal civil procedure."  Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570-71 (2004)(quoting Mollan v. Torrance, 22 U.S. 537 (1824))(applying time-of-filing rule in a diversity jurisdiction case); see also Freeport-McMoRan, Inc. v. K N Energy, 498 U.S. 426, 428 (1991)(same); Keene Corp. v. United States, 508 U.S. 200, 207 (1993)(applying time-of-filing rule in

a federal question case); Vianix Del. LLC v. Nuance Commc'ns, Inc., 2009 WL 1364346, at *2 (D. Del 2009)(same).

The Producers point the Court to two cases from this Circuit in which courts declined to apply the time-of-filing rule in federal question cases. See New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492 (3d Cir. 1996); Enterprise Bank v. Eltech, Inc. (In re Eltech, Inc.), 313 B.R. 659 (Bankr. W.D. Pa. 2004). They argue that this Court should assess its subject matter jurisdiction as it stands now, post-confirmation, rather than at the time the Tender Adversaries were filed.

In New Rock, the Third Circuit declined to apply the time-of-filing rule in a federal question case, noting that "the letter and spirit of the rule apply most clearly to diversity cases." 101 F.3d at 1503. The underlying dispute in New Rock was a state law claim. Entry of the Resolution Trust Corporation ("RTC") as a party gave rise to federal-question jurisdiction under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). See 12 U.S.C. § 1441a(l)(extending federal jurisdiction to "any civil action, suit, or proceeding to which the [RTC] is a party"). The RTC was then dismissed from the case and a private party was substituted for it. Because federal jurisdiction was premised entirely upon the RTC's presence in the case, the Third Circuit held that it no longer

-29-

had continuing jurisdiction under FIRREA.  101 F.3d at 1501.  In so holding, the court noted that "courts have not hesitated to abandon [the time-of-filing rule] where appropriate" and that "merely citing the time-of-filing rule is not enough to support jurisdiction in this case."  Id. at 1504.  New Rock rejects an "absolute time of filing requirement", but nowhere prohibits its application where appropriate.  Id.

Indeed, Supreme Court decisions subsequent to New Rock demonstrate the continuing vitality of and justifications for the time-of-filing rule.  See Grupo Dataflux, 541 U.S. at 582 ("We decline to endorse a new exception to a time-of-filing rule that has a pedigree of almost two centuries. Uncertainty regarding the question of jurisdiction is particularly undesirable, and collateral litigation on the point particularly wasteful.").  In 2003, the Supreme Court recited the rule while upholding subject matter jurisdiction in a federal question case.  Dole Food Company v. Patrickson, 538 U.S. 468, 478 (2003)("[J]urisdiction of the Court depends upon the state of things at the time of the action brought.").

The Producers also cite a recent decision from the Bankruptcy Court for the Western District of Pennsylvania for the proposition that plan confirmation or other similar events may divest a bankruptcy court of subject matter jurisdiction.  In re Eltech, Inc., 313 B.R. 659 (Bankr. W.D. Pa. 2004).  In Eltech,

the court found that it no longer had subject matter jurisdiction over a Chapter 11 case after it converted to a no-asset Chapter 7 case. See Eltech, 313 B.R. at 661. Notably, however, the court held that it "did not possess[] subject matter jurisdiction over the instant adversary proceeding when the [complaint was filed]." Id. at 666. The same is true of a case upon which Eltech expressly relied. See In re Spree.com Corp., 295 B.R. 762, 768 (Bankr. E.D. Pa. 2003)("[I]t is not subsequent events that divest this court of jurisdiction, but rather the subsequent revelation of facts that were in existence with the [action] was commenced that show jurisdiction was lacking at the proceeding's inception.").

Certain of the Producers have also urged this Court to take a narrow view of its post-confirmation subject matter jurisdiction under Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.), 505 F.3d 237 (3d Cir. 2007) and Binder v. Price Waterhouse Co. (In re Resorts Int'l, Inc.), 372 F.3d 154 (3d Cir. 2004). Those cases held that a stricter standard -- the "close nexus" standard – "applies for the purposes of determining whether a federal court has jurisdiction over a non-core 'related-to' proceeding in the post-confirmation context." Seven Fields, 505 F.3d at 260 (citing Resorts, 372 F.3d at 641-47). But those cases limit application of the "close nexus" test to a "claim or cause of action filed post-confirmation." Seven

-31-

<u>Fields</u>, 505 F.3d at 265 (emphasis added).

The Tender Adversaries were filed in the thick of Debtors' main bankruptcy case, ranging from ten months (J. Aron) to two months (Plains) before plan confirmation.  They are based on pre-petition agreements and conduct.  They are only being adjudicated now, post-confirmation, because the Downstream Purchasers' complaints for declaratory judgment yielded to the urgent collective exercise of reorganizing a large and complex group of debtors before confirmation.  The heightened scrutiny required by <u>Seven Fields</u> and <u>Resorts</u> is therefore inapplicable to this case. See <u>Newby v. Enron Corp. (In re Enron Corp. Sec.)</u>, 535 F.3d 325 (5th Cir. 2008)("[Plaintiffs] cannot point to a single case in which we have held that a plan confirmation divests a District Court of bankruptcy jurisdiction over pre-confirmation claims based on pre-confirmation activities that properly had been removed pursuant to 'related-to' jurisdiction.  We likewise find none.").

For the foregoing reasons, the Court will apply the <u>Pacor</u> test to the facts as they stood at the time the Tender Adversaries were filed.

        *c.  Application*

The most recent controlling decision construing the bounds of related-to jurisdiction under <u>Pacor</u> is the Third Circuit's ruling in the <u>W.R. Grace</u> case.  <u>In re W.R. Grace & Co.</u>, 591 F.3d

164 (3d Cir. 2009).  The parties to these Tender Adversaries
disagree about the import of the W.R. Grace holding, each
claiming that it supports their position.  It is therefore
worthwhile to review the facts of W.R. Grace and compare them to
the facts of this case, bearing in mind that the Court assesses
its jurisdiction as of the time the Tender Adversaries were
filed.

W.R. Grace ("Grace") was a debtor in possession in this
Court.  Prior to Grace's bankruptcy filing, certain plaintiffs
brought suit in Montana state courts claiming the State of
Montana was negligent for failing to warn them of risks of
asbestos in Grace's mine.  Montana asked the Bankruptcy Court to
lift the automatic stay so that Montana could implead Grace as a
third-party defendant in the Montana lawsuits.  Grace objected
and responded with a motion requesting that the Bankruptcy Court
expand its preliminary injunction to enjoin suits against the
State of Montana.  Grace argued that it shared an identity of
interests with the State of Montana such that a suit against
Montana was essentially a suit against Grace, because Montana
could potentially bring suit against Grace for common law
indemnity for any losses it sustained.  Id. at 168.  The question
the Bankruptcy Court faced was whether it possessed subject
matter jurisdiction over the Montana lawsuits sufficient to
expand the injunction.  The Bankruptcy Court held that it lacked

subject matter jurisdiction to enjoin the Montana lawsuits, and therefore declined to expand its preliminary injunction to cover those lawsuits. Id. at 169.

The Third Circuit agreed. Reviewing Pacor and its progeny, the Third Circuit noted that "in Pacor, we were clear that an inchoate claim of common law indemnity is not, in and of itself, enough to establish the bankruptcy court's subject matter jurisdiction." 591 F.3d at 171. The Third Circuit also observed that in In re Federal-Mogul Global, Inc., 300 F.3d 368 (3d Cir. 2002), it had interpreted the Pacor test to require that a related lawsuit could conceivably affect the bankruptcy proceeding "without the intervention of another lawsuit." W.R. Grace, 591 F.3d at 172 (quoting Federal-Mogul, 300 F.3d at 382). In other words, "there is no related-to jurisdiction over a third-party claim if there would need to be another lawsuit before the third-party claim could have any impact on the bankruptcy proceedings." Id.

In order for the Montana state court actions to affect Grace's bankruptcy proceedings, Montana would have had to bring a separate lawsuit against Grace and prevail on a claim for common law indemnity. The Third Circuit distinguished that case from its earlier decision in W.R. Grace, where it had expanded a preliminary injunction to cover Grace's insurer, MCC:

> It bears re-emphasis that MCC and Grace were
> parties to a contract in which Grace had
> agreed to indemnify MCC against any future
> asbestos-related claims filed against MCC that
> arose out of Grace's asbestos liability.
> Thus, MCC had a clear contractual right to
> indemnity, which may have presented a more
> direct threat to Grace's reorganization.  In
> the present case, by contrast, Montana has
> only a 'potential common law indemnification
> claim against Debtors pending the outcome of
> the state action, which falls far short of
> direct or automatic liability. . . .'

591 F.3d at 173-74 (quoting In re W.R. Grace & Co. v. Libby

Claimants, 2008 U.S. Dist. LEXIS 61361 (D. Del. 2008)).  While

the W.R. Grace decision clearly supports the relevancy of the

distinction between common law and contractual indemnification,

it did "not mean to imply that contractual indemnity rights are

in themselves sufficient to bring a dispute within the ambit of

related-to jurisdiction."  591 F.3d at 174 n.9.  That

determination must be "developed on a fact-specific, case-by-case

basis."  Id.

    The Downstream Purchasers in this case retained certain

contractual indemnification and breach of warranty of title

claims against the Debtors.  They argue that a suit against them

will necessarily affect Debtors' estate.  The Producers, on the

other hand, argue that enforcement of these indemnification

claims will require "intervention of another lawsuit," thus

defeating related-to jurisdiction under W.R. Grace.  591 F.3d at

172.

The Downstream Purchaser's Tender Adversary complaints seek
declarations that they have "rights of netting and recoupment,"
that they have "no obligation to pay any more than the Tendered
Amount or any portion thereof," and that their rights in the
purchased oil are "superior to those of any Defendant or other
creditor." See, e.g., J. Aron Compl. ¶¶ 26-31.  The effect of
any such declarations would be to adjust the amount of money owed
by and to the Debtors' estate.  The Tender Adversaries seek the
resolution of the competing claims of the Producers, the Debtors,
and the Downstream Purchasers in the same res.  If the Court were
to disallow netting or recoupment, for example, or were it to
order that the Downstream Purchasers tender more or less than
they proposed, the Debtors' estate would be directly affected.
Any determination of the Downstream Purchasers' claims will
necessarily affect the distribution to which other creditors are
entitled under the Plan.  The potential effect on the Debtors'
estate thus goes far beyond the inchoate common law indemnity
claims found insufficient in W.R. Grace.

The facts of this case are almost identical to those of a
recent Fifth Circuit case, In re TXNB Internal Case, 483 F.3d 292
(5th Cir. 2007).  Using the same "conceivable effect" standard as
is used in the Third Circuit, the Fifth Circuit held that the
bankruptcy court had jurisdiction because (substituting our

parties for theirs) "someone owes [the Producers] money for the
gas; if it is not [the Downstream Purchasers], it is [Debtors].
If it is [the Downstream Purchasers], then [the Downstream
Purchasers] will have discharged a liability of the debtors and .
. . will probably file a claim against the debtors' estates for
reimbursement."  TXNB, 483 F.3d at 298.

     The Producers urge that this case is more like the Third
Circuit case Quattrone Accountants, Inc., v. IRS, 895 F.2d 921
(3d Cir. 1990).  In that case, the IRS assessed a 100% penalty
against Quattrone Accountants, which was a business debtor, and a
separate 100% penalty against Philip Quattrone, part owner of
Quattrone Accountants, for withholding taxes.  Philip Quattrone
argued that his case was related to the debtor's bankruptcy case
because any amount collected against him would reduce the amount
the debtor would owe the IRS.  The court disagreed, noting that
Philip Quattrone's liability to the IRS was "entirely separate
and distinct" and that the debtor was jointly and severally
liable for 100% of the penalty regardless of what was collected
from Philip Quattrone.  Id. at 926.  Here, it cannot be said that
the Downstream Purchasers' liability will "in no way affect the
debtor's liability" to the Producers.  Id.  Instead, whatever the
Producers recover against the Downstream Purchasers will likely
have a direct effect on the estate's obligations to the
Downstream Purchasers.  Unlike Quattrone, the Tender Adversaries

involve competing claims over the estate's assets.  <u>Quattrone</u> is

therefore inapposite.

In addition to the above-mentioned effects the Tender

Adversaries may have on the Debtors' estate, two additional

considerations deserve mention.  First is that the Tender

Adversaries will likely require this Court to construe its own

prior orders and rulings, including the Tender Orders, the

settlements incorporated into the Plan and the three opinions

issued in the Producer Adversaries.  Second, the Debtors are

required under the Confirmation Order to "cooperate in any

discovery" in "any other litigation by oil and gas producers

against [the Downstream Purchasers] relating to oil and gas [the

Downstream Purchasers] purchased from the Debtors."

(Confirmation Order ¶¶ 65(f), 67(e)).  The ongoing costs of

defending the Tender Adversaries will have a considerable effect

on the Debtors' estate.  And, as discussed further below in

connection with abstention, the likely effect of this Court's

denial of jurisdiction or abstention from hearing the Tender

Adversaries would be to scatter the litigation relating to the

issues raised in the Tender Adversaries to numerous courts around

the country.  The effect on Debtors' estate would then be

multiplied.

Accordingly, the Court finds that subject matter

jurisdiction exists in this Court under 28 U.S.C. § 1334 because

the Tender Adversaries are "related to a case under title 11."

B.   Abstention

Having determined that the Court did and does have subject matter jurisdiction over the Tender Adversaries, the Court now considers whether it must or should abstain from hearing these matters in favor of allowing the Producer-Downstream Purchaser Actions to go forward in Oklahoma, Texas and New Mexico.

1.   Mandatory Abstention

The Producers first argue that this Court is required to abstain from hearing the Tender Adversaries under 28 U.S.C. § 1334(c)(2).  Under § 1334(c)(2), there are six requirements for mandatory abstention: (i) the motion to abstain is timely; (ii) the action is based upon a state law claim or cause of action; (iii) an action has been commenced in state court; (iv) the action can be timely adjudicated; (v) there is no independent basis for federal jurisdiction which would have permitted the action to be commenced in federal court absent bankruptcy; and (vi) the matter is non-core.  See In re LaRoche Indus., Inc., 312 B.R. 249, 252-253 (Bankr. D. Del. 2004).  A party moving for mandatory abstention "must meet all the requirements of mandatory abstention for relief to be granted."  In re Mobile Tool Int'l, Inc., 320 B.R. 552, 556 (Bankr. D. Del. 2005).

Samson was the first Producer to file a motion for this Court to abstain from hearing the Tender Adversaries.  See Adv.

-39-

No. 09-50038, Docket No. 6.  At that time, no state action was
pending.  Only after J. Aron pointed out the deficiency did
Samson file its numerous state court actions.  In addition, the
various state court actions do not appear to contain all of the
parties and all of the causes of action encompassed by the Tender
Adversaries, calling into question whether "an action" has been
"commenced" for purposes of § 1334(c)(2).  See In re Nationwide
Roofing & Sheet Metal, Inc., 130 B.R. 768 (Bankr. S.D. Ohio
1991)("[A]lthough the state court proceeding does contain some of
the same parties and some of the same causes of action which are
present in this adversary, the state court proceeding could not,
if [plaintiff] prevailed, provide the relief which Nationwide
could obtain in this adversary . . . ."); see also Indian River
Homes, Inc., 1993 U.S. Dist. LEXIS 2521 (D. Del. 1993)(following
Nationwide Roofing and holding that amendment of the pleadings to
add parties and causes of action would not satisfy the previous
state action requirement).  Because it appears that a state
action has not properly been commenced for purposes of 28 U.S.C.
§ 1334(c)(2), mandatory abstention is not appropriate.

    2.   Permissive Abstention

    The Producers also urge this Court to exercise its
discretionary authority to abstain pursuant to 28 U.S.C. §

1334(c)(1).[15]

Courts have identified the following twelve factors as relevant to permissive abstention:

> (1) the effect on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than section 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence of non-debtor parties.

In re Mobile Tool Int'l, 320 B.R. 552, 556-57 (Bankr. D. Del. 2005).

A number of these factors weigh in favor of abstention. For example, the Court will be called upon to interpret state laws and regulations governing the oil and gas industry, including

---

[15] 28 U.S.C. § 1334(c)(1) provides, in relevant part: "[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

questions which appear largely unsettled.  The Tender Adversaries involve many non-debtor parties, and this Court's subject matter jurisdiction is (as discussed above) predicated solely upon 28 U.S.C. § 1334(b).  The Producers have made a demand for a jury trial.[16]  On the other hand, determination of these issues will likely require construction of this Court's prior orders and rulings.  Additionally, with all due respect to our sister courts, it appears that this Court is well-positioned to provide for the efficient administration of the cases, as it is familiar with the factual background and the parties, and provides a unified forum to consider all claims.

Given these countervailing considerations, if this Court was considering permissive abstention on a blank slate, it would perhaps be a close question whether to keep the matters pending here or send them to other courts for adjudication.  The Court does not write on a blank slate in this regard, however.  At last count, six federal judges have transferred venue of the Producer-Downstream Purchaser Actions, including Judges Payne and White of the Eastern District of Oklahoma,[17] Judges Frizzell and Kern of

---

[16] As the court noted in Mobile Tool, however,  "even if [these proceedings] proceed to trial and even if the Individual Defendants have a right to a jury trial, the adversaries can proceed in [the District Court] in Delaware."  320 B.R. at 559.

[17] Order, New Dominion, L.L.C. v. B.P. Supply Co., Case No. 09-cv-75 (E.D. Okla. May 11, 2009); Order, New Dominion, LLC v. J. Aron & Co., Case No. 09-cv-007 (E.D. Okla. June 30, 2009); Order, IC-CO Inc. v. J. Aron & Co., Case No. 09-cv-122 (E.D.

the Northern District of Oklahoma,[18] Judge Heaton of the Western
District of Oklahoma,[19] and Judge Robinson of the Northern
District of Texas.[20]

Judge Payne, the first to so rule, ordered the actions
transferred to this Court to avoid "duplication of effort and the
risk of inconsistent rulings" and also cited "the interest of
justice" and "the convenience of the parties."  Order, New
Dominion, L.L.C. v. B.P. Supply Co., Case No. 09-cv-75 (E.D.
Okla. May 11, 2009).  Judges Frizzell and White cited similar
concerns.  Order, Samson Res. Co. v. BP Oil Supply Co., Case No.

---

Okla. June 30, 2009); Order, Degge v. ConocoPhilips Co., Case No.
09-cv-161 (E.D. Okla. June 30, 2009); see also New Dominion, LLC
v. 1. Aron & Co., Case No. 09-cv-478 (D. Del. July 1, 2009); IC-
CO Inc. v. J. Aron & Co., Case No. 09-cv-477 (D. Del. July 1,
2009); Degge v. ConocoPhilips Co., Case No. 09-cv-479 (D. Del.
July 1, 2009).

[18] Samson Res. Co. v. BP Oil Supply Co., Case No. 08-cv-753
(N.D. Okla. June 11, 2009); Order, Samson Res. Co. v. J. Aron &
Co., Case No. 08-cv-752 (N.D. Okla. July 14, 2009); Order, Samson
Res. Co. v. ConocoPhillps Co., Case No. 09-cv-21 (N.D. Okla. July
14, 2009); Order, Hope Partners, Inc. v. BP Oil Supply Co., Case
No. 09-cv-222 (N.D. Okla. July 14, 2009); see also Samson Res.
Co. v. J. Aron & Co., Case No. 09-51520 (Bankr. D. Del. July 20,
2009) (Shannon, J.); Samson Res. Co. v. ConocoPhillips Co., Case
No. 09-51518 (Bankr. D. Del. July 20,2009)(Shannon, J.); Hope
Partners, Inc. v. BP Oil Supply Co., Case No. 09-51519 (Bankr. D.
Del. July 20,2009)(Shannon, J.).

[19] Order, Samson Res. Co. v. Valero Mktg. & Supply Co., Case
No. 09-cv-807 (W.D. Okla. Nov. 19, 2009).

[20] Order Granting Mot. to Transfer, Samson Lone Star LLC v.
ConocoPhillips Co., Case No. 09-cv-12 (N.D. Tex. Sept. 2, 2009);
Order Denying Mot. to Remand or Abstain, Samson Lone Star LLC v.
ConocoPhilips Co., Case No. 09-cv-12 (N.D. Tex. Sept. 2, 2009).

08-cv-753 (N.D. Okla. June 11, 2009); Order, <u>New Dominion, LLC v.</u>
<u>J. Aron & Co.</u>, Case No. 09-cv-007 (E.D. Okla. June 30, 2009).
Judge Kern of the Northern District of Oklahoma transferred three
cases to this Court "for the same reasons espoused by Judge
Frizzell, Judge Payne and Judge White . . . ." Order, <u>Samson</u>
<u>Res. Co. v. J. Aron & Co.</u>, Case No. 08-cv-752 (N.D. Okla. July
14, 2009). Finally, Judge Heaton of the Western District of
Oklahoma transferred 15 cases to this Court, reasoning as
follows:

> Transfer avoids the duplication of effort by
> litigants and witnesses and the risk of
> inconsistent rulings, while conserving
> judicial resources and promoting the efficient
> administration of the bankruptcy estate. The
> significant disputes between the parties as to
> the interpretation of the confirmed plan are a
> further indication that the issues presented
> in these cases would most appropriately be
> heard by the Bankruptcy Court.

Order, <u>Samson Res. Co. v. Valero Mktg. & Supply Co.</u>, Case No.
09-cv-807 at 7 (W.D. Okla. Nov. 19, 2009).[21]

These holdings are nearly dispositive of the permissive
abstention question before this Court under the doctrine of law
of the case. "The doctrine of the law of the case posits that

---

[21] Judge Heaton also concluded that this Court possessed
subject matter jurisdiction over the cases. Order, <u>Samson Res.</u>
<u>Co. v. Valero Mktg. & Supply Co.</u>, Case No. 09-cv-807 at 4 (W.D.
Okla. Nov. 19, 2009)("The court has little difficulty in
concluding these cases are 'related to' the SemGroup
bankruptcy.").

when a court decides upon a rule of law, that decision should
continue to govern the same issues in subsequent stages in the
same case." <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983).
While the Court acknowledges that the doctrine of the law of the
case is a "prudential rather than a jurisdictional restriction on
a court's authority to reconsider an issue," <u>Women's Equity</u>
<u>Action League v. Cavazos</u>, 906 F.2d 742, 751 n.14 (D.C. Cir.
1990), it also notes that application of the doctrine to transfer
decisions is especially important: "Indeed, the policies
supporting the doctrine apply with even greater force to transfer
decisions than to decisions of substantive law; transferee courts
that feel entirely free to revisit transfer decisions of a
coordinate court threaten to send litigants into a vicious circle
of litigation." <u>Christianson v. Colt Indus. Operating Corp.</u>, 486
U.S. 800, 816 (1988).  "Perpetual game[s] of jurisdictional ping-
pong" waste time and court resources.  <u>Id.</u> at 832.  Further, the
likely alternative to litigation in this Court would be multiple
suits in various courts in at least four states.  This would
deplete the assets of the estate and could result in inconsistent
rulings.  The Court therefore declines to abstain from hearing
the Tender Adversaries.

## V. **CONCLUSION**

For the foregoing reasons, the Court finds that it has subject matter jurisdiction over the Tender Adversaries.  The Court will not abstain from hearing the Tender Adversaries.  Accordingly, the Motions to Dismiss are denied.

An appropriate order follows.


By the Court,

_____
Dated: April 9, 2010              Brendan Linehan Shannon
                                  United States Bankruptcy Judge